ORAL ARGUMENT SCHEDULED MAY 16, 2025

**Nos. 25-5037, 25-5055, 25-5057**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

CATHY A. HARRIS, in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board,

*Plaintiff-Appellee,*

v.

SCOTT BESSENT, in his official capacity as Secretary of the Treasury, et al.,

*Defendants-Appellants.*

---

GWYNNE A. WILCOX,

*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants.*

---

On Appeals from the United States District Court
for the District of Columbia

---

### JOINT APPENDIX

---

YAAKOV M. ROTH
 *Acting Assistant Attorney General*

ERIC D. McARTHUR
 *Deputy Assistant Attorney General*

MARK R. FREEMAN
MICHAEL S. RAAB
JOSHUA M. SALZMAN
DANIEL AGUILAR
LAURA E. MYRON
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7228*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 305-1754*

# TABLE OF CONTENTS

**Page**

**_Harris v. Bessent_, No. 25-cv-412 (D.D.C.)**

Docket Sheet ....................................................................JA1

1. Complaint ...............................................................JA11

8. Temporary Restraining Order.................................JA25

9. TRO Opinion ........................................................JA27

14. Notice of Appeal.................................................JA48

22-1. Plaintiff's Statement of Undisputed Facts..........JA49

22-3. Declaration of Cathy Harris ..............................JA61

22-4. Email from Trent Morse to Cathy Harris...........JA69

39. Summary Judgment Order ..................................JA70

40. Summary Judgment Opinion...............................JA72

41. Notice of Appeal.................................................JA107

**_Wilcox v. Trump_, No. 25-cv-334 (D.D.C.)**

Docket Sheet ................................................................JA109

1. Complaint ..............................................................JA118

10-1. Plaintiff's Statement of Undisputed Facts ........JA129

10-3. Declaration of Gwynne A. Wilcox ....................JA132

10-5. Email from Trent Morse to Geynne Wilcox........JA135

34. Summary Judgment Order ..................................JA137

35. Summary Judgment Opinion...............................JA139

36. Notice of Appeal .................................................................JA175

37. Excerpts of Hearing Transcript ...........................................JA177

## *1:25cv412, Harris V. Bessent Et Al*

### US District Court Docket

### United States District Court, District of Columbia

### (Washington, DC)

### This case was retrieved on 03/23/2025

## Header

**Case Number:** 1:25cv412
**Date Filed:** 02/11/2025
**Assigned To:** Judge Rudolph Contreras
**Cause:** Fed. Question
**Lead Docket:** None
**Other Docket:** USCA, 25-05037, USCA, 25-05055
**Jurisdiction:** Federal Question

**Class Code:** Closed
**Closed:** 03/04/2025
**Statute:** 28:1331
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutory Actions

## Participants

| Litigants | Attorneys |
| --- | --- |
| CATHY A. HARRIS<br>in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board \|<br>**Plaintiff** | Michael J. Kator<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>KATOR, PARKS, WEISER & WRIGHT, PLLC<br>1150 Connecticut Ave., Nw Suite 705<br>Washington, DC  20036<br>USA<br>202-898-4800 Fax: 202-289-1389<br>Email:Mkator@katorparks.Com<br><br>Ezra Louvis<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Milbank LLP<br>1850 K St. Nw Suite 1100<br>Washington, DC  20006<br>USA<br>202-835-7584 Email:Elouvis@milbank.Com<br><br>Jeremy D. Wright<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>KATOR, PARKS, WEISER & WRIGHT PLLC<br>1150 Connecticut Ave Nw Ste 705<br>Washington, DC  20036<br>USA<br>202-898-4800 Fax: 202-289-1389<br>Email:Jwright@katorparks.Com<br><br>Linda Marie Correia<br>ATTORNEY TO BE NOTICED<br>CORREIA & PUTH, PLLC |

1:25cv412, Harris V. Bessent Et Al

| Litigants | Attorneys |
|---|---|
| | 1400 16th Street, Nw Suite 450<br>Washington, DC  20036<br>USA<br>(202) 602-6500 Fax: (202) 602-6501<br>Email:Lcorreia@correiaputh.Com |
| | Nathaniel Avi Gideon Zelinsky<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Milbank LLP<br>1850 K St. Nw Suite 1100<br>Washington, DC  20006<br>USA<br>202-835-7523 Email:Nzelinsky@milbank.Com |
| | Neal Kumar Katyal<br>ATTORNEY TO BE NOTICED<br>MILBANK LLP<br>1850 K Street, Nw Suite 1100<br>Washington, DC  20006<br>USA<br>202-835-7505 Email:Nkatyal@milbank.Com |
| | Kerrie Diane Riggs<br>ATTORNEY TO BE NOTICED<br>KATOR, PARKS, WEISER & HARRIS, PLLC<br>1150 Connecticut Ave, N.W. Suite 705<br>Washington, DC  20036<br>USA<br>202-898-4800 Fax: 202-289-1389<br>Email:Kriggs@katorparks.Com |
| Scott Bessent<br>in his official capacity as Secretary of the Treasury \|<br>**Defendant** | Jeremy Samuel Bloch Newman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-532-3114 Email:Jeremy.S.Newman@usdoj.Gov |
| | Madeline McMahon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>[Terminated: 02/27/2025]<br>DOJ-CIV<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>(202) 451-7722 Fax: (202) 616-8470<br>Email:Madeline.M.Mcmahon@usdoj.Gov |
| Trent Morse<br>in his official capacity as  Deputy Assistant to the President<br>and Deputy Director of the White House Presidential<br>Personnel Office \|<br>**Defendant** | Jeremy Samuel Bloch Newman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-532-3114 Email:Jeremy.S.Newman@usdoj.Gov |
| | Madeline McMahon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>[Terminated: 02/27/2025] |

**JA2**

1:25cv412, Harris V. Bessent Et Al

| Litigants | Attorneys |
|---|---|
| | DOJ-CIV<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>(202) 451-7722 Fax: (202) 616-8470<br>Email:Madeline.M.Mcmahon@usdoj.Gov |
| Sergio Gor<br>in his official capacity as Director of the White House Presidential Personnel Office \|<br>**Defendant** | Jeremy Samuel Bloch Newman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-532-3114 Email:Jeremy.S.Newman@usdoj.Gov |
| | Madeline McMahon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>[Terminated: 02/27/2025]<br>DOJ-CIV<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>(202) 451-7722 Fax: (202) 616-8470<br>Email:Madeline.M.Mcmahon@usdoj.Gov |
| Henry J. Kerner<br>in his official capacity as Acting Chairman of the Merit Systems Protection Board \|<br>**Defendant** | Jeremy Samuel Bloch Newman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-532-3114 Email:Jeremy.S.Newman@usdoj.Gov |
| | Madeline McMahon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>[Terminated: 02/27/2025]<br>DOJ-CIV<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>(202) 451-7722 Fax: (202) 616-8470<br>Email:Madeline.M.Mcmahon@usdoj.Gov |
| Donald J. Trump<br>in his official capacity as President of the United States of America \|<br>**Defendant** | Jeremy Samuel Bloch Newman<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-532-3114 Email:Jeremy.S.Newman@usdoj.Gov |
| | Madeline McMahon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>[Terminated: 02/27/2025]<br>DOJ-CIV<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>(202) 451-7722 Fax: (202) 616-8470<br>Email:Madeline.M.Mcmahon@usdoj.Gov |
| Russell T. Vought | Jeremy Samuel Bloch Newman |

**JA3**

1:25cv412, Harris V. Bessent Et Al

| Litigants | Attorneys |
|---|---|
| in his official capacity as Director of the Office of Management and Budget \| **Defendant** | LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>202-532-3114 Email:Jeremy.S.Newman@usdoj.Gov<br><br>Madeline McMahon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>[Terminated: 02/27/2025]<br>DOJ-CIV<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>(202) 451-7722 Fax: (202) 616-8470<br>Email:Madeline.M.Mcmahon@usdoj.Gov |
| Constitutional Accountability Center<br>**Amicus** | Brianne Jenna Gorod<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CONSTITUTIONAL ACCOUNTABILITY CENTER<br>1200 18th Street, Nw Suite 501<br>Washington, DC  20036<br>USA<br>(202) 296-6889 Ext. 304<br>Email:Brianne@theusconstitution.Org |
| State of Florida<br>**Amicus** | Darrick Monson<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>FLORIDA ATTORNEY GENERALS OFFICE<br>107 W Gaines Street<br>Tallahassee, FL  32399<br>USA<br>850-414-3683 Email:Darrick.Monson@myfloridalegal.Com<br><br>David Costello<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>FLORIDA ATTORNEY GENERAL'S OFFICE<br>Concourse Center Iv 3507 E. Frontage Road Ste 200<br>Tampa, FL  33607<br>USA<br>908-461-5672 Email:David.Costello@myfloridalegal.Com<br><br>Jeffrey Paul DeSousa , I<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/FL<br>Pl-01, The Capitol<br>Tallahassee, FL  32399<br>USA<br>850-414-3830 Email:Jeffrey.Desousa@myfloridalegal.Com<br><br>Nathan Andrew Forrester<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/FL<br>Pl-01, The Capitol<br>Tallahassee, FL  32399<br>USA<br>703-906-0298 Email:Nathan.Forrester@myfloridalegal.Com |
| State of Tennessee<br>**Amicus** | Whitney D. Hermandorfer<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Office of Tennessee Attorney General |

**JA4**

| Litigants | Attorneys |
|---|---|
| | P.O. Box 20207
Nashville, TN  37202
USA
615-741-7403 Email:Whitney.Hermandorfer@ag.Tn.Gov

Joseph Fiorile
ATTORNEY TO BE NOTICED
OFFICE OF THE ATTORNEY GENERAL & REPORTER- TN
P.O. Box 20207
Nashville, TN  37202
USA
615-741-7404 Email:Joseph.Fiorile@ag.Tn.Gov |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 02/11/2025 | COMPLAINT  against All Defendants  ( Filing fee $ 405 receipt number ADCDC-11473515) filed by CATHY A. HARRIS. (Attachments: # 1 Exhibit Exhibit A, # 2 Civil Cover Sheet Civil Cover Sheet, # 3 Summons Summons for Attorney General, # 4 Summons Summons for Scott Bessent, # 5 Summons Summons for Sergio Gor, # 6 Summons Summons for Henry Kerner, # 7 Summons Summons for Trent Morse, # 8 Summons Summons for Donald Trump, # 9 Summons Summons for USAO, # 10 Summons Summons for Vought)(Kator, Michael) Modified attorney on 2/12/2025 (znmw). (Entered: 02/11/2025) | |
| 2 | 02/11/2025 | Emergency MOTION for Temporary Restraining Order  by CATHY A. HARRIS. (Attachments: # 1 Memorandum in Support, # 2 Exhibit Exhibit A, # 3 Compliance Report, # 4 Text of Proposed Order)(Riggs, Kerrie) (Entered: 02/11/2025) | |
| 3 | 02/11/2025 | NOTICE of Appearance by Linda Marie Correia on behalf of CATHY A. HARRIS (Correia, Linda) (Entered: 02/11/2025) | |
| | 02/12/2025 | Case Assigned to Judge Rudolph Contreras. (znmw) (Entered: 02/12/2025) | |
| 4 | 02/12/2025 | SUMMONS (8) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(znmw) (Entered: 02/12/2025) | |
| | 02/12/2025 | NOTICE OF ERROR regarding 2 Emergency MOTION for Temporary Restraining Order , 1 Complaint. Please note the following error for future filings: Invalid attorney signature-signature on document must match PACER login. Do not refile; future non-compliant documents may be entered in error. (znmw) (Entered: 02/12/2025) | |
| | 02/12/2025 | MINUTE ORDER: Upon consideration of 2 Plaintiff's Motion for Temporary Restraining Order, it is hereby ORDERED that the parties shall appear for a hearing on the matter on February 13, 2025, at 3:00 p.m. in Courtroom 23A. It is FURTHER ORDERED that Plaintiff shall serve Defendants with a copy of this order immediately upon receipt. SO ORDERED. Signed by Judge Rudolph Contreras on 2/12/2025. (lcrc3) (Entered: 02/12/2025) | |
| | 02/12/2025 | Set/Reset Hearings: Motion Hearing set for 2/13/2025 at 03:00 PM in Courtroom 23A- In Person before Judge Rudolph Contreras. (tj) (Entered: 02/12/2025) | |
| 5 | 02/13/2025 | NOTICE of Appearance by Madeline McMahon on behalf of All Defendants (McMahon, Madeline) (Entered: 02/13/2025) | |

1:25cv412, Harris V. Bessent Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 6 | 02/13/2025 | Memorandum in opposition to re 2 Motion for TRO filed by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. (McMahon, Madeline) (Entered: 02/13/2025) | |
| | 02/13/2025 | NOTICE: The Court will provide public access to the motion hearing in this matter now scheduled for 2/13/2025 at 3:00pm before the Hon. Rudolph Contreras. Members of the public shall adhere to the rules set forth on the Court's website. Toll Free Number: (833) 990-9400; Meeting ID 698780857. (tj) (Entered: 02/13/2025) | |
| | 02/13/2025 | Minute Entry for proceedings held before Judge Rudolph Contreras: Motion Hearing held on 2/13/2025 re 2 Emergency MOTION for Temporary Restraining Order filed by plaintiff CATHY A. HARRIS. Oral argument heard, and plaintiff shall file a reply to the government's opposition by 2/14/2025. The court takes the motion under advisement. (Court Reporter: Tim Miller) (tj) (Entered: 02/13/2025) | |
| 7 | 02/14/2025 | REPLY to opposition to motion re 2 Motion for TRO filed by CATHY A. HARRIS. (Attachments: # 1 Exhibit Exhibit B)(Riggs, Kerrie) (Entered: 02/14/2025) | |
| 8 | 02/18/2025 | ORDER granting 2 Motion for Temporary Restraining Order. See document for details. Signed by Judge Rudolph Contreras on 2/18/2025. (lcrc3) (Entered: 02/18/2025) | |
| 9 | 02/18/2025 | MEMORANDUM OPINION granting 2 Motion for Temporary Restraining Order. See document for details. Signed by Judge Rudolph Contreras on 2/18/2025. (lcrc3) (Entered: 02/18/2025) | |
| 10 | 02/18/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Jeremy Wright, Filing fee $ 100, receipt number ADCDC-11486595. Fee Status: Fee Paid. by CATHY A. HARRIS. (Attachments: # 1 Declaration Declaration of J.Wright, # 2 Text of Proposed Order Proposed Order)(Riggs, Kerrie) (Entered: 02/18/2025) | |
| | 02/18/2025 | NOTICE OF ERROR regarding 10 Motion for Leave to Appear Pro Hac Vice: Attorney Name- Jeremy Wright. The following error(s) need correction: Pro Hac Vice motion must be accompanied by a Certificate of Good Standing issued within the last 30 days (LCvR 83.2(c)(2)). Please file certificate as an Errata. (lcrc3) (Entered: 02/18/2025) | |
| 11 | 02/18/2025 | ERRATA Submission of Certificate of Good Standing by CATHY A. HARRIS re 10 Motion for Leave to Appear Pro Hac Vice,. (Riggs, Kerrie) (Entered: 02/18/2025) | |
| | 02/19/2025 | MINUTE ORDER granting 10 Motion for Leave to Appear Pro Hac Vice: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Jeremy D. Wright is admitted to represent Plaintiff Cathy A. Harris pro hac vice in this case. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to Local Civil Rule 83.6(a). Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 2/19/2025. (lcrc3) (Entered: 02/19/2025) | |
| 12 | 02/19/2025 | NOTICE of Appearance by Jeremy D. Wright on behalf of All Plaintiffs (Wright, Jeremy) (Entered: 02/19/2025) | |
| | 02/19/2025 | Set/Reset Deadlines/Hearings: Motions due by 2/23/2025. Responses due by 2/28/2025 Replies due by 3/2/2025. Status Report due by 2/19/2025 Motion Hearing set for 3/3/2025 at 02:00 PM in Courtroom 23A- In Person before Judge Rudolph Contreras. (tj) (Entered: 02/19/2025) | |
| 13 | 02/19/2025 | Joint STATUS REPORT by CATHY A. HARRIS, SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, | |

1:25cv412, Harris V. Bessent Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | DONALD J. TRUMP, RUSSELL T. VOUGHT. (Wright, Jeremy) (Entered: 02/19/2025) | |
| 14 | 02/20/2025 | NOTICE OF INTERLOCUTORY APPEAL TO DC CIRCUIT COURT as to 8 Order on Motion for TRO by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. Fee Status: No Fee Paid. Parties have been notified. (McMahon, Madeline) Modified event on 2/20/2025 (mg). (Entered: 02/20/2025) | |
| 15 | 02/20/2025 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 14 Notice of Interlocutory Appeal to DC Circuit Court,. (mg) (Entered: 02/20/2025) | |
| 16 | 02/20/2025 | MOTION to Stay re 8 Order on Motion for TRO Pending Appeal by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. (McMahon, Madeline) (Entered: 02/20/2025) | |
| 17 | 02/20/2025 | RESPONSE re 16 MOTION to Stay 8 Order on Motion for TRO Pending Appeal filed by CATHY A. HARRIS. (Wright, Jeremy) (Entered: 02/20/2025) | |
| 18 | 02/20/2025 | ORDER denying 16 Motion to Stay Temporary Restraining Order. See document for details. Signed by Judge Rudolph Contreras on 2/20/2025. (lcrc3) (Entered: 02/20/2025) | |
| | 02/20/2025 | USCA Case Number 25-5037 for 14 Notice of Appeal to DC Circuit Court, filed by RUSSELL T. VOUGHT, DONALD J. TRUMP, SERGIO GOR, HENRY J. KERNER, TRENT MORSE, SCOTT BESSENT. (mg) (Entered: 02/21/2025) | |
| 19 | 02/22/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Neal Kumar Katyal, Filing fee $ 100, receipt number ADCDC-11497771. Fee Status: Fee Paid. by CATHY A. HARRIS. (Attachments: # 1 Declaration Declaration of Neal Kumar Katyal, # 2 Exhibit Katyal Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Riggs, Kerrie) (Entered: 02/22/2025) | |
| 20 | 02/22/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Nathaniel A.G. Zelinsky, Filing fee $ 100, receipt number ADCDC-11497772. Fee Status: Fee Paid. by CATHY A. HARRIS. (Attachments: # 1 Declaration Declaration of Nathaniel A.G. Zelinsky, # 2 Exhibit Zelinsky Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Riggs, Kerrie) (Entered: 02/22/2025) | |
| 21 | 02/22/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name- Ezra Louvis, Filing fee $ 100, receipt number ADCDC-11497773. Fee Status: Fee Paid. by CATHY A. HARRIS. (Attachments: # 1 Declaration Declaration of Ezra Louvis, # 2 Exhibit Louvis Certificate of Good Standing, # 3 Text of Proposed Order Proposed Order)(Riggs, Kerrie) (Entered: 02/22/2025) | |
| 22 | 02/23/2025 | MOTION for Preliminary Injunction , MOTION for Judgment , MOTION for Permanent Injunction , MOTION for Summary Judgment , MOTION for Writ of Mandamus , MOTION for Declaratory Judgment by CATHY A. HARRIS. (Attachments: # 1 Text of Proposed Order, # 2 Statement of Facts, # 3 Exhibit Declaration of Cathy A. Harris, # 4 Exhibit Termination Email)(Wright, Jeremy) (Entered: 02/23/2025) | |
| | 02/24/2025 | MINUTE ORDER granting 19 , 20 , 21 Motions for Leave to Appear Pro Hac Vice: Pursuant to Local Civil Rule 83.2, it is hereby ORDERED that Neal K. Katyal, Nathaniel A.G. Zelinsky, | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | and Ezra P. Louvis are admitted to represent Plaintiff Cathy A. Harris pro hac vice in this case. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to Local Civil Rule 83.6(a). Click for instructions. SO ORDERED. Signed by Judge Rudolph Contreras on 2/24/2025. (lcrc3) (Entered: 02/24/2025) | |
| 23 | 02/24/2025 | Consent MOTION for Leave to File Amicus Curiae Brief by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Appendix Proposed Amicus Curiae Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/24/2025) | |
| 24 | 02/24/2025 | NOTICE of Appearance by Nathaniel Avi Gideon Zelinsky on behalf of CATHY A. HARRIS (Zelinsky, Nathaniel) (Entered: 02/24/2025) | |
| 25 | 02/24/2025 | NOTICE of Appearance by Ezra Louvis on behalf of CATHY A. HARRIS (Louvis, Ezra) (Entered: 02/24/2025) | |
| 26 | 02/25/2025 | NOTICE of Appearance by Neal Kumar Katyal on behalf of CATHY A. HARRIS (Katyal, Neal) (Entered: 02/25/2025) | |
| 27 | 02/26/2025 | TRANSCRIPT OF TRO HEARING before Judge Rudolph Contreras held on 2-13-25; Page Numbers: 1-19; Date of Issuance: 2-26-25; Court Reporter: Timothy R. Miller, Telephone Number (202) 354-3111. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 3/19/2025. Redacted Transcript Deadline set for 3/29/2025. Release of Transcript Restriction set for 5/27/2025.(Miller, Timothy) (Entered: 02/26/2025) | |
| 28 | 02/27/2025 | NOTICE OF SUBSTITUTION OF COUNSEL by Jeremy Samuel Bloch Newman on behalf of All Defendants Substituting for attorney Madeline M. McMahon (Newman, Jeremy) (Entered: 02/27/2025) | |
| 29 | 02/28/2025 | NOTICE of Appearance by Jeffrey Paul DeSousa, I on behalf of STATE OF FLORIDA (DeSousa, Jeffrey) (Entered: 02/28/2025) | |
| 30 | 02/28/2025 | NOTICE of Appearance by Nathan Andrew Forrester on behalf of STATE OF FLORIDA (Forrester, Nathan) (Entered: 02/28/2025) | |
| 31 | 02/28/2025 | NOTICE of Appearance by Darrick Monson on behalf of STATE OF FLORIDA (Monson, Darrick) (Entered: 02/28/2025) | |
| 32 | 02/28/2025 | NOTICE of Appearance by David Costello on behalf of STATE OF FLORIDA (Costello, David) (Entered: 02/28/2025) | |
| 33 | 02/28/2025 | RESPONSE re 22 MOTION for Preliminary Injunction MOTION for Judgment MOTION for Permanent Injunction MOTION for Summary Judgment MOTION for Writ of Mandamus MOTION for Declaratory Judgment filed by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. (Newman, Jeremy) (Entered: 02/28/2025) | |
| 34 | 02/28/2025 | AMICUS BRIEF by STATE OF FLORIDA. (DeSousa, Jeffrey) (Entered: 02/28/2025) | |

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 35 | 03/01/2025 | NOTICE of Appearance by Whitney D. Hermandorfer on behalf of STATE OF TENNESSEE (Hermandorfer, Whitney) (Entered: 03/01/2025) | |
| 36 | 03/01/2025 | NOTICE of Appearance by Joseph Fiorile on behalf of STATE OF TENNESSEE (Fiorile, Joseph) (Entered: 03/01/2025) | |
| 37 | 03/01/2025 | AMICUS BRIEF by STATE OF TENNESSEE. (Hermandorfer, Whitney) (Entered: 03/01/2025) | |
| 38 | 03/02/2025 | REPLY to opposition to motion re 22 Motion for Preliminary Injunction,, Motion for Judgment,, Motion for Permanent Injunction,, Motion for Summary Judgment,, Motion for Writ of Mandamus,, Motion for Declaratory Judgment, filed by CATHY A. HARRIS. (Wright, Jeremy) (Entered: 03/02/2025) | |
| | 03/03/2025 | Minute Entry for proceedings held before Judge Rudolph Contreras: Hearing on the Motion for Preliminary Injunction 22 held on 3/3/2025. Oral argument heard, and the court takes the motion under advisement. (Court Reporter: Tim Miller) (tj) (Entered: 03/03/2025) | |
| | 03/04/2025 | MINUTE ORDER granting 23 Motion for Leave to File Amicus Brief: It is hereby ORDERED that the motion is GRANTED, and that the brief is DEEMED FILED. SO ORDERED. Signed by Judge Rudolph Contreras on 3/4/2025. (lcrc3) (Entered: 03/04/2025) | |
| 39 | 03/04/2025 | ORDER granting 22 Plaintiff's Motion for Summary Judgment and granting declaratory and injunctive relief. See document for details. Signed by Judge Rudolph Contreras on 3/4/2025. (lcrc3) (Entered: 03/04/2025) | |
| 40 | 03/04/2025 | MEMORANDUM OPINION granting 22 Plaintiff's Motion for Summary Judgment and granting declaratory and injunctive relief. See document for details. Signed by Judge Rudolph Contreras on 3/4/2025. (lcrc3) (Entered: 03/04/2025) | |
| 41 | 03/04/2025 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 39 Order on Motion for Declaratory Judgment, Order on Motion for Preliminary Injunction, Order on Motion for Judgment, Order on Motion for Permanent Injunction, Order on Motion for Summary Judgment, Order on Motion for Writ of Mandamus, 40 Memorandum & Opinion by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. Fee Status: No Fee Paid. Parties have been notified. (Newman, Jeremy) (Entered: 03/04/2025) | |
| 42 | 03/04/2025 | MOTION to Stay Court's Order Pending Appeal by SCOTT BESSENT, TRENT MORSE, SERGIO GOR, HENRY J. KERNER, DONALD J. TRUMP, RUSSELL T. VOUGHT. (Newman, Jeremy) (Entered: 03/04/2025) | |
| 43 | 03/04/2025 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 41 Notice of Appeal to DC Circuit Court,. (zjm) (Main Document 43 replaced on 3/4/2025) (zjm). (Entered: 03/04/2025) | |
| 44 | 03/04/2025 | RESPONSE re 42 MOTION to Stay Court's Order Pending Appeal filed by CATHY A. HARRIS. (Wright, Jeremy) (Entered: 03/04/2025) | |
| 46 | 03/04/2025 | AMICUS BRIEF by CONSTITUTIONAL ACCOUNTABILITY CENTER. (mg) (Entered: 03/05/2025) | |
| | 03/04/2025 | USCA Case Number 25-5055 for 41 Notice of Appeal to DC Circuit Court, filed by RUSSELL T. VOUGHT, DONALD J. TRUMP, SERGIO GOR, HENRY J. KERNER, TRENT MORSE, | |

**JA9**

1:25cv412, Harris V. Bessent Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | SCOTT BESSENT. (mg) (Entered: 03/07/2025) | |
| 45 | 03/05/2025 | ORDER denying 42 Motion to Stay Order Pending Appeal. See document for details. Signed by Judge Rudolph Contreras on 3/5/2025. (lcrc3) (Entered: 03/05/2025) | |
| 47 | 03/20/2025 | TRANSCRIPT OF HEARING ON PRELIMINARY INJUNCTION before Judge Rudolph Contreras held on 3-3-25; Page Numbers: 1-24; Date of Issuance: 3-20-25; Court Reporter: Timothy R. Miller, Telephone Number (202) 354-3111. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 4/10/2025. Redacted Transcript Deadline set for 4/20/2025. Release of Transcript Restriction set for 6/18/2025.(Miller, Timothy) (Entered: 03/20/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

**JA10**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATHY A. HARRIS, in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board,<br>　　1615 M Street NW<br>　　Washington, DC 20419<br><br>　　　　　　　　　　*Plaintiff*,<br><br>　　　　-against-<br><br>SCOTT BESSENT, in his official capacity as Secretary of the Treasury,<br>　　1500 Pennsylvania Avenue NW<br>　　Washington, DC 20220<br><br>TRENT MORSE, in his official capacity as Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office,<br>　　1600 Pennsylvania Avenue NW<br>　　Washington, DC 20500<br><br>SERGIO GOR, in his official capacity as Director of the White House Presidential Personnel Office,<br>　　1600 Pennsylvania Avenue NW<br>　　Washington, DC 20500<br><br>HENRY J. KERNER, in his official capacity as Acting Chairman of the Merit Systems Protection Board,<br>　　1615 M Street NW<br>　　Washington, DC 20419<br><br>DONALD J. TRUMP, in his official capacity as President of the United States of America,<br>　　1600 Pennsylvania Avenue NW<br>　　Washington, DC 20500<br><br>RUSSELL VOUGHT, in his official capacity as Director of the Office of Management and Budget,<br>　　725 17th Street, NW<br>　　Washington, DC 20503<br>　　　　　　　　　　*Defendants.* | Civil Case No. _____<br><br><br><br>**EMERGENCY TEMPORARY RESTRAINING ORDER SOUGHT**<br><br><br>**EMERGENCY HEARING RESPECTFULLY REQUESTED** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      The Merit Systems Protection Board is an independent federal agency. Plaintiff Cathy A. Harris has been a Member of the Merit Systems Protection Board since June 1, 2022, following her nomination by the President and confirmation by the Senate. She is entitled to continue to serve as a Member of the Merit Systems Protection Board for the remainder of her term until March 1, 2028 and may be removed by the President "only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d).

2.      On February 10, 2025, President Trump disregarded that clear statutory language and, in a one-sentence email, purported to terminate Ms. Harris. That email made no attempt to comply with the statute's for-cause removal protection. It stated simply: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately."

3.      President Trump's purported removal of Ms. Harris is unlawful. It has no basis in fact and thus cannot be squared with the statutory text. And it is in direct conflict with nearly a century of precedent that defines the standard for removal of independent agency officials and upholds the legality of virtually identical for-cause removal protections for members of independent agencies.

4.      As a Member of the Merit Systems Protection Board, Ms. Harris brings this action against President Trump, the Director of the White House Presidential Personnel Office, the Acting Chairman of the Merit Systems Protection Board, the Secretary of the Treasury, and the Office of Management and Budget, seeking a declaratory judgment and injunction and, on an emergency basis, a temporary restraining order to prevent the deprivation of her statutory

entitlement to exercise the duties of her office.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action for declaratory and injunctive relief under 28 U.S.C. §§ 1331, 1361.

6.    Venue is proper in this district under 28 U.S.C. § 1391(e).

## PARTIES

7.    Plaintiff Cathy A. Harris is a Member of the United States Merit Systems Protection Board.

8.    Defendant Scott Bessent is the Secretary of the Treasury. He is sued in his official capacity.

9.    Defendant Trent Morse is the Deputy Assistant to the President and Deputy Director of the White House Presidential Personnel Office. He is sued in his official capacity.

10.    Defendant Sergio Gor is the Director of the White House Presidential Personnel Office. He is sued in his official capacity.

11.    Defendant Henry J. Kerner is the Acting Chairman of the Merit Systems Protection Board. He is sued in his official capacity.

12.    Defendant Donald J. Trump is the President of the United States and is responsible for the decision to remove Ms. Harris from her office. He is sued in his official capacity.

13.    Defendant Russell Vought is the Director of the Office of Management and Budget. He is sued in his official capacity.

## STATUTORY BACKGROUND

14.    The Merit Systems Protection Board ("MSPB") is an independent agency of the United States. In 1978, Congress first established the MSPB as part of the Civil Service

Reform Act of 1978 ("CSRA"), PL 95–454 (S 2640), 92 Stat. 1111 (Oct. 13, 1978). The CSRA was enacted to address widespread public concerns about the federal civil service.[1]

15.     The legislation that became the CSRA was first proposed by President Carter. In a letter to Congress, President Carter requested that Congress create the MSPB, whose members would be removable only for cause. President Carter explained that this structure was intended to "guarantee independent and impartial protection to employees" and thereby "safeguard the rights of Federal employees who 'blow the whistle' on violations of laws or regulations by other employees, including their supervisors."[2]

16.     Over the following seven months, Congress worked to formulate President Carter's proposal into final legislation. Throughout these deliberations, Congress emphasized the importance of an independent MSPB with sufficient authority to protect the federal workforce consistent with merit system principles. To ensure that independence, Congress in the CSRA provided that the Members of the MSPB "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." Civil Service Reform Act, P.L. 95-454, 92 Stat. 1111, Ch. 12, § 1202.

17.     On October 13, 1978, President Carter signed the CSRA into law, declaring that the "landmark legislation" would create "a new system of excellence and accountability."[3]

18.     The MSPB's primary mission is to provide the people of the United States with a competent, honest, and productive Federal workforce, provide that Federal personnel

---

[1] *The Civil Service and the Statutory Law of Public Employment*, 97 Harv. L. Rev. 1619, 1631–32 (1984).

[2] Federal Civil Service Reform Message to the Congress (Mar. 2, 1978), https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress.

[3] *President Jimmy Carter Remarks on Signing the Civil Service Reform Act of 1978 into Law* (Oct. 13, 1978), https://www.presidency.ucsb.edu/documents/civil-service-reform-act-1978-statement-signing-s-2640-into-law.

management is implemented consistent with merit systems principles and free from prohibited personnel practices, including reprisal for whistleblowing. Civil Service Reform Act, P.L. 95-454, 92 Stat. 1111, Ch. 11, § 1101.

19.    Members of the MSPB hear, adjudicate, or provide for the hearing or adjudication, of all matters within the MSPB's jurisdiction involving Federal employees and Federal agencies. Members of the Board are empowered to order any Federal agency or employee to comply with any order or decision issued by the Board and enforce compliance with any such order. 5 U.S.C. § 1204(a)(1)-(2).

20.    Members of the MSPB are to conduct, from time to time, special studies relating to the civil service and to other merit systems in the executive branch, and report to the President and to the Congress as to whether the public interest in a civil service free of prohibited personnel practices is being adequately protected. 5 U.S.C. § 1204(a)(3).

21.    Members of the MSPB are required to review rules and regulations of the Office of Personnel Management. 5 U.S.C. § 1204(a)(4).

22.    A Member of the MSPB must be nominated by the President and confirmed by the Senate. Members of the MSPB must also be "individuals who, by demonstrated ability, background, training, or experience are especially qualified to carry out the functions of the Board." 5 U.S.C. § 1201.

23.    Once confirmed, a Member of the MSPB serves a seven-year term and, if a successor has not yet been appointed, up to one additional year. "Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202.

## FACTUAL ALLEGATIONS

24.      On or about June 24, 2021, President Biden nominated Plaintiff Cathy A. Harris to be a Member of the MSPB.[4] Ms. Harris was renominated by President Biden to be a Member of the MSPB on January 4, 2022. The Senate confirmed Ms. Harris on May 25, 2022, and she was sworn in as a Member of the Board on June 1, 2022.[5] Ms. Harris's term expires on March 1, 2028.

25.      President Biden designated Ms. Harris as Vice Chairman of the MSPB on June 6, 2022, and she served as Acting Chairman of the MSPB until March 6, 2024. The Senate confirmed Ms. Harris as Chairman on March 6, 2024. Ms. Harris was sworn in as Chairman of the MSPB on March 14, 2024.[6]

26.      On February 11, 2025, Ms. Harris received an email from Trent Morse, Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, which stated in its entirety: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately. Thank you for your service[.]" Ex. A.

27.      The one-sentence email does not allege any inefficiency, neglect of duty, or malfeasance in office by Ms. Harris, nor is there any basis for such an allegation.[7] In flagrant

---

[4] *MSPB Annual Report for FY 2021*, Merit Systems Protection Board (Feb. 18, 2022), https://www.mspb.gov/about/annual_reports/MSPB_FY_2021_Annual_Report_1900943.pdf.

[5] *MSPB Welcomes Acting Chairman Cathy A. Harris*, Merit Systems Protection Board (June 6, 2022), https://www.mspb.gov/publicaffairs/press_releases/Cathy_Harris_Press_Release_1930967.pdf.

[6] *New MSPB Chairman and Vice Chairman*, Merit Systems Protection Board (Mar. 14, 2024), https://www.mspb.gov/publicaffairs/press_releases/New_MSPB_Chairman_and_Vice%20Chairman.pdf.

[7] Under Ms. Harris's leadership, the MSPB was able to complete the processing of an unprecedented backlog of pending appeals. In addition to new matters, when Ms. Harris joined

disregard for the clear statutory text, Ms. Harris was purportedly terminated without basis, justification or authority.

28.     The MSPB's ability to protect the civil service is needed now more than ever. Over the preceding three weeks, an unprecedented number of federal employees with civil service protections have been placed on administrative leave with a threat that their due process rights and civil service protections will be taken away.[8] Senior career officials have been purged from the Federal Bureau of Investigations. Eighteen Inspectors General from across the federal government have been removed without the justification required by statute.[9] And hundreds of federal employees have been locked out of their computer systems by the U.S. DOGE Service Temporary Organization.[10]

29.     The President has also attempted to remove Board Member Gwynne Wilcox from the National Labor Relations Board and Special Counsel Hampton Dellinger despite clear statutory for-cause removal protection.[11]

---

the MSPB, the Board inherited a case inventory at headquarters of 3793 cases which had accumulated over a five-year period during which the MSPB did not have a quorum of Members. As of January 1, 2025, the Board had issued decisions on 4620 cases, with only 56 cases from the inherited inventory remaining pending. Merit Systems Protection Board - Lack of Quorum and the Inherited Inventory: Chart of Cases Decided and Cases Pending, https://www.mspb.gov/foia/files/HQ_Case_Processing_Data.pdf.

[8] *See* Executive Order 14171 (Jan. 20, 2025).

[9] *Grassley, Durbin Seek Presidential Explanation for IG Dismissals*, Senate Judiciary Comm. (Jan. 28, 2025), https://www.judiciary.senate.gov/press/rep/releases/grassley-durbin-seek-presidential- explanation-for-ig-dismissals.

[10] Ellen Knickmeyer et al., *Trump and Musk move to dismantle USAID, igniting battle with Democratic lawmakers*, AP (Feb. 3, 2025), https://apnews.com/article/trump-musk-usaid-c0c7799be0b2fa7cad4c806565985fe2; Tim Reid, *Exclusive: Musk aides lock workers out of OPM computer systems*, Reuters (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock- government-workers-out-computer-systems-us-agency-sources-say-2025-01-31/.

[11] Andrew Hsu, *Trump fires EEOC and labor board officials, setting up legal fight*, NPR (Jan. 28, 2025), https://www.npr.org/2025/01/28/nx-s1-5277103/nlrb-trump-wilcox-abruzzo-democrats- labor; Chris Cameron, *A Judge blocked Trump's firing of government watchdog,*

30.     These events are ongoing, and they have caused "chaos" and "confusion" among civil servants and agency officials.[12] They directly implicate the public's interest in the smooth functioning of the federal workforce, and they raise troubling questions under both the civil service statutes and the Constitution.

### CLAIMS FOR RELIEF

### COUNT ONE
### ULTRA VIRES IN VIOLATION OF STATUTORY AUTHORITY

31.     The preceding paragraphs are incorporated and realleged here.

32.     Ms. Harris has a clear entitlement to remain in her office. Once confirmed by the Senate, a Member of the MSPB serves a seven-year term. 5 U.S.C. § 1202. A Member of the MSPB may be removed from that term "by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.*

33.     The constitutionality of that protection is dictated by nearly a century of binding Supreme Court precedent upholding materially identical restrictions. *Humphrey's Executor v. United States*, 295 U.S. 602, 620 (1935); *Wiener v. United States*, 357 U.S. 349, 356 (1958).

34.     President Trump's purported termination of Ms. Harris is unlawful. The President did not purport to remove Ms. Harris on the basis of "inefficiency, neglect of duty, or malfeasance in office." In fact, the President's termination email provided no justification at all for the termination.

35.     As a result, the President's termination of Ms. Harris is *ultra vires* and is a clear

---

New York Times (Feb. 10, 2025), https://www.nytimes.com/live/2025/02/10/us/trump-news/a-judge-blocked-trumps-firing-of-a-government-watchdog.

[12] Allan Smith, *'Fear' and 'chaos' grip federal workers as Trump rapidly remakes the government*, NBC News (Jan. 30, 2025), https://www.nbcnews.com/politics/donald-trump/fear-chaos-grip- federal-workers-trump-remakes-government-rcna189746.

violation of the statute.

## COUNT TWO
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §§ 706(1) and 706(2)
(Against Defendants Bessent, Gor, Morse, Kerner, and Vought)

36.     The preceding paragraphs are incorporated and realleged here.

37.     To the extent that Defendants Bessent, Gor, Morse, Kerner, and Vought exercise authority with respect to, or on behalf of, the Merit Systems Protection Board without regard to Ms. Harris's position as Member, those actions are "not in accordance with the law," "contrary to a constitutional right, power, privilege, or immunity," and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). Ms. Harris seeks to hold unlawful and set aside such actions, pursuant to section 706 the Administrative Procedure Act and to compel agency action unlawfully withheld or unreasonably delayed.

## COUNT THREE
### DECLARATORY JUDGMENT ACT, 28 U.S.C. §§ 2201 and 2202

38.     The preceding paragraphs are incorporated and realleged here.

39.     Ms. Harris is entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Ms. Harris and the Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that Ms. Harris is a Member of the MSPB and that the President does not have authority to remove her absent inefficiency, neglect of duty, or malfeasance in office.

## COUNT FOUR
### VIOLATION OF THE SEPARATION OF POWERS

40.     The preceding paragraphs are incorporated and realleged here.

41.     President Trump's purported removal of Ms. Harris is further invalid because it

violates Article I, section 8 and Article II, sections 2 and 3 of the U.S. Constitution. The Constitution empowers Congress to set reasonable limitations on the removal of the heads of independent agencies and it does not confer on the President an authority to violate Congress's scheme. The President's purported removal of Ms. Harris violates the authorities vested in Congress by the Constitution and further violates the President's duty to "take Care that the Laws be faithfully executed."

## COUNT FIVE
## WRIT OF MANDAMUS

42.    The preceding paragraphs are incorporated and realleged here.

43.    In the alternative, Ms. Harris is entitled to a writ of mandamus. The MSPB statute's removal restrictions impose a ministerial duty on the President and subordinate officials not to interfere with Ms. Harris's tenure in office absent cause for inefficiency, neglect of duty, or malfeasance in office. *See Swan v. Clinton*, 100 F.3d 973, 977-78 (D.C. Cir. 1996).

44.    Ms. Harris is entitled to a writ of mandamus prohibiting her removal from office and, absent this Court granting one of the counts identified above, there is no other adequate means of redress.

## COUNT SIX
## EQUITABLE RELIEF FOR STATUTORY AND
## CONSTITUTIONAL VIOLATIONS

45.    The preceding paragraphs are incorporated and realleged here.

46.    Under this Court's traditional equitable jurisdiction, the plaintiff is entitled to equitable relief to prevent and restrain ongoing violations of both statutory and constitutional federal law by the defendants. Equitable actions have "long been recognized as the proper means" to prevent public officials from acting unconstitutionally. Because such actions seek simply to halt or prevent a violation of federal law rather than the award of money

damages, they do not ask the Court to imply a new cause of action. To the contrary, the ability to sue to enjoin unlawful and unconstitutional actions by federal officers is the creation of courts of equity and reflects a long history of judicial review of illegal executive action, tracing back to England. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

## PRAYER FOR RELIEF

Plaintiff Cathy A. Harris requests that the Court:

a. Declare that the President's termination of Plaintiff Cathy A. Harris was unlawful, and that Plaintiff Cathy A. Harris is a Member of the Merit Systems Protection Board;

b. Declare that Plaintiff Cathy A. Harris is a Member of the Merit Systems Protection Board who may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office;

c. Order that Plaintiff Cathy A. Harris may not be removed from her office as Member of the Merit Systems Protection Board or in any way be treated as having been removed, denied or obstructed in accessing any of the benefits or resources of her office, or otherwise be obstructed from her ability to carry out her duties;

d. Order that Defendants Bessent, Gor, Morse, Kerner, and Vought may not exercise authority with respect to, or on behalf of, the Merit Systems Protection Board without regard to Ms. Harris's position as Member;

e. Order Defendants Bessent, Gor, Morse, Kerner, and Vought to pay Plaintiff Cathy A. Harris all wages and benefits owed to her as Member of the Merit Systems Protection Board;

f. Award Plaintiff's attorney fees and costs; and

g. Award all other appropriate relief.

Respectfully submitted,

  /s/ **Michael J. Kator**

Linda M. Correia, D.C. Bar No. 435027
CORREIA & PUTH, PLLC
1400 16th Street, NW, Suite 450
Washington, D.C.  20036
(202) 602-6500
lcorreia@correiaputh.com

James Eisenmann, D.C. Bar No. 435456
ALDEN LAW GROUP, PLLC
1850 M St., NW, Suite 901
Washington, D.C.  20036
(202) 463-0300
jeisenmann@aldenlg.com

Michael J. Kator, D.C. Bar No. 366936
Jeremy D. Wright, D.C. Bar No. 483297
Kerrie D. Riggs, D.C. Bar No. 995784
KATOR, PARKS, WEISER & WRIGHT, P.L.L.C.
1150 Connecticut Ave., NW, Suite 705
Washington, D.C.  20036
(202) 898-4800
(202) 289-1389 (fax)
mkator@katorparks.com
jwright@katorparks.com
kriggs@katorparks.com

*Attorneys for Plaintiff Cathy A. Harris*

# EXHIBIT A

**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Monday, February 10, 2025 10:49:52 PM
**To:** Harris, Cathy <Cathy.Harris@mspb.gov>
**Cc:** Office of General Counsel <OfficeofGeneralCounsel@mspb.gov>
**Subject:** Notice from the Office of Presidential Personnel


Cathy,

On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately.

Thank you for your service,

Trent Morse
Deputy Assistant to the President
Deputy Director of Presidential Personnel
The White House

**JA24**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |  |
|---|---|---|---|
| CATHY A. HARRIS, *in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board,* | : : : : | | |
| Plaintiff, | : : | Civil Action No.: | 25-412 (RC) |
| v. | : : | Re Document No.: | 2 |
| SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*, *et al.*, | : : : | | |
| Defendants. | : | | |

## ORDER

**GRANTING PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, Plaintiff Cathy A. Harris's Motion for Temporary Restraining Order (ECF No. 2) is **GRANTED**. It is hereby:

**ORDERED** that from the date of entry of this Court's Order until the Court rules on a preliminary injunction, Plaintiff Cathy A. Harris shall continue to serve as Chairman of the MSPB. Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from removing Harris from her office or in any way treating her as having been removed, denying or obstructing Harris's access to any of the benefits or resources of her office, placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the MSPB in Harris's position, pending further order of the Court; and it is

**JA25**

**FURTHER ORDERED** that Harris shall file any motion for a preliminary injunction on or before February 23, 2025.  Defendants shall file any opposition on or before February 28, 2025.  Harris shall file any reply on or before March 2, 2025; and it is

**FURTHER ORDERED** that the parties shall appear for a hearing on the motion for preliminary injunction, if such a motion is filed, on March 3, 2025, at 2:00 p.m., and that the Court will rule on the preliminary injunction as soon as possible thereafter; and it is

**FURTHER ORDERED** that the parties shall meet, confer, and submit a joint status report, on or before February 19, 2025, informing the Court of their respective positions on whether consideration of the motion for preliminary injunction should be consolidated with the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).

**SO ORDERED**.

Dated:  February 18, 2025                                  RUDOLPH CONTRERAS
                                                          United States District Judge

2

**JA26**

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| CATHY A. HARRIS, *in her personal capacity* *and in her official capacity as Member of the* *Merit Systems Protection Board*, | : : : : | | |
| Plaintiff, | : : | Civil Action No.: | 25-412 (RC) |
| v. | : : | Re Document No.: | 2 |
| SCOTT BESSENT, *in his official capacity as* *Secretary of the Treasury*, *et al.*, | : : : | | |
| Defendants. | : | | |

### <u>MEMORANDUM OPINION</u>

### Granting Plaintiff's Motion for Temporary Restraining Order

### I. INTRODUCTION

Plaintiff Cathy A. Harris was appointed to the Merit Systems Protection Board ("MSPB") on June 1, 2022, to a term set to expire on March 1, 2028. Federal law states that members of the Merit Systems Protection Board may be removed from office "only for inefficiency, neglect of duty, or malfeasance in office." On February 10, 2025, President Donald J. Trump informed Harris that her position on the MSPB was "terminated, effective immediately" but provided no reason for Harris's termination. The following day, Harris filed this lawsuit against President Trump and several other federal officials ("Defendants"), claiming that her termination violated federal law. She moves for a temporary restraining order declaring her removal from office to be unlawful, declaring that she remains a member of the MSPB, and enjoining Defendants from treating her as having been removed. For the following reasons, the Court grants that motion while the parties fully brief a motion for a preliminary injunction.

**JA27**

## II.  BACKGROUND

### A.  Statutory Background

Congress created the Merit Systems Protection Board as a component of the Civil Service Reform Act of 1978, which "establishes a framework for evaluating personnel actions taken against federal employees." *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012); *see also* Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, § 202, 92 Stat. 1111, 1121–25 (1978) (codified at 5 U.S.C. §§ 1201–05).  Congress's Findings and Statement of Purpose indicate that "[i]t is the policy of the United States that . . . to provide the people of the United States with a competent, honest, and productive Federal work force[,] . . . Federal personnel management should be implemented consistent with merit system principles."  CSRA § 3, 92 Stat. at 1112.  Those merit system principles include, among others, "[r]ecruitment . . . from qualified individuals" where "selection and advancement [is] determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity."  *Id.* § 101, 92 Stat. at 1113 (codified at 5 U.S.C. § 2301).  Congress additionally instructed that "[e]mployees should be . . . protected against arbitrary action, personal favoritism, or coercion for partisan political purposes," as well as "against reprisal for the lawful disclosure of information which the employees reasonably believe evidences," among other things, violations of law, gross waste of funds, an abuse of authority, or substantial and specific dangers to public health or safety.  *Id.*

The CSRA established the MSPB as "an independent agency consisting of three members" and "charged [it] with protecting the merit system principles and adjudicating conflicts between federal workers and their employing agencies."  *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 154 (D.C. Cir. 1982); *see also* CSRA § 101, 92 Stat. at 1114–17 (codified at 5

U.S.C. § 2302) (establishing prohibited personnel practices, such as employment discrimination, unlawful political activities, and any other violations of law within the federal civil service).  The Board reviews federal employee appeals of adverse actions "which [are] appealable to the Board under any law, rule, or regulation," including those related to removal or suspension for periods greater than fourteen days.  5 U.S.C. § 7701(a); *see also id.* § 1204(a)(1).  It may order federal agencies and employees to comply with its decisions and conduct studies "relating to the civil service" for the President and Congress.  5 U.S.C. § 1204(a)(2), (a)(3).  The MSPB also reviews "rules and regulations of the Office of Personnel Management."  *Id.* § 1204(a)(4).  The MSPB's final decisions are generally subject to judicial review.  *See id.* § 7703.

Members of the MSPB are "appointed by the President, by and with the advice and consent of the Senate," and "not more than 2 of [the members] may be adherents of the same political party."  CSRA § 202 (codified at 5 U.S.C. § 1201).  Members of the MSPB are appointed to seven-year terms that may be extended by up to one year if a successor has not yet been appointed.  *Id.* (codified at 5 U.S.C. § 1202(a)–(c)).  "Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office."  *Id.* (codified at 5 U.S.C. § 1202(d)).

### B.  Factual Background

President Joseph R. Biden initially nominated Harris to be a member of the MSPB on June 24, 2021, and renominated her on January 4, 2022.  Compl. ¶ 24, ECF No. 1.  The Senate confirmed Harris on May 25, 2022, and she was sworn in on June 1, 2022.  *Id.*  Her term expires on March 1, 2028.  *Id.*  The Senate later confirmed Harris as Chairman, and she was sworn in as Chairman on March 14, 2024.  *Id.* ¶ 25.

**JA29**

On February 10, 2025, Harris received an email from Trent Morse, Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, which stated in its entirety:

> On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately. Thank you for your service[.]

Ex. A to Compl., ECF No. 1-1; *see also* Ex. A to Pl.'s Mot. for TRO, ECF No. 2-2.  The communication does not explain the basis for Harris's termination.

Harris filed this lawsuit on February 11, 2025, claiming that her firing was *ultra vires*, unconstitutional, and a violation of the Administrative Procedure Act.  *See* Compl. ¶¶ 31–37, 40–41.  She seeks relief under the Declaratory Judgment Act, issuance of a writ of mandamus, and equitable relief.  *See id.* ¶¶ 38–39, 42–46.  Harris additionally filed a motion for a temporary restraining order, *see* Pl.'s Mot. for TRO, ECF No. 2, which Defendants oppose, *see* Defs.' Opp'n to Mot. for TRO ("Defs.' Opp'n"), ECF No. 6.  On February 13, 2025, the Court held a hearing on the TRO motion.

### III.  LEGAL STANDARD

"The purpose of a temporary restraining order is to preserve the status quo for a limited period of time until the Court has the opportunity to pass on the merits of the demand for a preliminary injunction."  *Barrow v. Graham*, 124 F. Supp. 2d 714, 715–16 (D.D.C. 2000) (citing *Warner Bros. Inc. v. Dae Rim Trading, Inc.*, 877 F.2d 1120, 1125 (2d Cir. 1989)).  "An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief."  *Scottsdale Cap. Advisors Corp. v. Fin. Indus. Regul. Auth., Inc.*, 678 F. Supp. 3d 88, 99 (D.D.C. 2023) (citing *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011)).

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the [movant] is entitled to such relief.'"  *John Doe Co. v. Consumer Fin. Prot.*

*Bureau*, 849 F.3d 1129, 1131 (D.C. Cir. 2017) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "The last two factors 'merge when the Government is the opposing party.'" *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). "Of course, the movant carries the burden of persua[ding]" the Court that these factors merit preliminary relief, *Fla. EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 11 (D.D.C. 2020) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)), and must do so by making a "clear showing," *Cobell*, 391 F.3d at 258. A district court must generally consider and balance each of these factors in deciding whether to issue a preliminary injunction. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011). "A preliminary injunction may be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell*, 391 F.3d at 261.

## IV.  ANALYSIS

The Court concludes that Harris has established a strong likelihood of success on the merits, that irreparable harm is likely to occur in the absence of injunctive relief, and that the public interest weighs in favor of enjoining Defendants' actions. Harris has thus carried her burden to establish that a temporary restraining order is warranted here.

### A.  Likelihood of Success on the Merits

Harris argues that she is likely to prevail on the merits of her claims based on Supreme Court precedent and the nature of the MSPB's powers. *See* Mem. in Supp. of Pl.'s Mot. for TRO

("Pl.'s Mot."), ECF No. 2-1. Specifically, she argues that *Humphrey's Executor v. United States* and its progeny confirm the constitutionality of the conditions placed on removal of MSPB members. 295 U.S. 602 (1935); *see also* Pl.'s Mot. at 5–6. She additionally cites the MSPB's limited authority, quasi-legislative functions, need for independence, and accountability to Congress and the President as reasons for the constitutionality of members' appointment for a term of years with specific conditions for removal. *See* Pl.'s Mot. at 8–10. Defendants argue that *Humphrey's Executor* does not apply because the MSPB exercises executive power—it may issue orders to federal employees, adjudicate and take final action, and litigate on its own behalf. *See* Defs.' Opp'n at 7. The Court concludes that Harris has demonstrated a likelihood of success on the merits.

*Humphrey's Executor* appears to dictate the outcome of this case. The Federal Trade Commission ("FTC") comprises five members "appointed by the President, by and with the advice and consent of the Senate," and "[n]ot more than three of the commissioners shall be members of the same political party." *Humphrey's Executor*, 295 U.S. at 619–20 (quoting 15 U.S.C. § 41). "Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." *Id.* (quoting 15 U.S.C. § 41). In *Humphrey's Executor*, President Hoover had appointed William Humphrey as a member of the Federal Trade Commission, which carried a term of seven years. 295 U.S. at 612. Less than two years later, President Roosevelt terminated Humphrey over differences of political opinion, stating, "[e]ffective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission." *Id.* at 619. Humphry died several months later, but his estate sued to recover backpay on the basis that his removal was unlawful. *Id.* at 612.

The Supreme Court confirmed that President Roosevelt's termination of Humphry was indeed unlawful.  The Court observed that "[t]he statute fixes a term of office, in accordance with many precedents."  *Id.* at 623.  The Court further explained:

> The commission is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality.  It is charged with the enforcement of no policy except the policy of the law.  Its duties are neither political nor executive, but predominantly quasi judicial and quasi legislative.  Like the Interstate Commerce Commission, its members are called upon to exercise the trained judgment of a body of experts "appointed by law and informed by experience."

*Id.* at 624.  The Court differentiated FTC members from the postmaster in *Myers v. United States*, 272 U.S. 52 (1926) (evaluating statute stating that postmasters "shall hold their offices for four years unless sooner removed or suspended according to law").  "A postmaster is an executive officer restricted to the performance of executive functions" and is "charged with no duty at all related to either the legislative or judicial power."  *Id.* at 627.  The FTC, in contrast, "acts in part quasi legislatively and in part quasi judicially" rather than exercising traditional executive powers.  *Id.* at 629.  "We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named," the Court concluded.  *Id.*

Two decades later, the Court considered President Eisenhower's removal of a member of the War Claims Commission, whom President Truman had appointed and the Senate had confirmed.  *See Wiener v. United States*, 357 U.S. 349, 350 (1958).  Congress charged that commission with processing "claims for compensating internees, prisoners of war, and religious organizations . . . who suffered personal injury or property damage at the hands of the enemy in connection with World War II," and the commissioners' terms were limited by the short duration of the commission's existence.  *Id.*  The Court reasoned that Congress intended to "preclude[] the President from influencing the Commission in passing on a particular claim," which meant

that the President naturally could not "hang . . . the Damocles' sword of removal" over the commissioners.  *Id.* at 356.  The Court reaffirmed that the President had "no such power" to "remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission."  *Id.*[1]

The Supreme Court recently recognized the constitutionality of this narrow restriction on the President's removal power in *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 215 (2020).  *Humprey's Executor*, the Court explained, "permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power."  *Id.* at 216; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 483 (2010) (summarizing *Humphrey's Executor* as holding that "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause.").

This case appears to be on all fours with *Humphrey's Executor*.  The MSPB is "a multimember body of experts" that is "balanced along partisan lines."  *Seila Law*, 591 U.S. at 215.  The President will therefore likely have the "opportunity to shape its leadership and thereby

---

[1] The Court once again considered a multi-member body in *Mistretta v. United States* when passing on the constitutionality of the United States Sentencing Commission, which formally resides in the Judiciary.  488 U.S. 361 (1989).  The Sentencing Report Act of 1984 empowered the President to appoint commissioners to the Sentencing Commission, with members "subject to removal by the President 'only for neglect of duty or malfeasance in office or for other good cause shown.'"  *Id.* at 368 (quoting 28 U.S.C. § 991(a)).  When considering whether the Act affords the President undue influence over federal judges who served as commissioners, the Court recognized that "the President's removal power under the Act is limited."  *Id.* at 410.  "Such congressional limitation on the President's removal power, like the removal provisions upheld in *Morrison v. Olson*, 487 U.S. 654 (1988), and *Humphrey's Executor* . . . , is specifically crafted to prevent the President from exercising 'coercive influence' over independent agencies."  *Id.*

**JA34**

influence its activities." *Id.* at 225. The CSRA envisions that the Board "is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality." *Humphrey's Executor*, 295 U.S. at 624. The CSRA also "fixes a term of office." *Id.* at 623. The MSPB's duties are "quasi judicial," *id.* at 624, in that it conducts preliminary adjudication of federal employees' claims, which may then be appealed to the Federal Circuit. *See* 5 U.S.C. §§ 1204(a)(1), 7703. Although the MSPB lacks its own rulemaking authority, Congress intended the agency to aid its legislative goals by regularly transmitting reports to Congress regarding the Board's functions. *See* 5 U.S.C. §§ 1204(l), 1205. It is additionally evident that Congress hoped to "preclude[] the President from influencing the [Board] in passing on a particular claim." *Wiener*, 357 U.S. at 356.

The MSPB additionally regulates government activity rather than that of private parties, limiting the risk that its members can represent any "special threat to individual liberty." *Seila Law*, 591 U.S. at 223; *see also* Pl.'s Mot. at 8 (emphasizing that "the MSPB does not regulate or penalize private activity"). Instead, the MSPB primarily enforces merit system principles within the federal government and responds to prohibited personnel practices, such as employment discrimination and retaliation against whistleblowers. *See* 5 U.S.C. § 2302(b). This authority is fundamentally narrower than that of the FTC, which regulates private conduct. *See* 15 U.S.C. § 45a–55 (defining scope of trade practices regulated by the FTC); *id.* § 45 (empowering FTC to regulate commerce); *see also Dellinger v. Bessent*, No. 25-cv-0385, 2025 WL 471022, at *8 (D.D.C. Feb. 12, 2025), *aff'd*, No. 25-5028 (D.C. Cir. Feb. 15, 2025) (per curiam) (explaining that the Office of Special Counsel "is not an agency endowed with the power to articulate, implement, or enforce policy that affects a broad swath of the American public or its economy"). The Board also remains politically accountable to Congress and the President through the

appropriations process in a manner inapplicable to independent agencies with their own funding sources. *See Selia Law*, 591 U.S. at 226 (discussing Consumer Financial Protection Bureau's "receipt of funds outside the appropriations process"); *Collins v. Yellen*, 594 U.S. 220, 231 (2021) (observing that "the [Federal Housing Finance Agency] is not funded through the ordinary appropriations process").

Finally, the MSPB's mission and purpose require independence. *See* Pl.'s Mot. at 9–10. In enacting the CSRA, Congress exercised its power to regulate the civil service. *See U.S. Civ. Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 555 (1973) ("Congress and the President are responsible for an efficient public service." (quoting *United Pub. Workers of Am. (C.I.O.) v. Mitchell*, 330 U.S. 75, 99 (1947))). It defined certain prohibited personnel practices, to include discrimination, loyalty oaths, coercion to engage in political activity, and retaliation against whistleblowers. *See* 5 U.S.C. § 2302(b)(1)–(3), (8). Direct political control over the MSPB would have limited effect on the President's implementation of his policy agenda. It would instead neuter the CSRA's statutory scheme by allowing high-ranking government officials to engage in prohibited practices and then pressure the MSPB into inaction. The MSPB's independence is therefore structurally inseparable from the CSRA itself.[2]

Because the MSPB falls within the scope of *Humphrey's Executor*, Congress has the power to specify that members of the MSPB may serve for a term of years, with the President empowered to remove those members only for inefficiency, neglect of duty, or malfeasance in office. The President did not indicate that any of these reasons drove his decision to terminate

---

[2] Furthermore, the MSPB's duties dovetail with *United States v. Perkins*, in which the Supreme Court held that Congress may place some limitations on the removal of inferior officers. 116 U.S. 483, 485 (1886). Denying independence to the Board would undermine these constitutionally sound limitations on the removal of civil servants.

Harris. The Court thus concludes that Harris has demonstrated that she is likely to show her termination as a member of the MSPB was unlawful.[3]

## B.  Irreparable Harm

Harris asserts that she will suffer irreparable harm because, absent interim relief, she will be deprived of her "statutory right to function" as a senior government official. Pl.'s Mot. at 10 (quoting *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983) (per curiam)). She additionally contends that the injury will be irreparable because her claim to MSPB membership may be frustrated by the appointment of a successor. *Id.* at 11. She also argues that denial of emergency relief and confusion about the status of the MSPB may "deprive Plaintiff and the MSPB of the 'ability to fulfill [their] mandate' to federal employees." *Id.* (quoting *Berry*, 1983 WL 538, at *5). Defendants respond that Harris cannot claim irreparable harm as an employee separated from her position, *see* Defs.' Opp'n at 10–11, because the MSPB continues to function with a quorum, *see id.* at 11–13, and because the President has not yet nominated a successor, *see id.* at 13. The Court concludes that Harris has established irreparable harm in this case.

To sustain injunctive relief, the threat of irreparable injury must be "*likely* in the absence of an injunction," rather than a mere "possibility." *Winter*, 555 U.S. at 22. The injury must be

---

[3] Defendants argue that Harris cannot show entitlement to reinstatement because she has been removed from office, and "[t]he President cannot be compelled to retain the services of a principal officer whom the President no longer believes should be entrusted with the exercise of executive power." Defs.' Opp'n at 10. Defendants posit that Harris's remedy should be limited to back pay. *See id. Sampson v. Murray*, 415 U.S. 61 (1974), discussed further below, appears to cut against this conclusion, as there the Supreme Court did "not wish to be understood as foreclosing [injunctive] relief in the genuinely extraordinary situation." *Id.* at 92 n.68. In addition, the Court's job at this stage is to determine whether to issue a temporary restraining order preserving the "the regime in place" before Defendants issued the termination order while these issues are fully considered. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022).

truly irreparable: "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a[n injunction] are not enough." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. Fed. Energy Reg. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam)). The "the irreparable harm analysis . . . assumes, without deciding, that the movant has demonstrated a likelihood that the non-movant's conduct violates the law." *Id.* at 303.

In addition, a federal employee seeking an injunction requiring the Government to employ her during the course of litigation "must make a showing of irreparable injury sufficient in kind and degree to override" the Government's traditional autonomy over its internal affairs, which "cut[s] against the availability of preliminary injunctions in Government personnel cases." *Sampson v. Murray*, 415 U.S. 61, 84 (1974). In *Sampson*, the Supreme Court considered whether a probationary employee at the General Services Administration could receive a temporary restraining order enjoining her dismissal during an administrative appeal to the Civil Service Commission. *Id.* at 62–63. The Court concluded that, particularly considering the Government's prerogative to manage its employees, the loss of wages and reputation that may be remedied through further proceedings fell "far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case." *Id.* at 91–92. The Court nonetheless allowed that a "District Court is not totally without authority to grant interim injunctive relief to a discharged Government employee," *id.* at 63, and that relief may be appropriate "in the genuinely extraordinary situation," rather than "in the routine case." *Id.* at 92 n.68.

Harris has established that this case represents a "genuinely extraordinary situation" meriting injunctive relief for a discharged Government employee. Unlike the probationary

12

**JA38**

employee in *Sampson*, Harris was appointed Chairman of a federal agency and confirmed by the Senate.[4]  *See Sampson*, 415 U.S. at 80–81.  The conditions under which the President may end her tenure are made plain by federal statute and supported by ninety years of Supreme Court precedent.  *See Dellinger*, at *10 (finding *Sampson*'s "analysis" to be "of little utility" in case of employee terminated despite for-cause removal protections).  *Sampson* additionally relied on "the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83 (quoting *Cafeteria & Rest. Workers Union, Local 473, A.F.L.-C.I.O. v. McElroy*, 367 U.S. 886, 896 (1961)).  Yet that concern is minimized in the context of an action that at this stage appears to be nakedly illegal, such that the Government's range of options is necessarily constrained.

Harris cites *Berry v. Reagan*, which—although vacated as moot under *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950), *see* 732 F.2d 949—remains instructive here.  *See* Pl.'s Mot. at 10–11.  In that case, Congress established "[t]he Commission on Civil Rights [as] a temporary, bipartisan agency" to be "composed of six members, appointed by the President, by and with the advice and consent of the Senate." *Berry*, 1983 WL 538, at *1.  The commissioners were to serve for a fixed term set to "expire[] sixty days after submission of [the Commission's] final report and recommendations to the President and to Congress." *Id.*  Three years after their appointments, President Reagan notified the commissioners of their termination, and they sought an injunction. *Id.*

---

[4] Defendants cite numerous cases in which courts have declined to issue injunctive relief based on "the deprivation of a unique, singular, or high-level position."  Defs.' Opp'n at 11.  None of these cases involved plaintiffs who enjoyed removal protections enacted by Congress and signed into law by the President.  Courts have found injunctive relief warranted in such situations.  *See Berry*, 1983 WL 538, at *5; *Dellinger*, 2025 WL 471022, at *14.

The *Berry* court proceeded through analysis remarkably similar to that here. The court considered whether the Civil Rights Act of 1957 contained a congressional intent to protect the commissioners' independence under *Humphrey's Executor*. *See id.* *2–4. After concluding that Congress intended the commissioners to serve for the full life of the Commission, the court moved on to consider irreparable harm. *See id.* at *4. The court then looked to *Sampson* to determine if the commissioners' injuries "override the factors militating against the issuance of preliminary relief" in Government personnel actions. *Id.* at *5. The court concluded that the injury was irreparable because denial of preliminary relief would have an "obviously disruptive effect" on "the Commission's final activities." *Id.* "Moreover," the court continued, "it is not clear that the President has the power to remove Commissioners at his discretion and that he should be given the widest latitude to exercise this authority." *Id.* In addition, the commissioners did "not have administrative, statutory, or other relief that is readily available to many federal employees." *Id.*[5] The court then granted the injunction. *Id.* at *6.

One Judge in this Circuit recently issued a temporary restraining order under similar circumstances. *See generally Dellinger*, 2025 WL 471022. In that case, the President terminated Special Counsel Hampton Dellinger, who was appointed to a five-year term to the independent Office of Special Counsel and "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* at *3 (quoting 5 U.S.C. § 1211(b)). The court concluded that these for-cause removal conditions were likely constitutional. *Id.* at *9. Analyzing the irreparable harm, the court also turned to *Sampson* and *Berry*, determining that Dellinger "was appointed for a fixed term, and he has a statutory mission that his removal has rendered him

---

[5] The parties do not discuss what administrative relief may be available to Harris here, so the Court does not consider the issue.

unable to fulfill." *Id.* at *11. "[T]he loss of the ability to do what Congress specifically directed him to do cannot be remediated with anything other than equitable relief." *Id.*

At the motion hearing in this case, Defendants argued that *Dellinger* is incorrect in part because the court there conflated the notion of an agency's statutory right to function with what they say is "essentially an employment action." But *Berry*, *Dellinger*, *Humphrey's Executor*, and *Wiener* together make clear that these cases represent far more than grievances over backpay and routine personnel issues. Like the plaintiffs in *Berry* and *Dellinger*, Harris was appointed to and confirmed as a member of an agency charged with acting with a degree of independence from the President. By vindicating their rights to occupy those offices, these plaintiffs act as much in their own interests as those of their agencies'.[6] The Supreme Court in *Humphrey's Executor* and *Wiener* similarly viewed the plaintiffs before them as vindicating the independence of their agencies and discussed at length the nature of the President's power over those agencies rather than the narrow issue of unpaid salaries. *See, e.g.*, *Humphrey's Executor*, 295 U.S. at 629 (discussing the relative authorities of Congress and the President over independent agencies); *Wiener*, 357 U.S. at 353–56 (same). The plaintiffs in these cases are not low-ranking staff members at those agencies, either—Dellinger was appointed to lead the Office of Special Counsel, and Harris was appointed as one of three members of the MSPB. Striking at the independence of these officials accrues harm to their offices, as well. *See Berry*, 1983 WL 538, at *5 (considering the effect on the federal agency of declining to issue an injunction); *English v. Trump*, 279 F. Supp. 3d 307, 335 (D.D.C. 2018) (same).

---

[6] Indeed, Harris stands before this Court in her personal *and* official capacities. *See* Compl. at 1; *see also* Pl.'s Reply at 4–6, ECF No. 7 (discussing harm to Harris in her official capacity).

With this in mind, the irreparable harm in this case becomes clear.  Were the President able to displace independent agency heads from their positions for the length of litigation such as this, those officials' independence would shatter.  *See* Pl.'s Mot. at 10 ("Simply put, Congress reasonably concluded that the MSPB cannot serve as an independent protector of a merit system if the Members are subject at all times to removal without cause by the President."); Pl.'s Reply at 7, ECF No. 7 ("Allowing Ms. Harris's illegal termination to stand for even a short period would violate the bipartisan, independent nature of the Board.").  Even if this Court were to direct Harris's reinstatement after resolving the merits of her claims—a process that can take some time—the MSPB's congressionally mandated independence would be permanently marred by the threat of renewed removal and delayed reinstatement while litigation proceeds.  *See Humphrey's Executor*, 295 U.S. at 629–30 (explaining that the "coercive influence" of the removal power "threatens the independence of a commission").  Harris would reenter the position as a Chairman of the MSPB who had just been removed from her role for a significant length of time, and "the Damocles' sword of removal by the President," *Wiener*, 357 U.S. at 356, would hang over her and her colleagues.  This harm would accrue in the absence of a temporary restraining order, and the passage of time would both cause this damage and preclude a remedy.  *See Wisc. Gas Co.*, 758 F.2d at 674 (stating that injunctive relief is appropriate when post-hoc "legal remedies" are "inadqeua[te]").  If there ever were an "extraordinary case[]" meriting injunctive relief for a Government employee, *Sampson*, 415 U.S. at 92 n.68, then this would be it.

Assuming that the Defendants' actions are unlawful, *see Chaplaincy of Full Gospel Churches* at 303, Harris additionally suffers irreparable harm because she is at present prevented from chairing the Board following Senate confirmation to that position, *see* Pl.'s Mot. at 10–11.

16

**JA42**

The *Berry* court reasoned that "deprivation" of the plaintiff commissioners' "statutory right to function as Commissioners" following "their unlawful removal from office by the President" represented irreparable harm.  1983 WL 538, at *5.  So too did the Special Counsel in *Dellinger* suffer irreparable harm by the inability to fulfill his "statutory mission" to protect employees from prohibited personnel practices, such that "the loss of the ability to do what Congress specifically directed him to do cannot be remediated with anything other than equitable relief." *Dellinger*, 2025 WL 471022, at *11.  MSPB members are similarly charged with protecting federal employees from prohibited practices, *see* 5 U.S.C. § 1204, and subtracting time from Harris's congressionally mandated seven-year term prevents her from carrying out the duties Congress has assigned to her.

Furthermore, Defendants contend that because Harris has been removed from office and seeks to return, she can suffer no injury in her capacity as a member of the MSPB.  *See* Defs.' Opp' at 10 (arguing that Harris "seek[s] judicial reinstatement to a principal office"); *id.* at 11 (comparing Harris's situation to those of government employees lacking tenure protections). This puts the cart before the horse.  First, assuming that the President lacked the power to terminate Harris without cause, then she rightfully remains a Senate-confirmed member of the MSPB.  *See Humphrey's Executor* at 629 (holding that the removal "power does not extend to an office such as that here involved").  Defendants thus conflate wrongful termination with the lack of power to effectuate termination—at least without cause.  Second, this position fails to recognize that any later reinstatement of Harris would not restore the state of affairs that existed prior to her purported termination, given that she would not longer serve as a member of a truly independent agency.

17

**JA43**

Defendants contend that Harris "cites no injury of a kind that the Supreme Court has recognized as irreparable in this context." Def.'s Mot. at 11 (citing *Sampson*, 415 U.S. at 92 & n.6). They aver that "court after court in this Circuit and others has concluded that loss of employment does not constitute irreparable harm." *Id.* Indeed, it is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wisc. Gas Co.*, 758 F.2d at 674. Yet courts often reach this conclusion based on the notion that a wrongfully discharged employee may be entitled to back pay. *See, e.g.*, *id.* (reasoning that "adequate compensatory or other corrective relief [may] be available at a later date"); *Sampson*, 415 U.S. at 90; *Davenport v. Int'l Bhd. of Teamsters, AFL-CIO*, 166 F.3d 356, 367 (D.C. Cir. 1999); *Williams v. Walsh*, 619 F. Supp. 3d 48, 63–64 (D.D.C. 2022). That is not the issue in this case. Harris does not seek compensatory damages, but rather complains of injury arising from her inability to occupy a position at an independent agency following her presidential appointment and Senate confirmation.

Defendants additionally cite *English v. Trump* for the notion that "'any such harm' to Plaintiff coming solely from her not functioning as a Member of the MSPB 'can be remediated in the ordinary course of this case.'" Defs.' Opp'n at 12 (quoting *English*, 279 F. Supp. at 335). In *English*, the CFPB Director resigned, he appointed his Deputy to take his place, and an apparent conflict arose between two statutes governing succession at the agency. *English*, 279 F. Supp. at 319. One provision of the Dodd-Frank Act stated that the CFPB Deputy Director would "serve as acting Director in the absence or unavailability of the Director." *Id.* (quoting 12 U.S.C. § 5491(b)(5)(B)). The Federal Vacancy Reform Act ("FVRA"), however, also grants the President the power to appoint acting officers either from within a federal agency or from a different agency if the official is Senate-confirmed. *See id.* at 312. The *English* court

determined that the two statutes could be read to avoid a conflict, such that the Dodd-Frank Act provided a default rule that the President may override under the FVRA. *Id.* at 319. Even assuming that the Deputy Director were likely to prevail, however, the court found no irreparable harm because CFPB would continue to operate, and the Deputy Director never functioned as the CFPB's acting director. *See id.* at 334 (distinguishing *Berry*).

*English* does not guide the outcome here for at least three reasons. First, Harris was duly appointed to her position at the MSPB. In contrast, the Deputy Director in *English* was not Senate-confirmed to carry out specific duties and never occupied the position of acting Director. *See id.* at 335; *see also Dellinger*, 2025 WL 471022, at *12. The Deputy Director was instead denied the opportunity to fill a role in the context of a statutory conflict between the Dodd-Frank Act and the FVRA, and she was not attempting to preserve the status quo. *See English*, 279 F. Supp. at 335; *see also Dellinger*, 2025 WL 471022, at *12. Second, Harris was terminated from her Senate-confirmed position without cause, while the Deputy Director was not fired from any position, much less one from which she could be removed solely for cause. *See English*, 279 F. Supp. at 313–15. Finally, Harris's termination from the MSPB has foreclosed her ability to carry out the agency's mission, whereas the Deputy Director remained in place at the CFPB. *See id.* at 334.[7]

For the foregoing reasons, the Court finds that Harris has demonstrated a likelihood that she will experience irreparable harm that cannot be remedied by her reinstatement once the merits have been decided.[8]

---

[7] The parties additionally appeal to *Mackie v. Bush*, 809 F. Supp. 144 (D.D.C.), to support their respective positions. *See* Pl.'s Mot. at 11; Defs.' Opp'n at 12–13. *Mackie* is inapplicable here for the reasons articulated in *Dellinger*. *See Dellinger*, 2025 WL 471022, *11 n.6.

[8] The Court does not, at present, find the threat of Harris's replacement to represent

## C.  Balance of the Equities and Public Interest

Harris argues that the balance of the equities and public interest weigh in her favor because the Government's recent flurry of personnel actions has led to uncertainty that requires stability at the MSPB.  Pl.'s Mot. at 12.  Defendants respond that the public interest counsels against injunctive relief, which would "intru[de] into the President's authority to exercise 'all of' the 'executive Power' of the United States."  Defs.' Opp'n at 13–14.

Given that federal law limits the conditions under which Harris's tenure may be terminated, Supreme Court precedent supports the constitutionality of those conditions, and Defendants do not argue that those conditions were met here, the Court finds that it is in the public interest to issue injunctive relief.  "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  So too is there substantial public interest in the protections from removal Congress has given to certain members of independent agencies.  Furthermore, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

## V.  CONCLUSION

For the foregoing reasons, Plaintiff Cathy A. Harris's Motion for Temporary Restraining Order is **GRANTED**; and it is

---

irreparable injury, as she does not establish that the President is "likely" to nominate a replacement "in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted); *see* Defs.' Opp'n at 13 (citing *English*, 279 F. Supp. 3d at 335).

**JA46**

**FURTHER ORDERED** that from the date of entry of this Court's Order until the Court rules on a preliminary injunction, Plaintiff Cathy A. Harris shall continue to serve as Chairman of the MSPB. Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from removing Harris from her office or in any way treating her as having been removed, denying or obstructing Harris's access to any of the benefits or resources of her office, placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the MSPB in Harris's position, pending further order of the Court; and it is

**FURTHER ORDERED** that Harris shall file any motion for a preliminary injunction on or before February 23, 2025. Defendants shall file any opposition on or before February 28, 2025. Harris shall file any reply on or before March 2, 2025; and it is

**FURTHER ORDERED** that the parties shall appear for a hearing on the motion for preliminary injunction, if such a motion is filed, on March 3, 2025, at 2:00 p.m., and that the Court will rule on the preliminary injunction as soon as possible thereafter; and it is

**FURTHER ORDERED** that the parties shall meet, confer, and submit a joint status report, on or before February 19, 2025, informing the Court of their respective positions on whether consideration of the motion for preliminary injunction should be consolidated with the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: February 18, 2025                                    RUDOLPH CONTRERAS
                                                           United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS,

                *Plaintiff,*

*v.*                                                        Civil Action No. 1:25-cv-00412-RC

SCOTT BESSENT, *et al.,*

                *Defendants.*

## DEFENDANTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's Memorandum Opinion and Order granting Plaintiff's Motion for a Temporary Restraining Order. *See* ECF Nos. 8, 9.

Dated: February 20, 2025                    Respectfully submitted,

BRETT A. SHUMATE
*Principal Deputy Assistant Attorney General*

CHRISTOPHER R. HALL
*Assistant Branch Director*

*/s/ Madeline M. McMahon*
MADELINE M. MCMAHON
(DC Bar No. 1720813)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 451-7722
Email: madeline.m.mcmahon@usdoj.gov

*Counsel for Defendants*

1

**JA48**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS, in her personal capacity
and in her official capacity as Member of the
Merit Systems Protection Board,

                Plaintiff,

        -against-                     Civil Case No. 1:25-cv-00412-RC

SCOTT BESSENT, in his official capacity as
Secretary of the Treasury, TRENT MORSE,
in his official capacity as Deputy Assistant to
the President and Deputy Director of the
White House Presidential Personnel Office,
SERGIO GOR, in his official capacity as
Director of the White House Presidential
Personnel Office, HENRY J. KERNER, in his
official capacity as Acting Chairman of the
Merit Systems Protection Board, DONALD J.
TRUMP, in his official capacity as President
of the United States of America, RUSSELL
VOUGHT, in his official capacity as Director
of the Office of Management and Budget,

                Defendants.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Local Rule 7(h), Plaintiff hereby submits this Statement of Material Facts Not

in Dispute in conjunction with her motion for preliminary injunction and judgment on the merits.

1.      In January 2022, President Biden nominated Plaintiff Cathy Harris to be a member

of the Merit Systems Protection Board in January 2022.  Ex. 1 at ⁋2.

2.      The Senate confirmed Plaintiff on May 25, 2022, and she was sworn in on June 1,

2022. Ex. 1 at ⁋2; William Spencer, *MSPB Welcomes Acting Chairman Cathy A. Harris*, U.S.

Merit Systems Protection Board (June 6, 2022),

https://www.mspb.gov/publicaffairs/press_releases/Cathy_Harris_Press_Release_1930967.pdf.

3.  Harris's current term expires on March 1, 2028.  Ex. 1 at ¶2.

4.  Shortly after being sworn in, President Biden designated Plaintiff as Vice Chairman, and she served as Acting Chairman of the Board until March 6, 2024, when the Senate confirmed her as Chairman.  Ex. 1 at ¶3.

5.  Harris was sworn in as Chairman of the Board on March 14, 2024. Ex. 1 at ¶3; William Spencer, *New MSPB Chairman and Vice Chairman*, U.S. Merit Systems Protection Board (Mar. 14, 2024), https://www.mspb.gov/publicaffairs/press_releases/New_MSPB_Chairman _and_Vice%20Chairman.pdf.

6.  On February 11, 2025, Ms. Harris received an email from Trent Morse, Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, which stated in its entirety: "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately. Thank you for your service[.]"  Ex. 1 at ¶15; Ex. 2.

7.  The one-sentence email does not allege any inefficiency, neglect of duty, or malfeasance in office.  Ex. 2.

8.  During her time as a member of the Board, Harris has been extremely efficient and effective.  Ex. 1 at ¶¶4-14, 18-22.

9.  As a member of the Board since June 1, 2022, Ms. Harris has deliberated and voted on cases at the Board's appellate level, which are mostly on "petitions for review." Ex. 1 at ¶6.

10.  From June 1, 2022, through the date of the termination (February 10, 2025), Ms. Harris participated in approximately 4,472 decisions. Ex. 1 at ¶6.

**JA50**

11.     As of the date of the termination, there were approximately 70 additional cases that had been voted by the three Board members and pending issuance by the Board's staff. Ex. 1 at ⁋6.

12.     When the Board lost its quorum between January 7, 2017, and March 3, 2022, the Board could not vote on any petitions for review. At the time the quorum was restored on March 4, 2022, the new Board, consisting of Tristan Leavitt and Raymond Limon, inherited a caseload of 3,793 cases. The Board have referred to this as the "inherited inventory." Ex. 1 at ⁋7.

13.     Between March 4 and June 1, 2022, the other Board members began issuing decisions. They issued about 225 decisions before Ms. Harris's arrival. Ex. 1 at ⁋8.

14.     When she arrived at the Board in June 2022, Ms. Harris was informed that it was predicted that it would take 5-6 years to clear the remaining inherited inventory. Ex. 1 at ⁋9.

15.     Ms. Harris determined that the Board needed to try to clear the inherited inventory much sooner. Ms. Harris set a target that we would clear the inherited inventory by the end of 2025, if not sooner. Ex. 1 at ⁋9.

16.     The Board has provided statistics at the end of each month to show the progress with the inherited inventory. *See* https://www.mspb.gov/foia/files/HQ_Case_Processing_Data.pdf. Ex. 1 at ⁋10.

17.     Between the restoration of the quorum and the end of the 2022 fiscal year, the Board decided 528 cases, which included both inherited inventory headquarters (HQ) cases as well as HQ cases docketed after the restoration of the quorum. At that point, there was 87% of the inherited inventory remaining. Ex. 1 at ⁋11.

**JA51**

18.    By the end of the FY 2023, the Board had decided a total of 2,027 cases since the quorum was restored. At that point, there was 50% of the inherited inventory remaining. Ex. 1 at ₱12.

19.    By the end of FY 2024, the Board had decided 4,368 cases since the quorum was restored. This left only 6% of the inherited inventory remaining. Ex. 1 at ₱13.

20.    By the end of January 2025, the Board had decided 4620 cases. This left only 56 inherited inventory cases, representing only 1% of the inherited inventory. Ex. 1 at ₱14.

21.    As of Friday, February 7, 2025, the Board had 44 inherited inventory cases remaining. As of Friday, February 21, 2025, the Board had 32 inherited inventory cases remaining. Ex. 1 at ₱15.

22.    In addition to deciding the inherited inventory cases, the Board has also worked to decide newly-filed appellate-level cases. Ex. 1 at ₱16.

23.    Historically, about 400-600 cases are filed each year at the appellate level. Ex. 1 at ₱16.

24.    The Board decided that, in addition to deciding the oldest cases pending before the Board, the Board would decide newly-incoming cases so that a perpetual backlog would not be created. Ex. 1 at ₱16.

25.    Between February 11, 2025, and February 18, 2025, the Board did not issue any Board-level decisions. The Board resumed issuance of such decisions on February 19, 2025. Ex. 1 at ₱17.

26.    Generally, the issued cases are available on the Board's website the next business day. See, e.g., https://www.mspb.gov/decisions/nonprecdec.htm (non-precedential decisions); https://www.mspb.gov/decisions/precdec.htm (precedential decisions). Ex. 1 at ₱17.

**JA52**

27.    After Ms. Harris was appointed and confirmed as a member, and once Ms. Harris became acclimated to the job at the Board, she sought to consider, deliberate, and vote on approximately 35 cases per week. Some weeks were higher, some lower. Some cases were more complex or required more extensive deliberations. Ex. 1 at ¶18.

28.    Ms. Harris encouraged her fellow Board members to have the same goal of 35 cases per week, if possible. Ex. 1 at ¶18.

29.    To reach a decision on a case, the attorneys in the Board's Office of Appeals Counsel (OAC), prepare a draft decision for consideration by the Board members. Ex. 1 at ¶19.

30.    Ms. Harris typically reviews materials prepared by OAC counsel as well as relevant portions of the hearing-level record from the initial appeal stage of the case. The hearing-level record can be quite voluminous. Ex. 1 at ¶19.

31.    At times, Ms. Harris has adopted the draft decision from OAC. At other times, she has revised the draft decision, written an entirely new decision, or recommended to the other Board members that they send the case back to OAC for a rewrite. At times, multiple alternative decisions are exchanged until consensus is reached by the Board members. Ex. 1 at ¶19.

32.    To maximize the efficiency of the Board's decisions, the Board deployed a Case Review Update team to review and revise the draft decisions that had been drafted by the OAC attorneys during the lack of quorum. Because of changes in the law that had occurred during the lack of quorum, many of the previously drafted decisions had to be updated. Ex. 1 at ¶20.

33.    The Board also determined that it would be most efficient to focus on the cases that would likely be precedential decisions, so that other cases that might rely on such precedent could flow afterward and be more efficiently processed. Ex. 1 at ¶21.

**JA53**

34.    Before Ms. Harris's arrival, the other Board members issued 15 precedential decisions. Ex. 1 at ⁋21.

35.    Between June 1, 2022 and September 30, 2022, the Board issued an additional 18 precedential decisions. Ex. 1 at ⁋21.

36.    In FY 2023, the Board issued 37 precedential decisions. Ex. 1 at ⁋21.

37.    In FY 2024, the Board issued 13 precedential decisions. Ex. 1 at ⁋21.

38.    So far, in FY 2025, the Board has issued 9 precedential decisions. Ex. 1 at ⁋21.

39.    In terms of the volume of overall decisions, both precedential and non-precedential, before the loss of quorum, the Board issued 207 cases at the appellate-level in FY 2017 before it lost its quorum. Ex. 1 at ⁋22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2017_Annual_Report_1481375.pdf at 13.

40.    The Board issued decisions in 1,180 cases in FY 2016. Ex. 1 at ⁋22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2016_Annual_Report_1374269.pdf at 15.

41.    The Board issued decisions in 3,120 cases in FY 2015, an unusual year in which mass furloughs were conducted in the federal government. Ex. 1 at ⁋22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2015_Annual_Report_1275851.pdf at 15.

42.    The Board issued decisions in 1,101 cases in FY 2014. Ex. 1 at ⁋22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2014_Annual_Report_1179694.pdf at 15.

43.    The Board issued decisions in 952 cases in FY 2013. Ex. 1 at ⁋22; https://www.mspb.gov/about/annual_reports/MSPB_FY_2013_Annual_Report_1038222.pdf.

44.     The Board does not establish policy other than policies regarding its own staff and operations and has no rulemaking authority.   Ex. 1 at ⁋23.

45.     The Board is also neither an investigative nor prosecutorial agency. Ex. 1 at ⁋24.

46.     The Board performs no investigations of external parties and does not prosecute cases. Ex. 1 at ⁋24.

47.     The Board does not investigate allegations of wrongdoing brought by federal employees in the first instance; rather, it adjudicates appeals brought by federal employees who have been subject to an adverse action, or who bring an individual right of action alleging whistleblower retaliation after first bringing such allegations for investigation to the Office of Special Counsel (OSC). Ex. 1 at ⁋24.

48.     Rarely, the Board also adjudicates appeals brought to it by agencies, such as in the case of discipline sought against administrative law judges, or in Hatch Act cases brought by OSC. Ex. 1 at ⁋24.

49.     The Board does not initiate disciplinary actions against federal employees (with the exception of disciplinary actions against Board employees, when appropriate). Ex. 1 at ⁋24.

50.     The Board has no enforcement units, such as a Hatch Act unit or a USERRA unit, like OSC has. Rather, the Board adjudicates cases brought before the Board under the Hatch Act and USERRA. Ex. 1 at ⁋24.

51.     The Board does not order other agencies to conduct investigations or to produce written reports. Ex. 1 at ⁋24.

52.     The Board is a multi-member, bi-partisan tribunal, consisting of three members. The President may nominate a Chairman, who must be confirmed by the Senate. The President

may also appoint a Vice Chairman, who is not subject to Senate confirmation. In the absence of a confirmed Chairman, the Vice Chairman may serve as Acting Chairman. Ex. 1 at ¶25.

53.    As a member of the Board, Ms. Harris cannot issue adjudication decisions unilaterally. Rather, there must be a quorum, consisting of at least two Board members, to issue a decision. The decisions are voted on by all of the Board members. There may be dissents, split decisions, concurrences, and recusals. Ex. 1 at ¶26.

54.    During Ms. Harris's tenure, over 95% of the decisions (not including any recusals) have been unanimous. Ex. 1 at ¶26.

55.    During her tenure with the Board, Ms. Harris estimates that over 95% of the time spent working by a Board member is devoted to adjudicating cases before the Board. Ex. 1 at ¶27.

56.    The Chairman, who is the "chief executive and administrative officer of the Board," 5 U.S.C. § 1203(a), acts on behalf of the Board with respect to most administrative and operational matters, and spends additional time on internal administrative matters such as Board personnel matters, labor-management relations, hiring, IT (including the Board's new e-Appeal system), security, strategic planning, and MSPB budgetary issues.  Ex. 1 at ¶27.

57.    The Chairman supervises the Executive Director and the EEO Director. Ex. 1 at ¶27.

58.    The agency's Performance Improvement Officer is housed within the Chairman's office. Ex. 1 at ¶27.

59.    The Chairman also selects and hires the General Counsel of the agency. The Chairman is the official who responds on behalf of the agency to FOIA and Privacy Act appeals made by external parties. Ex. 1 at ¶27.

8

60.    The Board does not dictate or enforce policies regarding the federal workforce. That power is entrusted to the Office of Personnel Management. Ex. 1 at ¶28.

61.    5 U.S.C. § 1204(a)(2) provides that the Board shall "order any Federal agency or employee to comply with any order or decision issued by the Board under the authority granted under paragraph (1) of this subsection and enforce compliance with any such order." This is similar to the powers of a court to issue orders and is in no way a prosecutorial function. Ex. 1 at ¶29.

62.    5 U.S.C. § 1204(a)(3) provides that the Board shall "conduct, from time to time, special studies relating to the civil service and to other merit systems in the executive branch, and report to the President and to the Congress as to whether the public interest in a civil service free of prohibited personnel practices is being adequately protected." These studies are recommendations provided to Congress and the President and are similar to the studies conducted by the legislative Congressional Research Service. The Board's studies have no authoritative force of law and are not enforced by the Board. All of the Board members vote on whether the studies are released to Congress and the President, and are not subject to any unilateral action by any one Board member. This is a very limited duty and has taken up less than 1% of the working time spent by Ms. Harris. Ex. 1 at ¶30.

63.    5 U.S.C. § 1204(a)(4) provides that the Board shall "review, as provided in subsection (f), rules and regulations of the Office of Personnel Management." Subsection (f) provides that the Board may review such rules and regulations "on its own motion," "on the granting by the Board . . . of any petition for review filed with the Board by any interested person," or "on the filing of a written complaint by the Special Counsel seeking such review." These reviews are done through an adjudicative review process. The Board may declare such rules or regulations invalid on its face only under very limited circumstances, i.e. if the rule or regulation "on its face"

9

requires any employee to violate 5 U.S.C. § 2302(b). The Board may declare a rule or regulation "invalidly implemented by any agency" if it its implementation required any employee to violate section 2302(b). Ms. Harris cannot recall any such instances occurring during her tenure, and her understanding is that this is an exceedingly rare occurrence. Ex. 1 at ¶31.

64.     The Board's decisions are subject to judicial review. Ex. 1 at ¶32.

65.     Pursuant to 5 U.S.C. § 7703(a), an employee may appeal to an Article III court, which is generally but not always the Federal Circuit. Ex. 1 at ¶32.

66.     Pursuant to 5 U.S.C. § 7703(d), the Director of the Office of Personnel Management may also petition a federal court, which is generally but not always the Federal Circuit, to review decisions by the Board. Ex. 1 at ¶32.

67.     The Board may be a named defendant before a court in two circumstances.  First, if the Board issues a decision on a procedural or jurisdictional basis, the Board will be a defendant, and the Board's attorneys will appear in court (with the exception that the Solicitor General represents the Board before the Supreme Court).  This ensures the Board's expert attorneys can provide their specialized knowledge in procedurally and jurisdictionally complex cases.  Second, if the Director of the Office of Personnel Management petitions for review, the Board will be a named defendant.  This ensures the Board's attorneys can provide the court the Board's perspective on the matter.  Finally, the Board will also be a plaintiff before a court when it requests that court to enforce a subpoena issued by the Board.  That is a very rare occurrence, and Ms. Harris is aware of no instances in which this has occurred during her tenure. The Board is otherwise not a party in court and does not litigate before courts. Ex. 1 at ¶33.

68.     The Board has seen an increase in new filings this year. Ex. 1 at ¶34.

10

**JA58**

69.     While ordinarily the MSPB will receive about 400 new appeals per month at the regional level, during the time period from February 9-20, 2025, the MSPB received more than 1,600 new appeals. Ex. 1 at ¶34.

Respectfully submitted,

Dated: February 23, 2025
Washington, D.C.

/s/ Jeremy D. Wright
MICHAEL J. KATOR, D.C. Bar No. 366936
JEREMY D. WRIGHT, D.C. Bar No. 483297
KERRIE D. RIGGS, D.C. Bar No. 995784
KATOR, PARKS, WEISER & WRIGHT,
    P.L.L.C.
1150 Connecticut Ave., NW, Suite 705
Washington, DC 20036
(202) 898-4800
(202) 289-1389 (fax)
mkator@katorparks.com
jwright@katorparks.com
kriggs@katorparks.com

LINDA M. CORREIA, D.C. Bar No. 435027
CORREIA & PUTH, PLLC
1400 16th Street, NW, Suite 450
Washington, D.C. 20036
(202) 602-6500
lcorreia@correiaputh.com

NEAL KUMAR KATYAL, D.C. Bar No. 462071
   *pro hac vice application pending*
NATHANIEL A.G. ZELINSKY, D.C. Bar No. 1724093
   *pro hac vice application pending*
EZRA P. LOUVIS, D.C. Bar No. 90005185
   *pro hac vice application pending*
MILBANK LLP
1850 K St., NW
Suite 1100
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com
nzelinsky@milbank.com
elouvis@milbank.com

*Attorneys for Plaintiff Cathy A. Harris*

**JA60**

## DECLARATION OF CATHY A. HARRIS

I, Cathy A. Harris, hereby declare:

1. I have served as a member of the Merit Systems Protection Board (MSPB or Board) since June 1, 2022.

2. On or about June 24, 2021, President Biden nominated me to be a member and Chairman of the MSPB. I was renominated by President Biden to be a member of the MSPB on January 4, 2022. The Senate confirmed my nomination as a member to the MSPB on May 25, 2022. I was sworn in as a member of the Board on June 1, 2022. My term as a member of the MSPB expires on March 1, 2028.

3. President Biden designated me as Vice Chairman of the MSPB on June 6, 2022, and I served as Acting Chairman of the MSPB until March 6, 2024. The Senate confirmed me as Chairman of the MSPB on March 6, 2024, and I was sworn in as Chairman of the MSPB on March 14, 2024.

4. Early in the morning on February 11, 2025, I saw an email from Trent Morse from the White House Office of Presidential Personnel. The email indicated that it was sent on February 10, 2025, at 10:49 PM. The email stated, "On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately." A true and correct copy of the email that I received is attached as Exhibit 2.

5. I did not perform any Board work after I received the email until the Court issued its TRO order on February 18, 2025. On February 19, 2025, I resumed deliberating and voting on cases.

6. In my role as a member of the Board since June 1, 2022, I deliberate and vote on cases at the Board's appellate level, which are mostly on "petitions for review." Since June 1, 2022, through the date I was terminated (February 10, 2025), I participated in approximately 4,472 decisions. As of the date of my termination, there were approximately 70 additional cases that have been

voted by the three Board members and pending issuance by the Board's staff.

7.  When the Board lost its quorum between January 7, 2017, and March 3, 2022, the Board could not vote on any petitions for review. At the time the quorum was restored on March 4, 2022, the new Board, consisting of Tristan Leavitt and Raymond Limon, inherited a caseload of 3,793 cases. We have referred to this as the "inherited inventory."

8.  I joined the Board on June 1, 2022. Between March 4 and June 1, 2022, the other Board members began issuing decisions. They issued about 225 decisions before my arrival.

9.  When I arrived at the Board in June 2022, I was informed that it was predicted that it would take 5-6 years to clear the remaining inherited inventory. I determined that we needed to try to clear the inherited inventory much sooner. I set a target that we would clear the inherited inventory by the end of 2025, if not sooner.

10. The Board provides statistics at the end of each month to show the progress with the inherited inventory. *See* https://www.mspb.gov/foia/files/HQ_Case_Processing_Data.pdf.

11. Between the restoration of the quorum and the end of the 2022 fiscal year, the Board decided 528 cases, which included both inherited inventory headquarters (HQ) cases as well as HQ cases docketed after the restoration of the quorum. At that point, there was 87% of the inherited inventory remaining.

12. By the end of the FY 2023, we had decided a total of 2,027 cases since the quorum was restored. At that point, there was 50% of the inherited inventory remaining. We were well ahead of the goal to clear the inherited inventory by the end of 2025.

13. By the end of FY 2024, we had decided 4,368 cases since the quorum was restored. This left us with only 6% of the inherited inventory.

14. By the end of January 2025, we had decided 4620 cases. This left us with only 56 inherited inventory cases, representing only 1% of the inherited inventory.

15. As of Friday, February 7, 2025, the Board had 44 inherited inventory cases remaining. As of Friday, February 21, 2025, the Board had 32 inherited inventory cases remaining.

16. In addition to deciding the inherited inventory cases, the Board has also worked to decide newly-filed appellate-level cases. Historically, about 400-600 cases are filed each year at the appellate level. We decided that, in addition to deciding the oldest cases pending before the Board, we would decide newly-incoming cases so that a perpetual backlog would not be created. This proved to be quite efficient.

17. Between February 11, 2025, and February 18, 2025, the Board did not issue any Board-level decisions. The Board resumed issuance of such decisions on February 19, 2025. Generally, the issued cases are available on the Board's website the next business day. *See, e.g.,* https://www.mspb.gov/decisions/nonprecdec.htm (non-precedential decisions); https://www.mspb.gov/decisions/precdec.htm (precedential decisions).

18. After I was appointed and confirmed as a member, and once I became acclimated to the job, I sought to consider, deliberate, and vote on approximately 35 cases per week. Some weeks were higher, some lower. Some cases were more complex or required more extensive deliberations. I encouraged my fellow Board members to have the same goal of 35 cases per week, if possible.

19. To reach a decision on a case, the attorneys in the Board's Office of Appeals Counsel (OAC), prepare a draft decision for consideration by the Board members. I typically review materials prepared by OAC counsel as well as relevant portions of the hearing-level record from the initial appeal stage of the case. The hearing-level record can be quite voluminous. At times, I adopt the draft decision from OAC. At other times, I revise the draft decision,

write an entirely new decision, or recommend to my fellow Board members that we send the case back to OAC for a rewrite. At times, multiple alternative decisions are exchanged until consensus is reached by the Board members.

20. To maximize the efficiency of our decisions, we deployed a Case Review Update team to review and revise the draft decisions that had been drafted by the OAC attorneys during the lack of quorum. Because of changes in the law that had occurred during the lack of quorum, many of the previously drafted decisions had to be updated.

21. We also determined that it would be most efficient for us to focus on the cases that would likely be precedential decisions, so that other cases that might rely on such precedent could flow afterward and be more efficiently processed. Therefore, before my arrival, the other Board members issued 15 precedential decisions. Between June 1, 2022 and September 30, 2022, we issued an additional 18 precedential decisions. In FY 2023, we issued 37 precedential decisions. In FY 2024, we issued 13 precedential decisions. So far, in FY 2025, we have issued 9 precedential decisions.

22. In terms of the volume of overall decisions, both precedential and non-precedential, before the loss of quorum, the Board issued 207 cases at the appellate-level in FY 2017 before it lost its quorum; 1,180 cases in FY 2016; 3,120 cases in FY 2015, an unusual year in which mass furloughs were conducted in the federal government; 1,101 cases in FY 2014; and 952 cases in FY 2013. *See* https://www.mspb.gov/about/annual_reports/MSPB_FY_2017_Annual_Report_1481375.pdf at 13; https://www.mspb.gov/about/annual_reports/MSPB_FY_2016_Annual_Report_1374269.pdf at 15; https://www.mspb.gov/about/annual_reports/MSPB_FY_2015_Annual_Report_1275851.pdf at 15; https://www.mspb.gov/about/annual_reports/MSPB_FY_2014_Annual_Report_1179694.pdf at 15;

**JA64**

https://www.mspb.gov/about/annual_reports/MSPB_FY_2013_Annual_Report_1038222.pdf.

23. The Board does not establish policy other than policies regarding its own staff and operations and has no rulemaking authority.

24. The Board is also neither an investigative nor prosecutorial agency. The Board performs no investigations of external parties and does not prosecute cases. The Board does not investigate allegations of wrongdoing brought by federal employees in the first instance; rather, it adjudicates appeals brought by federal employees who have been subject to an adverse action, or who bring an individual right of action alleging whistleblower retaliation after first bringing such allegations for investigation to the Office of Special Counsel (OSC). Rarely, the Board also adjudicates appeals brought to it by agencies, such as in the case of discipline sought against administrative law judges, or in Hatch Act cases brought by OSC. The Board does not initiate disciplinary actions against federal employees (with the exception of disciplinary actions against Board employees, when appropriate). The Board has no enforcement units, such as a Hatch Act unit or a USERRA unit, like OSC has. Rather, the Board adjudicates cases brought before the Board under the Hatch Act and USERRA. The Board does not order other agencies to conduct investigations or to produce written reports.

25. The Board is a multi-member, bi-partisan tribunal, consisting of three members. The President may nominate a Chairman, who must be confirmed by the Senate. The President may also appoint a Vice Chairman, who is not subject to Senate confirmation. In the absence of a confirmed Chairman, the Vice Chairman may serve as Acting Chairman.

26. As a member of the Board, I cannot issue adjudication decisions unilaterally. Rather, there must be a quorum, consisting of at least two Board members, to issue a decision. The decisions are voted on by all of the Board members. There may be dissents, split decisions, concurrences, and recusals. However, during my tenure, over 95% of the decisions (not including any recusals) have been unanimous.

27. During my tenure with the Board, I estimate that over 95% of the time spent working by a Board member is devoted to adjudicating cases before the Board. The Chairman, who is the "chief executive and administrative officer of the Board," 5 U.S.C. § 1203(a), acts on behalf of the Board with respect to most administrative and operational matters, and spends additional time on internal administrative matters such as Board personnel matters, labor-management relations, hiring, IT (including the Board's new e-Appeal system), security, strategic planning, and MSPB budgetary issues.  The Chairman supervises the Executive Director and the EEO Director. The agency's Performance Improvement Officer is housed within the Chairman's office. The Chairman also selects and hires the General Counsel of the agency. The Chairman is the official who responds on behalf of the agency to FOIA and Privacy Act appeals made by external parties.

28. The Board does not dictate or enforce policies regarding the federal workforce. That power is entrusted to the Office of Personnel Management.

29. 5 U.S.C. § 1204(a)(2) provides that the Board shall "order any Federal agency or employee to comply with any order or decision issued by the Board under the authority granted under paragraph (1) of this subsection and enforce compliance with any such order." This is similar to the powers of a court to issue orders and is in no way a prosecutorial function.

30. 5 U.S.C. § 1204(a)(3) provides that the Board shall "conduct, from time to time, special studies relating to the civil service and to other merit systems in the executive branch, and report to the President and to the Congress as to whether the public interest in a civil service free of prohibited personnel practices is being adequately protected." These studies are prepared by the Board's Office of Policy and Evaluations, and are recommendations provided to Congress and the President and are similar to the studies conducted by the legislative Congressional Research Service. The Board's studies have no authoritative force of law and are not enforced by the Board. All of the Board members vote on whether the studies are released to Congress and the President, and are not subject to any unilateral action by

any one Board member. This is a very limited duty and has taken up less than 1% of my time.

31. 5 U.S.C. § 1204(a)(4) provides that the Board shall "review, as provided in subsection (f), rules and regulations of the Office of Personnel Management." Subsection (f) provides that the Board may review such rules and regulations "on its own motion," "on the granting by the Board . . . of any petition for review filed with the Board by any interested person," or "on the filing of a written complaint by the Special Counsel seeking such review." Thus, these reviews are done through an adjudicative review process. The Board may declare such rules or regulations invalid on its face only under very limited circumstances, i.e. if the rule or regulation "on its face" requires any employee to violate 5 U.S.C. § 2302(b). The Board may declare a rule or regulation "invalidly implemented by any agency" if its implementation required any employee to violate section 2302(b). I cannot recall any such instances occurring during my tenure, and my understanding is that this is an exceedingly rare occurrence.

32. The Board's decisions are subject to judicial review. Pursuant to 5 U.S.C. § 7703(a), an employee may appeal to an Article III court, which is generally but not always the Federal Circuit. Pursuant to 5 U.S.C. § 7703(d), the Director of the Office of Personnel Management may also petition a federal court, which is generally but not always the Federal Circuit, to review decisions by the Board.

33. By statute, the Board may be a named defendant before a court in two circumstances. First, if the Board issues a decision on a procedural or jurisdictional basis, the Board will be a defendant, and the Board's attorneys will appear in court (with the exception that the Solicitor General represents the Board before the Supreme Court). This ensures the Board's expert attorneys can provide their specialized knowledge in procedurally and jurisdictionally complex cases. Second, if the Director of the Office of Personnel Management petitions for review, the Board will be a named defendant. This ensures the Board's attorneys can provide the court the Board's perspective on the matter. Finally, the Board will also be a plaintiff

before a court when it requests that court to enforce a subpoena issued by the Board. However, that is a very rare occurrence, and I am aware of no instances in which this has occurred during my tenure. The Board is otherwise generally not a party in court and does not litigate before courts.

34. The Board has seen an increase in new filings this year. While ordinarily the MSPB will receive about 400 new appeals per month at the regional level, during the time period from February 9-20, 2025, the MSPB received more than 1,600 new appeals.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.


_Cathy Harris_
Cathy A. Harris

2/23/2025
Date

**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Monday, February 10, 2025 10:49:52 PM
**To:** Harris, Cathy <Cathy.Harris@mspb.gov>
**Cc:** Office of General Counsel <OfficeofGeneralCounsel@mspb.gov>
**Subject:** Notice from the Office of Presidential Personnel


Cathy,

On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately.

Thank you for your service,

Trent Morse
Deputy Assistant to the President
Deputy Director of Presidential Personnel
The White House

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| CATHY A. HARRIS, *in her personal capacity and in her official capacity as Member of the Merit Systems Protection Board,* | : : : : | | |
| Plaintiff, | : : | Civil Action No.: | 25-412 (RC) |
| v. | : : | Re Document No.: | 22 |
| SCOTT BESSENT, *in his official capacity as Secretary of the Treasury,* et al., | : : : | | |
| Defendants. | : | | |

## ORDER

### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, Plaintiff Cathy A. Harris's Motion for Summary Judgment (ECF No. 22) is **GRANTED**.  It is hereby:

**DECLARED** that Plaintiff Cathy A. Harris remains a member of the Merit Systems Protection Board, having been confirmed by the Senate on May 25, 2022, and sworn in on June 1, 2022, and that she may be removed by the President prior to the expiration of her term in office only for inefficiency, neglect of duty, or malfeasance in office pursuant to 5 U.S.C. § 1202; and it is

**FURTHER ORDERED** that Plaintiff Cathy A. Harris shall continue to serve as a member of the Merit Systems Protection Board until her term expires pursuant to 5 U.S.C. § 1202, unless she is earlier removed for inefficiency, neglect of duty, or malfeasance in office under that statute.  Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from

removing Harris from her office without cause or in any way treating her as having been

removed without cause, denying or obstructing Harris's access to any of the benefits or resources

of her office, placing a replacement in Harris's position, or otherwise recognizing any other

person as a member of the Merit Systems Protection Board in Harris's position; and it is

 **FURTHER ORDERED** that the Court's Temporary Restraining Order (ECF No. 8) is

**VACATED**.

 **SO ORDERED**.

Dated: March 4, 2025         RUDOLPH CONTRERAS
                 United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS, *in her personal capacity*    :
*and in her official capacity as Member of the*    :
*Merit Systems Protection Board*,    :
                                    :
    Plaintiff,    :    Civil Action No.:    25-412 (RC)
                                    :
    v.    :    Re Document No.:    22
                                    :
SCOTT BESSENT, *in his official capacity as*    :
*Secretary of the Treasury*, *et al.*,    :
                                    :
    Defendants.    :

## MEMORANDUM OPINION

### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff Cathy A. Harris was appointed to the Merit Systems Protection Board ("MSPB") on June 1, 2022, for a term set to expire on March 1, 2028. Federal law states that members of the MSPB may be removed from office "only for inefficiency, neglect of duty, or malfeasance in office." On February 10, 2025, President Donald J. Trump informed Harris that her position on the MSPB was "terminated, effective immediately" but provided no reason for Harris's termination. The following day, Harris filed this lawsuit against President Trump and several other federal officials ("Defendants"), claiming that her termination violated federal law. She moved for a temporary restraining order enjoining Defendants from treating her as removed from office, which this Court granted. The parties consolidated preliminary injunction briefing with the merits, and Harris moved for summary judgment. The Court grants that motion, along with declaratory judgment and a permanent injunction.

## II.  BACKGROUND

### A.  Statutory Background

Congress created the Merit Systems Protection Board as a component of the Civil Service Reform Act of 1978 ("CSRA"), which "establishes a framework for evaluating personnel actions taken against federal employees."  *Kloeckner v. Solis*, 568 U.S. 41, 44 (2012); *see also* CSRA, Pub. L. No. 95-454, § 202, 92 Stat. 1111, 1121–25 (1978) (codified at 5 U.S.C. §§ 1201–05). Congress's Findings and Statement of Purpose indicate that "[i]t is the policy of the United States that . . . to provide the people of the United States with a competent, honest, and productive Federal work force[,] . . . Federal personnel management should be implemented consistent with merit system principles."  CSRA § 3, 92 Stat. at 1112.  Those merit system principles include, among others, "[r]ecruitment . . . from qualified individuals" where "selection and advancement [is] determined solely on the basis of relative ability, knowledge, and skills, after fair and open competition which assures that all receive equal opportunity."  *Id.* § 101, 92 Stat. at 1113 (codified at 5 U.S.C. § 2301).  Congress additionally instructed that "[e]mployees should be . . . protected against arbitrary action, personal favoritism, or coercion for partisan political purposes," as well as "against reprisal for the lawful disclosure of information which the employees reasonably believe evidences," among other things, violations of law, gross waste of funds, an abuse of authority, or substantial and specific dangers to public health or safety.  *Id.*, 92 Stat. at 1114 (codified at 5 U.S.C. § 2301).

The CSRA established the MSPB as "an independent agency consisting of three members" and "charged [it] with protecting the merit system principles and adjudicating conflicts between federal workers and their employing agencies."  *Frazier v. Merit Sys. Prot. Bd.*, 672 F.2d 150, 154 (D.C. Cir. 1982); *see also* CSRA § 101, 92 Stat. at 1114–17 (codified at 5

U.S.C. § 2302) (establishing prohibited personnel practices, such as employment discrimination, unlawful political activities, and any other violations of law within the federal civil service). The Board's primary function is to review federal employee appeals of adverse actions "which [are] appealable to the Board under any law, rule, or regulation," including those related to removal or suspension for periods greater than fourteen days. 5 U.S.C. § 7701(a); *see also id.* § 1204(a)(1). These adjudications consume approximately 95 percent of MSPB members' time. *See* Pl.'s Statement of Undisputed Material Facts ¶ 54 ("SUMF"), ECF No. 22-2. The Board may order federal agencies and employees to comply with its decisions, *see* 5 U.S.C. § 1204(a)(2), which are nonetheless subject to judicial review. *See id.* § 7703. The MSPB thus acts as a preliminary adjudicator of these employment disputes, with federal courts providing the final say if the parties so desire.

The MSPB carries out other limited tasks in pursuit of its mission. It conducts studies "relating to the civil service" for the President and Congress, *see* 5 U.S.C. § 1204(a)(3), although this function takes up less than one percent of members' time, *see* SUMF ¶ 62. The Board may also review "rules and regulations of the Office of Personnel Management," *see id.* § 1204(a)(4), on its own motion, following a complaint from the Special Counsel, or in response to a third party's petition, *see id.* § 1204(f)(1). The MSPB may invalidate the rule or its implementation if it would require a federal employee to engage in prohibited personnel practices. *See id.* § 1204(f)(2).[1]

Members of the MSPB are "appointed by the President, by and with the advice and consent of the Senate," and "not more than 2 of [the members] may be adherents of the same

---

[1] Harris explains that invalidation of an Office of Personnel Management rule under this mechanism "is an exceedingly rare occurrence" that has not happened during her tenure. Harris Decl. ¶ 31, ECF No. 22-3.

3

**JA74**

political party." CSRA § 202 (codified at 5 U.S.C. § 1201). Members of the MSPB are appointed to seven-year terms that may be extended by up to one year if a successor has not yet been appointed. *Id.* (codified at 5 U.S.C. § 1202(a)–(c)). "Any member may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." *Id.* (codified at 5 U.S.C. § 1202(d)).

### B.  Factual and Procedural Background

President Joseph R. Biden nominated Harris to be a member of the MSPB in January 2022. SUMF ¶ 1. The Senate confirmed her on May 25, 2022, and she was sworn in on June 1, 2022. *Id.* ¶ 2. Her term expires on March 1, 2028. *Id.* ¶ 3. The Senate later confirmed Harris as Chairman, and she was sworn in as Chairman on March 14, 2024. *Id.* ¶¶ 4–5.

Defendants do not dispute that Harris has been efficient and effective in her role at the MSPB. *See id.* ¶ 8. When the MSPB's quorum was restored in March 2022, the agency had a backlog of approximately 3,800 cases that had accrued since 2017, and officials estimated that it would take five or six years for the agency to catch up. *Id.* ¶¶ 12–14. By January 2025, however, the MSPB had cleared nearly 99 percent of its backlog. *Id.* ¶ 20. From June 1, 2022, to February 10, 2025, Harris participated in nearly 4,500 decisions. *Id.* ¶ 10.

On February 10, 2025, Harris received an email from Trent Morse, Deputy Assistant to the President and the Deputy Director of the White House Presidential Personnel Office, which stated in its entirety:

> On behalf of President Donald J. Trump, I am writing to inform you that your position on the Merit Systems Protection Board is terminated, effective immediately. Thank you for your service[.]

Ex. 4 to Pl.'s Mot. for Prelim. Inj. and J. on the Merits, ECF No. 22-4. The communication did not explain the basis for Harris's termination.

4

**JA75**

Harris filed this lawsuit on February 11, 2025, claiming that her firing was *ultra vires*,

unconstitutional, and a violation of the Administrative Procedure Act ("APA").  *See* Compl.

¶¶ 31–37, 40–41, ECF No. 1.  She seeks relief under the Declaratory Judgment Act, issuance of a

writ of mandamus, and equitable relief.  *See id.* ¶¶ 38–39, 42–46.  Harris additionally filed a

motion for a temporary restraining order, *see* Pl.'s Mot. for TRO, ECF No. 2, which Defendants

opposed, *see* Defs.' Opp'n to Mot. for TRO, ECF No. 6.  The Court held a hearing on the TRO

motion on February 13, 2025, and granted the motion on February 18, 2025.  *See* Min. Entry

dated Feb. 13, 2025; Order Granting Pl.'s Mot. for TRO, ECF No. 8; Mem. Op. Granting Pl.'s

Mot. for TRO ("Mem. Op."), ECF No. 9.  Defendants appealed that order to the D.C. Circuit,

and the appeal remains pending.  *See* Notice of Appeal, ECF No. 15.

On February 19, 2025, the parties filed a joint status report indicating that the Court's

consideration of the subsequent motion for preliminary injunction should be consolidated with

the merits of the case pursuant to Federal Rule of Civil Procedure 65(a)(2).  *See* Joint Status

Report, ECF No. 13.  On February 23, 2025, Harris filed a motion for a preliminary injunction

and judgment on the merits.  *See* Pl.'s Mot. for Prelim. Inj. and J. on the Merits ("Pl.'s Mot."),

ECF No. 22.  Defendants opposed the motion, *see* Defs.' Opp'n to Pl.'s Mot. for Prelim. Inj. and

J. on the Merits ("Defs.' Opp'n"), ECF No. 33, and Harris filed a reply, *see* Defs.' Reply, ECF

No. 38.  The parties appeared for a hearing before the Court on March 3, 2025.

### III.  LEGAL STANDARD

"Having granted consolidation under Rule 65(a)(2), the Court 'treats the parties' briefing

as cross-motions for summary judgment.'"  *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 226

(D.D.C. 2020) (quoting *Trump v. Comm. on Oversight & Reform of the U.S. House of*

*Representatives*, 380 F. Supp. 3d 76, 90 (D.D.C. 2019)).  "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. On summary judgment, the Court views all evidence "in the light most favorable to the nonmoving party and . . . must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV. ANALYSIS

The Court first considers the constitutionality of the MSPB's structure, concluding that its members' for-cause removal protections are constitutional under *Humphrey's Executor*.

Federal law thus prevents the President from removing members of the MSPB without cause, and the President's attempt to terminate Harris was unlawful. As such, Harris is entitled to summary judgment. The Court next determines the remedies to which Harris may be entitled, granting her declaratory judgment and a permanent injunction. To the extent that injunctive relief may be unavailable, the Court would grant mandamus relief in the alternative.

### A. Constitutionality of the MSPB Members' Removal Protections

Harris claims that her termination was *ultra vires* in violation of statutory authority, violated the separation of powers, and was contrary to law under the APA. *See* Compl. ¶¶ 31–37, 40–41. She argues that this case falls squarely within the heartland of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and its progeny, and that the Board is a traditional multimember body that does not wield traditional executive power. *See* Pl.'s Mot. at 11–20. MSPB members' removal protections are therefore constitutional, according to Harris. *See id.* at 11–12. Defendants respond that the MSPB does not fall within *Humphrey's Executor*, and that the independent agency wields substantial executive power. *See* Defs.' Opp'n at 5–13. The Court concludes that MSPB members' removal protections are constitutional under *Humphrey's Executor* and must be upheld here.

In *Humphrey's Executor*, the Supreme Court upheld a statutory provision identical to the one at issue here restricting removal of Federal Trade Commission ("FTC") members. *See Humphrey's Executor*, 295 U.S. at 619–20 (discussing 15 U.S.C. § 41); 5 U.S.C. § 1202(d). The FTC comprises five members "appointed by the President[,] by and with the advice and consent of the Senate," and "[n]ot more than three of the commissioners shall be members of the same political party." *Humphrey's Executor*, 295 U.S. at 619–20 (quoting 15 U.S.C. § 41). "Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance

in office." *Id.* (quoting 15 U.S.C. § 41). In *Humphrey's Executor*, President Hoover had appointed William Humphrey as a member of the Federal Trade Commission, which carried a term of seven years. 295 U.S. at 612. Less than two years later, President Roosevelt terminated Humphrey over differences of political opinion, stating, "[e]ffective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission." *Id.* at 619. Humphrey died several months later, but his estate sued to recover backpay on the basis that his removal was unlawful. *Id.* at 612.

The Supreme Court confirmed that President Roosevelt's termination of Humphrey was indeed unlawful. The Court observed that "[t]he statute fixes a term of office, in accordance with many precedents." *Id.* at 623. The Court further explained that the commission comprised a "nonpartisan" "body of experts" that was intended to "act with entire impartiality." *Id.* at 624. It was "charged with the enforcement of no policy except the policy of the law" and acted in a manner that was "predominantly quasi judicial and quasi legislative" rather than traditionally "political []or executive" in nature. *Id.* The Court differentiated FTC members from the postmaster in *Myers v. United States*, 272 U.S. 52 (1926) (evaluating statute stating that postmasters "shall hold their offices for four years unless sooner removed or suspended according to law"). "A postmaster is an executive officer restricted to the performance of executive functions" and is "charged with no duty at all related to either the legislative or judicial power." *Id.* at 627. The FTC, in contrast, "acts in part quasi legislatively and in part quasi judicially" rather than exercising traditional executive powers. *Id.* at 628. "We think it plain under the Constitution that illimitable power of removal is not possessed by the President in respect of officers of the character of those just named," the Court concluded. *Id.* at 629.

Two decades later, the Court considered President Eisenhower's removal of a member of the War Claims Commission, whom President Truman had appointed and the Senate had confirmed. *See Wiener v. United States*, 357 U.S. 349, 350 (1958). Congress charged that commission with processing "claims for compensating internees, prisoners of war, and religious organizations . . . who suffered personal injury or property damage at the hands of the enemy in connection with World War II," and the commissioners' terms were limited by the short duration of the commission's existence. *Id.* The Court reasoned that Congress intended to "preclude[] the President from influencing the Commission in passing on a particular claim," which meant that the President naturally could not "hang . . . the Damocles' sword of removal" over the commissioners. *Id.* at 356. The Court reaffirmed that the President had "no such power" to "remove a member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission." *Id.*[2]

In two more recent cases, however, the Supreme Court ruled that for-cause removal provisions applying to independent agencies with a single director violated the separation of powers. *See Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 218 (2020); *Collins v. Yellen*, 594 U.S. 220, 253 (2021). Neither of those cases undermines the

---

[2] The Court once again considered a multimember body in *Mistretta v. United States* when passing on the constitutionality of the United States Sentencing Commission, which formally resides in the Judiciary. 488 U.S. 361 (1989). The Sentencing Report Act of 1984 empowered the President to appoint commissioners to the Sentencing Commission, with members "subject to removal by the President 'only for neglect of duty or malfeasance in office or for other good cause shown.'" *Id.* at 368 (quoting 28 U.S.C. § 991(a)). When considering whether the Act affords the President undue influence over federal judges who served as commissioners, the Court recognized that "the President's removal power under the Act is limited." *Id.* at 410. "Such congressional limitation on the President's removal power, like the removal provisions upheld in *Morrison v. Olson*, 487 U.S. 654 (1988), and *Humphrey's Executor* . . . , is specifically crafted to prevent the President from exercising 'coercive influence' over independent agencies." *Id.* at 410–411.

**JA80**

constitutionality of for-cause removal provisions for multimember bodies of experts heading an independent agency. *See Seila Law*, 591 U.S. at 228 ("[W]e do not revisit *Humphrey's Executor* or any other precedent today.").

"Rather than create a traditional independent agency headed by a multimember board or commission, Congress elected to place the [Consumer Financial Protection Bureau ("CFPB")] under the leadership of a single Director." *Seila Law*, 591 U.S. at 207. In *Seila Law*, the Court observed that "[a]n agency with a structure like that of the CFPB is almost wholly unprecedented." *Id.* as 220; *see also id.* at 220–22 (searching for historical precedent to support the CFPB's structure). The Court further concluded that "[t]he CFPB's single-Director structure" contravenes the separation of powers "by vesting significant governmental power in the hands of a single individual accountable to no one," emphasizing that the director may act "*unilaterally*" and "[w]ith no colleagues to persuade." *Id.* at 224–25. Two other features of the CFPB undermined the constitutionality of the agency's structure. First, the director's five-year term meant that "some Presidents may not have any opportunity to shape [the agency's] leadership and thereby influence its activities." *Id.* at 225. Second, "[t]he CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential control." *Id.* at 226. For these reasons, the Court concluded that the CFPB's structure violated the separation of powers. *See id.* at 232.

None of the reasoning in *Seila Law* undermined the constitutionality of the traditional independent agency structure outlined in *Humphrey's Executor*. *See id.* at 218 (describing "exception[]" for "multimember expert agencies that do not wield substantial executive power"). Rather, the Court's reasoning reaffirmed the constitutionality of multimember boards with for-cause removal protections, as those agencies have a robust basis in this country's history, and

their members lack the power to act unilaterally. *See* Pl.'s Mot. at 11 (emphasizing that Congress established the first such board in 1887). The Court's rationale also relied on the CFPB's divergence from traditional agency structures when finding the for-cause removal protections unconstitutional. *See, e.g.*, *Seila Law*, 591 U.S. at 205–07 (emphasizing facts showing drift from Elizabeth Warren's initial proposal for multimember board to Congress's enactment of single-headed agency). The Court even opined that Congress could fix the problem by "for example, converting the CFPB into a multimember agency." *Id.* at 237.

*Collins* then represented a "straightforward application" of the Court's "reasoning in *Seila Law*" to the Federal Housing Finance Agency ("FHFA"). 594 U.S. at 251; *see also Seila Law*, 591 U.S. at 222 (noting doubt as to the constitutionality of the FHFA's structure). Similarly to the CFPB, the FHFA was "an agency led by a single Director" that "lack[ed] a foundation in historical practice and clashe[d] with constitutional structure by concentrating power in a unilateral actor insulated from Presidential control." 594 U.S. at 251.

*Humphrey's Executor* thus remains alive and well, and it dictates the outcome here. The MSPB is "a traditional independent agency headed by a multimember board or commission," *Seila Law*, 591 U.S. at 207, and as such Congress may grant the Board's members for-cause removal protections. The MSPB is "a multimember body of experts" that is "balanced along partisan lines." *Seila Law*, 591 U.S. at 216; *see also Humphrey's Executor*, 295 U.S. at 624 (noting that the FTC is a "nonpartisan" "body of experts" that was intended to "act with entire impartiality"). The CSRA envisions that the Board "is to be nonpartisan; and it must, from the very nature of its duties, act with entire impartiality." *Humphrey's Executor*, 295 U.S. at 624. The CSRA also "fixes a term of office." *Id.* at 623. The Board's members serve on overlapping, staggered seven-year terms, meaning that the President will have the "opportunity to shape [the

MSPB's] leadership and thereby influence its activities."[3]  *Seila Law*, 591 U.S. at 225.  The members' staggered terms permit them to "accumulate[] expertise" in the operation of federal agencies and federal employment law.  *Id.* at 218.  The MSPB's duties are "quasi judicial," *Humphrey's Executor*, 295 U.S. at 624, in that it conducts preliminary adjudications of federal employees' claims, which may then be appealed to Article III courts.  *See* 5 U.S.C. § 7703 (providing for review in the Federal Circuit); *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 423 (2017) (providing for review of mixed cases in district court).  The MSPB's rulemaking authority is limited to "regulations . . . necessary for the performance of its functions."  5 U.S.C. § 1204(h).  Congress further intended the agency to aid its legislative goals by regularly transmitting reports to Congress regarding the Board's functions.  *See* 5 U.S.C. §§ 1204(l), 1205.  It is additionally evident that Congress hoped to "preclude[] the President from influencing the [Board] in passing on a particular claim."  *Wiener*, 357 U.S. at 356.  The MSPB nonetheless remains politically accountable to both Congress and the President through the appropriations process in a manner inapplicable to independent agencies with their own funding sources, such as the CFPB and FHFA.  *See Selia Law*, 591 U.S. at 226; *Collins*, 594 U.S. at 231.

The MSPB also "do[es] not wield substantial executive power," *Seila Law*, 591 U.S. at 218, but rather spends nearly all of its time adjudicating "inward-facing personnel matters" involving federal employees, Pl.'s Mot. at 4.  The Board does not regulate the conduct of private parties, nor does it possess its own rulemaking authority except in furtherance of its judicial functions.  *See id.* at 12.  It cannot initiate its own personnel cases, but must instead "passively

---

[3] One MSPB member's term has now expired, and Harris's term expires on March 1, 2028.  *See* Pl.'s Mot. at 29 n.20; Pl.'s Reply at 13–14; SUMF ¶ 3.  President Trump will therefore have the opportunity to appoint at least two members to the MSPB during his term in office.

wait for them to be brought." *Id.* at 12; *see also* 5 U.S.C. § 1204 (defining the Board's powers and functions). Harris additionally points out that the MSPB *preserves* power within the executive branch by charging presidentially appointed Board members with mediation and initial adjudication of federal employment disputes, rather than shifting those decisions to Article III courts in the first instance. *See* Pl.'s Mot. at 14.

Several other features of the MSPB demonstrate its limited effects on the President's powers. The MSPB's jurisdiction is generally restricted to civil servants and does not include political appointees.[4] *See* 5 U.S.C. § 7511. Even among civil servants, members of the Senior Executive Service removed "for less than fully successful executive performance" are entitled only to an informal hearing before the Board. *See* 5 U.S.C. § 3592(a). Furthermore, the MSPB's decisions are generally not the final word. Federal employees may appeal the Board's decisions to Article III courts, *see* 5 U.S.C. § 7703(a), and the Director of the Office of Personnel Management may similarly seek review of any decision that he determines "will have a substantial impact on a civil service law, rule, regulation, or policy directive," *id.* § 7703(d)(1)–(2).

Finally, the MSPB's mission and purpose require independence. In enacting the CSRA, Congress exercised its power to regulate the civil service, defining certain prohibited personnel practices, to include discrimination, loyalty oaths, coercion to engage in political activity, and retaliation against whistleblowers. *See* 5 U.S.C. § 2302(b)(1)–(3), (8). Direct political control over the MSPB would have limited effect on the President's implementation of his policy agenda. It would instead neuter the CSRA's statutory scheme by allowing high-ranking

---

[4] Nor may the Board review the merits of determinations concerning an employee's eligibility to occupy a sensitive position that implicates national security. *See Kaplan v. Conyers*, 733 F.3d 1148, 1166 (Fed. Cir. 2013).

government officials to engage in prohibited practices and then pressure the MSPB into inaction. The MSPB's independence is therefore structurally inseparable from the CSRA itself. These duties dovetail with *United States v. Perkins*, in which the Supreme Court held that Congress may "limit, restrict, and regulate the removal" of inferior officers. 116 U.S. 483, 485 (1886). Denying independence to the Board would undermine these constitutionally sound limitations on the removal of civil servants.

Defendants cannot argue that *Humphrey's Executor* has been overturned, so they instead suggest that even if the MSPB is a traditional multimember agency, it wields "'substantial' executive power" in a manner found significant in *Seila Law*. Defs.' Opp'n at 8 (quoting *Seila Law*, 591 U.S. at 218). Yet the Supreme Court has clarified that it did not mean *Humphrey's Executor* to exclude removal protections for any official exercising authority within the executive branch. *See Morrison v. Olson*, 487 U.S. 654, 688–89 (1988); *see also Seila Law*, 591 U.S. at 216 (detailing "several organizational features that helped explain" the *Humphrey's Executor* court's "characterization of the FTC as non-executive"). There is instead a "spectrum" that runs from "'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role" and those who serve "'quasi-legislative' or 'quasi-judicial'" roles, where the President's control is not "so central to the functioning of the Executive Branch" as to require the President to be able to terminate the official at will. *Morrison*, 487 U.S. at 690–91. As the Court explained above, the Board's duties—which primarily include adjudication of employment claims—do not represent "substantial" executive power and instead take on a quasi-judicial role. Furthermore, the MSPB's powers are no more expansive than the FTC's functions upheld in *Humphrey's Executor*, which remains good law.

Several courts have deployed similar reasoning when rejecting challenges to the structures of traditional multimember agencies in the years since *Seila Law* and *Collins*.  Last year, the Fifth Circuit upheld the structure of the Consumer Product Safety Commission ("CPSC"), concluding that the agency is "a prototypical 'traditional independent agency, run by a multimember board,'" is not directed by a single individual, and that the President may influence its activities through appointments or the appropriations process.  *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 354–55 (5th Cir. 2024), cert. denied, 145 S. Ct. 414, 170 (2024).  The Tenth Circuit turned away a comparable challenge to the agency, reasoning that *Humphrey's Executor* remains good law, that the CPSC is structured similarly to the FTC, and that limited civil and criminal enforcement powers do not undermine the constitutionality of its tenure protections.  *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762 (10th Cir. 2024), cert. denied, No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025).  Courts have additionally found the FTC's structure constitutionally sound because the Supreme Court has not revisited *Humphrey's Executor*.  *See Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1047 (5th Cir. 2023); *Meta Platforms, Inc. v. Fed. Trade Comm'n*, 723 F. Supp. 3d 64, 87 (D.D.C. 2024).  This Court, likewise, cannot reach a different outcome regarding the MSPB.

Because the MSPB falls within the scope of *Humphrey's Executor*, Congress has the power to specify that members of the MSPB may serve for a term of years, with the President empowered to remove those members only for inefficiency, neglect of duty, or malfeasance in office.  The President thus lacks the power to remove Harris from office at will.  Because the President did not indicate that he sought to remove Harris for inefficiency, neglect of duty, or

malfeasance in office, his attempt to terminate her was unlawful and exceeded the scope of his authority.[5]

## B. Remedy

With the merits aside, the Court turns to the question of remedy. Harris offers up three avenues for relief: declaratory judgment, a permanent injunction, and a writ of mandamus. *See* Compl. ¶¶ 38–39, 42–44, 45–46; Pl.'s Mot. at 27–36. The Court concludes that because any attempt to remove Harris is unlawful, she is entitled to declaratory judgment that she remains a properly appointed member of the MSPB. The Court additionally determines that Harris has met her burden for the permanent injunction she seeks, and that a writ of mandamus would be appropriate if such injunctive relief were unavailable.

### 1. Declaratory Judgment

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). It provides neither jurisdiction nor a cause of action, but rather a form of relief when the case is already properly before the Court. *See C&E Servs., Inc. of Washington v. D.C. Water & Sewer Autho.*, 310 F.3d 197, 201 (D.C. Cir. 2002); *Glenn v. Thomas Fortune Fay*, 222 F. Supp. 3d 31, 35 (D.D.C. 2016). The Article III case-or-controversy requirement "is no less strict when a party is seeking a declaratory judgment than for any other

---

[5] The parties do not debate the cause of action through which this legal challenge must flow—whether it be the APA, an *ultra vires* claim, or a separation of powers claim. These distinctions can be meaningful. *See, e.g.*, *Lewis v. U.S. Parole Comm'n*, 743 F. Supp. 3d 181, 199–201 (D.D.C. 2024) (examining the compatibility of an APA and *ultra vires* claim). The Court does not interpret this issue to be jurisdictional, however, and does not address an question the parties themselves declined to raise.

16

relief." *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 963 (D.C. Cir. 1995) (citing *Altvater v. Freeman*, 319 U.S. 359, 363 (1943)).  To establish that a matter is a "controversy" within the meaning of the Declaratory Judgment Act and Article III of the Constitution, a party "must 'show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Hoffman v. Dist. of Columbia*, 643 F. Supp. 2d 132, 140 (D.D.C. 2009) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

"[A] declaratory judgment always rests within the sound discretion of the court," *President v. Vance*, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980) (citing *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 494 (1942)), and "[t]here are no dispositive factors a district court should consider in determining whether it should entertain an action brought under the Declaratory Judgment Act." *New York v. Biden*, 636 F. Supp. 3d 1, 31 (D.D.C. 2022) (quoting *POM Wonderful LLC v. FTC*, 894 F. Supp. 2d 40, 44 (D.D.C. 2012)).  Several factors may be helpful to the Court's consideration of "the propriety of granting a declaratory judgment," however, such as "whether it would finally settle the controversy between the parties"; "whether other remedies are available or other proceedings pending"; and "the public importance of the question to be decided." *Hanes Corp. v. Millard*, 531 F.2d 585, 592 n.4 (D.C. Cir. 1976).  The Court might also consider "1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn*, 222 F. Supp. 3d at 36 (citing *President*, 627 F.2d at 365 n.76).

First, the Court finds a "controversy" here within the meaning of the Declaratory Judgment Act.  The parties place before the Court a "substantial controversy" over the

lawfulness of the President's effort to terminate Harris without cause, and whether she remains a member of the MSPB. *Hoffman*, 643 F. Supp. 2d at 140; *see also* Pl.'s Mot. at 11–26; Defs.' Opp'n at 5–13. The parties have adverse legal interests, with Defendants arguing that the President has a power that Harris claims he does not. *See, e.g.*, Defs.' Opp'n at 5 (arguing that the President's removal power over principal officers is absolute). This controversy is also "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Hoffman*, 643 F. Supp. 2d at 140. The controversy here is not based, for instance, on "the occurrence of a future or contingent event," but has rather come to a head after the President attempted to terminate Harris. *C.F. Folks, Ltd. v. DC Jefferson Bldg., LLC*, 308 F. Supp. 3d 145, 150 (D.D.C. 2018).

The Court additionally finds that declaratory relief is appropriate here. A declaratory "judgment will serve a useful purpose in clarifying the legal relations" between Harris and Defendants and abate ongoing "uncertainty, insecurity, and controversy" over her status as a member of the MSPB. *Glenn*, 222 F. Supp. 3d at 36. The question is also one of significant "public importance," *Hanes Corp.*, 531 F.2d at 592 n.4, given that it concerns the structure and independence of a federal agency. Although "other remedies" may be available, *id.*, declaratory judgment remains appropriate to clarify Harris's legal status, particularly given the complexity of injunctive relief in this area. In addition, the Declaratory Judgment Act grants authority to enter declaratory judgment "whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

Defendants argue that the Court cannot issue declaratory judgment because it cannot enjoin the President. *See* Defs.' Mot. at 21–22 (citing *Samuels v. Mackell*, 401 U.S. 66, 70 (1971)). First, the declaratory judgment here clarifies not just the President's legal relationship with MSPB members, but also subordinate officials' legal rights and duties. Second, the

Supreme Court clarified in *Samuels* that it did "not mean to suggest that a declaratory judgment should never be issued in cases of this type if it has been concluded that injunctive relief would be improper." *Samuels*, 401 U.S. at 73. "There may be unusual circumstances in which an injunction might be withheld because, despite a plaintiff's strong claim for relief under the established standards, the injunctive remedy seemed particularly intrusive or offensive." *Id.* "[I]n such a situation, a declaratory judgment might be appropriate and might not be contrary to the basic equitable doctrines governing the availability of relief." *Id.* Courts withhold injunctive relief against the President precisely because it is considered "particularly intrusive or offensive," and declaratory judgment remains warranted here given Harris's "strong claim for relief under the established standards." *Id.* Defendants additionally cite no controlling authority for the notion that declaratory judgment may not clarify the legal relationship between the President and other parties. To the contrary, appellate courts have previously affirmed the issuance of declaratory relief involving the President. *See Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (considering declaratory judgment to be a less drastic remedy than a writ of mandamus); *see also Clinton v. City of New York*, 524 U.S. 417, 421 (1998) (affirming declaratory judgment that the President's actions under Line Item Veto Act were invalid).

For these reasons, the Court enters declaratory judgment in this case clarifying that Harris remains a member of the MSPB, and that she may not be removed from her position absent inefficiency, neglect of duty, or malfeasance in office.

## 2. Permanent Injunction

Harris additionally seeks a permanent injunction barring several officials—not including the President—from removing her or treating her as removed. *See* Compl. ¶¶ 45–46; Pl.'s Mot.

at 28–30; Pl.'s Proposed Order, ECF No. 22-1.  Defendants argue that Harris is not entitled to an injunction because the Court lacks the power to issue equitable relief "reinstating" an officer removed by the President.  Defs.' Opp'n at 14–18.  Defendants also contend that Harris has not suffered an irreparable injury and that the balance of the equities weigh in their favor.  *See id.* at 18–21.  The Court must therefore examine its power to issue equitable relief here before it considers whether to issue that relief.

### a.  *Availability of Injunctive Relief*

Defendants argue that Harris's remedy must be limited to backpay, and that an injunction is inappropriate because that relief was not "traditionally accorded by courts of equity" to remedy an official's wrongful removal from office.  Defs.' Opp'n at 14 (quoting *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).  Plaintiff responds that federal courts have long granted injunctive relief reinstating federal employees, and that mandamus should be available in the alternative.  *See* Pl.'s Reply at 10–19.

In *Grupo Mexicano*, the Supreme Court considered whether "a United States District Court has the power to issue a preliminary injunction preventing the [debtor] defendant from transferring assets in which no lien or equitable interest is claimed."  527 U.S. at 310.  The Court explained that "equity is flexible; but in the federal system, at least, that flexibility is confined within the broad boundaries of traditional equitable relief."  *Id.* at 322.  "[E]quity jurisdiction of the federal courts is the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73)."  *Id.* at 318 (quoting A. Dobie, Handbook of Federal Jurisdiction and Procedure 660 (1928)).  The Court concluded that because the Court of Chancery lacked "an equitable power to restrict a debtor's use of his unencumbered property

before judgment," a contemporary federal court lacks that power as well.  *Id.* at 322; *see also id.* at 319–20.  Defendants similarly reason that because the Court of Chancery did not issue injunctions returning public officials to their offices, this Court cannot either.  *See* Defs.' Opp'n at 14–15.  That contention stumbles, however, for at least two reasons.

The first is on-point Supreme Court guidance.  In *Sampson v. Murray*, the Supreme Court considered whether a probationary employee at the General Services Administration could receive a temporary restraining order enjoining her dismissal during an administrative appeal to the Civil Service Commission.  415 U.S. 61, 62–63 (1974).  The Court explained that a district court has "authority to grant interim injunctive relief to a discharged Government employee," *id.* at 63, but that the plaintiff before the Court did not make the elevated "showing of irreparable injury sufficient in kind and degree to override" the Government's usual autonomy over its internal affairs, *id.* at 84.  Loss of wages and reputation could be remedied through further proceedings and was not enough to warrant injunctive relief for a federal employee, *see id.* at 91–92, but that relief may be appropriate "in the genuinely extraordinary situation," rather than "in the routine case."  *Id.* at 92 n.68.  The Court specifically addressed *White v. Berry*, in which the Supreme Court reasoned that "a court of equity has no jurisdiction over the appointment and removal of public officers."  171 U.S. 366, 377 (1898) (quoting *In re Sawyer*, 124 U.S. 200, 212 (1888)).  The *Sampson* Court asserted that "[m]uch water has flowed over the dam since 1898," and that subsequent cases had recognized that federal courts are generally empowered to review the claims of discharged federal employees.  *Sampson*, 415 U.S. 71–72 (citing *Service v. Dulles*, 354 U.S. 363 (1957)); *see also Kloeckner*, 568 U.S. at 44–46 (discussing remedies for federal employee under the CSRA, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 22 (2012)

(listing "reinstatement" as among "the kinds of relief that the CSRA empowers" courts to provide). Harris's situation is additionally akin to that of the *Sampson* plaintiff because there is a federal standard to which Harris's hiring and firing must adhere, and one that the Court must enforce. *Sampson* thus instructs that equitable relief is available to Harris if she can show that her termination represents a "genuinely extraordinary situation," rather than a "routine case." *Sampson*, 415 U.S. at 92 n.68.[6]  *Sampson* is not unique; the Supreme Court has repeatedly determined that plaintiff federal employees were entitled to reinstatement after termination violated their legal rights. *See Service*, 354 U.S. at 388–89; *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959); *see also Miller v. Clinton*, 687 F.3d 1332, 1360 n.7 (D.C. Cir. 2012) (Kavanaugh, J., dissenting) (explaining that for a federal employee experiencing "unconstitutional discrimination, equitable relief could include an injunction prior to termination or reinstatement subsequent to termination").

The D.C. Circuit has also found injunctive relief against subordinate federal officials to be available to restore presidential appointees to their offices, although the Government did not raise the scope of historical equitable relief in those cases. *See Swan v. Clinton*, 100 F.3d 973, 976–81 (D.C. Cir. 1996); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023).[7]  In *Swan*, the six-year term of a member of the Board of the National Credit Union Administration ("NCUA") had expired, but he remained in office because the relevant statute allowed members to serve until their successors had qualified. *Swan*, 100 F.3d at 975–76.  President Clinton

---

[6] There can additionally be no dispute that federal courts may grant injunctive relief "with respect to violations of federal law by federal officials."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (citing *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902)).

[7] Cases before other courts add further evidence that this power exists. *See* Pl.'s Reply at 11–12 (collecting cases).

removed the board member, who then sued seeking declaratory judgment and an injunction ordering his reinstatement. *See id.* The court assessed the board member's standing to bring the case, focusing on whether his claims were judicially redressable. *Id.* at 976–81. The court was uncertain of its power to enjoin the President himself from removing the plaintiff from office, *see id.* at 977–78, but reasoned that it could instead "ensure the rule of law" by issuing "injunctive relief against subordinate officials" effectuating his reinstatement "*de facto* by" requiring his colleagues to treat him "as a member of the NCUA Board and allowing him to exercise the privileges of that office," *id.* at 978, 980. This encompassed, for instance, "including [the plaintiff official] in Board meetings, giving him access to his former office, recording his votes as official votes of a Board member, allowing him to draw the salary of a Board member *etc.*"[8] *Id.* at 980. The Circuit reprised this analysis in *Severino*, in which President Biden removed a member of the Administrative Conference of the United States Council, *see Severino*, 71 F.4th at 1041, and the plaintiff had standing because a court could "enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment," *id.* at 1042–43 (quoting *Swan*, 100 F.3d at 980).[9]

Second, it is also clear that even if *Sampson*, *Swan*, and *Severino* did not make equitable relief available to Harris in a "genuinely extraordinary situation," she would nonetheless be entitled to a writ of mandamus—which is a remedy at law. *See Kalbfus v. Siddons*, 42 App. D.C.

---

[8] The Circuit ultimately concluded that the board member's claim failed on the merits because, even assuming that NCUA board members had removal protections, holdover members would be entitled to no such protection. *See Swan*, 100 F.3d at 983–88.

[9] Defendants argue that these cases are not on point because the courts there were considering the redressability of the plaintiffs' claims when evaluating their standing. *See* Defs.' Opp'n at 16; *Swan*, 100 F.3d 976–81; *Severino*, 71 F.4th at 1042–43. Yet the Circuit's reasoning is no mere dicta, as a federal court must determine that it has the power to grant effective relief before assuming jurisdiction over a case. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

310, 319–21 (D.C. Cir. 1914) (collecting cases); *see also* Pl.'s Reply at 15–16 (collecting

sources).  To the extent that English equity courts declined to issue injunctions reinstating

officials to their positions, they likely did so because the King's Bench, a court of law, would

readily issue mandamus instead.  *See Walkley v. City of Muscatine*, 73 U.S. 481, 483–84 (1867)

(explaining, relying on English cases, that "a court of equity is invoked" only where "a court of

law . . . is inadequate to afford the proper remedy"); *Parker v. Winnipiseogee Lake Cotton &*

*Woolen Co.*, 67 U.S. 545, 550–51 (1862) (similar).  English courts around the time of the

founding recognized this power and exercised it regularly.  *See, e.g.*, *R. v. Mayor of London*, 100

Eng. Rep. 96, 98 (1787) (recognizing power to issue mandamus reinstating public official);[10] *R.*

*v. Mayor and Aldermen of Doncaster* (1752), 96 Eng. Rep. 795 (restoring municipal official to

his office after removal by town council); *R. v. Mayor, Bailiffs, and Common Council of the*

*Town of Liverpool* (1759), 97 Eng. Rep. 533 (same);[11] *R. v. Mayor, Aldermen and Burgesses of*

*Doncaster* (1729), 92 Eng. Rep. 513 (same); 73 Eng. Rep. at 752 (discussing *Thompson v.*

*Edmonds*, in which the King's Bench restored a bailiff to his office because he "was removed"

by the mayor "without cause"); *R. v. Mayor, Aldermen, and Common Council of Gloucester*, 90

Eng. Rep. 1148 (restoring official to office of capital burgess).  Numerous treatises further

confirm this practice.  *See* 3 W. Blackstone, Commentaries *264–265 ("The writ of mandamus is

. . . a most full and effective remedy, in the first place, for refusal of admission where a person is

entitled to an office or place in any such [municipal] corporation; and, secondly, for wrongful

---

[10] During this case, respected trial lawyer Thomas Erskine explained that "[w]henever a person is improperly suspended or removed from an office, whether it concern public or private duties, if he has a certain term in it, and there are profits annexed to it, and the party has no other specific legal remedy, the Court will grant mandamus to restore him."  100 Eng. Rep. at 97.

[11] Here, Lord Mansfield explained that when officials respond to an action for mandamus, "the return must set out all the necessary facts, precisely; to shew that the person is removed in legal and proper manner, and for a legal cause."  97 Eng. Rep. at 537.

removal, when a person is legally possessed."); Thomas Tapping, *The Law and Practice of the High Prerogative Writ of Mandamus as it Obtains Both in England and in Ireland* 221 (1853) ("The writ of mandamus . . . has by a great number of cases held to be grantable . . . to restore him who has been wrongfully displaced, to any office, function, or franchise of a public nature . . . ."); *id.* at 224 (distinguishing an officer "at pleasure" who may be removed without cause).[12] Even the treatise cited in Defendants' opposition explains that a court sitting in equity would "not interfere by injunction" in such cases simply because it would instead "leave that question to be determined by a legal forum."  2 James L. High, *Treatise on the Law of Injunctions* § 1312 (2d ed. 1880); *see also* Defs.' Opp'n at 15.  This was the state of the law at the time of the founding, as well as when Congress passed the All Writs Act as part of the Judiciary Act of 1789.  *See Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985).  For this reason, the Supreme Court was careful in both *In re Sawyer* and *White v. Berry* to specify that mandamus was available "to determine the title to a public office" in "the courts of law."  *In re Sawyer*, 124 U.S. at 212; *White*, 171 U.S. at 377.[13]

---

[12] Later treatises provide additional support for use of the writ of mandamus "for the purpose of restoring an individual to an office, where he has been illegally deprived of the possession thereof."  Horace G. Wood, *A Treatise on the Legal Remedies of Mandamus and Prohibition, Habeas Corpus, Certiorari and Quo Warranto* 11 (1891).  "When the title to the office is indisputable," proceedings for the writ of *quo warranto* would be "dilatory" and "a mandamus would be proper and should be awarded."  *Id.* at 12 (quoting 7 How., 128); *see also* 1 Howard Clifford Joyce, *A Treatise on the Law Relating to Injunctions* § 55 (1909) ("The jurisdiction to determine the title to a public office belongs only to courts of law and is exercised . . . by mandamus . . . and the mode of procedure established by the common law or by statute"); 2 Eugene McQuillin, *A Treatise on the Law of Municipal Corporations* § 582 (1911) (same).

[13] Defendants argue that Harris was effectively removed from office and seeks a court order returning her to it.  *See* Defs.' Opp'n at 15.  The D.C. Circuit has clarified that this is not the case, and that Harris was never in fact removed.  *See Kalbfus*, 42 App. D.C. at 321 ("In the present case the removal of the relator having been illegal and void, the office never became vacant . . . .").

As the Court explains below, however, a writ of mandamus can issue under our contemporary jurisprudence only when "the party seeking issuance of the writ ha[s] no other adequate means to attain the relief he desires." *Kerr v. U. S. Dist. Ct. for N. Dist. of California*, 426 U.S. 394, 403 (1976) (citing *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). Because the Court reads *Sampson*, *Swan*, and *Severino* to allow it to issue an injunction, it concludes that this injunction represents "adequate means" to provide Harris's requested relief, barring a mandamus remedy. *Kerr*, 426 U.S. at 403. This represents a curious reversal from norms before English courts, where reinstatement of officials through legal means was preferred over restoration through equitable means. *See Swan*, 100 F.3d at 976–81; *Severino*, 71 F.4th at 1042–43. Yet the broader point is that this Court may provide Harris *some* form of effective relief preventing her unlawful termination from the MSPB, whether it be through an injunction or a writ of mandamus. *See Swan*, 100 F.3d at 977 n.1 (explaining that a request for injunction and request for writ of mandamus can be "essentially" the same thing in some contexts).

Finally, Defendants argue that the Court cannot enjoin the President or enjoin others in a manner that restricts his Article II authority. *See* Defs.' Opp'n at 16. To be clear, Harris does not ask the Court to enjoin President Trump, *see, e.g.*, Pl.'s Proposed Order, and the Court does not do so.[14] Yet Defendants cite no authority for the proposition that a court lacks the power to enjoin the President's subordinates to restrain the President's violation of law. In fact, that is

---

[14] The availability of injunctive relief against the President may depend in part on whether compliance with 5 U.S.C. 1202(d) represents a ministerial rather than executive duty, a question the Supreme Court has "left open." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion); *see also State of Mississippi v. Johnson*, 71 U.S. 475, 498 (1866) (declining to decide whether a court may require the President "to perform a purely ministerial act," and defining a "ministerial duty" as "one in respect to which nothing is left to discretion); *McCray v. Biden*, 574 F. Supp. 3d 1, 9 (D.D.C. 2021) ("*Franklin*, however, did not absolutely slam the door shut on presidential injunctions."). Of course, the Court need not decide this question here.

precisely the remedy the Supreme Court affirmed in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952) (describing preliminary injunction restraining Secretary of Commerce from following President Truman's orders and "continuing the seizure and possession of the [steel] plant"). And in *Swan v. Clinton*, the D.C. Circuit concluded that a district court could enjoin the President's subordinates in order to effectuate a federal official's reinstatement. *See* 100 F.3d at 979; *see also id.* (concluding that "injunctive relief against such officials could substantially redress [the terminated official's] injury"); *see also Severino*, 71 F.4th at 1042–43. Having assured itself that injunctive relief is available here, the Court proceeds to consider whether a permanent injunction is warranted.[15]

### b. Factors for Permanent Injunction

An injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Yet "it goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief." *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quoting *Horne v. Flores*, 557 U.S. 433, 450 (2009)). A permanent injunction is a "forward-looking" remedy, *Gratz v. Bollinger*, 539 U.S. 244, 284 (2003), the "principal purpose" of which is to "deter future violations, and not to punish the violator," *Sec. & Exch. Comm'n v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C. Cir. 1978). "[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). A plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies

---

[15] Defendants additionally suggest that "when executive officers have challenged their removal by the President, they have traditionally sought back pay, not reinstatement." Defs.' Opp'n at 13. The Court fails to see how it might lack the power to issue injunctive relief here simply because the plaintiffs in *Wiener* and *Humphrey's Executor* decided to seek another remedy.

available at law, such as monetary damages, are inadequate to compensate for that injury; (3)

that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity

is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

*Id.* Where the federal government is the opposing party, the balance of equities and public

interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The Supreme Court "has

repeatedly held that the basis for injunctive relief in the federal courts has always been

irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456

U.S. 305, 312 (1982); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290,

297 (D.C. Cir. 2006) (same).

      For the same reasons the Court discussed in its previous opinion, Harris has established

that she has suffered irreparable harm and will likely suffer irreparable harm in the future absent

injunctive relief. *See* Mem. Op. at 11–19; *Standing Rock Sioux Tribe v. U.S. Army Corps of

Eng'rs*, 540 F. Supp. 3d. 45, 55 (D.D.C. May 21, 2021) ("While the irreparable-harm

requirement is recited in the past tense, it is clear that future harm may qualify." (citing

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 162 (2010))). Congress intended the

MSPB and its members to carry out their limited duties with a degree of independence from the

President, guided primarily by his selection of members for the multimember board rather than

"the Damocles' sword of removal." *Wiener*, 357 U.S. at 356. As the Court reasoned in its

previous memorandum opinion, the MSPB's independence would evaporate if the President

could terminate its members without cause, even if a court could later order them reinstated. *See*

Mem. Op. at 16. Harris has undoubtedly experienced an injury to this independence in her

capacity as a member of the MSPB following the President's attempt to terminate her without

cause, and any future attempts would prove just as harmful to that autonomy.

Harris additionally suffers irreparable harm because she has been "depriv[ed] of [her] statutory right to function" as a member of the MSPB, and any further attempts to separate her from her position will exacerbate this injury. *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983). The termination email Harris received resulted in the inability to pursue her "statutory mission" to protect employees from prohibited personnel practices, such that "the loss of the ability to do what Congress specifically directed [her] to do cannot be remediated with anything other than equitable relief." *Dellinger v. Bessent*, No. 25-cv-0385, 2025 WL 471022, at *11 (D.D.C. Feb. 12, 2025). In addition, unlike most other federal employees, Harris was duly appointed by the President and confirmed by the Senate to a position carrying a term of years with specific reasons for her removal.

The Court finds that this harm represents a "genuinely extraordinary situation" meriting injunctive relief related to a federal employee's discharge. *Sampson*, 415 U.S. at 92 n.68; *see also* Mem. Op. at 12–13 (discussing *Sampson*). The clear federal statute granting Harris for-cause removal protections, coupled with longstanding precedent upholding the constitutionality of analogous provisions, overcomes the "latitude" traditionally afforded the Government "in the 'dispatch of its own internal affairs.'" *Sampson*, 415 U.S. at 83. The plaintiff in *Sampson*, who failed to meet this standard, sought an injunction temporarily enjoining her dismissal during an administrative appeal. *See id.* at 63. Yet the parties point to no administrative pathway here through which Harris could seek reinstatement following improper termination. Furthermore, whereas the *Sampson* plaintiff was a probational employee, *see id.* at 62, Harris is a member of the board of an independent agency, was appointed by the President and confirmed by the Senate, and enjoys tenure protections to preserve her independence.

For similar reasons, it is also apparent that "remedies available at law, such as monetary damages, are inadequate to compensate for" Harris's injuries. *eBay Inc.*, 547 U.S. at 391. Defendants argue that loss of salary generally does not represent irreparable harm. *See* Defs.' Opp'n at 19. As the Court has explained, however, this is not a standard employment action that can be remedied through back pay and later reinstatement, and Harris's claims do not revolve around her salary. *See* Mem. Op. at 15.

Defendants additionally cite *Raines v. Byrd*, 521 U.S. 811 (1997), for the notion that "a loss of political power" does not represent injury. Defs.' Mot. at 15. *Raines* is a case about legislators' standing to sue over legislation they perceive to cede power to the Executive Branch, and the case has minimal application to the irreparable injury analysis here. *See* 521 U.S. at 820–21. Harris is not a member of Congress, nor is standing at issue. The Supreme Court reasoned in *Raines* that any injury would be far too diffuse to support the legislators' standing, as it was spread across both Houses of Congress, and the legislators did not claim injury arising from "something to which they *personally* are entitled." *Id.* at 821. If anything, *Raines* supports Harris's claim to injury based on exclusion from her office: she has "been singled out for specially unfavorable treatment as opposed to other Members," and has lost something to which she is "personally" entitled. *Id.*

Finally, injunctive relief in this case is in the public interest, and the balance of the equities tips in Harris's favor. Given that federal law limits the conditions under which Harris's tenure may be terminated, Supreme Court precedent supports the constitutionality of those conditions, and Defendants do not argue that those conditions were met here, the Court finds that it is in the public interest to issue injunctive relief. "[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and

operations.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). So too is there substantial public interest in the for-cause removal protections Congress has given to certain members of independent agencies. Furthermore, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)).

      Defendants suggest that the public interest weighs against injunctive relief here because "[s]uch a remedy would undermine the accountability of the Executive Branch instilled by the Constitution," and the President "cannot be compelled to retain the services of a principal officer." Defs.' Opp'n at 20–21. This argument largely relies on Defendants' success on the merits, and the Court has already determined that the President lacks the power to remove Harris at will. Defendants additionally argue that "the public interest is better served by an MSPB member who holds the President's confidence." *Id.* at 21. Yet Defendants decline to explain exactly how the public interest would be better served by removing Harris from her position. They do not dispute any of Harris's factual assertions, including her efforts to consider, deliberate, and vote on 35 cases per week to clear the MSPB's backlog of nearly 3,800 cases. *See* SUMF ¶¶ 12–28. This effort was successful, as by early this year the inherited cases had all but disappeared. *See id.* ¶ 20. Recall that many of these cases involve allegations that federal agencies engaged in prohibited personnel practices, such as targeting of federal employees based on political affiliation; retaliation against whistleblowers reporting violations of law, waste, fraud and abuse; discrimination; and USERRA violations, among others. *See* Pl.'s Mot. at 4–5 (collecting cases). Defendants make no effort to enlighten the Court as to how Harris's handling

of these cases might differ from the President's preferred approach, let alone in a manner that might tilt the public interest factor in their favor. Defendants additionally overlook the fact that if Harris or her colleagues were ever to become inefficient, neglect their duty, or engage in malfeasance in office, the President would be empowered to remove them for cause. *See* 5 U.S.C. § 1202(d). The Court thus finds nothing in Defendants' arguments that might support a public interest against injunctive relief here.

The Court additionally notes that in opposing injunctive relief in its entirety, Defendants have declined to engage with the scope of Harris's proposed relief. *See generally* Proposed Order; Defs.' Opp'n. The Court will nonetheless tailor its declaratory and injunctive relief to meet Harris's entitlement under the law.[16]

### 3. Writ of Mandamus

Harris requests that the Court issue a writ of mandamus if no other relief is available. *See* Pl.'s Mot. at 34–35. Defendants argue that the President has no clear nondiscretionary duty here, as his selection of "who should lead an Executive Branch agency is certainly not a mere ministerial task." Defs.' Mot. at 22.

"The preemptory common-law writs are among the most potent weapons in the judicial arsenal." *Will v. United States*, 389 U.S. 90, 107 (1967). A district court has "original jurisdiction of any action in the nature of mandamus" only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy

---

[16] Although injunctive relief is merited, the Court narrows Harris's request slightly. Harris seeks a permanent injunction prohibiting several Defendants from removing her or treating her as removed. *See* Proposed Order. Yet § 1202(d) permits the President to remove her for inefficiency, neglect of duty, or malfeasance in office. The Court nonetheless notes the undisputed record demonstrating that Harris and her colleagues have carried out their duties to decide cases in addition to clearing a significant backlog.

available to [the] plaintiff." *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022)

(quoting *Muthana v. Pompeo*, 985 F.3d 893, 910 (D.C. Cir. 2021)).  "[M]andamus jurisdiction

under § 1361 merges with the merits." *Muthana*, 985 F.3d at 910 (quoting *Lovitky v. Trump*, 949

F.3d 753, 759 (D.C. Cir. 2020)).  "[E]ven if the plaintiff overcomes all these hurdles, whether

mandamus relief should issue is discretionary." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir.

2005).

The Court finds the first two requirements for mandamus relief to be satisfied.  A court

"can analyze the clear right to relief and clear duty to act requirements for mandamus

'concurrently.'" *Illinois v. Ferriero*, 60 F.4th 704, 715 (D.C. Cir. 2023) (quoting *Lovitky*, 949

F.3d at 760).  "[T]o meet the 'clear duty to act' standard, '[t]he law must not only authorize the

demanded action, but require it; the duty must be clear and indisputable.'" *Ferriero*, 60 F.4th at

715 (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931).  Based on the

Court's holding that federal law precludes the President's power to remove Harris at will, the

Court finds a duty here that is clear and indisputable, and under binding Supreme Court

precedent there is no "room for an honest difference of opinion" on the part of federal officials.

*Reichelderfer v. Johnson*, 72 F.2d 552, 554 (D.C. Cir. 1934).  In other words, the statute does not

provide room for executive discretion—the President has no menu of options to pick from when

he categorically may not remove Harris without cause.  In making this determination, the Court

additionally looks to the voluminous precedent demonstrating that courts of law issued

mandamus relief in similar situations at the time Congress passed the All Writs Act in 1789 and

over the ensuing centuries.

As the Court previewed earlier, however, it appears at present that Harris has a separate,

"adequate remedy" available in the form of a permanent injunction.  *In re Nat'l Nurses United*,

47 F.4th at 752 n.4.  The Court thus determines that her request for mandamus relief fails on that basis alone.  Were equitable injunctive relief unavailable here, however, the Court would not hesitate to "vigilantly enforce federal law" and "award[] necessary relief" through a writ of mandamus as an alternative remedy at law.  *DL*, 860 F.3d at 726.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff Cathy A. Harris's motion for summary judgment is **GRANTED**; and it is

**DECLARED** that Plaintiff Cathy A. Harris remains a member of the Merit Systems Protection Board, having been confirmed by the Senate on May 25, 2022, and sworn in on June 1, 2022, and that she may be removed by the President prior to the expiration of her term in office only for inefficiency, neglect of duty, or malfeasance in office pursuant to 5 U.S.C. § 1202; and it is

**FURTHER ORDERED** that Plaintiff Cathy A. Harris shall continue to serve as a member of the Merit Systems Protection Board until her term expires pursuant to 5 U.S.C. § 1202, unless she is earlier removed for inefficiency, neglect of duty, or malfeasance in office under that statute.  Defendants Secretary Scott Bessent, Deputy Director Trent Morse, Director Sergio Gor, Acting Chairman Henry Kerner, and Director Russell Vought are **ENJOINED** from removing Harris from her office without cause or in any way treating her as having been removed without cause, denying or obstructing Harris's access to any of the benefits or resources of her office, placing a replacement in Harris's position, or otherwise recognizing any other person as a member of the Merit Systems Protection Board in Harris's position; and it is

**FURTHER ORDERED** that the Court's Temporary Restraining Order is **VACATED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 4, 2025                                RUDOLPH CONTRERAS
                                                     United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATHY A. HARRIS,

*Plaintiff,*

*v.*                                                    Civil Action No. 1:25-cv-00412-RC

SCOTT BESSENT, *et al.,*

*Defendants.*

## DEFENDANTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from this Court's Order Granting Plaintiff's Motion for Summary Judgment and Memorandum Opinion Granting Plaintiff's Motion for Summary Judgment. *See* ECF Nos. 39, 40.

Dated: March 4, 2025

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*
*Civil Division*

CHRISTOPHER R. HALL
*Assistant Branch Director*

/s/ *Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
(DC Bar No. 1024112)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 532-3114
Email: jeremy.s.newman@usdoj.gov

*Counsel for Defendants*

### *1:25cv334, Wilcox V. Trump Et Al*

US District Court Docket

United States District Court, District of Columbia

(Washington, DC)

**This case was retrieved on 03/24/2025**

## Header

**Case Number:** 1:25cv334
**Date Filed:** 02/05/2025
**Assigned To:** Judge Beryl A. Howell
**Nature of Suit:** Other Statutory Actions (890)
**Cause:** Declaratory Judgment
**Lead Docket:** None
**Other Docket:** USCA, 25-05057
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Closed
**Closed:** 03/06/2025
**Statute:** 28:2201
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Statutory Actions

## Participants

| Litigants | Attorneys |
|---|---|
| Gwynne A. Wilcox<br>**Plaintiff** | Gregory A. Beck<br>ATTORNEY TO BE NOTICED<br>GUPTA WESSLER LLP<br>2001 K Street, Nw Suite 850 North<br>Washington, DC  20006<br>USA<br>202-888-1741 Email:Greg@guptawessler.Com<br><br>Jennifer Bennett<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Gupta Wessler LLP<br>505 Montgomery Street Suite 625<br>San Francisco, CA  94111<br>USA<br>415-573-0336 Email:Jennifer@guptawessler.Com<br><br>Matthew Wessler<br>ATTORNEY TO BE NOTICED<br>Gupta Wessler LLP<br>2001 K St Nw Suite 850 North<br>Washington, DC  20006<br>USA<br>202-888-1741 Email:Matt@guptawessler.Com<br><br>Deepak Gupta<br>ATTORNEY TO BE NOTICED<br>GUPTA WESSLER LLP<br>2001 K Street, Nw Suite 850 North<br>Washington, DC  20006 |

**JA109**

1:25cv334, Wilcox V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| | USA<br>202-888-1741 Fax: 202-888-7792<br>Email:Deepak@guptawessler.Com |
| Donald J. Trump<br>in his official capacity as President of the United States \|<br>**Defendant** | Alexander William Resar<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-CIV<br>1100 L Street Nw Suite 11208<br>Washington, DC  20530<br>USA<br>(202) 616-8188 Fax: (202) 616-8470<br>Email:Alexander.W.Resar@usdoj.Gov |
| | Madeline McMahon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>[Terminated: 03/02/2025]<br>DOJ-CIV<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>(202) 451-7722 Fax: (202) 616-8470<br>Email:Madeline.M.Mcmahon@usdoj.Gov |
| | Harry Graver<br>ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue Nw<br>Washington, DC  20530<br>USA<br>202-514-2000 Email:Harry.Graver@usdoj.Gov |
| Marvin Kaplan<br>in his official capacity as Chairman of the National Labor<br>Relations Board \|<br>**Defendant** | Alexander William Resar<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>DOJ-CIV<br>1100 L Street Nw Suite 11208<br>Washington, DC  20530<br>USA<br>(202) 616-8188 Fax: (202) 616-8470<br>Email:Alexander.W.Resar@usdoj.Gov |
| | Madeline McMahon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>[Terminated: 03/02/2025]<br>DOJ-CIV<br>1100 L Street Nw<br>Washington, DC  20005<br>USA<br>(202) 451-7722 Fax: (202) 616-8470<br>Email:Madeline.M.Mcmahon@usdoj.Gov |
| | Harry Graver<br>ATTORNEY TO BE NOTICED<br>U.S. DEPARTMENT OF JUSTICE<br>950 Pennsylvania Avenue Nw<br>Washington, DC  20530<br>USA<br>202-514-2000 Email:Harry.Graver@usdoj.Gov |
| Constitutional Accountability Center<br>**Defendant** | |
| Constitutional Accountability Center | Brianne Jenna Gorod |

**JA110**

1:25cv334, Wilcox V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| **Amicus** | LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>CONSTITUTIONAL ACCOUNTABILITY CENTER<br>1200 18th Street, Nw Suite 501<br>Washington, DC  20036<br>USA<br>(202) 296-6889 Ext. 304<br>Email:Brianne@theusconstitution.Org |
| State of Tennessee<br>**Amicus** | Whitney D. Hermandorfer<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Office of Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, TN  37202<br>USA<br>615-741-7403 Email:Whitney.Hermandorfer@ag.Tn.Gov |
| State of Florida<br>**Amicus** | Nathan Andrew Forrester<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/FL<br>Pl-01, The Capitol<br>Tallahassee, FL  32399<br>USA<br>703-906-0298 Email:Nathan.Forrester@myfloridalegal.Com<br><br>Darrick Monson<br>ATTORNEY TO BE NOTICED<br>FLORIDA ATTORNEY GENERALS OFFICE<br>107 W Gaines Street<br>Tallahassee, FL  32399<br>USA<br>850-414-3683 Email:Darrick.Monson@myfloridalegal.Com<br><br>David Costello<br>ATTORNEY TO BE NOTICED<br>FLORIDA ATTORNEY GENERAL'S OFFICE<br>Concourse Center Iv 3507 E. Frontage Road Ste 200<br>Tampa, FL  33607<br>USA<br>908-461-5672 Email:David.Costello@myfloridalegal.Com<br><br>Jeffrey Paul DeSousa , I<br>ATTORNEY TO BE NOTICED<br>OFFICE OF THE ATTORNEY GENERAL/FL<br>Pl-01, The Capitol<br>Tallahassee, FL  32399<br>USA<br>850-414-3830 Email:Jeffrey.Desousa@myfloridalegal.Com |
| State of Minnesota<br>**Amicus** | Zach Biesanz<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Minnesota Attorney General's Office<br>445 Minnesota Street Suite 600<br>St. Paul, MN  55101<br>USA<br>651-757-1257 Fax: 651-296-7438<br>Email:Zach.Biesanz@ag.State.Mn.Us |
| State of Arizona<br>**Amicus** | |
| State of California<br>**Amicus** | |

1:25cv334, Wilcox V. Trump Et Al

| Litigants | Attorneys |
|---|---|
| State of Colorado **Amicus** | |
| State of Connecticut **Amicus** | |
| State of Delaware **Amicus** | |
| District of Columbia **Amicus** | |
| State of Hawaii **Amicus** | |
| State of Illinois **Amicus** | |
| State of Maryland **Amicus** | |
| Commonwealth of Massachusetts **Amicus** | |
| State of Michigan **Amicus** | |
| State of Nevada **Amicus** | |
| State of New Jersey **Amicus** | |
| State of New Mexico **Amicus** | |
| State of New York **Amicus** | |
| State of Oregon **Amicus** | |
| State of Rhode Island **Amicus** | |
| State of Vermont **Amicus** | |
| State of Wisconsin **Amicus** | |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 02/05/2025 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number ADCDC-11456936) filed by GWYNNE A. WILCOX. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet, # 3 Summons, # 4 Summons)(Gupta, Deepak) (Entered: 02/05/2025) | |
| | 02/05/2025 | Case Assigned to Judge Beryl A. Howell. (zmtm) (Entered: 02/05/2025) | |
| 2 | 02/05/2025 | SUMMONS (2) Issued Electronically as to MARVIN KAPLAN, DONALD J. TRUMP. (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 02/05/2025) | |
| | 02/05/2025 | NOTICE OF NEW CASE ERROR The following error(s) need correction: Missing summonses- U.S. government. When naming a U.S. government agent or agency as a defendant, you must supply a summons for each defendant & two additional summonses for the U.S. Attorney & U.S. Attorney General. Please submit using the event Request for Summons to Issue. (zmtm) (Entered: 02/05/2025) | |

1:25cv334, Wilcox V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 3 | 02/05/2025 | REQUEST FOR SUMMONS TO ISSUE filed by GWYNNE A. WILCOX. Related document: 1 Complaint filed by GWYNNE A. WILCOX.(Gupta, Deepak) (Entered: 02/05/2025) | |
| 4 | 02/05/2025 | REQUEST FOR SUMMONS TO ISSUE filed by GWYNNE A. WILCOX. Related document: 1 Complaint filed by GWYNNE A. WILCOX.(Gupta, Deepak) (Entered: 02/05/2025) | |
| 5 | 02/05/2025 | STANDING ORDER. Signed by Judge Beryl A. Howell on February 5, 2025. (lcbah4) (Entered: 02/05/2025) | |
| 6 | 02/06/2025 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (mg) (Entered: 02/06/2025) | |
| 7 | 02/07/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Jennifer D. Bennett,  Filing fee $ 100, receipt number ADCDC-11465758. Fee Status: Fee Paid. by GWYNNE A. WILCOX. (Attachments: # 1 Declaration, # 2 Text of Proposed Order)(Gupta, Deepak) (Entered: 02/07/2025) | |
| | 02/07/2025 | MINUTE ORDER (paperless) DENYING without prejudice plaintiff's 7 Motion for Pro Hac Vice Admission of Jennifer D. Bennett. Pursuant to Local Rule 83.2(e)(2), motions for pro hac admission must be accompanied by "a certificate of the court or bar for the state in which the applicant regularly practices, which has been issued within thirty (30) days of filing and states that the applicant is a member in good standing of the bar of that state court." Signed by Judge Beryl A. Howell on February 7, 2025. (lcbah4) (Entered: 02/07/2025) | |
| 8 | 02/07/2025 | NOTICE of Appearance by Matthew Wessler on behalf of GWYNNE A. WILCOX (Wessler, Matthew) (Entered: 02/07/2025) | |
| 9 | 02/10/2025 | NOTICE of Appearance by Gregory A. Beck on behalf of GWYNNE A. WILCOX (Beck, Gregory) (Entered: 02/10/2025) | |
| 10 | 02/10/2025 | MOTION for Summary Judgment , MOTION to Expedite  by GWYNNE A. WILCOX. (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 Declaration, # 4 Exhibit, # 5 Text of Proposed Order)(Gupta, Deepak) (Entered: 02/10/2025) | |
| | 02/10/2025 | MINUTE ORDER (paperless), upon consideration of plaintiff's 10 Motion for Expedited Summary Judgment, DIRECTING the parties to confer and jointly propose an expedited summary judgment briefing schedule by 2:00 pm on February 11, 2025. Signed by Judge Beryl A. Howell on February 10, 2025. (lcbah4) (Entered: 02/10/2025) | |
| | 02/10/2025 | Set/Reset Deadlines: Parties Joint Proposed Expedited Summary Judgment Briefing Schedule due no later than 2:00PM on 2/11/2025. (mac) (Entered: 02/10/2025) | |
| 11 | 02/11/2025 | NOTICE of Appearance by Madeline McMahon on behalf of All Defendants (McMahon, Madeline) (Entered: 02/11/2025) | |
| 12 | 02/11/2025 | PROPOSED BRIEFING SCHEDULE Joint by GWYNNE A. WILCOX. (Gupta, Deepak) (Entered: 02/11/2025) | |
| | 02/11/2025 | MINUTE ORDER (paperless), upon consideration of the parties' 12 Proposed Briefing Schedule, ISSUING the following SCHEDULING ORDER: 1. By February 21, 2025 at 5:00 pm, defendants shall file any opposition to plaintiff's motion for expedited summary judgment and any cross-motion for summary judgment; 2. By February 25, 2025 at 5:00 pm, plaintiff shall file any reply in support of her motion and any opposition to defendants' cross motion; 3. By February 28, 2025 at 5:00 pm, defendants shall file any reply in support of their cross-motion; and 4. On March 5, 2025 at 10:00 AM any hearing, if necessary, will be held in-person in Courtroom 26A. Signed by Judge Beryl A. Howell on February 11, 2025. (lcbah4) (Entered: 02/11/2025) | |

1:25cv334, Wilcox V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | 02/12/2025 | Set/Reset Deadlines/Hearings: Defendants Opposition To Plaintiff's Motion For Expedited Summary Judgment And Any Cross-Motion For Summary Judgment due no later than 5:00PM on 2/21/2025.Plaintiff Reply In Support Of Motion And Any Opposition To Defendants' Cross Motion due no later than 5:00PM on 2/25/2025. Defendants Reply In Support Of Cross-Motion due no later than 5:00PM on 2/28/2025. Motion Hearing set for 3/5/2025 at 10:00 AM in Courtroom 26A- In Person before Judge Beryl A. Howell. (mac) (Entered: 02/12/2025) | |
| 13 | 02/14/2025 | RETURN OF SERVICE/Affidavit of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/11/2025. Answer due for ALL FEDERAL DEFENDANTS by 4/12/2025. (Attachments: # 1 Affidavit)(Gupta, Deepak) (Entered: 02/14/2025) | |
| 14 | 02/14/2025 | MOTION for Leave to File Amicus Brief by CONSTITUTIONAL ACCOUNTABILITY CENTER. (Attachments: # 1 Exhibit Proposed Amicus Brief, # 2 Text of Proposed Order)(Gorod, Brianne) (Entered: 02/14/2025) | |
| | 02/14/2025 | MINUTE ORDER (paperless) GRANTING the Constitutional Accountability Center's 14 Motion for Leave to File Amicus Brief to which all parties consent. Signed by Judge Beryl A. Howell on February 14, 2025. (lcbah4) (Entered: 02/14/2025) | |
| 15 | 02/14/2025 | AMICUS BRIEF by CONSTITUTIONAL ACCOUNTABILITY CENTER. (mg) (Entered: 02/18/2025) | |
| 16 | 02/19/2025 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name-Jennifer D. Bennett,  Filing fee $ 100, receipt number ADCDC-11490360. Fee Status: Fee Paid. by GWYNNE A. WILCOX. (Attachments: # 1 Declaration, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order)(Gupta, Deepak) (Entered: 02/19/2025) | |
| 17 | 02/20/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 02/20/2025., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARVIN KAPLAN served on 2/19/2025 (Attachments: # 1 Exhibit United States Attorney General Certified Mail Receipt, # 2 Affidavit Marvin E. Kaplan, # 3 Exhibit Marvin E. Kaplan Certified Mail Receipt)(Gupta, Deepak) (Entered: 02/20/2025) | |
| 18 | 02/20/2025 | AMICUS BRIEF by STATE OF TENNESSEE. (Hermandorfer, Whitney) Modified docket text on 2/27/2025 (mg). (Entered: 02/20/2025) | |
| | 02/20/2025 | MINUTE ORDER (paperless) GRANTING plaintiff's 16 Motion to Appear Pro Hac Vice. Ms. Jennifer Bennett may enter an appearance pro hac vice for the purpose of representing the plaintiff in this action. Counsel should register for e-filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a) Click for instructions. Signed by Judge Beryl A. Howell on February 20, 2025. (lcbah4) (Entered: 02/20/2025) | |
| 19 | 02/21/2025 | NOTICE of Appearance by Nathan Andrew Forrester on behalf of STATE OF FLORIDA (Forrester, Nathan) (Entered: 02/21/2025) | |
| 20 | 02/21/2025 | NOTICE of Appearance by Darrick Monson on behalf of STATE OF FLORIDA (Monson, Darrick) (Entered: 02/21/2025) | |
| 21 | 02/21/2025 | NOTICE of Appearance by Jeffrey Paul DeSousa, I on behalf of STATE OF FLORIDA (DeSousa, Jeffrey) (Entered: 02/21/2025) | |
| 22 | 02/21/2025 | NOTICE of Appearance by David Costello on behalf of STATE OF FLORIDA (Costello, David) (Entered: 02/21/2025) | |
| 23 | 02/21/2025 | Cross MOTION for Summary Judgment  by DONALD J. TRUMP, | |

**JA114**

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | MARVIN KAPLAN. (Attachments: # 1 Text of Proposed Order, # 2 Statement of Facts)(McMahon, Madeline) (Entered: 02/21/2025) | |
| 24 | 02/21/2025 | ENTERED IN ERROR.....RESPONSE re 10 MOTION for Summary Judgment  MOTION to Expedite , 23 Cross MOTION for Summary Judgment  filed by STATE OF FLORIDA. (Forrester, Nathan) Modified on 2/24/2025, pursuant to Counsel (mg). (Entered: 02/21/2025) | |
| 25 | 02/24/2025 | NOTICE of Appearance by Jennifer Bennett on behalf of GWYNNE A. WILCOX (Bennett, Jennifer) (Entered: 02/24/2025) | |
| 26 | 02/24/2025 | AMICUS BRIEF in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross-Motion for Summary Judgment by STATE OF FLORIDA. (Forrester, Nathan) (Entered: 02/24/2025) | |
| | 02/24/2025 | NOTICE OF ERROR re 26 Amicus Brief; emailed to nathan.forrester@myfloridalegal.com, cc'd 38 associated attorneys -- The PDF file you docketed contained errors: 1. Please note the following for future filings; do not refile document, 2. Signature on Filing must match PACER account (mg, ) (Entered: 02/24/2025) | |
| 27 | 02/25/2025 | Memorandum in opposition to re 10 Motion for Summary Judgment, Motion to Expedite, 23 Motion for Summary Judgment filed by GWYNNE A. WILCOX. (Gupta, Deepak) (Entered: 02/25/2025) | |
| 28 | 02/25/2025 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DONALD J. TRUMP served on 2/25/2025 (Attachments: # 1 Exhibit Donald J. Trump Certified Mail Receipt)(Gupta, Deepak) (Entered: 02/25/2025) | |
| | 02/27/2025 | NOTICE of Hearing: The Parties Shall Appear For A Motion Hearing scheduled for March 5, 2025 at 10:00 AM in Courtroom 26A- In Person before Judge Beryl A. Howell. (mac) (Entered: 02/27/2025) | |
| | 02/28/2025 | NOTICE: Members of the public or media who wish to listen to live audio of the hearing scheduled for March 5, 2025 at 10AM ET, without physically attending the proceeding, may do so by dialing the Toll Free Number: 833-990-9400, Meeting ID: 491822013. Any use of the public access telephone line requires adherence to the general prohibition against photographing, recording, livestreaming, and rebroadcasting of court proceedings (including those held by telephone or videoconference), as set out in Standing Order No. 24-31 (JEB), available here: <https://www.dcd.uscourts.gov/sites/dcd/files/Standing%20Order% 20No.%2024-31_001.pdf >  Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. (mac) (Entered: 02/28/2025) | |
| 29 | 02/28/2025 | NOTICE of Appearance by Harry Graver on behalf of DONALD J. TRUMP, MARVIN KAPLAN (Graver, Harry) (Entered: 02/28/2025) | |
| 30 | 02/28/2025 | REPLY to opposition to motion re 23 Motion for Summary Judgment  filed by DONALD J. TRUMP, MARVIN KAPLAN. (McMahon, Madeline) (Entered: 02/28/2025) | |
| 31 | 02/28/2025 | AMICUS BRIEF  by STATE OF MINNESOTA, STATE OF ARIZONA, STATE OF CALIFORNIA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAII, STATE OF ILLINOIS, STATE OF MARYLAND, COMMONWEALTH OF MASSACHUSETTS, STATE OF MICHIGAN, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, | |

1:25cv334, Wilcox V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | STATE OF NEW YORK, STATE OF OREGON, STATE OF RHODE ISLAND, STATE OF VERMONT, STATE OF WISCONSIN. (Biesanz, Zach) (Entered: 02/28/2025) | |
| 32 | 03/02/2025 | NOTICE OF SUBSTITUTION OF COUNSEL by Alexander William Resar on behalf of DONALD J. TRUMP, MARVIN KAPLAN Substituting for attorney Madeline M. McMahon (Resar, Alexander) (Entered: 03/02/2025) | |
| 33 | 03/04/2025 | NOTICE OF SUPPLEMENTAL AUTHORITY by GWYNNE A. WILCOX (Attachments: # 1 Exhibit Harris v. Bessent, # 2 Exhibit Dellinger v. Bessent)(Gupta, Deepak) (Entered: 03/04/2025) | |
| | 03/05/2025 | Minute Entry for proceedings held before Judge Beryl A. Howell: Motion Hearing held on 3/5/2025 re 10 Motion for Summary Judgment/Expedite and 23 Cross Motion for Summary Judgment. The Court Heard Oral Arguments From The Parties. (Court Reporter ELIZABETH DAVILA.) (mac) (Entered: 03/05/2025) | |
| 34 | 03/06/2025 | ORDER GRANTING plaintiff's 10 Motion for Summary Judgment and DENYING defendants' 23 Cross Motion for Summary Judgment. See Order for further details. Signed by Judge Beryl A. Howell on March 6, 2025. (lcbah4) (Entered: 03/06/2025) | |
| 35 | 03/06/2025 | MEMORANDUM OPINION regarding plaintiff's 10 Motion for Summary Judgment and defendants' 23 Cross Motion for Summary Judgment. Signed by Judge Beryl A. Howell on March 6, 2025. (lcbah4) (Entered: 03/06/2025) | |
| 36 | 03/06/2025 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 35 Memorandum & Opinion, 34 Order on Motion for Summary Judgment, by DONALD J. TRUMP, MARVIN KAPLAN. Fee Status: No Fee Paid. Parties have been notified. (Resar, Alexander) (Entered: 03/06/2025) | |
| 37 | 03/06/2025 | TRANSCRIPT OF PROCEEDINGS, before Judge Beryl A. Howell, held on 3-05-2025; Page Numbers: 1 - 101. Date of Issuance: 3-06-2025. Court Reporter: Elizabeth Davila, Telephone number: 202-354-3242. Transcripts may be ordered by submitting the Transcript Order FormFor the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter.NOTICE RE REDACTION OF TRANSCRIPTS: The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 3/27/2025. Redacted Transcript Deadline set for 4/6/2025. Release of Transcript Restriction set for 6/4/2025.(Davila, Elizabeth) (Entered: 03/06/2025) | |
| 38 | 03/07/2025 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 36 Notice of Appeal to DC Circuit Court. (znmw) (Entered: 03/07/2025) | |
| | 03/07/2025 | USCA Case Number 25-5057 for 36 Notice of Appeal to DC Circuit Court filed by MARVIN KAPLAN, DONALD J. TRUMP. (mg) (Entered: 03/07/2025) | |
| 39 | 03/07/2025 | MOTION to Stay Court's Order Pending Appeal by DONALD J. TRUMP, MARVIN KAPLAN. (Resar, Alexander) (Entered: | |

1:25cv334, Wilcox V. Trump Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 03/07/2025) | |
| 40 | 03/07/2025 | RESPONSE re 39 MOTION to Stay Court's Order Pending Appeal filed by GWYNNE A. WILCOX. (Gupta, Deepak) (Entered: 03/07/2025) | |
| 41 | 03/08/2025 | ORDER DENYING defendants' 39 Motion for Stay. See Order for further details. Signed by Judge Beryl A. Howell on March 8, 2025. (lcbah4) (Entered: 03/08/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GWYNNE A. WILCOX,
    2001 K Street, NW,
    Washington, DC 20006,
              *Plaintiff*,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United States,
    1600 Pennsylvania Avenue, NW,
    Washington, DC 20500,

    and

MARVIN E. KAPLAN, in his official
capacity as Chairman of the National
Labor Relations Board,
    1015 Half Street SE,
    Washington, D.C. 20570,
              *Defendants*.

Case No. _____

COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF

## INTRODUCTION

This case challenges President Trump's unprecedented and illegal removal of Gwynne A. Wilcox from her position as a duly confirmed member of the National Labor Relations Board. Ms. Wilcox is the first Black woman to serve on the Board, the first Black woman to serve as its Chair, and—if the President's action is allowed to stand—will also be the first member to be removed from office since the Board's inception in 1935.

The President's firing of Ms. Wilcox by late-night email was a blatant violation of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, which allows the President to remove Board members only in cases of "neglect of duty or malfeasance in office, but for no other cause," and only after "notice and hearing," 29 U.S.C. § 153(a). The President's removal of Ms. Wilcox without even purporting to identify any neglect of duty or malfeasance, and without notice or a hearing,

1

defies ninety years of Supreme Court precedent that has ensured the independence of critical government agencies like the Federal Reserve. And because the removal reduced the National Labor Relations Board to just two members, it also eliminated a quorum—bringing an immediate and indefinite halt to its critical work of adjudicating labor-relations disputes.

The President's action against Ms. Wilcox is part of a string of openly illegal firings in the early days of the second Trump administration that are apparently designed to test Congress's power to create independent agencies like the Board. Although Ms. Wilcox has no desire to aid the President in establishing a test case, she is also cognizant of the fact that, if no challenge is made, the President will have effectively succeeded in rendering the NLRA's protections—and, by extension, that of other independent agencies—nugatory. As a rightful member of the Board, Ms. Wilcox accordingly seeks declaratory and injunctive relief to remedy the President's unlawful action, ensure that the Board can resume its important work, and restore the Board's congressionally mandated independence.

## JURISDICTION AND VENUE

1.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1361, 1651, 2201, and 2202.

2.    Venue is proper in this district under 28 U.S.C. § 1391(e).

## PARTIES

3.    Plaintiff Gwynne A. Wilcox is a member of the National Labor Relations Board, duly confirmed by the U.S. Senate to a five-year term expiring in August 2028.

4.    Defendant Donald J. Trump is the President of the United States and is responsible for the decision to remove Ms. Wilcox from that position. He is sued in his official capacity.

5.    Defendant Marvin E. Kaplan is the Chairman of the National Labor Relations Board, in which position he oversees the administration, operation, and personnel of the Board. He is sued in his official capacity.

**STATUTORY BACKGROUND**

6.    Ninety years ago, Congress established the National Labor Relations Board as an independent federal agency charged with remedying the "inequality of bargaining power" between employers and employees "by encouraging … collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing." 29 U.S.C. § 151. The Board's responsibilities include the exclusive jurisdiction to protect employees from unfair labor practices and to adjudicate labor disputes. *See id.* §§ 157–60. The Board adjudicates hundreds of unfair-labor-practice charges and disputes concerning workplace elections each year from more than 30 regional offices throughout the United States.

7.    Congress created the Board as an independent, quasi-judicial body consisting of five members appointed by the President "with the advice and consent of the Senate" for staggered five-year terms. 29 U.S.C. § 153(a). One member, designated by the President, serves as the Board's Chair. *Id.*

8.    Congress expressly provided that the Board's members do not serve at the pleasure of the President but instead can be removed only for cause. The NLRA provides that a "member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." *Id.*

9.    Congress established these protections to ensure the Board's status as an independent and impartial adjudicative body. The independence of Board members, Congress concluded, was critical to protect them "from being subject to immediate political reactions at elections." NLRB, *1 Legislative History of the National Labor Relations Act*, at 1467 (1949). The Act's

3

**JA120**

sponsor, Senator Robert Wagner, explained that only an autonomous tribunal—"detached from any particular administration that happens to be in power"—could fairly adjudicate disputes between employers and employees. *Id.* at 1428.

10.    Congress has a long history of establishing independent agencies, beginning nearly 150 years ago with the Interstate Commerce Commission. *See* Interstate Commerce Act, § 11, 24 Stat. at 383 (1887). Since then, Congress has created and fine-tuned the structures for dozens of additional agencies, including the Federal Reserve Board, whose leaders are removable only for cause. In *Humphrey's Executor v. United States*, the Supreme Court upheld the constitutionality of such statutory protections, holding that the President lacked authority to remove Commissioners of the Federal Trade Commission for reasons other than those specified by Congress. 295 U.S. 602 (1935). Congress has relied on that precedent for ninety years in structuring independent agencies, and abandoning it now could cast a cloud over a wide variety of agency decision-making.

11.    Congress's decision to structure the Board as an independent agency follows directly in this well-established tradition. As Senator Wagner stated, "[t]here is no more reason why the Board should be connected with the Department of Labor than why the Federal Trade Commission should be attached to the Department of Commerce." NLRB, *1 Legislative History of the National Labor Relations Act*, at 1428.

## FACTUAL ALLEGATIONS

12.    Ms. Wilcox was confirmed by the U.S. Senate as a member of the NLRB on August 4, 2021. The Senate confirmed her for a second term of five years on September 6, 2023—a term that will not end until August 27, 2028. On December 17, 2024, President Biden designated Ms. Wilcox as the Board's Chair.

13.    Immediately upon taking office, President Trump designated defendant Kaplan to replace Ms. Wilcox as Chair of the Board.

14.     In open disregard of the NLRB's for-cause removal provision, President Trump then removed Ms. Wilcox from her position as a member of the Board on Monday, January 27. In a late-night email sent on behalf of the President, the Deputy Director of the White House Presidential Personnel Office—the division of the White House responsible for political appointments—stated that Ms. Wilcox (whom the email incorrectly calls "Commissioners [sic] Wilcox") is "hereby removed from the office of Member[] of the National Labor Relations Board." *See* Ex. 1 (email from Trent Morse). The President's decision to remove Ms. Wilcox is unprecedented. In the 90 years since Congress passed the NLRA, no President has previously attempted to remove a member of the Board.[1]

15.     Ms. Wilcox was never given a "notice and hearing" before her removal, as required by 29 U.S.C. § 153(a).

16.     Rather than identifying any "neglect of duty or malfeasance in office," as required by section 153(a), the email cites the President's belief that "heads of agencies within the Executive Branch must share the objectives of [his] administration"—a blatantly political purpose that flies in the face of the NLRB's independent status. Although the email acknowledges that "the National Labor Relations Act purports to limit removal of Board members to 'neglect of duty or malfeasance in office,'" it asserts that "this limitation is inconsistent with the vesting of the executive Power in the President."

17.     Ms. Wilcox has disputed the President's authority to fire her, calling the move "unprecedented and illegal." The next morning, however, the Board's Director of Admin-

---

[1] The email also states that President Trump removed the Board's General Counsel, Jennifer Abruzzo. Although the email mistakenly states that Ms. Abruzzo is subject to the same removal protections as Ms. Wilcox, the NLRA's protections apply by their terms only to a "member of the Board." 29 U.S.C. § 153(a). The President's decision to remove Ms. Abruzzo is not at issue in this case.

istration—who reports directly to defendant Kaplan—began the termination process, cutting off Ms. Wilcox's email access and telling her to clean out her office or that it would be cleaned out for her. The following day, the agency requested that Ms. Wilcox return her government laptop, phone, and iPad. As a result of these actions, Ms. Wilcox is unable to carry out the duties of a member of the Board.

18.    Although the NLRA allows the Board to continue operating if there are vacancies, it requires at least three members for a quorum. 29 U.S.C. § 153(b). Because there were already two vacancies on the five-member Board, the President's removal of Ms. Wilcox without nominating a replacement leaves the Board with just two sitting members, effectively shutting down its operations. As a consequence, no mechanism remains for resolving labor disputes under the NLRA, and workers—who lack a private right to enforce their rights under the Act—are left without legal recourse for unfair labor practices.

### CLAIM FOR RELIEF

### VIOLATION OF THE NATIONAL LABOR RELATIONS ACT, 29 U.S.C. § 153(a)

19.    Under the NLRA's plain language, Ms. Wilcox has a clear legal entitlement to retain her position as a member of the National Labor Relations Board. Section 153(a) states, in mandatory terms, that a "member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for *no other cause*." 29 U.S.C. § 153(a) (emphasis added).

20.    President Trump's removal of Ms. Wilcox as a member of the Board without purporting to identify any neglect of duty or malfeasance, and without providing notice or a hearing, is unlawful under section 153(a) and is an obvious attempt to intentionally contravene Congress's statutory scheme.

**JA123**

21.     The President, however, asserts that the Act's limitations are "inconsistent with the vesting of the executive Power in the President." Because there is thus a substantial and continuing controversy between Ms. Wilcox and the defendants over the efficacy of the removal, a declaration of rights under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, is both necessary and appropriate to establish that Ms. Wilcox remains a rightful member of the Board and that the President lacks authority to remove her in contravention of the NLRA's requirements. Relief is also appropriate under the Administrative Procedure Act, 5 U.S.C. § 706.

22.     Ms. Wilcox does not seek an injunction against President Trump, but asks for and is entitled to one against defendant Kaplan. Despite Ms. Wilcox's legal right to continue in the position of member of the Board, defendant Kaplan, acting in his capacity as Chair of the Board, acceded to her removal. Defendant Kaplan directly supervises the Board's Director of Administration, who carried out Ms. Wilcox's termination and made it impossible for her to continue to perform the duties of her position. Ms. Wilcox has been and continues to be irreparably harmed by defendant Kaplan's actions and is without an adequate remedy at law.

### PRAYER FOR RELIEF

The plaintiff requests that the Court:

a.  Declare that Ms. Wilcox was unlawfully removed as a member of the National Labor Relations Board, in violation of the National Labor Relations Act, 29 U.S.C. § 153(a);

b.  Enter an injunction against defendant Kaplan, ordering him to reinstate Ms. Wilcox as a member of the Board, including by providing her with access to government facilities and equipment, and to refrain from taking any further action to obstruct Ms. Wilcox's ability to carry out her duties;

c.  Award all other appropriate relief.

7

**JA124**

Dated: February 5, 2025              Respectfully submitted,

                                     */s/ Deepak Gupta*

                                     Deepak Gupta (D.C. Bar No. 495451)
                                     Matthew W.H. Wessler (D.C. Bar No. 985241)
                                     Gregory A. Beck (D.C. Bar No. 494479)
                                     **GUPTA WESSLER LLP**
                                     2001 K Street, NW
                                     Washington, DC 20006
                                     (202) 888-1741

                                     Jennifer D. Bennett*
                                     **GUPTA WESSLER LLP**
                                     505 Montgomery Street
                                     San Francisco, CA 94111
                                     (415) 573-0335

                                     * motion to appear *pro hac vice* forthcoming

                                     *Attorneys for Plaintiff Gwynne A. Wilcox*

8

**JA125**

# Exhibit A

**From:** Morse, Trent M. EOP/WHO [    6    ]@who.eop.gov
**Sent:** 1/28/2025 3:38:24 AM
**To:** jennifer.abruzzo@nlrb.gov; gwynne.wilcox@nlrb.gov
**CC:** Gor, Sergio N. EOP/WHO [    6    ]@who.eop.gov
**Subject:** [EXTERNAL] Notification from PPO RE: NLRB

Gwynne and Jennifer,

On behalf of President Donald J. Trump, please see the letter below.

Trent Morse
Deputy Director
Office of Presidential Personnel

Article II of the U.S. Constitution vests the entire executive power in a single President, who alone is accountable to the people. Pursuant to my constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. Art. II, §3, I must ensure that those who wield executive power on my behalf are held accountable. Of particular importance, heads of agencies within the Executive Branch must share the objectives of my administration and its commitment to serving the will of the American people.

In my judgment, the National Labor Relations Board is not presently fulfilling its responsibility to the American people. The NLRB wields immense executive power over private employment relationships and relations with unions—an area with vast economic consequences.

The aims and purposes of the Administration with respect to the work on the Board can be carried out most effectively with personnel of my own selection. To that end, effective as of this date, Gwynne A. Wilcox and Jennifer Abruzzo are hereby removed from the office of Members of the National Labor Relations Board.[1]

In addition, these two Board Members have not, in my judgment, been operating in a manner consistent with the objectives of my administration. In my judgment, Members Wilcox and General Counsel Abruzzo have adopted a host of decisions that have improperly cabined employers' rights to speak on the subject of unionization, raising serious First Amendment concerns about the censorship of important

---

[1]While the National Labor Relations Act purports to limit removal of Board members to "neglect of duty or malfeasance in office, but for no other cause," 29 U.S.C. § 153(a), this limitation is inconsistent with the vesting of the executive Power in the President and his constitutional duty to take care that the laws are faithfully executed and thus does not operate as a restriction on my ability to remove Board members. U.S. Const., Art. II, § 1, cl. 1; *id.* at § 3. "[A]s a general matter,' the Constitution gives the President 'the authority to remove those who assist him in carrying out his duties.'" *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 204 (2020) (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 513-514 (2010)). There are two recognized exceptions: one for certain inferior officers and one for "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216. Board members have broad policy making responsibilities and thus are not inferior officers. *See* 29 U.S.C § 160(a); *Seila Law LLC*, 591 U.S. at 219. Moreover, while the NLRB is a multimember board, it is not "balanced along partisan lines." Finally, and most importantly, the Board exercises core executive powers. To wit, the Board has authority to promulgate binding regulations (*see* 29 U.S.C. § 159; *Seila Law LLC*, 591 U.S. at 218; pursue enforcement actions in federal court (*see* 29 USC 160(e); *Seila Law LLC*, 591 U.S. at 219); and unilaterally issue final decisions awarding equitable relief in administrative adjudications (*see* 29 USC 160(c)); *Seila Law LLC*, 591 U.S. at 219). Since neither exception applies to members of the NLRB, you are removable with or without statutory cause by the President.

**JA127**

speech. Several such decisions were issued on the eve of the new Administration. They have also issued decisions that, in my judgment, have vastly exceeded the bounds of the National Labor Relations Act. To take just one example, they supported a new joint employer rule—a rule that courts then invalidated and the Board seemingly acknowledged could not go forward.

Viewing their record collectively, I lack confidence that Commissioners Wilcox and General Counsel Abruzzo can fairly evaluate matters before them without unduly disfavoring the interests of employers large and small. The country is eager to get to work, revitalize our economy, and operate under clear, predictable rules that are fair to employers, unions, and employees alike. I lack confidence that Commissioners Wilcox and General Counsel Abruzzo will faithfully execute those objectives.

[1] While the National Labor Relations Act purports to limit removal of Board members to "neglect of duty or malfeasance in office, but for no other cause," 29 U.S.C. § 153(a), this limitation is inconsistent with the vesting of the executive Power in the President and his constitutional duty to take care that the laws are faithfully executed and thus does not operate as a restriction on my ability to remove Board members. U.S. Const., Art. II, § 1, cl. 1; *id.* at § 3. "[A]s a general matter,' the Constitution gives the President 'the authority to remove those who assist him in carrying out his duties.'" *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 204 (2020) (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 513-514 (2010)). There are two recognized exceptions: one for certain inferior officers and one for "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216. Board members have broad policy making responsibilities and thus are not inferior officers. *See* 29 U.S.C § 160(a); *Seila Law LLC*, 591 U.S. at 219. Moreover, while the NLRB is a multimember board, it is not "balanced along partisan lines." Finally, and most importantly, the Board exercises core executive powers. To wit, the Board has authority to promulgate binding regulations (*see* 29 U.S.C. § 159; *Seila Law LLC*, 591 U.S. at 218; pursue enforcement actions in federal court (*see* 29 USC 160(e); *Seila Law LLC*, 591 U.S. at 219); and unilaterally issue final decisions awarding equitable relief in administrative adjudications (*see* 29 USC 160(c)); *Seila Law LLC*, 591 U.S. at 219). Since neither exception applies to members of the NLRB, you are removable with or without statutory cause by the President.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GWYNNE A. WILCOX,

        *Plaintiff*,

    v.

DONALD J. TRUMP, in his official
capacity as President of the United States,

    and

MARVIN E. KAPLAN, in his official
capacity as Chairman of the National
Labor Relations Board,

        *Defendants*.

Case No. 1:25-cv-00334-BAH

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS
TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Civil Rule 7(h), the plaintiff hereby provides the following statement of

material facts as to which there is no genuine issue:

1.    Ms. Wilcox was confirmed by the U.S. Senate as a member of the National Labor

Relations Board on July 28, 2021. Roll Call Vote on the Nomination of Gwynne A. Wilcox to be a

Member of the National Labor Relations Board, 117th Cong., July 28, 2021.

2.    The U.S. Senate confirmed her for a second term of five years on September 6,

2023. Roll Call Vote on the Nomination of Gwynne A. Wilcox to be a Member of the National

Labor Relations Board, 118th Cong., Sept. 6, 2023.

3.    On January 27, 2025, at 10:38 PM ET, more than three years before her term expires,

Ms. Wilcox received a letter, sent by email "on behalf of" President Trump. Wilcox Decl. Ex. A,

1

at 1. The letter stated that Ms. Wilcox is "hereby removed from the office of Member[] of the National Labor Relations Board."[1]

4.    The letter does not identify any neglect of duty or malfeasance in office committed by Ms. Wilcox. Wilcox Decl. Ex. A. Nor has the President informed Ms. Wilcox in any other way that he believes she has committed any neglect of duty or malfeasance. Wilcox Decl. ¶ 3.

5.    Ms. Wilcox was not provided advance notice or a hearing. Wilcox Decl. ¶ 4.

6.    The letter states that although the National Labor Relations Act prohibits removal of Board members except for "neglect of duty or malfeasance in office," the President views this restriction as "inconsistent with the vesting of the executive Power in the President and his constitutional duty to take care that the laws are faithfully executed." Wilcox Decl. Ex. A, at 1 n.1. The letter states that in his view, therefore, the statutory limitation on removal "does not operate as a restriction on [his] ability to remove Board members." *Id.*


Dated: February 10, 2025          Respectfully submitted,

                                  */s/ Deepak Gupta*

                                  Deepak Gupta (D.C. Bar No. 495451)
                                  Matthew W.H. Wessler (D.C. Bar No. 985241)
                                  Gregory A. Beck (D.C. Bar No. 494479)
                                  **GUPTA WESSLER LLP**
                                  2001 K Street, NW
                                  Washington, DC 20006
                                  (202) 888-1741

---

[1] Ms. Wilcox received the letter at 10:38 PM Eastern Time on January 27. Wilcox Decl., Ex. A. The copy of the letter attached as an exhibit to the complaint is a version procured from the government through FOIA and filed in another lawsuit. That copy has a timestamp of January 28, 3:38 AM, but the same text. It appears that the sender may have been in a different time zone. In any event, the small difference in time is irrelevant to the motion for partial summary judgment.

2

Jennifer D. Bennett*
**GUPTA WESSLER LLP**
505 Montgomery Street
San Francisco, CA 94111
(415) 573-0335

* motion to appear *pro hac vice* forthcoming

*Attorneys for Plaintiff Gwynne A. Wilcox*

3

**JA131**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GWYNNE A. WILCOX,
                    *Plaintiff,*

        v.

DONALD J. TRUMP, in his official
capacity as President of the United States,

        and

MARVIN E. KAPLAN, in his official
capacity as Chairman of the National
Labor Relations Board,

                    *Defendants.*

Case No. 1:25-cv-00334-BAH

DECLARATION OF GWYNNE A.
WILCOX

I, Gwynne A. Wilcox, declare as follows:

1.      I was nominated by President Joseph R. Biden and confirmed by the United States

Senate as a member of the National Labor Relations Board for a five-year term expiring on August

27, 2028.

2.      On January 27, 2025, at 10:38 PM ET, I received an email from Trent Morse, Deputy

Director, Office of Presidential Personnel, transmitting a letter "on behalf of President Donald J.

Trump." The letter stated that I was "hereby removed from the office of Member[] of the National

Labor Relations Board." A copy of that email is attached to this declaration as Exhibit A.

3.      Neither President Trump's letter, nor any other communication from him, has

sought to justify my removal on the ground that I committed any neglect of duty or malfeasance

in office.

4.      I was not given either advance notice or a hearing concerning the reasons for my

removal from the Board.

1

**JA132**

5.    The morning after I received the letter, the Board's Director of Administration began the termination process, cutting off my email access and telling me to clean out my office or it would be cleaned out for me.

6.    The following day, the agency requested that I return my government laptop, phone, and iPad.

7.    As a result of these actions, I am unable to carry out my duties as a Senate-confirmed member of the National Labor Relations Board.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed in New York, New York on February 8, 2025.

Gwynne A. Wilcox

2

**JA133**

# Exhibit A

**From:** Morse, Trent M. EOP/WHO <Trent.M.Morse@who.eop.gov>
**Sent:** Monday, January 27, 2025 10:38:24 PM
**To:** Abruzzo, Jennifer <Jennifer.Abruzzo@nlrb.gov>; Wilcox, Gwynne <Gwynne.Wilcox@nlrb.gov>
**Cc:** Gor, Sergio N. EOP/WHO <Sergio.Gor@who.eop.gov>
**Subject:** [EXTERNAL] Notification from PPO RE: NLRB

Gwynne and Jennifer,

On behalf of President Donald J. Trump, please see the letter below.

Trent Morse

Deputy Director

Office of Presidential Personnel


Article II of the U.S. Constitution vests the entire executive power in a single President, who alone is accountable to the people.  Pursuant to my constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. Art. II, §3, I must ensure that those who wield executive power on my behalf are held accountable. Of particular importance, heads of agencies within the Executive Branch must share the objectives of my administration and its commitment to serving the will of the American people.

In my judgment, the National Labor Relations Board is not presently fulfilling its responsibility to the American people.  The NLRB wields immense executive power over private employment relationships and relations with unions—an area with vast economic consequences.

The aims and purposes of the Administration with respect to the work on the Board can be carried out most effectively with personnel of my own selection.  To that end, effective as of this date, Gwynne A. Wilcox and Jennifer Abruzzo are hereby removed from the office of Members of the National Labor Relations Board. [1]

In addition, these two Board Members have not, in my judgment, been operating in a manner consistent with the objectives of my administration.  In my judgment, Members Wilcox and General Counsel Abruzzo have adopted a host of decisions that have improperly cabined employers' rights to speak on the subject of unionization, raising serious First Amendment concerns about the censorship of important speech.  Several such decisions were issued on the eve of the new Administration.  They have also issued decisions that, in my judgment, have vastly exceeded the bounds of the National Labor Relations Act.  To take just one example, they supported a new joint employer rule—a rule that courts then invalidated and the Board seemingly acknowledged could not go forward.

Viewing their record collectively, I lack confidence that Commissioners Wilcox and General Counsel Abruzzo can fairly evaluate matters before them without unduly disfavoring the interests of employers large and small.  The country is eager to get to work, revitalize our economy, and operate under clear, predictable rules that are fair to employers, unions, and employees alike.  I lack confidence that Commissioners Wilcox and General Counsel Abruzzo will faithfully execute those objectives.

[1]  While the National Labor Relations Act purports to limit removal of Board members to "neglect of duty or malfeasance in office, but for no other cause," 29 U.S.C. § 153(a), this limitation is inconsistent with the vesting of the executive Power in the President and his constitutional duty to take care that the laws are faithfully executed and thus does not operate as a restriction on my ability to remove Board members.  U.S. Const., Art. II, § 1, cl. 1; *id.* at § 3. "[A]s a general matter,' the Constitution gives the President 'the authority to remove those who assist him in carrying out his duties.'" *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 204 (2020) (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 513-514 (2010)).  There are two recognized exceptions: one for certain inferior officers and one for "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216. Board members have broad policy making responsibilities and thus are not inferior officers. *See* 29 U.S.C § 160(a); *Seila Law LLC*, 591 U.S. at 219. Moreover, while the NLRB is a multimember board, it is not "balanced along partisan lines." Finally, and most importantly, the Board exercises core executive powers. To

wit, the Board has authority to promulgate binding regulations (*see* 29 U.S.C. § 159; *Seila Law LLC*, 591 U.S. at 218; pursue enforcement actions in federal court (*see* 29 USC 160(e); *Seila Law LLC*, 591 U.S. at 219); and unilaterally issue final decisions awarding equitable relief in administrative adjudications (*see* 29 USC 160(c)); *Seila Law LLC*, 591 U.S. at 219). Since neither exception applies to members of the NLRB, you are removable with or without statutory cause by the President.

---

[1]While the National Labor Relations Act purports to limit removal of Board members to "neglect of duty or malfeasance in office, but for no other cause," 29 U.S.C. § 153(a), this limitation is inconsistent with the vesting of the executive Power in the President and his constitutional duty to take care that the laws are faithfully executed and thus does not operate as a restriction on my ability to remove Board members. U.S. Const., Art. II, § 1, cl. 1; *id.* at § 3. "[A]s a general matter,' the Constitution gives the President 'the authority to remove those who assist him in carrying out his duties.'" *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 204 (2020) (quoting *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 513-514 (2010)). There are two recognized exceptions: one for certain inferior officers and one for "a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* at 216. Board members have broad policy making responsibilities and thus are not inferior officers. *See* 29 U.S.C § 160(a); *Seila Law LLC*, 591 U.S. at 219. Moreover, while the NLRB is a multimember board, it is not "balanced along partisan lines." Finally, and most importantly, the Board exercises core executive powers. To wit, the Board has authority to promulgate binding regulations (*see* 29 U.S.C. § 159; *Seila Law LLC*, 591 U.S. at 218; pursue enforcement actions in federal court (*see* 29 USC 160(e); *Seila Law LLC*, 591 U.S. at 219); and unilaterally issue final decisions awarding equitable relief in administrative adjudications (*see* 29 USC 160(c)); *Seila Law LLC*, 591 U.S. at 219). Since neither exception applies to members of the NLRB, you are removable with or without statutory cause by the President.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

GWYNNE A. WILCOX,

               Plaintiff,

        v.

DONALD J. TRUMP, *in his official capacity as President of the United States*

and

MARVIN E. KAPLAN, *in his official capacity as Chairman of the National Labor Relations Board*,

               Defendants.

---

Civil Action No. 25-cv-334

Judge Beryl A. Howell

---

<u>**ORDER**</u>

Upon consideration of plaintiff's motion for summary judgment, ECF No. 10, defendants' cross motion for summary judgment, ECF No. 23, the legal memoranda in support and in opposition, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby--

**ORDERED** that plaintiff's motion for summary judgment, ECF No. 10, is **GRANTED**; it is further

**ORDERED** that defendants' motion for summary judgment, ECF No. 23, is **DENIED**; it is further

**DECLARED** that the termination of plaintiff Gwynne A. Wilcox was unlawful, in violation of the National Labor Relations Act, 29 U.S.C. § 153(a), and therefore null and void; it is further

1

**DECLARED** that plaintiff Gwynne A. Wilcox remains a member of the National Labor Relations Board ("NLRB"), having been appointed by the President and confirmed by the Senate to a five-year term on September 6, 2023, and she may be removed by the President prior to expiration of her term only "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause," pursuant to 29 U.S.C. § 153(a); it is further

**ORDERED** that plaintiff shall continue to serve as a member of the NLRB until her term expires pursuant to 29 U.S.C. § 153(a), unless she is earlier removed "upon notice and hearing, for neglect of duty or malfeasance in office," *id.*; it is further

**ORDERED** that defendant Mark Kaplan, as well as his subordinates, agents, and employees, are **ENJOINED**, during plaintiff's term as a member of the NLRB, from removing plaintiff from her office without cause or in any way treating plaintiff as having been removed from office, from impeding in any way her ability to fulfill her duties as a member of the NLRB, and from denying or obstructing her authority or access to any benefits or resources of her office; it is further

**ORDERED** that defendant Mark Kaplan and his subordinates, agents, and employees provide plaintiff with access to the necessary government facilities and equipment so that she may carry out her duties during her term as a member of the NLRB; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**SO ORDERED**.

Date:  March 6, 2025

*This is a final and appealable order.*

_____
**BERYL A. HOWELL**
United States District Judge

2

**JA138**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GWYNNE A. WILCOX, <br><br> Plaintiff, <br><br> v. <br><br> DONALD J. TRUMP, *in his official capacity as President of the United States* <br><br> and <br><br> MARVIN E. KAPLAN, *in his official capacity as Chairman of the National Labor Relations Board*, <br><br> Defendants. | Civil Action No. 25-334 (BAH) <br><br> Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Scholars have long debated the degree to which the Framers intended to consolidate executive power in the President.  The "unitary executive theory"—the theory, in its purest form, that, under our tri-partite constitutional framework, executive power lodges in a single individual, the President, who may thus exercise complete control over all executive branch subordinates without interference by Congress—has been lauded by some as the hallmark of an energetic, politically accountable government, while rebuked by others as "anti-American," a "myth," and "invented history."[1]  Both sides of the debate raise valid concerns, but this is no

---

[1]    *Compare, e.g.*, Steven G. Calabresi & Christopher S. Yoo, *The Unitary Executive: Presidential Power from Washington to Bush* (2008), Saikrishna B. Prakash, *Imperial from the Beginning: The Constitution of the Original Executive* (2015), *and* Steven G. Calabresi & Saikrishna B. Prakash, *The President's Power to Execute the Laws*, 104 Yale L.J. 541, 597 (1994); *with, e.g.*, Allen Shoenberger, *The Unitary Executive Theory is Plainly Wrong and Anti-American: "Presidents are Not Kings*,*"* 85 Alb. L. Rev. 837, 837 (2022), Christine Kexel Chabot, *Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129 (2022), *and* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 4 (1994) ("Any faithful reader of history must conclude that the unitary executive . . . is just myth."); Cass R. Sunstein, *This Theory is Behind Trump's Power Grab*, N.Y. Times (Feb. 26, 2025), https://www.nytimes.com/2025/02/26/opinion/trump-roberts-unitary-executive-theory.html; *see*

JA139

mere academic exercise.[2]  The outcome of this debate has profound consequences for how we Americans are governed.  On the one hand, democratic principles militate against a "headless fourth branch"[3] made up of politically unaccountable, independent government entities that might become agents of corrupt factions or private interest groups instead of the voting public. Additionally, at least theoretically, empowering a President with absolute control over how the Executive branch operates, including the power to "clean house" of federal employees, would promote efficient implementation of presidential policies and campaign promises that are responsive to the national electorate.  On the other hand, the advantages of impartial, expert-driven decision-making and congressional checks on executive authority favor some agency independence from political changes in presidential administrations, with the concomitant benefits of stability, reliability, and moderation in government actions.  No matter where these pros and cons may lead, the crucial question here is, what does the U.S. Constitution allow?

To start, the Framers made clear that no one in our system of government was meant to be king—the President included—and not just in name only.  *See* U.S. CONST. art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States.").  Indeed, the very structure of the Constitution was designed to ensure no one branch of government had absolute power, despite

---

*also* Julian Davis Mortenson, *The Executive Power Clause*, 168 U. PA. L. REV. 1269, 1334 (2020) (describing "the exercise of executive power" as "fully subordinate to instructions by its legislative principal" at the founding).

[2]    The academy has provided various formulations of the "unitary executive" theory.  *See, e.g*., Steven G. Calabresi & Kevin H. Rhodes*, The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 HARV. L. REV. 1153, 1158 (1992) ("Unitary executive theorists claim that all federal officers exercising executive power must be subject to the direct control of the President."); Lessig & Sunstein, *supra*, at 2 ("Many think that under our constitutional system, the President must have the authority to control all government officials who implement the laws."); Chabot, *supra*, at 129 (2022) (describing the "unitary executive" theory as the idea that the Constitution gave the President "plenary removal power" affording him "'exclusive control over subordinates' exercise of executive power").

[3]    Peter L. Strauss, *The Place of Agencies in Government: Separation of Powers and the Fourth Branch*, 84 COLUM. L. REV. 573, 578 (1974) (quoting The President's Comm. on Admin. Mgmt., Administrative Management in the Government of the United States 30 (1937)).

the perceived inefficiencies, inevitable delays, and seemingly anti-democratic consequences that may flow from the checks and balances foundational to our constitutional system of governance.

The Constitution provides guideposts to govern inter-branch relations but does not fully delineate the contours of the executive power or the degree to which the other two branches may place checks on the President's execution of the laws. As pertinent here, the Constitution does not, even once, mention "removal" of executive branch officers. The only process to end federal service provided in the Constitution is impeachment, applicable to limited offices (like judges and the President) after a burdensome political process. *See, e.g.*, *id.* art. II, § 4 (impeachment of President); *id.* art. III, § 1 (impeachment of federal judges). This constitutional silence on removal perplexed the First Congress, bedeviled a President shortly thereafter and a second President after the Civil War during Reconstruction (leading to condemnation of the former and impeachment proceedings against the latter), and has beset jurists and scholars in our modern era. *See infra* Part III.A.3.b.[4]

Yet, in assessing separation of powers, the Constitution itself is not the only available guide. Historical practice and a body of case law are, respectively, instructive and binding. *See infra* Part III.A.1; *e.g.*, *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) ("In separation of powers cases this Court has often 'put significant weight upon historical practice.'" (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014))). Both make clear that textual

---

[4]    In 1834, President Andrew Jackson fired two Secretaries of the Treasury when each refused his order to remove U.S. funds from the Second National Bank, which Jackson viewed as having "resist[ed] his reelection in part with bank funds," and these removal actions triggered a congressional condemnation resolution for an abuse of power. *See* Lessig & Sunstein, *supra* n.1, at 78-80. Jackson's replacement as Secretary at Treasury, Roger Taney, did as ordered and was later appointed Chief Justice. *Id.* at 79. The resolution condemning President Jackson was ultimately expunged, in 1837, but not without significant debate and Jackson's reputational decline. *See id.* at 81-83.

Over thirty years later, in 1867, President Andrew Johnson's removal of the Secretary of War in defiance of a congressional statute led to his impeachment and near conviction. Richard Murphy, 32 FED. PRAC. & PROC. JUD. REV. § 8128 (2d ed.) (2024).

silence regarding removal does not confer absolute authority on a President to willy-nilly

override a congressional judgment that expertise and insulation from direct presidential control

take priority when a federal officer is tasked with carrying out certain adjudicative or

administrative functions.  As Justice Louis Brandeis eloquently opined, "[c]hecks and balances

were established in order that this should be 'a government of laws and not of men,'" observing

further that the separation of powers was not adopted "to promote efficiency but to preclude the

exercise of arbitrary power.  The purpose was, not to avoid friction, but, by means of the

inevitable friction incident to the distribution of the governmental powers among three

departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 292-93

(1926) (Brandeis, J., dissenting**).**

    A President who touts an image of himself as a "king" or a "dictator,"[5] perhaps as his

vision of effective leadership, fundamentally misapprehends the role under Article II of the U.S.

Constitution.  In our constitutional order, the President is tasked to be a conscientious custodian

of the law, albeit an energetic one, to take care of effectuating his enumerated duties, including

the laws enacted by the Congress and as interpreted by the Judiciary.  U.S. CONST. art. II, § 3

("[H]e shall take Care that the Laws be faithfully executed . . . .").  At issue in this case, is the

President's insistence that he has authority to fire whomever he wants within the Executive

branch, overriding any congressionally mandated law in his way.  *See* Letter from Sarah Harris,

Acting Solicitor General, to Sen. Richard Durbin on Restrictions on the Removal of Certain

---

[5]    *See* @WhiteHouse, X (Feb. 19, 2025, 1:58 PM), https://perma.cc/V9Y2-SWRD ("LONG LIVE THE
KING!"); WSJ News, *Trump Says He Won't Be a Dictator "Except for Day One" if Re-Elected*, YOUTUBE (DEC. 6,
2023), https://www.youtube.com/watch?v=dQkrWL7YuGk; *see also* @realDonaldTrump, X (Feb. 15, 2025, 1:32
PM), https://perma.cc/S5GR-BXF5 ("He who saves his Country does not violate any Law.").  Some of defendants'
supporting amici also draw analogies to the British monarchy; Tennessee has described the tradition of the British
king's "'prerogative power to remove' executive officers 'at will,'" which "carried into the United States."
Tennessee's Amicus Br. at 5-6 (quoting Michael W. Connell, *The President Who Would Not Be King* 162 (2020)).
In a democracy created to repudiate that very regime, that analogy has little purchase.

Principal Officers of the United States ("Letter from Acting SG") (Feb. 12, 2025),

https://perma.cc/D67G-FKK4 (describing the Trump administration's view of the removal

power). Luckily, the Framers, anticipating such a power grab, vested in Article III, not Article

II, the power to interpret the law, including resolving conflicts about congressional checks on

presidential authority. The President's interpretation of the scope of his constitutional power—

or, more aptly, his *aspiration*—is flat wrong.

The President does not have the authority to terminate members of the National Labor

Relations Board at will, and his attempt to fire plaintiff from her position on the Board was a

blatant violation of the law. Defendants concede that removal of plaintiff as a Board Member

violates the terms of the applicable statute, *see* Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:12-

13, and because this statute is a valid exercise of congressional power, the President's excuse for

his illegal act cannot be sustained.

## I.    BACKGROUND

The statutory and procedural background relevant to resolving this dispute is summarized

below.

### A.    *Statutory Background*

The National Labor Relations Board ("NLRB") was established ninety years ago by

Congress in the National Labor Relations Act ("NLRA") in response to a long and violent

struggle for workers' rights. *See generally*, J. Warren Madden, *Origin and Early Years of the

National Labor Relations Act*, 18 HASTINGS L.J. 571 (1967); Arnold Ordman, *Fifty Years of the

NLRA*: *An Overview*, 88 W. VA. L. REV. 15, 15-16 (1985). Congress sought to protect industrial

peace and stability in labor relations and thus created a board to resolve efficiently labor disputes

and protect the rights of employees to "self-organization, to form, join, or assist labor

organizations [and] to bargain collectively through representatives of their own choosing." 29

U.S.C. §157; *see also id.* § 151; *Crey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 271 (1964)

(describing these goals); *Colgate-Palmolive-Peet Co. v. NLRB*, 338 U.S. 355, 362 (1949) (same).

The NLRB is a "bifurcated agency" consisting, on one side, of a five-member, quasi-

judicial "Board" that adjudicates appeals of labor disputes from administrative law judges

("ALJs"), and on the other, of a General Counsel ("GC") and several Regional Directors who

prosecute unfair labor practices and enforce labor law and policy.  *See* NLRB, *Who We Are*,

https://perma.cc/9RLA-FSYL; 29 U.S.C. §§ 153(a), (d), 160; *Starbucks v. McKinney*, 602 U.S.

339, 357 (2024) (Jackson, J., concurring in part and dissenting in part).  The two sides operate

independently, with the GC independent of the Board's control.  *NLRB v. United Food & Com.*

*Workers Union, Local 23, AFL-CIO*, 484 U.S. 112, 117-18 (1987) (describing how the Labor

Management Relations Act of 1947 amended the NLRA to separate the prosecutorial and

adjudicatory functions between the Board and General Counsel).

The NLRB generally addresses labor disputes as follows: Upon the filing of a "charge"

by an employer, employee, or labor union, a team working under the Regional Director will

investigate and decide whether to pursue the allegation as a formal complaint.  *See* NLRB,

*Investigate Charges*, https://perma.cc/CU82-KU4V.[6]  If the parties do not settle and the Director

formally pursues the complaint, the Director will issue notice of a hearing before an ALJ.  *Id.*; 29

U.S.C. § 160(b); 29 C.F.R. § 101.10; *Starbucks*, 602 U.S. at 342-43.[7]   If necessary, after

issuance of a complaint, the Board may seek temporary injunctive relief in federal district court

while the dispute is pending at the NLRB.  29 U.S.C. § 160(j); *Starbucks*, 602 U.S. at 342.  The

---

[6]    The initial request made by the employee, union, or employer is referred to as a "charge"; only the Director issues a "complaint."   NLRB, *What We Do*, https://perma.cc/CU82-KU4V.

[7]    If the parties do formally settle after issuance of a complaint, Board approval is required.  *NLRB*, 484 U.S. at 120.

6

**JA144**

ALJ then gathers evidence and presents "a proposed report, together with a recommended order to the Board." 29 U.S.C. § 160(c). That order will become the order of the Board unless the parties file "exceptions." *Id.*; 29 C.F.R. §§ 101.11-.12. If the parties file exceptions requesting the Board's review, the Board will consider the ALJ's recommendation, gather additional facts as necessary, and issue a decision. 29 U.S.C. § 160(c); 29 C.F.R. § 101.12. The Board may craft relief, such as a cease-and-desist order to halt unfair labor practices or an order requiring reinstatement of terminated employees. 29 U.S.C. § 160(c). These orders, however, are not independently enforceable; the Board must seek enforcement in a federal court of appeals (and may appoint attorneys to do so). *Id.* §§ 154, 160(e); *In re NLRB*, 304 U.S. 486, 495 (1938) (noting compliance with a Board order is not obligatory until entered as a decree by a court). Aside from adjudicating disputes, the Board may also conduct and certify the outcome of union elections, 29 U.S.C. § 159, and promulgate rules and regulations to carry out its statutory duties, *id.* § 156.

Although both the Board members and the GC are appointed by the President with "advice and consent" from the Senate, *id.* §§ 153(a), (d), only the Board is protected from removal at-will by the President, who is authorized to remove a Board member "upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause," *id.* § 153(a). Such restrictions were intentional; much like many other multimember entities, the Board was designed to be an independent panel of experts that could impartially adjudicate disputes. *See* 29 U.S.C. § 153(a); Kirti Datla & Richard L. Revesz, *Deconstructing Independent Agencies (and Executive Agencies)*, 98 CORNELL L. REV. 76, 770-71 (2013) (describing the NLRB as a classic example of an agency designed to be independent). Board members serve staggered five-year terms, and the President is authorized to designate one board member as Chairman. 29 U.S.C.

**JA145**

§ 153(a).  In practice, the Board is partisan-balanced based on longstanding norms, though such a balance is not statutorily mandated.  *See* Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 COLUM. L. REV. 9, 54-55 (2018).

### B.    *Factual Background*

As set out in plaintiff's complaint and statement of material facts, and undisputed by defendants, plaintiff Gwynne Wilcox was nominated by President Biden and confirmed by the U.S. Senate to a second five-year term as member of the NLRB in September 2023.  Pl.'s Mot. for Expedited Summ. J. ("Pl.'s Mot."), Statement of Material Facts ("Pl.'s SMF") ¶ 2, ECF No. 10-1; Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J., Statement of Undisputed Material Facts ("Defs.' SUMF") ¶ 2, ECF No. 23-2.  She was designated Chair of the Board in December 2024.  Complaint ¶ 12, ECF No. 1.

Shortly after taking office, President Trump moved Marvin Kaplan, a then-sitting Board member and a defendant in this case, into the position of Chair, replacing plaintiff.  *Id*. ¶ 13.  President Trump then, on January 27, 2025, terminated plaintiff from her position on the Board via an email sent shortly before 11:00 PM, by the Deputy Director of the White House Presidential Personnel Office.  Pl.'s Decl., Ex. A, ECF No. 10-4; Pl.'s SMF ¶ 3; Defs.' SUMF ¶ 3.  The termination was not preceded by "notice and hearing," nor was any "neglect of duty or malfeasance" identified, despite the explicit restrictions to removal of a Board member in the NLRA.  Pl.'s Decl. ¶¶ 3-4; Pl.'s SMF ¶¶ 4-5; Defs.' SUMF ¶ 5 (regarding lack of notice and hearing); Motions H'rg (Mar. 5, 2025), Rough Tr. at 51:10-17.  The email instead cited only political motivations—that plaintiff does not share the objectives of the President's administration—and asserted, in a footnote, that the restriction on the President's removal authority is unconstitutional as "inconsistent with the vesting of the executive Power in the President."  Pl.'s Decl. ¶ 3; Ex. A.

**JA146**

The NLRB's Director of Administration, who reports directly to Mr. Kaplan, began the termination process, cutting off plaintiff's access to her accounts and instructing her to clean out her office. Pl.'s Decl. ¶¶ 5-6. The Board already had two vacancies, and now, without plaintiff, it is reduced to only two sitting members—one short of the three-member quorum required to operate. Compl. ¶ 18; 29 U.S.C. § 153(b). Removal of plaintiff has thus stymied the functioning of the Board.

Plaintiff filed the instant suit, challenging her removal and requesting injunctive relief against Mr. Kaplan so that she may resume her congressionally mandated role. *See* Compl. ¶¶ 21-22. Recognizing that this case involves a pure question of law, plaintiff moved for expedited summary judgment, on February 10, 2025, Pl.'s Mot., ECF No. 10, and defendants responded with a cross-motion for summary judgment, with briefing completed on a condensed schedule. *See* Defs.' Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n"), ECF No. 23; Pl.'s Opp'n to Defs.' Cross-Mot. and Reply in Supp. of Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 27; Defs.' Reply in Supp. of Cross-Mot. for Summ. J. ("Defs.' Reply"), ECF No. 30. Interested parties also weighed in as amici.[8] Following a hearing, held on March 5, 2025, the parties' cross-motions for summary judgement are ready for resolution.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is only "'material' if a dispute over it might affect the outcome of a suit under the

---

[8]    Amici include: the Constitutional Accountability Center ("CAC") and a cohort of nineteen states and the District of Columbia, led by Minnesota, writing in support of plaintiff, *see* CAC's Amicus Br., ECF No. 15; Nineteen States & D.C.'s Amicus Br., ECF No. 31; and Tennessee and a cohort of twenty states, led by Florida, writing in support of defendants, *see* Tennessee's Amicus Br., ECF No. 18; Twenty States' Amicus Br., ECF No. 26.

governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary

judgment determination." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The dispute is only "genuine" if

"the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

(quoting *Anderson*, 477 U.S. at 248).

A plaintiff "seeking a permanent injunction . . . must demonstrate: (1) that it has suffered

an irreparable injury; (2) that remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest

would not be disserved by a permanent injunction." *Monsanto Co v. Geertson Seed Farms*, 561

U.S. 139, 156-57 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## III.    DISCUSSION

In the ninety years since the NLRB's founding, the President has never removed a

member of the Board. Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem.") at 4, ECF No. 10-2. His

attempt to do so here is blatantly illegal, and his constitutional arguments to excuse this illegal

act are contrary to Supreme Court precedent and over a century of practice. For the reasons

explained below, plaintiff's motion is granted. Plaintiff's termination from the Board was

unlawful, and Mr. Kaplan and his subordinates are ordered to permit plaintiff to carry out all of

her duties as a rightful, presidentially-appointed, Senate-confirmed member of the Board.

### A.    *Humphrey's Executor* and its Progeny are Binding on this Court.

The Board is a paradigmatic example of a multimember group of experts who lead an

independent federal office. Since the early days of the founding of this country, Congress, the

President, and the Supreme Court all understood that Congress could craft executive offices with

some independence, as a check on presidential authority. That understanding has not changed

10

**JA148**

over the 150-year history of independent, multimember commissions, nor over the 90-year
history of the NLRB.  The Supreme Court recognized this history and tradition in *Humphrey's
Executor v. United States*, 295 U.S. 602 (1935), in upholding removal protections for such
boards or commissions, and this precedent remains not only binding law, but also a well-
reasoned reflection of the balance of power between the political branches sanctioned by the
Constitution.

> **1.  *Removal Restrictions on Board Members are Well-Grounded in History and Binding Precedent.***

As a textual matter, the Constitution is silent as to removals.  *See In re Hennen*, 38 U.S.
230, 258 (1839).  Consequently, though Article II grants the President authority over some
appointments—with advice and consent of the Senate—and vests in him the "executive power,"
Article II contains no express authority from which to infer an absolute removal power.
*Compare* U.S. CONST. art. II, § 1, cl. 1 (vesting clause), *and id.*, § 2, cl. 2 (appointments clause);
*to id.* art. I, § 8, cl. 18 (clause granting *Congress* the authority "to make all laws" "necessary and
proper" for carrying out its powers and "all other Powers vested . . . in the Government").  The
Supreme Court has held that a general power to remove executive officers can be inferred from
Article II, *see Myers,* 272 U.S. at 163-64, yet the contours of that removal power and the extent
to which Congress may impose constraints are nowhere clearly laid out.

The courts in such cases must therefore turn to established precedent—judicial decisions
as well as general practice and tradition.  The Supreme Court has repeatedly recognized that
"'traditional ways of conducting government . . . give meaning' to the Constitution."  *Mistretta v.
United States*, 488 U.S. 361, 401 (1989) (alteration in original) (quoting *Youngstown Sheet &
Tube Co. v. Sawyer*, 343 U.S. 579, 610 (1952) (Frankfurter, J., concurring)).  Thus, "[i]n
separation-of-powers cases this Court has often 'put significant weight upon historical practice.'"

11

*Zivotofsky*, 576 U.S. at 23 (quoting *Noel Canning*, 573 U.S. at 524).  Even when the validity of a particular power is in question, the Court will, "in determining the . . . existence of [that] power," give weight to "the usage itself," *United States v. Midwest Oil Co.*, 236 U.S. 459, 473 (1915), and "hesitate to upset the compromises and working arrangements that the elected branches of Government themselves have reached," *Noel Canning*, 573 U.S. at 526.  Justice Frankfurter in his seminal concurring opinion in *Youngstown* declared that "systematic, unbroken" practice could even "be treated as a gloss on 'executive Power' vested in the President."  343 U.S. at 610-11.

Not only are the removal protections on members of the independent, multimember boards like the NLRB supported by over a century of unbroken practice, but they have also been expressly upheld in clear Supreme Court precedent.  Since 1887, Congress has created multiple independent offices led by panels whose members are appointed by the President but removable only for cause.  *See, e.g.*, Interstate Commerce Act, Pub. L. No. 49-41, ch. 104, § 11, 24 Stat. 379, 383 (1887) (creating the Interstate Commerce Commission, with restrictions on officers' removal except for "inefficiency, neglect of duty, or malfeasance"); Federal Reserve Act, Pub. L. No. 63-64, ch. 6, § 10, 38 Stat. 251, 260-61 (1913) (creating the Federal Reserve Board, whose members are removable only "for cause").  In 1914, Congress established the Federal Trade Commission ("FTC") with an "inefficiency, neglect of duty, or malfeasance in office" removal restriction for its five commissioners.  FTC Act, Pub. L. No. 63-203, ch. 311, § 1, 38 Stat. 717, 717-18 (1914).

The Supreme Court explicitly upheld removal restrictions for such boards when considering removal protections for the commissioners of the FTC in *Humphrey's Executor* in 1935, while also recognizing the President's general authority over removal of executive branch

12

**JA150**

officials.  The Court noted that commissioners of the FTC, "like the Interstate Commerce Commission" "are called upon to exercise the trained judgment of a body of experts 'appointed by law and informed by experience.'"  *Id.* at 624 (quoting *Ill. Cent. R.R. Co. v. Interstate Com. Comm'n*, 206 U.S. 441, 454 (1907)).  Congress, having the power to create such expert commissions with quasi-legislative and quasi-judicial authority, must also have, "as an appropriate incident, power to fix the period during which they shall continue, and to forbid their removal for except for cause in the meantime."  *Id.* at 629.

Two months later, with the guidance supplied in *Humphrey's Executor* and following the model of the FTC as endorsed by the Supreme Court there, Congress established the National Labor Relations Board.  *See* Madden, *supra*, at 572-73; *Yapp USA Auto. Sys., Inc. v. NLRB*, --F. Supp. 3d--, No. 24-cv-12173, 2024 WL 4119058, at *5 (E.D. Mich. Sep. 9, 2024).  Both entities—the FTC and NLRB—have five-member leadership boards with staggered terms of several years, minimizing instability and allowing for expertise to accrue.  *See* 29 U.S.C. § 153(a); *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 216 (2020).  Both were intended to exercise impartial judgment.  *See* Datla & Revesz, *supra*, at 770-71 (describing independence of the NLRB); *Seila L.*, 591 U.S. at 215-16 (describing the FTC as "designed to be 'non-partisan' and 'to act with entire impartiality'" (quoting *Humphrey's Ex'r*, 295 U.S. at 624)).  The Board, like the FTC, is "predominately quasi judicial and quasi legislative" in nature, with the primary responsibility of impartially reviewing decisions made by ALJs.  *Humphrey's Ex'r*, 292 U.S. at 624; *see* 29 U.S.C. § 160.  In fact, the Board does not prosecute labor cases nor enforce its rulings.  The side of the NLRB managed by the General Counsel—who is removable at-will by the President—carries out those more "executive" powers.  *See* 29 U.S.C. § 153(d) (describing the General Counsel's "final authority, on behalf of the Board" over "the

13

**JA151**

investigation of charges and issuance of complaints . . . and . . . the prosecution of such

complaints before the Board").  As plaintiff correctly states, the Board closely resembles the

FTC and is thus "squarely at the heart of the rule adopted in *Humphrey's Executor*."  Pl.'s Mem.

at 9.

Numerous other offices have followed the mold of the NLRB and FTC with

multimember independent leadership boards protected from at-will removal by the President.

*See* Pl.'s Mem. at 7 n.2 (listing, *e.g.*, the Merit Systems Protection Board, 5 U.S.C. § 1202(d); the

Federal Labor Relations Authority, 5 U.S.C. § 7104(b); and the Federal Energy Regulatory

Commission, 42 U.S.C. § 7171(b)(1)).  "Since the Supreme Court's decision in *Humphrey's*

*Executor*, the constitutionality of independent [multimember] agencies, whose officials possess

some degree of removal protection that insulates them from unlimited and instantaneous political

control, has been uncontroversial."  *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th

748, 760 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025); *see*

*also The Pocket Veto Case*, 279 U.S. 655, 689 (1929) ("Long settled and established practice is a

consideration of great weight in a proper interpretation of constitutional" issues of separation of

powers.).[9]

Recent consideration of the constitutionality of the removal protections for NLRB

members have accordingly upheld those constraints on presidential removal authority under

*Humphrey's Executor*.  *See, e.g.*, *Overstreet v. Lucid USA Inc.*, No. 24-cv-1356, 2024 WL

5200484, at *10 (D. Ariz. Dec. 23, 2024); *Company v. NLRB*, No. 24-cv-3277, 2024 WL

---

[9]      Defendants protest the reliance on history and tradition because independent multimember commissions
date back only to the late 1880s.  Defs.' Reply at 4-5.  "[S]uch a practice comes far too late to provide reliable
evidence of the original public meaning of Article II or the Constitution's separation of powers," in defendants'
view.  Defs.' Reply at 4-5.  That in no way invalidates the significance of longstanding tradition, however, which is
probative "[e]ven when the nature of or longevity of [the] practice is subject to dispute, and even when that practice
began after the founding era."  *Noel Canning*, 573 U.S. at 525; *see id.* at 528-29 (relying on a post- Civil War
practice of intra-recess appointments); CAC's Amicus Br. at 11, ECF No. 15 (making this point).

5004534, at *6 (W.D. Mo. Nov. 27, 2024); *Kerwin v. Trinity Health Grand Haven Hosp.*, No.

24-cv-445, 2024 WL 4594709, at *7 (W.D. Mich. Oct. 25, 2024); *Alivio Med. Ctr. v. Abruzzo*,

No. 24-cv-2717, 2024 WL 4188068, at *9 (N.D. Ill. Sep. 13, 2024); *YAPP USA Automotive Sys.*,

2024 WL 4119058, at *7.  Courts have also recently upheld restrictions on removal under

*Humphrey's Executor* for other multimember boards, such as the Consumer Product Safety

Commission ("CPSC").  *See, e.g.*, *Leachco*, 103 F.4th at 761-62; *Consumers' Rsch. v. CPSC*, 91

F.4th 342, 352 (5th Cir. 2024); *United States v. SunSetter Prods. LP*, No. 23-cv-10744, 2024 WL

1116062, at *4 (D. Mass. Mar. 14, 2024).  The same has been true for the FTC.  *See, e.g.*,

*Illumina, Inc. v. FTC*, 88 F.4th 1036, 1046-47 (5th Cir. 2023); *Meta Platforms, Inc. v. FTC*, 723

F. Supp. 3d 64, 87 (D.D.C. 2024).  A court in this district has also upheld removal protections for

the Merit Systems Protection Board.  *See Harris v. Bessent*, No. 25-cv-412 (RC), 2025 WL

679303, at *7 (D.D.C. Mar. 4, 2025).  The 150-year history and tradition of multimember boards

or commissions and 90-year precedent from the Supreme Court approving of removal

protections for their officers dictates the same outcome for the NLRB here.

### 2.    *Defendants' Argument that* **Humphrey's Executor** *Does Not Control Fails.*

Discounting this robust history, defendants posit that the President's removal power is

fundamentally "unrestricted" and that only two, narrow "exceptions" have been recognized: one

for "inferior officers with narrowly defined duties," as established in *Morrison v. Olson*, 487

U.S. 654 (1988), and the other for "multimember bod[ies] of experts, balanced along partisan

lines, that performed legislative and judicial functions and [do not] exercise any executive

power," as established in *Humphrey's Executor*.  Defs.' Opp'n at 5-6 (second passage quoting

*Seila L.*, 591 U.S. at 216).  According to defendants, neither exception applies to the Board.  *Id.*

at 6.  Putting aside to address later whether congressional authority to constrain the President's

**JA153**

removal authority is characterized fairly by defendants as a narrow "exception" to the rule of

"unrestricted" removal power, *see infra* Part III.A.3.b, *Humphrey's Executor* plainly controls.

Defendants emphasize that *Humphrey's Executor* understood the FTC at the time not to

exercise any "executive power," which was key to its "exception," and that the NLRB today

clearly "wield[s] substantial executive power." Defs.' Opp'n at 6-8 (relying on *Seila L.*, 591

U.S. at 216 n.2, 218); *see also* Defs.' Reply at 3. They do not, however, meaningfully

distinguish between the authority of the FTC in 1935, as recognized in *Humphrey's Executor*,

and the authority of the NLRB today. The FTC in 1935 had powers mimicking those of both the

Board and the NLRB's GC. The FTC had broad powers of investigation and could issue a

complaint and hold a hearing for potential unfair methods of competition. *See Humphrey's Ex'r*,

295 U.S. at 620, 621; *see also* 15 U.S.C. § 49 (authorizing the FTC's subpoena power). The

FTC, upon finding a violation, could issue a cease-and-desist order and then go to the Court of

Appeals for enforcement. *Humphrey's Ex'r*, 295 U.S. at 620-21; *see also* FTC Act, ch. 311, § 5,

38 Stat. at 719-20. The party subject to the order could also appeal to that court. *Humphrey's

Ex'r*, 295 U.S. at 621. Further, the FTC could issue rules and regulations regarding unfair and

deceptive acts. *See* FTC Act, § 6, 38 Stat. at 722; Hon. R. E. Freer, Member of the FTC,

Remarks on the FTC, its Powers and Duties at 2 (1940),

https://www.ftc.gov/system/files/documents/public_statements/676771/19400827_freer_remarks

_._rational_association_of_credit_jewelers.pdf.

The NLRB's collective authority, though comparable, *see supra* Part I.A (describing the

NLRB's GC's authority to investigate and pursue enforcement against unfair labor practices and

the Board's adjudicatory authority and power to issue unenforceable cease-and-desist orders), is,

if anything, less extensive than that of the FTC. The NLRB hardly engages in rulemaking (other

than to establish its own procedures), instead relying on adjudications for the setting of

precedential guidance. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374

(1998) ("The [NLRB], uniquely among major federal administrative agencies, has chosen to

promulgate virtually all the legal rules in its field through adjudication rather than rulemaking.").

Moreover, the aspects of the NLRB's authority most executive in nature—prosecutorial authority

to investigate and bring civil enforcement actions—are tasks assigned to the GC instead of the

Board itself. *See* 29 U.S.C. § 153(d).[10]

Even though the Supreme Court of 1935 may have not referred to these classic

administrative powers as "executive" and the Supreme Court today would, *see, e.g.*, *Seila Law*,

591 U.S. at 216 n.2, the substantive nature of authority granted to these two independent

government entities does not significantly differ. If the Supreme Court has determined that

removal restrictions on officers exercising substantially the same authority do not impermissibly

intrude upon presidential authority, *Humphrey's Executor* cannot be read to allow a different

outcome here. That is especially true considering that the Supreme Court, in its next major

decision addressing removal protections for executive branch officers, rejected the notion that

the permissibility of "'good cause'-type restriction[s] . . . turn[s] on whether or not th[e] official"

---

[10]    Defendants suggest that because the NLRB makes "significant decisions shaping the rights and obligations of Americans" and "set[ting] federal labor policy," the "constitutional calculus" is different, and the *Humphrey's Executor* "exception" cannot apply. Defs.' Reply at 3, 5; Motions H'rg (Mar. 5, 2025), Rough Tr. at 54:1-7 (citing *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990) ("[T]he NLRB has the primary responsibility for developing and applying national labor policy.")). Defendants do not, however, explain how applying federal law in individual adjudications establishes "federal labor policy" any more than the rulemaking and adjudications of the FTC in *Humphrey's Executor* do, nor do they explain why subsequent caselaw—*see supra* Part III.A.3.a—should be read as putting such a gloss on the holding of *Humphrey's*. Plaintiff contributed little to the debate about the scope of the NLRB's powers that may be considered "executive," simply tying its authorities closely to the FTC in 1935, despite the NLRB's bifurcated structure, resulting in a more cabined exercise of any executive authority by the Board itself. *See* Pl.'s Reply at 3-5; *see also* Motions H'rg (Mar. 5, 2025), Tr. at 23:5-13 (plaintiff's counsel stating, "answering the question about exactly what 'executive' means and what those terms 'quasi-legislative' and 'quasijudicial' mean, it's not the easiest thing in the world. I think, for purposes of this motion that's before you, I think what matters is that . . . *Humphrey's Executor* is binding.").

is classified as "purely executive" or exercising quasi-legislative or quasi-judicial functions.  *See*

*Morrison*, 487 U.S. at 689.[11]

Defendants make a final, superficial distinction between the NLRB and the FTC to argue

that the precedent of *Humphrey's Executor* should not apply.  Defs.' Opp'n at 10.  The NLRB,

they note, has stricter removal protections because its members cannot be removed for

"inefficiency," whereas FTC members can.  *Id.*  In both *Consumers' Research*, 91 F.4th at 346,

355-56, and *Leachco*, 103 F.4th at 761-63, however, courts of appeals upheld removal

protections that did not include an exception for "inefficiency."  "Inefficiency" does not differ in

substance from "neglect of duty," so omitting "inefficiency" as a grounds for removal cannot be

a dispositive difference in the President's ability to exercise his Article II powers over the

NLRB.  *See* Jane Manners & Lev Menand, *The Three Permissions: Presidential Removal and

the Statutory Limits of Agency Independence*, 121 COLUM. L. REV. 1, 8, 69 (2021) (explaining

---

[11]    Defendants' argument about the exercise of "executive power" is ultimately tautological and leaves
*Humphrey's Executor* completely devoid of force.  They reason that because the NLRB is housed within the
executive branch, the Board inherently exercises "executive power."  Defs.' Opp'n at 7 (citing *Seila L.*, 591 U.S. at
216 n.2 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013))).  Reading *Humphrey's Executor* to allow
removal protections only for offices that do not exercise "executive power," defendants then conclude that the
NLRB does not fit within *Humphrey's Executor*.  The necessary implication of such reasoning is that *no board or
commission placed with the executive branch* could, as a constitutional matter, be legally subject to removal
protections duly enacted by Congress.  Yet, defendants dodge that extraordinary result and contradictorily suggest
that removal protections on the Federal Reserve Board are acceptable because that Board does not exercise an
"executive function."  Defs.' Reply at 5; *see also* Motions H'rg (Mar. 5, 2025), Rough Tr. at 59-60 (defense counsel
declining to discuss Federal Reserve Board or the Federal Open Market Committee or why these entities should be
treated differently than the NLRB as to presidential removal power).
        Recognizing that the exercise of "executive power" could not be dispositive, the Fifth Circuit in
*Consumers' Research* agreed with the plaintiffs there that the CPSC "wields substantial executive power" but still
held that the CPSC was constitutional under *Humphrey's Executor*.  91 F.4th at 353-55 ("Having concluded that the
Commission exercises substantial executive power (in the modern sense), we must next consider whether that
characteristic—standing alone—removes the Commission from the *Humphrey*'s exception. We conclude that it does
not . . . .").  The Fifth Circuit examined the other factors in *Seila Law* to conclude that the removal protections for
CPSC members were constitutionally sound: The CPSC does not have a novel structure or present a historically
unprecedented situation; the CPSC does not have a single director but rather a multimember board; and the CPSC
does not have any of the other features that concerned the Court in *Seila Law*, such as the receipt of funds outside
the appropriation process or the inability of the President to influence the office's leadership through the
appointment power.  *See id.*
        Regardless whether the NLRB exercises "substantial executive power," "executive power," or "quasi-
legislative and quasi-judicial power," the NLRB does not sufficiently differ from the FTC to warrant a departure
from *Humphrey's Executor*.

**JA156**

that the absence of "inefficiency" as a ground for removal does not unconstitutionally interfere with the President's authority).  Defendants offer no reason to suggest otherwise.  The NLRB fits well within the scope of *Humphrey's Executor*.

### 3. *Defendants' Argument that* **Humphrey's Executor** *Has Been "Repudiated" and is No Longer Good Law Is Not Persuasive.*

Fundamentally, the position of defendants and their supporting state amici urging this Court not to apply *Humphrey's Executor* stems from a reading of the Supreme Court's subsequent case law as "repudiat[ing]" the precedent.  Defs.' Opp'n at 9 (quoting *Seila L.*, 591 U.S. at 239 (Thomas, J., concurring in part)); Tennessee's Amicus Br. at 7-10, ECF No. 18 (arguing forcefully that *Humphrey's Executor* was wrongly decided and has been "narrowed . . . nearly out of existence"); Twenty States' Amicus Br. at 3-8, ECF No. 26.  Defendants therefore argue that *Humphrey's Executor* must be read extremely narrowly, despite that "whatever little remains" is binding on this Court.  Defs.' Opp'n at 8 n.2.  To the contrary, an unbroken line of cases since *Humphrey's Executor* has reinforced the constitutionality of removal restrictions on multimember expert boards, and the pre-*Humphrey's Executor* history demonstrates that this decision was well-grounded in accepted principles of checks and balances.

### a. *Post-***Humphrey's Executor** *Case Law Reinforces its Central Holding.*

In every case following *Humphrey's Executor*, the Supreme Court has preserved the constitutionality of removal protections on independent, multimember boards and commissions. Shortly following *Humphrey's Executor*, in *Wiener v. United States*, 357 U.S. 349 (1958), the Court held that the Constitution did not grant the President authority to remove members of the multimember War Claims Commission "for no reason other than that he preferred to have on that Commission men of his own choosing."  *Id.* at 355-56.  Thirty years later, in *Morrison*, the Court again recognized the exception to the President's removal power for officers with

19

adjudicatory powers, but further explained that the permissibility of removal restrictions did not turn on whether the officers' functions were "quasi-legislative and quasi-judicial," as opposed to executive in nature, instead looking to the degree to which they impeded the President's ability to execute the laws.  *See* 487 U.S. at 691-93 (upholding removal protections for independent counsel contained in the Ethics in Government Act).

Then, in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477 (2010), the Court reiterated its holding in *Humphrey's Executor* that "Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause" and declined to reexamine that precedent.  *Id.* at 483 (striking down double for-cause removal protections); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 686 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) (describing the defendants as attempting to compare the office's removal protections to that of "the FCC, the FTC, and the NLRB," which were understood to be "permissible under the Supreme Court's 1935 decision in *Humphrey's Executor*").

Most recently, in *Seila Law*, the Supreme Court likewise declined to "revisit [its] prior decisions allowing certain limitations on the President's removal power."  591 U.S. at 204. While defendants make much of dicta in this decision, such as that the FTC's powers would now be considered executive, Defs.' Opp'n at 9; *see also* Tennessee's Amicus Br. at 9, *Seila Law* made key distinctions between single-head offices and multimember boards or commissions that reinforce why placing restrictions on removal of leaders of the latter is not problematic under our Constitution, *see* 591 U.S. at 224-26.  Despite restrictions on removal, the President can exercise more control over a multimember board through his *appointment power* as vacancies arise, and with staggered terms, some Board vacancies arise during each administration.  *See id.* at 225.

20

**JA158**

Those new appointees can restrain the Board member the President might otherwise prefer to remove, and no President will be "saddled" with a single "holdover Director from a competing political party who is dead set *against*" his agenda. *Id.* at 225 (emphasis in original). That is particularly the case here, where President Trump could exercise near total control over the NLRB by appointing two members of his choosing to the Board to join Mr. Kaplan, whom the President appointed during his first term and recently elevated to Chairman, creating a majority of Trump appointees, and by appointing a General Counsel of his choice. *See* NLRB, *Members of the NLRB Since 1935*, https://www.nlrb.gov/about-nlrb/who-we-are/the-board/members-of-the-nlrb-since-1935 (last visited Mar. 5, 2025); 29 U.S.C. § 153(d) (allowing the General Counsel to be removed at will).[12]

Moreover, the multimember structure prevents the public from being subject to decisions made unilaterally by an unelected official, who could become captured by private interests. The distribution of power among several individuals on the Board "avoids concentrating power in the hands of any single individual." *Seila L.*, 591 U.S. at 222-23. Lastly, unlike single-head offices, entities led by multimember boards have a robust basis—more than even a "foothold"—in "history [and] tradition." *Id.* at 222. For these reasons, when the Court ultimately invalidated the removal restrictions on the CFPB's director as a *single* head of the bureau, Chief Justice Roberts expressly suggested that "converting the CFPB into a multimember agency" would solve "the problem." *Id.* at 237.[13]

---

[12]    Instead, by bringing the Board to a complete halt, the President has foreclosed his own ability to see his Board appointees effectuate his agenda and has frozen the functioning of an important government office.

[13]    The Supreme Court's most recent removal protections case, *Collins v. Yellen*, 594 U.S. 220 (2021), was likewise about an office led by a single director, and the Court there reaffirmed it "did 'not revisit [its] prior decisions allowing certain limitations on the President's removal power'" in *Seila Law*. *Id.* at 250-51 (quoting *Seila L.*, 591 U.S. at 204).

Finally, two months ago, the Supreme Court denied certiorari in *Leachco*, where the

Tenth Circuit upheld removal protections for commissioners on the Consumer Product Safety

Commission under *Humphrey's Executor*—once again, declining to revisit that precedent.  *See*

103 F.4th 748 (10th Cir. 2024), *cert. denied* No. 24-156, 2025 WL 76435 (U.S. Jan. 13, 2025).

> **b.**    ***Presidential Removal Power Has Never Been Viewed as Unrestricted.***

Defendants and their supporting states' amici go even further in suggesting that not only

has *Humphrey's Executor* been repudiated over time but the opinion was also wrong at the time

it was decided.  Defs.' Opp'n at 8 n.2, 9; Tennessee's Amicus Br. at 7; *see* Twenty States'

Amicus Br. at 6-7.  Defendants read *Humphrey's* predecessor, *Myers v. United States*, 272 U.S.

52 (1926), as formalizing the President's "unrestricted removal power," which ultimately derives

from the "vesting" clause in Article II establishing a "unitary" executive.  Defs.' Reply at 1-2

(first passage quoting *Seila L.*, 591 U.S. at 215); Motions H'rg (Mar. 5, 2025), Rough Tr. at

30:22-31:4 (plaintiff's counsel describing *Myers* as a "building block" in the unitary executive

theory).  They are again misguided.  While the *Myers* Court made clear that the President has a

general removal power for executive officials, defendants' myopic focus on this case loses sight

of the limitations in its holding, a point driven home in *Humphrey's Executor* decided less than a

decade later.  Nothing in the Constitution or the historical development of the removal power has

suggested the President's removal power is absolute.  In fact, the history upon which *Myers*

relies and the immediately following Supreme Court decisions undercut any view that Congress,

when exercising its constitutional authority to shape executive offices, is completely barred from

conditioning the President's exercise of his removal authority.

In *Myers*, Chief Justice Taft—the only person to have served both as the President and a

Justice of the Supreme Court—recounted and relied on the history of the Decision of 1789, a

congressional debate about the President's removal powers during the First Congress, to declare unconstitutional a statute requiring the "advice and consent of the Senate" for both appointment *and* removal of federal postmasters. *See* 272 U.S. at 107, 111-36, 176-77.[14]  The First Congress had created the first three executive departments, the Departments of Foreign Affairs, War, and Treasury, and after much debate, ultimately granted plenary removal power to the President over the Secretary of Foreign Affairs and crafted that agency to be an arm of the President. *Id.* at 145; *see also* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 COLUM. L. REV. 1, 25-29 (1994).  The First Congress did not make clear whether that decision—to grant the President plenary removal authority over the Secretary of Foreign Affairs—derived from the Constitution or rather was granted by Congress's own prerogative.  *See Myers*, 272 U.S. at 285 n.75 (Brandeis, J., dissenting); Lessig & Sunstein, 94 COLUM. L. REV. at 26-28; *Seila L.*, 591 U.S. at 271 (Kagan, J., dissenting in part and concurring in part) ("The summer of 1789 thus ended without resolution of the critical question: Was the removal power 'beyond the reach of congressional regulation'?" (quoting Saikrishna Prakash, *New Light on the Decision of 1789*, 91 CORNELL L. REV. 1021, 1072 (2006))).  Some clarity in the First Congress's view may be gleaned, however, by the disparate approach that the Congress took with respect to the Department of the Treasury.  Seeing the Treasury as a department less intrinsically tied to core executive powers enumerated in Article II like that over foreign policy, Congress gave far more direction to the structure of that department, specifying in detail its offices and functions and granting independence from unfettered presidential removal power to the Comptroller.  *See* Lessig & Sunstein, *supra*, at 27-28.  In short, the executive branch was not treated as strictly

---

[14]    The statute regarding removal of the postmasters read: "Postmasters of the first, second, and third classes shall be appointed and may be removed by the President by and with the advice and consent of the Senate, and shall hold their offices for four years unless sooner removed or suspended according to law." *Myers*, 272 U.S. at 107.

unitary, but rather as a branch with units of varying degrees of independence and generally

subject to congressional direction through checks and balances—including on its personnel.  *See*

John F. Manning, *Separation of Powers as Ordinary Interpretation*, 124 HARV. L. REV. 1939,

1964 n.135 (2011).

Chief Justice Taft in *Myers* cherry-picked only one portion of that 1789 story by

highlighting what the First Congress did with the Department of Foreign Affairs.  *See* 272 U.S.

at 113-36; *Seila L.*, 591 U.S. at 277 (Kagan, J., dissenting in part and concurring in part)

(describing how scholars have "rejected Taft's one-sided history").  Despite the structure of the

Post Office far more closely resembling the Treasury Department of 1789 than the Department

of Foreign Affairs, Chief Justice Taft ignored the actual nuances reflected in the Decision of

1789 as to congressional power to condition the President's removal power reflected in the

treatment of the new Treasury Department and instead read this history "through executive-

colored glasses" to support "his strong preconceptions" as former President "about presidential

removal power," to reach the conclusion that a regional postmaster could not be subject to

removal protections.  Robert Post, *Tension in the Unitary Executive: How Taft Constructed the*

*Epochal Opinion of* Myers v. United States, 45 J. SUP. CT. HIST. 167, 172 & n.56 (2020) (first

passage quoting Hayden Smith to William H. Taft (Sep. 1, 1925) (Taft Papers)); *Myers*, 272 U.S.

at 176; Lessig & Sunstein, *supra*, at 25-30.[15]  Dicta in the lengthy *Myers* majority opinion made

broad pronouncements about the importance of the presidential removal power that were both

contradictory and inapposite: While Chief Justice Taft promoted the benefits of recognizing vast

---

[15]    Notably, Chief Justice Taft reached this conclusion over three dissents, including from Justices Holmes and
Brandeis.  *Myers*, 272 U.S. at 178-295.  Justice Brandeis, in particular, espoused a view of checks and balances that
emphasized the interdependence of the executive and legislative branches, vindicated in Justice Jackson's
concurring opinion in *Youngstown*, 343 U.S. at 634.  *See Myers*, 272 U.S. at 240-95.

presidential removal authority on one hand, he recognized that Congress could legislate around appointment and removal of principal officers, in some circumstances, and inferior officers, refusing to threaten protections for the civil service, on the other. *Id.* at 127, 134-35, 161-62, 183, 186 ("[T]here may be duties of a quasi judicial character imposed on executive officers and members of executive tribunals whose decisions after hearing affect interests of individuals, the discharge of which the President cannot in a particular case properly influence or control. . . . [Moreover,] [the appointments clause] give[s] to Congress the power to limit and regulate removal of such inferior officers by heads of departments when it exercises its constitutional power to lodge the power of appointment with them.").[16]

Only nine years later, in *Humphrey's Executor*, the Supreme Court—consisting of six of the same justices who participated in the *Myers* decision (*i.e.,* Justices Sutherland, Van Devanter, Brandeis, Stone, McReynolds, and Butler)—unanimously retreated, denouncing the idea of "illimitable" removal authority and disavowing *Myers'* abundant dicta. *Morrison*, 487 U.S. at 687 ("In *Humphrey's Executor*, we found it 'plain' that the Constitution did not give the President 'illimitable power of removal' over the officers of independent agencies." (quoting 292 U.S. at 629)). Justice Sutherland, who authored *Humphrey's* despite joining the majority opinion in *Myers*, limited *Myers* to "the narrow point" that "the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress" and wrote that other "expressions . . . are beyond the point involved and therefore do not come within the rule of stare decisis. In so far as they are out of harmony with the views here set forth, these expressions are disapproved." *Humphrey's Ex'r*, 292 U.S. at 626-27.

---

[16]   The bold position taken by the current administration, *see* Exec. Order No. 14215, 90 Fed. Reg. 10447 (2025), that the President has supreme control over *all* of his subordinates threatens to upend limits on the removal power over *inferior* officers, expressly acknowledged in *Myers*.

*Humphrey's Executor*, consistent with the dissents in *Myers*, did not foreclose that the President may have total authority over removal of some officials (like "high political officers," *Myers*, 272 U.S. at 241 (Brandeis, J., dissenting)), but it made clear that his removal authority may certainly be limited by Congress in other circumstances.[17]  *Humphrey's Ex'r*, 292 U.S. at 629-32.

The takeaway from *Myers* is therefore discrete and uncontroversial: While Congress may structure executive branch offices via statute and legislate about the roles of executive branch officers, including standards for their removal, Congress cannot reserve for itself an active role in the removal decision.  The problem in *Myers* was that the statute required Senate advice and consent to remove postmasters and that encroached on the presidential power of removal.  272 U.S. at 107.  It cannot be gainsaid that the President has the power of removal of executive branch officers.  When Congress has statutorily provided a for-cause removal requirement, this means that the President has the authority to determine whether the for-cause requirement

---

[17]      Justice Brandeis's dissent in *Myers* was not so broad as to authorize Congress to restrict presidential authority over removal of anyone in the executive branch.  *See Myers*, 272 U.S. at 240-42 (Brandise, J., dissenting). Rather, he focused on the fact that the postmaster was an *inferior officer*, very unlike that of the Secretary of Foreign Affairs, and the mischief that would result if the majority decision were read to endorse absolute presidential removal authority for all officials.  *Id.* at 241, 247, 257 ("Power to remove, as well as to suspend, a high political officer, might conceivably be deemed indispensable to democratic government and, hence, inherent in the President. But power to remove an inferior administrative officer appointed for a fixed term cannot conceivably be deemed an essential of government."); *see also id.* at 181-82, 187, 193 (McReynolds, dissenting) (resisting *Myers'* overbroad dicta suggesting that *all* executive officers must serve at the pleasure of the President).  In the dissenters' views, a functional analysis into an office's role and responsibilities—like that in *Humphrey's Executor*—was necessary, but only for principal officers.

In the face of the current administration's push for a more absolutist presidential removal power, history provides significant cautions: Protections for inferior federal officers came about to counter the extensive "spoils system" that characterized the executive branch in the early 1800s—particularly during the presidency of Andrew Jackson, whose controversial legacy is due in part to his association with widespread corruption.  *See Myers*, 272 U.S. at 276-83 (McReynolds, J., dissenting); *id.* at 272 U.S. at 250-52 (Brandeis, J., dissenting).  Congress having a hand in executive appointments and removal was seen as an antidote to corruption.  Such provisions set the stage for the development of the modern civil service system. *See id.*; Katherine Shaw, *Partisanship Creep*, 118 Nw. Univ. L. Rev. 1563, 1573 & n. 48 ("[A] few decades after Andrew Jackson's administration, strong discontent with the corruption and inefficiency of the patronage system of public employment eventuated in the Pendleton Act, the foundation of modern civil service." (quoting *Elrod v. Burns*, 427 U.S. 347, 354 (1976))).

**JA164**

prescribed by Congress has been met.  As the Supreme Court has since repeatedly articulated,
"the essence" of "*Myers* was the judgment that the Constitution prevents Congress from
draw[ing] to itself the" power to remove.  *Morrison*, 487 U.S. at 686 (citing *Bowsher v. Synar*,
478 U.S. 714 (1986), for that interpretation).  That holding is completely compatible with
*Humphrey's Executor*.  Little more can be gleaned from the unreliable historical retelling and
prolix *Myers* majority opinion.[18]

In short, neither the Founding-era history nor *Myers* can carry the heavy weight that the
current President has thrust upon it.  *See* Letter from Acting SG ("In *Myers* . . ., the Supreme
Court recognized that Article II of the Constitution gives the President an 'unrestricted' power of
'removing executive officers.'").  Neither supports the view that the President's removal power
is "illimitable."  Whatever the benefits of unrestricted removal authority under certain
circumstances, "[t]he Framers did not constitutionalize presidential control over all that is now
considered 'executive'; they did not believe that the President must have plenary power over all
we now think of as administration," Lessig & Sunstein, *supra*, at 118, and neither did the early
twentieth century Supreme Court.

---

[18]    At the motions hearing, defense counsel argued that this interpretation of both *Myers* and *Humphrey's Executor* had been rejected by the Supreme Court in *Seila Law*, 591 U.S. at 228.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 62:1-17.  That is not so.  In *Seila Law*, amicus had distilled the Court's precedent as follows:

> *Humphrey's Executor* and *Morrison* establish a general rule that Congress may impose "modest" restrictions on the President's removal power, with only two limited exceptions. . . . Congress may not reserve a role *for itself* in individual removal decisions (as it attempted to do in *Myers* and *Bowsher*). And it may not eliminate the President's removal power altogether (as it effectively did in *Free Enterprise Fund*). Outside those two situations, amicus argues, Congress is generally free to constrain the President's removal power.

*Seila L.*, 591 U.S. at 228 (emphasis in original) (internal citations omitted).  Rather than reject that reconciliation of *Myers* and *Humphrey's Executor*, the Court simply restated the principle, uncontroverted in either precedent, that "the President's removal power is the rule, not the exception," *id.*, and then declined to revisit these precedents or to "elevate [*Humphrey's Executor*] into a freestanding invitation for Congress to impose additional restrictions on the President's removal authority," *id.*  In other words, the Supreme Court neither constrained *Humphrey's Executor* by expanding *Myers* beyond its holding nor endorsed an expansion of *Humphrey's Executor* itself.  In short, *Seila Law*, on this matter, had frankly little to add.

**JA165**

The holding in *Humphrey's Executor*, that Congress could create boards or commissions with elements of independence from the President, was therefore not at all a "fiction" or an aberration, as defendants have supposed.  Defs.' Opp'n at 9.[19]  *Humphrey's Executor*, and thus NLRB Board members' removal protections, are consistent with the text and historical understandings of Article II, as well as the Supreme Court's most recent pronouncements.  That Congress can exert a check on the President by imposing for-cause restrictions on the removal of leaders of multimember boards or commissions is a stalwart principle in our separation of powers jurisprudence.

c.    **Humphrey's Executor** *Remains Binding.*

In any case, *Humphrey's Executor* remains binding on this Court, as defendants rightly acknowledge.  *See* Defs.' Opp'n at 8 n.2; *Illumina*, 88 F.4th at 1047 ("[T]he question of whether . . . *Humphrey's Executor* [is] no longer binding" is for the Supreme Court alone to answer.).  As the Supreme Court has made clear, "[i]f a precedent . . . has direct application in a case, yet appears to rely on reasons rejected in some other line of decisions," the lower courts should still "leav[e] to the [Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 272 n.1 (D.C. Cir. 2024) ("This court is charged with following case law that directly controls a particular issue, 'leaving to [the Supreme] Court the prerogative of overruling its own decisions.'" (alterations in original) (quoting *Mallory v. Norfolk S. Ry. Co.*,

---

[19]    Nor can *Humphrey's Executor* be fairly described as an "exception[]" to the general rule of presidential removal authority.  *Contra Seila L.*, 591 U.S. at 198.  As explained, a careful reading of the history and the scope of the dispute in *Myers* confirms that *Humphrey's Executor* was not some exception to an otherwise absolute presidential removal power previously established in *Myers*.  To the extent *Myers* extolled such an absolute presidential removal power in overbroad dicta, it was in short order rejected by a unanimous Supreme Court.  *Myers* simply established that the President alone may exercise removal authority over principal officers, and *Humphrey's Executor* explained that Congress can set standards, without conferring the exercise of that power to itself, to cabin the President's singular exercise of that authority in the circumstances presented.

28

**JA166**

600 U.S. 122, 136 (2023))); *Meta Platforms*, 723 F. Supp. 3d at 87 ("It is certainly not this Court's place to deem a long-standing Supreme Court precedent obsolete . . . and thus no longer binding." (internal quotation marks and citation omitted)).  This Court would be bound to conclude that plaintiff's termination was unlawful even were the conclusion reached—and this Court adamantly has not—that *Humphrey's Executor* was, by today's measure, ill-reasoned or wrongly decided.

### B.    Plaintiff is Entitled to Permanent Declaratory and Injunctive Relief.

For all of these reasons, plaintiff prevails on the merits and is therefore entitled to a declaratory ruling that she was unlawfully terminated from her position as a member of the Board.  Defendants concede as much.  Motions H'rg (Mar. 5, 2025), Rough Tr. at 71:23-72:1 (defense counsel stating, "We are not fighting this requested declaratory judgment.").

Plaintiff further requests injunctive relief against Mr. Kaplan, ordering him to allow plaintiff to carry out all of her duties.  Compl. at 7.  To demonstrate that injunctive relief is warranted, a plaintiff must show that (1) she has suffered an irreparable injury, (2) remedies available at law are inadequate to compensate, (3) a remedy in equity is warranted considering the balance of the hardships to each party, and (4) the public interest is not disserved.  *eBay Inc. v. MercExchange LLC*, 547 U.S. 388, 391 (2006).  Notwithstanding plaintiff's success on the merits, defendants contest her entitlement to injunctive relief.  Defs.' Opp'n at 10.

#### 1.    *Plaintiff's Irreparable Harm and Inadequate Remedies at Law*

Plaintiff is suffering irreparable harm that cannot be repaired in the absence of an injunction.[20]  Courts have recognized as irreparable harms the "unlawful removal from office by the President" and "the obviously disruptive effect" that such removal has on the organization's

---

[20]        These two factors are often considered together.  *See, e.g.*, *Ridgley v. Lew*, 55 F. Supp. 3d 89, 98 (D.D.C. 2014); *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ), 2025 WL 665041, at *32 (D.D.C. Mar. 1, 2025).

functioning. *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at * 5 (D.D.C. Nov. 14, 1983),

*vacated as moot*, 732 F.2d 949 (Mem.) (D.C. Cir. 1983). In *Berry*, terminated members of the

Civil Rights Commission challenged President Reagan's decision to remove them. *Id.* at *1.

The Commission was "left without a quorum," and the court recognized as an irreparable injury

both the commission's inability to "fulfill its mandate" and the individuals' inability to serve

"Congress in the furtherance of civil rights." *Id.* at *5. Likewise here, plaintiff has been

deprived of a presidentially appointed and congressionally confirmed position of high

importance, and both she and, by consequence, the NLRB have been deprived of the ability to

carry out their congressional mandate in protecting labor rights—which cannot be retroactively

cured by monetary damages. *See id.*; *Dellinger v. Bessent*, No. 25-cv-385 (ABJ), 2025 WL

471022, at *11-13 (D.D.C. Feb. 12, 2025) ("[T]he loss of the ability to do what Congress

specifically directed [her] to do cannot be remedied with anything other than equitable relief.");

*Harris v. Bessent*, --F. Supp.3d--, No. 25-cv-412 (RC), 2025 WL 521027, at *7 (D.D.C. Feb. 18,

2025) ("By vindicating [her] right to occupy th[at] office, th[is] plaintiff[] act[s] as much in [her]

own interests as those of [her] agenc[y's]. . . . Striking at the independence of these officials

accrues harm to their offices, as well.").[21]

Furthermore, plaintiff and the NLRB suffer an injury due to the loss of the office's

independence. As an entity entrusted with making impartial decisions about sensitive labor

---

[21]    Defendants argue that because President Trump could restore the NLRB's quorum by appointing members
to fill the vacant seats, the harm here is not irreparable. Defs.' Opp'n at 14. While filling the open seats would halt
the ongoing harm and prevent future harm, restoration of the NLRB's quorum would not do anything to *repair* the
past harm—the backlog of cases, the months employers and employees have spent waiting for adjudications, the
practical ramifications felt across the country (from workers' rights violations to workplace unrest) of labor disputes
left unresolved, delayed union recognition, and so forth. The possibility that the NLRB could once again operate
may be one difference between this case and the situation of the Civil Rights Commission in *Berry*, where the
Commission was set to expire before it could fulfill its statutory mandate, *see* 1983 WL 538, at *5, but that
possibility does not make the harm here somehow reparable. The NLRB's statutory mandate is not to—at some
point in time—operate, contrary to defendants' suggestion, Defs.' Opp'n at 14-15, but rather to have an ongoing,
efficient administration of the country's labor laws.

disputes, the NLRB's character and perception as neutral and expert-driven is damaged by

plaintiff's unlawful removal.  *See Humphrey's Ex'r*, 295 U.S. at 630 ("[The] coercive influence

[of the removal power] threatens the independence of a commission."); *Harris*, 2025 WL

679303, at *13 ("[T]he MSPB's independence would evaporate if the President could terminate

its members without cause, even if a court could later order them reinstated.").  Money likewise

cannot make up for that kind of intangible and reputational harm.

Defendants argue that, regardless of the injury, plaintiff's requested remedy—

reinstatement to her position—is one the Court cannot grant.  Defs.' Opp'n at 11.  Not only have

all previous cases sought back pay instead of reinstatement, defendants point out, but also

reinstatement is not a remedy historically available at equity, which constrains the relief

available to the Court today.  *Id.* at 12 (citing *Grupo Mexicano de Desarrollo S.A. v. All. Bond

Fund, Inc.*, 527 U.S. 308, 319 (1999)).  Plaintiff counters, however, that she does not request the

remedy of "reappointment" and does not need to be reinstated: She requests only a declaration

that the President lacked authority to remove her—making the termination email void *ab initio*—

and injunctive relief to enable her to carry out her position as before.  *See* Pl.'s Reply at 9.

Defendants do not challenge the Court's ability to afford declaratory relief, but they do

challenge an injunction running against the executive branch, even against the President's

subordinates, to permit plaintiff to carry out her duties.  Defs.' Opp'n at 11, 13.  They contend

that such relief would effectively "compel[]" the President "to retain the services of a principal

officer whom he no longer believes should be entrusted with the exercise of executive power."

Defs.' Opp'n at 11; *see also* Defs.' Reply at 7-8.  At most, however, this argument simply

restates defendants' position on the merits, because, as a general matter, courts undoubtedly have

authority to constrain unlawful presidential action by enjoining the President's subordinates.

31

**JA169**

*See, e.g.*, *Youngstown*, 343 U.S. at 582, 589 (holding a presidential act unconstitutional and affirming the district court judgment which restrained Secretary of Commerce); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("[I]t is now well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.' *Franklin v. Massachusetts*, 505 U.S. 788, 815 (1992) (Scalia, J., concurring in part and concurring in the judgment). Even if the Secretary were acting at the behest of the President, this 'does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands.' *Soucie v. David*, 448 F.2d 1067, 1072 n. 12 (D.C. Cir. 1971)." (alterations in original)); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *6 n.1 (D.C. Cir. Feb. 15, 2025) (noting that a court "can unquestionably review the legality of the President's action by enjoining the officers who would attempt to enforce the President's order").

Moreover, the D.C. Circuit has held such relief is appropriate in this type of employment context: A court may, by targeting a President's subordinates, "reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment" that would require injunctive relief against the President himself. *Severino v. Biden*, 71 F.4th 1038, 1042-43 (D.C. Cir. 2023) (holding that the plaintiff's injury was therefore redressable); *cf. Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (holding that plaintiff's claim was redressable because injunctive relief against inferior officials, who could *de facto* reinstate plaintiff by allowing him to exercise the privileges of his office, would remedy plaintiff's harm); *see also Harris*, 2025 WL 679303, at *10-12 (holding that the court can order such relief to remedy an unlawful termination and relying on *Swan* and *Severino*); *Dellinger v. Bessent*, --F. Supp. 3d--, No. 25-cv-385 (ABJ),

32

**JA170**

2025 WL 665041, at \*29-31 (D.D.C. Mar. 1, 2025) (same). The Court therefore has the

authority to issue both the declaratory and injunctive remedies that plaintiff seeks.[22]

## 2.    *Balance of the Equities and the Public Interest*

The balance of the equities and the public interest also favor injunctive relief here. *See*

*Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that, where the government is a party, "[t]hese

two factors merge"). The public has an interest in efficient and peaceful resolution of labor

conflicts, and the Board's functioning is crucial to that goal. In 2024, the NLRB received 20,000

to 30,000 unfair labor practice charges, and the Board reviewed 144 unfair labor practice cases

---

[22]    Defendants' arguments that plaintiff may not be "reinstated" or "reappointed" because reinstatement was not a remedy originally available at equity are not only inconsequential because relief need not be fashioned in that form, as described above, but they are also flawed. Defendants' argument ultimately boils down to a technical distinction: Historically, requests for reinstatement were styled as writs of mandamus or *quo warranto* before courts of law instead of requests for injunctions before courts of equity, as defendants' cited cases reflect. Defs.' Opp'n at 12; Twenty States' Amicus Br. at 3; *see In re Sawyer*, 124 U.S. 200, 212 (1888) (noting that while a court of equity does not have "jurisdiction over the appointment and removal of public officers, . . . the courts of law, . . . either by certiorari, error, or appeal, or by *mandamus*, prohibition, *quo warranto*, or information in the nature of a writ of *quo warranto*" do); *White v. Berry*, 171 U.S. 366, 377 (1898) (same). After the merger of law and equity in the federal courts over eighty years ago, however, that distinction makes no difference and does not render improper the injunctive relief plaintiff requests.

Unsurprisingly, many courts have, therefore, reinstated federal employees to their positions or prevented their removals from taking effect. *See, e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 546 (1959) ("[P]etitioner is entitled to the reinstatement which he seeks."); *Pelicone v. Hodges*, 320 F.2d 754, 757 (D.C. Cir. 1963) (holding that plaintiff was "entitled to reinstatement"); *Paroczay v. Hodges*, 219 F. Supp. 89, 94 (D.D.C. 1963) (holding that, because plaintiff "was never legally separated," the court "will therefore order plaintiff's reinstatement"); *Berry*, 1983 WL 538, at \*6 (enjoining removal of members of the U.S. Commission on Civil Rights); *cf. Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) (acknowledging that "[u]se of the court's injunctive power" may be appropriate in certain cases regarding discharge of employees). The other cases cited by defendants for the principle that reinstatement is not available as equitable relief, Defs.' Opp'n at 12, involve the unique situation of federal courts presiding over questions about state officers' entitlement to their positions, which is wholly inapplicable here. *See Baker v. Carr*, 369 U.S. 186, 231 (1962) (citing cases about "enjoin[ing] a state proceeding to remove a public officer"); *Walton v. House of Representatives of Okla.*, 265 U.S. 487, 489-90 (1924) (holding that the district court did not have "jurisdiction over the appointment and removal of state officers"); *Harkrader v. Wadley*, 172 U.S. 148, 165-70 (1898) (declining to enjoin a state criminal proceeding); *see also* Twenty States' Amicus Br. at 16-17 (making the inapposite argument that imposing a remedy of reinstatement of state officers invades state sovereignty).

In any case, the D.C. Circuit has "note[d] that a request for an injunction based on the general federal question statute is essentially a request for a writ of mandamus in this context, where the injunction is sought to compel federal officials to perform a statutorily required ministerial duty." *Swan*, 100 F.3d at 976 n.1. Indeed, plaintiff made a last-minute request in her Notice of Supplemental Authority, ECF No. 33 at 4, for a writ of mandamus in the alternative. A writ of mandamus requires that "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." *Id.* at 4 n.1 (alteration accepted) (quoting *In re Nat'l Nurses United*, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (citation omitted)). Accordingly, if injunctive relief were not available here because of adherence to the historical dividing lines of law and equity, a writ of mandamus would likely be available, and the effective relief provided to plaintiff would be the same. *See Harris*, 2025 WL 679303, at \*11.

33

**JA171**

and 115 election certification cases. *See* Nineteen States & D.C.'s Br. at 7, ECF No. 31 (citing

NLRB, *Investigate Charges*, https://perma.cc/CU82-KU4V; NLRB, *Board Decisions Issued*,

https:www.nlrb.gov/reports/agency-performance/board-decisions-issued (last visited Feb. 24,

2025)).  Without a functioning NLRB, unfair labor practices go unchallenged, union elections go

unrecognized, and pending labor disputes go unreviewed.  *See* Pl.'s Mem. at 12 (providing one

example where Whole Foods has refused to recognize a union election because it claims the

NLRB lacks the authority to certify it); Pl.'s Reply at 12 (citing an additional example where

CVS has refused to recognize a majority elected union).  Incentives to comply with national

labor law may be severely undercut if no agency is available for enforcement.  Employees,

employers, and bargaining units all suffer as a result.  The public also has an interest in the

protection of duly enacted, constitutional laws—like the NLRA—from encroachment from other

branches.  *See League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[T]here is a

substantial public interest 'in having governmental agencies abide by the federal laws that

govern their existence and operations.'" (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th

Cir. 1994))).  Reinstating plaintiff would allow the NLRB to reach a quorum, thereby allowing

the Board to carry out the important work in promoting labor stability, adjudicating labor

disputes, and protecting workers' rights, without inflicting any measurable harm on defendants.[23]

Defendants protest that the President will indeed experience harm—by virtue of retaining

"a principal officer whom the President no longer believes should be entrusted with the exercise

of executive power," resulting in the executive branch "slip[ping] from the Executive's control,

and thus from that of the people."  Defs.' Opp'n at 15 (second passage quoting *Free Enter. Fund*,

---

[23]   As plaintiff's supporting state amici point out, a less partisan Board, insulated from at-will removal, is less likely to whipsaw the public by taking completely disparate approaches every four years, which has concomitant public benefits in greater stability and predictability in administration of the law.  *See* Nineteen States & D.C. Br. at 9 n.21.

561 U.S. at 499).  Yet, President Trump can exercise control over the NLRB by appointing two members of his choosing to the vacant seats and appointing a General Counsel who will adopt his enforcement priorities; he simply has chosen not to do so.  In any case, whether the public will benefit more from the balance Congress has struck in preserving some independence from political whims in the administration of our national labor laws or from complete executive control goes to the core of the constitutional question underlying the merits—and thus the answer is dictated by binding precedent.

Finally, defendants predict their ultimate success before the Supreme Court, warning that if plaintiff is allowed to resume her duties on the Board now, any NLRB decisions in the meantime may be voidable, and "the NLRB will be under a heavy cloud of illegitimacy."  Defs.' Reply at 9; *see also* Defs.' Opp'n at 16; Twenty States' Amicus Br. at 16 (suggesting that "reinstatement hampers effective governance" by causing "intra-office 'chaos'" and questions about the fitness of the official).  The possibility of future changes in the law is not enough, however, to permit an unlawful termination and the halting of all Board activity in the meantime.  Plaintiff's wrongful termination has caused "chaos" enough and shall not be allowed to stand based on defendants' self-serving speculation.

## IV.    CONCLUSION

The President seems intent on pushing the bounds of his office and exercising his power in a manner violative of clear statutory law to test how much the courts will accept the notion of a presidency that is supreme.  Defendants cite in their briefing *Trump v. United States*, 603 U.S. 593, 608-09 (2024) (granting the President absolute and presumptive immunity from criminal liability for "official acts"), to argue that the removal power is "conclusive and preclusive," with the result that the President need not be subject to criminal *or civil* legislative constraints.  Defs.'

**JA173**

Reply at 7.  The courts are now again forced to determine how much encroachment on the

legislature our Constitution can bear and face a slippery slope toward endorsing a presidency that

is untouchable by the law.  The President has given no sufficient reason to accept that path here.

  *Humphrey's Executor* and its progeny control the outcome of this case and require that

plaintiff be permitted to continue her role as Board member of the NLRB and her termination

declared unlawful and void.  The Constitution and caselaw are clear in allowing Congress to

limit the President's removal power and in allowing the courts to enjoin the executive branch

from unlawful action.  Defendants' hyperbolic characterization that legislative and judicial

checks on executive authority, as invoked by plaintiff, present "extraordinary intrusion[s] on the

executive branch," Defs.' Opp'n at 1, is both incorrect and troubling.  Under our constitutional

system, such checks, by design, guard against executive overreach and the risk such overreach

would pose of autocracy.  *See Myers*, 272 U.S. at 293 (Brandeis, J., dissenting).  An American

President is not a king—not even an "elected" one[24]—and his power to remove federal officers

and honest civil servants like plaintiff is not absolute, but may be constrained in appropriate

circumstances, as are present here.

  An order consistent with this Memorandum Opinion will be entered contemporaneously.

  Date:  March 6, 2025

                    _____

                    **BERYL A. HOWELL**
                    United States District Judge

---

[24] Motions H'rg (Mar. 5, 2025), Rough Tr. at 43:9 (plaintiff's counsel highlighting the constitutional role of other branches in checking President's authority).

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GWYNNE A. WILCOX, | |
| *Plaintiff,* | |
| *v.* | Civil Action No. 1:25-cv-00334-BAH |
| DONALD J. TRUMP and MARVIN KAPLAN | |
| *Defendants.* | |

### DEFENDANTS' NOTICE OF APPEAL

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit the Court's March 6, 2025 Order, *see* ECF No. 34, and Memorandum Opinion, *see* ECF No. 35. Defendants intend to request a stay of this Court's Order pending appeal, including an immediate administrative stay, from the United States Court of Appeals for the District of Columbia Circuit.

1

Dated: March 6, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

CHRISTOPHER R. HALL
Assistant Branch Director

/s/ *Alexander W. Resar*
ALEXANDER W. RESAR
(NY Bar No. 5636337)
*Trial Attorney*
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530
Telephone: (202) 616-8188
Email: alexander.w.resar@usdoj.gov

*Counsel for Defendants*

2

**JA176**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
GWYNNE A. WILCOX,                   )  Civil Action
                                    )  No. 25-334
            Plaintiff,              )
vs.                                 )
                                    )
DONALD J. TRUMP, et al.,            )  March 5, 2025
                                    )  10:04 a.m.
            Defendants.             )  Washington, D.C.
  \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE BERYL A. HOWELL,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**

**APPEARANCES:**

FOR THE PLAINTIFF:
                    DEEPAK GUPTA
                    GREGORY BECK
                    Gupta Wessler LLP
                    2001 K Street, NW
                    Suite 850 North
                    Washington, DC 20006
                    (202) 888-1741
                    deepak@guptawessler.com
                    greg@guptawessler.com


FOR DEFENDANTS:
                    HARRY GRAVER
                    CHRISTOPHER HALL
                    U.S. Department of Justice
                    950 Pennsylvania Avenue NW
                    Washington, DC 20530
                    (202) 514-2000
                    harry.graver@usdoj.gov


Court Reporter:    Elizabeth Davila, RPR, FCRR
                   Official Court Reporter

Proceedings reported by machine shorthand.
Transcript produced by computer-aided transcription.

1    that you are talking about -- partisan balance, things like

2    that -- is it puts you into the *Humphrey's* lane.  But

3    *Humphrey's* is not concerned with structure alone, it's also

4    concerned about power.  That's why my friend won't talk

5    about the power that the NLRB wields, except for the first

6    part of the argument about how important it is to keep

7    independent.  I don't think they have any argument that it

8    qualifies for that standard under *Seila Law*, they are just

9    saying ignore that piece.

10            THE COURT:  Well, Mr. Gupta, you might have to

11   answer that question on reply.

12            Go ahead.

13            I'm sorry to interrupt you, but...

14            MR. GRAVER:  No.  That is -- I did also want to

15   talk about the remedy piece.

16            THE COURT:  Yes.  Let's get to the remedy.

17            MR. GRAVER:  So --

18            THE COURT:  I am ready to get to remedy.

19            MR. GRAVER:  Sorry?

20            THE COURT:  So on remedy -- let me just ask you a

21   simple question to start us off before we get into Latin.

22            Do you agree that the plaintiff is at least

23   entitled to declaratory relief?

24            MR. GRAVER:  Yeah.  We are not fighting this

25   requested declaratory judgment --

1    THE COURT:  Okay.  I wasn't totally clear from the

2    briefing on that.  I thought I was reading between the lines

3    that that's true, but -- okay.  I just wanted to be clear on

4    that.

5    MR. GRAVER:  And just to make -- as I understand

6    it, the declaratory relief would be sufficient in their view

7    so long as it runs only to Chairman Kaplan.  It is not a

8    remedy running directly against the President.  But that

9    declaratory relief piece, yeah, we are not fighting that.

10    The issue is the reinstatement.  And with prior

11    declaratory judgments sometimes folks try to push the remedy

12    piece into the declaratory judgment, which becomes a mess.

13    THE COURT:  Let's talk about reinstatement because

14    it's a little bit of a word game; confused a little bit by

15    the plaintiff's briefing because the plaintiff's opening

16    brief does talk about:  We want reinstatement; we want an

17    injunction for reinstatement.

18    MR. GRAVER:  Right.

19    THE COURT:  But I think as the briefing has gone

20    on and -- as I've thought about it, what they're asking for

21    is not me to appoint Ms. Wilcox to the Board.  I don't have

22    that power.  They are not asking me to reinstate her,

23    actually, to the Board.

24    What they're asking is for me to direct the

25    chairman of the Board to give her back her computer, let her

1    have her office and her email so that she can complete her

2    term on the Board.  It's not really a reinstatement.  It's

3    just, like, stop -- get rid of those obstacles you have put

4    in her way to serve her term.

5            Do you call that a "reinstatement"?  Maybe in a

6    general way it is; but are we just talking word games here?

7            MR. GRAVER:  I don't think it's word -- I mean, we

8    take their -- don't take my word for it, here is the

9    complaint.  We would like --

10           THE COURT:  No.  I know.  I understand that.

11           MR. GRAVER:  The requested injunction is expressly

12    pegged to reinstatement.  In their opening brief, the first

13    pages expressly asked for reinstatement.

14           THE COURT:  I agree.  To be sure.

15           MR. GRAVER:  So then, you know, basic party

16    presentation is reinstatement, the requested remedy

17    available.

18           It's not a situation like *Severino*, where we're

19    figuring out just access to office.  The entire rationale

20    and the entire relief requested is to restore a quorum so

21    that the Board can keep operating, where they fired the

22    principal officer as part of it.

23           I don't know what that is if not reinstatement.

24    If the idea is in Day 1 you are fired, in Day 2 you get to

25    perform the job in all of its trappings, binding on private

1  parties, setting policy for the country -- I have no idea

2  what that is but reinstatement; and that's a problem.

3           I kind of want to get to the law and equity piece

4  of it.

5           THE COURT:  Yes.

6           MR. GRAVER:  So that is a huge problem under

7  *Grupo*.

8           THE COURT:  Why are we still talking about law and

9  equity when we got rid of that --

10          MR. GRAVER:  Right.  So --

11          THE COURT:  -- long before I became a lawyer even?

12          MR. GRAVER:  For better or worse, we still have to

13  talk about it because, you know, *Grupo* is after 1938.

14          Here is the basic piece of it, as I understand:

15  After the merger of law and equity, a federal court's

16  remedial toolbox has both legal and equitable remedies.  You

17  don't have to go down the street for law and across the

18  avenue for equity.  And that's great.

19          THE COURT:  It all sits right here.

20          MR. GRAVER:  Totally.

21          But when it comes to the equitable side of your

22  toolbox, the remedies that you have available to you are

23  those that were available to -- at court of equity at the

24  founding.

25          What the Supreme Court has been express about --

1     and this is the square holding of *White* -- is that you do

2     not have equitable jurisdiction over appointments and

3     removals.  This whole subject matter is beyond your remedial

4     capacity.

5              And my friends, again, party presentation piece,

6     up until last night, in the last paragraph of the

7     supplemental authority notice, exclusively asked for an

8     injunction.

9              THE COURT:  It caught my attention.

10             MR. GRAVER:  Here is also just a piece of it, too:

11     It's not just labeling.  It's very much just not labeling.

12     There are two fundamentally different standards.  There's

13     four factors for equitable relief, there's three different

14     standards for mandamus.  None of that is briefed.  One is an

15     equitable remedy, one is a legal remedy played by completely

16     different rules.

17             So just to say:  Oh, you don't like an

18     injunction -- whatever -- toss a mandamus on top.

19             I don't think it works that way.  I don't think

20     you can append this the night before our argument and ask

21     for this Court to issue what I think would be the first time

22     in American history a mandamus injunction -- a mandamus

23     remedy running against the President.

24             The basic part, I think --

25             THE COURT:  Well, I don't think they're asking for

 1    it to run against the President; they're asking it to run

 2    against the chairman of the Board.  But picking up that

 3    clarification --

 4            MR. GRAVER:  That would be -- I mean, mandamus

 5    requires the violation of an indisputable right.  I don't

 6    know where that would run but for the President on their

 7    view.  Again, it's not a point that's briefed, it's a point

 8    that was added.

 9            THE COURT:  Yes.  Except that you are conceding

10    that she's entitled to the declaratory judgment.

11            MR. GRAVER:  But that's a different -- I think

12    that -- for the declaratory judgement, we're not fighting

13    that against Chairman Kaplan because, in smaller aspects of

14    his role, he is able to essentially apply the removal that

15    you were talking about before; let's say:  Access to office;

16    small things like that.

17            It doesn't run with respect to reinstating her

18    full panoply of powers, and that's the key part.  The

19    declaratory judgment just acknowledges the removal was

20    unlawful.  It doesn't talk at all about what happens after

21    the fact and all of the difficult remedies that come from

22    that; that's a whole different kettle of fish.  And mandamus

23    presents its whole set of issues.

24            But if I can just focus for a second just on at

25    least the -- what they were asking for until 9:00 p.m. last

1    night, is that their whole theory on the merits, at least,

2    is you are bound by -- even if it's been narrowed, even if

3    it's been doubted, you are bound by existing Supreme Court

4    precedent.  If you disagree with me on the merits, fine.

5    But that music cuts decidedly against her favor when it

6    comes to remedy.  The square holding of *White* is no

7    reinstatements for officers.

8            In *Sampson*, Justice Rehnquist essentially said:  I

9    don't want to apply that to the entire federal government;

10   there might be narrow circumstances where employees --

11   employees can obtain an equitable relief.

12           But for present purposes, *White* on *Sampson's* own

13   terms remains good law.  So the requested injunction that

14   they have asked for, whether it comes from bottom up or top

15   down -- there is no equitable jurisdiction to order

16   reinstatement under the square holding of *White* and all of

17   the cases preceding it and all of the cases that came after.

18           So I think that our *Grupo* argument -- which is

19   totally separate from anything Article II -- the *Grupo*

20   argument, I think, is decisive with respect to what they

21   have asked for.

22           THE COURT:  All right.  Thank you.

23           Anything else you think I should know?

24           MR. GRAVER:  I don't think so.

25           THE COURT:  Thank you.