MERITS ORAL ARGUMENT SCHEDULED MAY 16,
2025  Nos. 25-5037, 25-5055

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

CATHY A. HARRIS, IN HER PERSONAL CAPACITY AND IN
HER  OFFICIAL CAPACITY AS MEMBER OF THE MERIT
SYSTEMS  PROTECTION BOARD,

*Appellee,*

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE  TREASURY, ET AL.,

*Appellants.*

*On Appeal from the United States District Court
for the District of Columbia*

**BRIEF OF GOVERNMENT ACCOUNTABILITY PROJECT,
NATIONAL SECURITY COUNSELORS, NATIONAL
WHISTLEBLOWER CENTER, PROJECT ON GOVERNMENT
OVERSIGHT, AND WHISTLEBLOWERS OF AMERICA AS
*AMICI CURIAE* IN  SUPPORT OF APPELLEE**

Thad M. Guyer
T.M. GUYER AND AYERS & FRIENDS, PC
116 Mistletoe Street
Medford, OR 97501
Tel.: (206) 941-2869
thad@guyerayers.com
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that no party to this brief is a publicly held corporation, issues stock or has a parent corporation.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT                                    2

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES 6

SEPARATE STATEMENT, PURSUANT TO FED. R. APP. P. 29(A)(2),
REGARDING CONSENT OF ALL PARTIES IN LIEU OF A MOTION
FOR LEAVE TO FILE                                                6

CERTIFICATE OF COUNSEL, PURSUANT TO CIRCUIT RULE
29(D), REGARDING THE NECESSITY OF FILING
THIS *AMICUS* BRIEF                                               6

GLOSSARY OF ABREVIATIONS                                          7

STATEMENTS OF INTEREST OF AMICI                                   8

I.   SUMMARY OF ARGUMENT                                          10

   A. The Congressional Goal of Fostering Public Trust:           10

   B. The Goal of Good Government:                                 12

   C. The Goal of Preventing Vacancy Manipulation:                13

ARGUMENT                                                          14

II.  HISTORICAL AND CONSTITUTIONAL FOUNDATIONS OF
PUBLIC TRUST                                                      14

   A. Early Supreme Court Recognition of Impartial Adjudication as
   Condition of Public Trust                                      14

   B. Merger of Constitutional Principles with Legislative Design to
   Achieve Trust of Civil Servants                                15

III. THE CIVIL SERVICE REFORM ACT AND THE MSPB'S ROLE IN
FOSTERING TRUST OF CIVIL SERVANTS                                 17

   A. Statutory and Legislative Objectives                        17

   B. Safeguarding Neutral Adjudication Through Removal

    Protections                                                                    19

IV. PUBLIC TRUST REQUIRES MULTI-LAYER REMOVAL
PROTECTIONS                                                                    20

V.  VACANCY CREATION AND PRESIDENTIAL FAVOR CAN KILL
THE CONGRESSIONAL RELIANCE ON CIVIL SERVANTS TO
PROTECT THE PUBLIC                                                            22

VI. CONCLUSION                                                                 23

CERTIFICATE OF COMPLIANCE                                                      24

CERTIFICATE OF  SERVICE                                                        24

# TABLE OF AUTHORITIES

## CASES

*Arnett v. Kennedy*, 416 U.S. 134, 152 (1974) .......................................... 19

*Bush v. Lucas*, 462 U.S. 367, 389 (1983). ................................................. 19

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936) ...................................... 16

*Consumer Financial Protection Bureau v. Community Financial Services Association*, 601 U.S. 416 (2024) ........................................... 21

*Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 386–88 (2015) ........ 17

*Evans v. Gore*, 253 U.S. 245 (1920) ......................................................... 16

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010) ................................................................................ 20

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)................................. 14

*McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) ......................... 16

*O'Boyle v. United States DOJ*, No. 23-1216, 2024 U.S. App. LEXIS 30519, at *2-3 (D.C. Cir. Dec. 3, 2024) ................................................. 18

*Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990) ............. 18

*Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), .......................................................................................... 20

*Tumey v. Ohio*, 273 U.S. 510 (1927) ........................................................ 15

*United States v. Lee*, 106 U.S. 196 (1882) ............................................... 15

## STATUTES

5 U.S.C. § 2302(b)(8)

Civil Service Reform Act of 1978 (CSRA), Pub. L. No. 95-454, 92 Stat. 1111 ....................................................................................................... 16

Pendleton Act, Act of Jan. 16, 1883, c. 27, 22 Stat. 403 ........................ 20

## OTHER AUTHORITIES

2 Commentaries on the Constitution of the United States § 1348 (3d ed. 1858) ..................................................................................................... 18

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Except for *Amici Curiae*, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Appellee.

References to the ruling at issue appear in the Brief for Appellee.

*Amici* is unaware of any related cases pending before this Court or any other court.

## SEPARATE STATEMENT, PURSUANT TO FED. R. APP. P. 29(A)(2), REGARDING CONSENT OF ALL PARTIES IN LIEU OF A MOTION FOR LEAVE TO FILE

Undersigned counsel of record for *amici* has received consent from counsel from all parties to file an *amicus* brief in support of Appellees' pending Petition for Initial Hearing En Banc and Rehearing En Banc.

Pursuant to Fed. R. App. P. 29(a)(2), these consents obviate the need for *amici* to move this Court for leave to file their *amicus* brief.

## CERTIFICATE OF COUNSEL, PURSUANT TO CIRCUIT RULE 29(D), REGARDING THE NECESSITY OF FILING THIS *AMICUS* BRIEF

Undersigned counsel of record for *amici* hereby certifies, pursuant to Circuit Rule 29(d), that this *amicus* brief is necessary

because it addresses issues, asserts facts, and makes arguments that none of the parties have addressed or addressed adequately. These points include the history of the Civil Service Reform Act of 1978 ("CSRA"), the history of the Pendleton Act, the central importance of federal whistleblowers in exposing governmental waste, fraud, and abuse of authority, and the critical importance of the Merit Systems Protection Board in adjudicating the CSRA rights of federal employees.

## GLOSSARY OF ABREVIATIONS

CSA        Civil Service Act

CSRA       Civil Service Reform Act

GAP        Government Accountability Project

MSPB       U.S. Merit Systems Protection Board

NSC        National Security Counselors

NWC        National Whistleblower Center

OSC        U.S. Office of Special Counsel

POGO       Project On Government Oversight

WOA        Whistleblowers of America

WPA        Whistleblower Protection Act

## STATEMENTS OF INTEREST OF AMICI [1]

**Government Accountability Project ("GAP")** is an independent, nonpartisan, nonprofit, public interest organization that promotes corporate and government accountability by protecting whistleblowers and advancing free speech in the civilian and governmental workforce. Founded in 1977, GAP is the nation's oldest such group. GAP advocates for effective implementation of whistleblower protections throughout industry, international institutions, and the federal government.

**National Security Counselors ("NSC")** is a non-profit public interest law firm which specializes, in pertinent part, in national security employment law, including whistleblower protection. NSC regularly represents whistleblowers in all stages of the administrative process, including before the Merit Systems Protection Board ("MSPB") and the federal courts.

---

[1]  Pursuant to Fed. R. App. P. 29(a)(4)(E), *amici* affirm that no counsel for a party authored this brief in whole or in part, and that no person other than the *amici* or their counsel and no party or counsel for a party contributed money that was intended to fund preparing or submitting this brief.

**National Whistleblower Center ("NWC")** is a nonprofit, nonpartisan, tax-exempt, charitable organization dedicated to the protection of whistleblowers. Founded in 1988, the NWC is keenly aware of the issues facing government employees who report waste, fraud, or abuse. Over the years, the NWC has worked aggressively to ensure that laws protecting federal employees achieve Congress' goals. On a non-partisan basis the NWC, its officers and directors have represented or assisted numerous federal employees.

**Project On Government Oversight ("POGO")** is a nonpartisan independent watchdog that investigates and exposes waste, corruption, abuse of power. POGO champions reforms to achieve a more effective, ethical, and accountable federal government that safeguards constitutional principles. Working with whistleblowers for such purposes is an integral part of POGO's mission, and ensuring strong whistleblower protections is one of POGO's core policy priorities.

**Whistleblowers Of America ("WOA")** is a voluntary peer support network. WOA concentrates on whistleblower mental health through a trauma-informed approach and assists employees suffering the psychosocial impacts of whistleblower retaliation. Founded in 2017,

WOA provides support, advocacy, resources and referrals to a global network of employees and advocates and has provided support to over 1,050 individuals in over 30 countries.

## I. SUMMARY OF ARGUMENT

### A. <u>The Congressional Goal of Fostering Public Trust:</u>

From the inception of the American republic, the concept of "public trust" has served as the backbone for structuring government institutions and limiting executive power. This notion appears explicitly in the writings of the Founders and early jurists—James Wilson, John Adams, Alexander Hamilton, and James Madison—who repeatedly stressed that officeholders must operate "without fear or favor" in their service to the people. They recognized that if such independence and neutrality erode, the legitimacy of governance deteriorates. This principle of public trust applied to all three branches of government.

In light of these foundational ideals, the Merit Systems Protection Board (MSPB) was designed by Congress to embody this independence. The MSPB's removal protections, including the principle that its high-level officials like Appellee Ms. Harris cannot be removed without cause, reflect a 20th century iteration of the Founders' insistence on impartial adjudication and accountability in executive branch quasi-

judicial forums. Permitting at-will removal of MSPB members would subvert that constitutional heritage embodied in Congressional enactments like the CSRA and invite precisely the sort of corrupt executive influences that the Constitution's framers feared would corrode the rule of law.

James Madison articulated the imperative of preserving public trust in Federalist No. 57, where he insisted that the aim of every political constitution is to take the most effectual precautions for keeping public officials virtuous whilst they continue to "hold their public trust." It is an Article I legislative objective the Article II public officials are entrusted with authority that must be wielded only for the benefit of the citizenry, not for partisan or personal gain. The CSRA legislative framework that established the MSPB implements this founding principle in the federal workforce context. Article III judges must respect this exercise of Article I power to keep Article II officials on the straight and narrow.

Congress deliberately shielded MSPB officials from at-will dismissal to safeguard the Board's adjudicative neutrality. A body tasked with judging federal personnel disputes, including claims of

whistleblower retaliation or other violations of merit systems principles, cannot function credibly if Board members and top officials may be fired without legitimate grounds. Central to Ms. Harris's argument is the principle that the MSPB's independence is not a novel or accidental design. Rather, it is an outgrowth of nearly two centuries of constitutional evolution and jurisprudence emphasizing the need for an impartial mechanism to resolve disputes "without fear or favor." This phrase, appearing in colonial and early state judicial oaths, demands that judges (and by extension, analogous adjudicators) must not cave to external pressure when assessing facts and applying the law. John Adams' terminology "without fear or favor, affection, or ill will" echo in the CSRA.

### B.  The Goal of Good Government:

The MSPB's role as the guardian of the merit systems is a linchpin of transparency and fairness in government. If its adjudicative members are beholden to the barely restrained ambitions of a President, the sword of Damocles hangs fear above them. That chilling effect would erode the Board's ability to adjudicate personnel disputes impartially. The CSRA's framers were acutely aware that federal

employees, especially those reporting improprieties, would not come

forward if they perceived the Board to be too close to the Executive.

Congress determined that MSPB officials should remain secure in their

positions to avoid outside intimidation.

### C.  The Goal of Preventing Vacancy Manipulation:

The facts of *Marbury* are especially instructive to the flip side of

"removal"—"vacancy".  The judicial position denied to William Marbury

by James Madison's refusal to deliver it was not motivated by animus

toward Marbury, but was designed to create a vacancy, and a vacancy

creates opportunities for promises. Once a vacancy arises, prospective

MSPB candidates—eager to fill the seat—may feel obliged to

demonstrate fealty to the President or the appointing authority. If the

President can reward compliance or partisan loyalty by selecting

replacements who display the "right" views, the Board's neutrality

weakens further. This is precisely what Congress sought to prevent

when it built removal safeguards into the Civil Service Reform Act. The

lawmakers anticipated that preventing unjust removals would not only

shield current members' independence but also block the subtle,

corrosive incentive structure that leads applicants to curry favor for a future post.

This vacancy-based dynamic is particularly dangerous for whistleblowers and other civil servants in the executive branch. If the Board member who might adjudicate their cases can be cashiered at will—and replaced by someone aligned with the administration—those employees will rationally conclude that reporting misconduct is too risky. The MSPB would devolve into an echo of the White House's will, undermining the foundational principle that it be a truly impartial and expert body. By discouraging vacancy manipulation, Congress sought to maintain a stable, reliable MSPB whose members possess both the freedom and the resolve to do justice "without fear or favor."

## ARGUMENT

## II. HISTORICAL AND CONSTITUTIONAL FOUNDATIONS OF PUBLIC TRUST

### A. <u>Early Supreme Court Recognition of Impartial Adjudication as Condition of Public Trust</u>

From the earliest years of the Republic, the Supreme Court has underscored that legitimate government depends on the public's confidence in neutral dispute resolution. In *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), Chief Justice Marshall insisted that courts, to

fulfill their duty of saying what the law is, must remain free from executive or legislative interference. While *Marbury* addressed the judiciary's power to invalidate unconstitutional statutes, it implicitly highlighted that adjudication cannot function properly if subject to external control.

Later decisions like *United States v. Lee*, 106 U.S. 196 (1882), reaffirmed that no person or governmental entity can place itself above the law's constraints, emphasizing that equitable relief must be available in a fair tribunal. Indeed, the Court stressed that "no man in this country is so high that he is above the law." *Id*. at 220. This principle resonates with the concept that officers tasked with adjudicating claims against powerful government interests must be fully independent. The same ethos underlies *Tumey v. Ohio*, 273 U.S. 510 (1927), which invalidated a system where a mayor-judge had financial incentives to convict. An official who fears removal and loss of salary and benefits can be swayed by "with[] fear or favor."

## B. <u>Merger of Constitutional Principles with Legislative Design to Achieve Trust of Civil Servants</u>

The Constitution grants Congress flexibility to structure agencies and offices necessary to implement federal powers. In M'Culloch v.

State [Maryland], 17 U.S. 316 (1819), the Supreme Court recognized Congress's prerogative to establish instrumentalities essential to governance. Thus, the Court held that though the power of establishing a corporation is not among the enumerated powers granted by the constitution, such power may be exercised as an appropriate means of exercising any of the powers expressly granted. The MSPB is such an instrumentality, integral to the Civil Service Reform Act of 1978 (CSRA), Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.). In *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936), the Court observed that delegating authority to interested or biased parties undermines fairness. Analogously, if the President could remove MSPB members at will, the Board's authority would effectively be delegated back to the Executive's preferences, contravening the legislative intent to create a forum insulated from partisan demands.

In *Evans v. Gore*, 253 U.S. 245, 263 (1920), the Court's protection of judicial salaries evinced a broader theme: adjudicators must not be subject to manipulation by external forces; but "for the common good -- to render him, in the words of John Marshall, 'perfectly and completely

independent, with nothing to influence or control him but God and his conscience'." While *Evans* arose in an Article III context, the profound cultural value that anyone with "judge" in her name applies to Article II quasi-judicial agencies whose independence is central to their function. No civil servant is going to risk his career in reporting corruption or looming catastrophe as Congress intended if the MSPB judge is beholden to the White House.[2] Creating an independent quasi-judicial body is, at minimum,  a necessary and incidental power under Article I.

## III.  THE CIVIL SERVICE REFORM ACT AND THE MSPB'S ROLE IN FOSTERING TRUST OF CIVIL SERVANTS

### A. Statutory and Legislative Objectives

The CSRA established a merit-based regime for federal employment, one that preserves fair treatment and channels allegations of wrongdoing into reliable adjudication. This structure was a direct

---

[2] During MacLean's briefing, a TSA official told him that the hijackers were planning to "smuggle weapons in camera equipment or children's toys through foreign security," and then "fly into the United States ... into an airport that didn't require them to be screened." The hijackers would then board U.S. flights, "overpower the crew or the Air Marshals and ... fly the planes into East Coast targets."

*Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 386–88 (2015).

response to perceived deficiencies in earlier systems that subjected civil

servants to political favoritism or retaliation. Congress knew that the

public trust in government relies on employees being free to expose

fraud, corruption, and abuse, without fear that any complaint crossing

the Executive's wishes would end a career.[3]

    The MSPB sits at the apex of the complaints and appeals process,

rendering decisions that can affirm or overturn agency actions. Its

neutrality is indispensable for persuading civil servants to step forward

with evidence of misconduct, and protection from retaliation is a

substantive statutory right. As explained in *O'Boyle v. United States

DOJ*, No. 23-1216, 2024 U.S. App. LEXIS 30519, at \*2-3 (D.C. Cir. Dec.

3, 2024), federal employees have certain whistleblower protections. 5

U.S.C. § 2302(b)(8). Article I undoubtedly gave Congress the power to

create these substantive rights to protect the citizenry through the

---

[3] The power to control and direct the appropriations, constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation...." 2 Commentaries on the Constitution of the United States § 1348 (3d ed. 1858).

*Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427–28 (1990).

early warning of whistleblowers.[4] The President does not, to date, have

an Article II power to rip the procedure from the substance of their legal

protections. "Where the focus of legislation was thus strongly on the

procedural mechanism for enforcing the substantive right, which was

simultaneously conferred, we decline to conclude that the substantive

right may be viewed wholly apart from the procedure provided for its

enforcement." *Arnett v. Kennedy*, 416 U.S. 134, 152 (1974).

## B. Safeguarding Neutral Adjudication Through Removal Protections

Congress recognized that in the historically controversial realm of

civil service,[5] substantive rights would fail if adjudicative neutrality

---

[4] In 1978, a Senate Committee Print stated, "Federal employees are often the source of information about agency operations suppressed by their superiors. Since they are much closer to the actual working situation than top agency officials, they have testified before Congress, spoken to reporters, and informed the public.

*Bush v. Lucas*, 462 U.S. 367, 389 (1983).

5 Following the Civil War, grass-roots sentiment for 'Civil Service reform' began to grow, and it was apparently brought to a head by the assassination of President James A. Garfield on July 2, 1881. Garfield, having then held officer only four months, was accosted in Washington's Union Station and shot by a dissatisfied office seeker who believed that the President had been instrumental in refusing his request for appointment as United States Consul in Paris. During the

were illusory because MSPB members could be dismissed by the President without cause. The single-layer for-cause removal standard ensures that an MSPB official need not yield to political pressure. This design addresses a core worry repeatedly flagged by the Supreme Court: partial or biased adjudication erodes the rule of law. If MSPB members anticipate that issuing decisions unfavorable to powerful officials might provoke firing, they cannot realistically apply statutory and constitutional commands. For the same reason that judicial officers require independence, so too do administrative judges and Board members who act in a quasi-judicial capacity.

## IV. PUBLIC TRUST REQUIRES MULTI-LAYER REMOVAL PROTECTIONS

*Free Enterprise Fund v. Public Company Accounting Oversight Board,* 561 U.S. 477 (2010), and *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), scrutinized different

---

summer, while President Garfield lingered prior to his death in September, delegates from 13 Civil Service reform associations met and formed the National Civil Service Reform League. Responding to public demand for reform led by this organization, Congress in January 1883 enacted the Pendleton Act [Act of Jan. 16, 1883, c. 27, 22 Stat. 403] ***

*Arnett v. Kennedy*, 416 U.S. at 148–50.

configurations of agency removal protections. In *Free Enterprise Fund*, the Court invalidated dual for-cause layers that shielded PCAOB members under the SEC, concluding that such a structure created too many barriers to executive oversight. However, the Court did not strike down the fundamental notion of for-cause removal itself. The MSPB's arrangement, in contrast, presents only one level of removal protection. There is no nested, multi-tier scenario. *Seila Law* addressed a single-director agency wielding extensive enforcement authority. The Court emphasized that the CFPB's structure vested singular executive-like power in one director largely unaccountable to the President. More recently, *Consumer Financial Protection Bureau v. Community Financial Services Association*, 601 U.S. 416 (2024), examined the CFPB's funding mechanism and underscored concerns about excessive insulation from political checks, which is not the situation here. The MSPB sits securely within that tradition, policing federal employment abuses and ensuring that neither agency managers nor the President can act with unchecked power.

## V. VACANCY CREATION AND PRESIDENTIAL FAVOR CAN KILL THE CONGRESSIONAL RELIANCE ON CIVIL SERVANTS TO PROTECT THE PUBLIC

Arbitrary removals create immediate vacancies that allow the Executive to reshape the Board. Members who remain may become more cautious, wary of being next if they issue an unfavorable ruling. This phenomenon recalls *Carter v. Carter Coal Co.*, 298 U.S. at 311, which objected to delegations that permitted private interests to dominate. Here, the "private" interest analog is the Executive's unilateral prerogative to appoint successors more amenable to its agenda. In an environment of precarious tenure, members might tailor decisions to stay in good graces. That pattern subverts the CSRA's design and severely weakens the Board's credibility in the eyes of employees.

Preserving the MSPB's functional independence is essential to upholding the constitutional commitment that no branch or official stands beyond legal constraints. The public trust, so vital to stable governance, erodes if it appears that the Board's composition and rulings hinge on pleasing the Executive. Congress's decision to implement a single-layer, for-cause removal structure, consistent with

*Humphrey's Executor*, acts as a bulwark against that outcome and is

integral to maintaining the Board's integrity.

## VI.  CONCLUSION

For whistleblowers to protect the public, they must trust that the

MSPB serve as the impartial adjudicator that Congress envisioned.

> Respectfully submitted,
> /s/ *Thad M. Guyer*
> Thad M. Guyer
> T.M. GUYER AND AYERS &
> FRIENDS, PC
> 116 Mistletoe Street
> Medford, OR 97501
> Tel.: (206) 941-2869
> thad@guyerayers.com
> *Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

This filing complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). Its typeface is Century Schoolbook, 14-point font with a word count of  2,471 words.

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on April 9, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed this 9th of April, 2025.


/s/ Thad M. Guyer

Thad M. Guyer

*Counsel for Amici Curiae*