ORAL ARGUMENT HELD MAY 16, 2025

Nos. 25-5037, 25-5055

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

CATHY A. HARRIS, IN HER PERSONAL CAPACITY AND IN HER OFFICIAL CAPACITY AS MEMBER OF THE MERIT SYSTEMS PROTECTION BOARD,

*Plaintiff-Appellee*,

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE TREASURY, *et al.*,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Columbia, No. 1:25-cv-00412-RC
Hon. Rudolph Contreras, J.

## PETITION FOR EN BANC REVIEW ADDENDUM

MICHAEL J. KATOR
JEREMY D. WRIGHT
KERRIE D. RIGGS
KATOR, PARKS, WEISER &
  WRIGHT, P.L.L.C.
1150 Connecticut Ave. NW
Suite 705
Washington, DC 20036
(202) 898-4800
mkator@katorparks.com

NATHANIEL A.G. ZELINSKY
SAMANTHA BATEMAN
MARY L. DOHRMANN†
KYLE R. FREENY
JAMES I. PEARCE††
WASHINGTON LITIGATION
  GROUP
1717 K St. NW
Suite 1120
Washington, DC 20006
(202) 521-8750
nzelinsky@washington
litigationgroup.org

NEAL KUMAR KATYAL
*Counsel of Record*
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20006
(202) 835-7500
nkatyal@milbank.com

LINDA M. CORREIA
CORREIA & PUTH, PLLC
1400 16th St. NW
Suite 450
Washington, DC 20036
(202) 602-6500
lcorreia@correiaputh.com

*Counsel for Appellee Cathy A. Harris*

December 12, 2025
† *admitted only in New York; practicing under supervision of D.C. Bar members*
†† *admitted only in New York and North Carolina; practicing under supervision of D.C. Bar member*

## TABLE OF CONTENTS

Page

Opinion (D.C. Cir. No. 25-5037, Dec. 5, 2025) ...............................................Add. 1

Certificate of Parties and Amici Curiae Circuit.............................................Add. 83

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 16, 2025          Decided December 5, 2025

No. 25-5037

CATHY A. HARRIS, IN HER PERSONAL CAPACITY AND IN HER
OFFICIAL CAPACITY AS MEMBER OF THE MERIT SYSTEMS
PROTECTION BOARD,
APPELLEE

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF
THE TREASURY, ET AL.,
APPELLANTS

———

Consolidated with 25-5055

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:25-cv-00412)

———

*Harry Graver*, Attorney, U.S. Department of Justice, argued the cause for appellants. On the briefs were *Eric D. McArthur*, Deputy Assistant Attorney General, and *Mark R. Freeman*, *Michael S. Raab*, *Joshua M. Salzman*, *Laura E. Myron*, and *Daniel Aguilar*, Attorneys.

**Add. 1**

2

*Martin Akerman*, pro se, was on the brief for *amicus curiae* Martin Akerman in support of appellants.

*James Uthmeier*, Attorney General, Office of the Attorney General for the State of Florida, *Jeffrey Paul Desousa*, Acting Solicitor General, and *Nathan A. Forrester*, Chief Deputy Solicitor General, were on the brief for *amici curiae* State of Florida, et al. in support of appellants.

*Nathaniel A. Zelinsky* argued the cause for appellee Cathy A. Harris.  With him on the brief were *Michael J. Kator*, *Jeremy D. Wright*, *Kerrie D. Riggs*, *Linda M. Correia*, *Neal Kumar Katyal*, *Kristina Alekseyeva*, and *Ezra P. Louvis*.

*Steven A. Hirsch* was on the brief for *amici curiae* Law Professors John C. Coates, et al. in support of appellee.

*Elizabeth B. Wydra*, *Brianne J. Gorod*, and *Brian R. Frazelle* were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellee.

*Nicolas A. Sansone* and *Allison M. Zieve* were on the brief for *amicus curiae* Public Citizen in support of appellee.

*Anthony Schoenberg*, *Alexis Loeb*, *John Ugai*, and *Raven Quesenberry* were on the brief for *amici curiae* 253 Members of Congress in support of appellee.

*Elizabeth C. Lockwood* and *Kathryn M. Ali* were on the brief for *amici curiae* Former Board Members and General Counsel of the Merit Systems Protection Board in support of appellee.

3

*Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawaii, *Kaliko'onalani D. Fernandes*, Solicitor General, *Kristin K. Mayes*, Attorney General, Office of the Attorney General for the State of Arizona, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Andrea Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Keith Ellison*, Attorney General, Office of the Attorney General for the State of Minnesota, *Matthew J. Platkin*, Attorney General, Office of the Attorney General for the State of New Jersey, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, *Raul Torrez*, Attorney General, Office of the Attorney General for the State of New Mexico, *Jeff Jackson*, Attorney General, Office of the Attorney General for the State of North Carolina, *Dan Rayfield*, Attorney General, Office of the Attorney General for the State of Oregon, *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, *Joshua L. Kaul*, Attorney General, Office of the Attorney General for the State of Wisconsin, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Nicholas W. Brown*, Attorney General, Office of the Attorney General for the State of Washington, and *Brian*

**Add. 3**

4

*L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, were on the brief for *amici curiae* State of Hawaii, et al. in support of appellee.

*William Pittard* and *Daniel Csigirinszkij* were on the brief for *amicus curiae* Professor Peter Conti-Brown in support of appellee.

*Joseph M. Sellers* was on the brief for *amici curiae* Patrick J. Borchers, et al. in support of appellee.

*Thad M. Guyer* was on the brief for *amici curiae* Government Accountability Project, et al. in support of appellee.

*Joseph Carson*, pro se, was on the brief for *amicus curiae* Joseph Carson, PE in support of appellee.

No. 25-5057

GWYNNE A. WILCOX,
APPELLEE

v.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES AND MARVIN E. KAPLAN, IN HIS OFFICIAL CAPACITY AS CHAIRMAN OF THE NATIONAL LABOR RELATIONS BOARD,
APPELLANTS

**Add. 4**

5

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:25-cv-00334)

———

*Harry Graver*, Attorney, U.S. Department of Justice, argued the cause for appellants. On the briefs were *Eric D. McArthur*, Deputy Assistant Attorney General, and *Mark R. Freeman*, *Michael S. Raab*, *Joshua M. Salzman*, *Laura E. Myron*, and *Daniel Aguilar*, Attorneys.

*Daniel Z. Epstein* and *R. Trent McCotter* were on the brief for *amicus curiae* Separation of Powers Clinic in support of appellants.

*Michael Pepson* was on the brief for *amicus curiae* Americans for Prosperity Foundation in support of appellants.

*Jonathan Skrmetti*, Attorney General and Reporter, Office of the Attorney General for the State of Tennessee, and *Whitney Hermandorfer*, Director of Strategic Litigation at the time the brief was filed, were on the brief for *amicus curiae* State of Tennessee in support of appellants.

*Michael H. McGinley*, *Brian A. Kulp*, *Jordan L. Von Bokern*, and *Steven A. Engel* were on the brief for *amicus curiae* the Chamber of Commerce of the United States of America in support of appellants.

*James Uthmeier*, Attorney General, Office of the Attorney General for the State of Florida, *Jeffrey Paul Desousa*, Acting Solicitor General, and *Nathan A. Forrester*, Chief Deputy

6

Solicitor General, were on the brief for *amici curiae* State of Florida, et al. in support of appellants.

Kevin F. King, Matthew J. Glover, Eli Nachmany, and Brad J. Grisenti were on the brief for *amicus curiae* Coalition for a Democratic Workplace in support of appellants.

William J. Olson and Jeremiah L. Morgan were on the brief for *amicus curiae* America's Future, et al. in support of appellants.

Deepak Gupta argued the cause for appellee Gwynne A. Wilcox. With him on the brief were Jennifer D. Bennett, Matthew W. H. Wessler, Gregory A. Beck, and Alisa C. Philo.

Dennis Fan was on the brief for *amici curiae* Former Members of the National Labor Relations Board in support of appellee.

Steven A. Hirsch was on the brief for *amici curiae* Law Professors John C. Coates, et al. in support of appellee.

Elizabeth B. Wydra, Brianne J. Gorod, and Brian R. Frazelle were on the brief for *amicus curiae* Constitutional Accountability Center in support of appellee.

Nicolas A. Sansone and Allison M. Zieve were on the brief for *amicus curiae* Public Citizen in support of appellee.

Anthony Schoenberg, Alexis Loeb, John Ugai, and Raven Quesenberry were on the brief for *amici curiae* 253 Members of Congress in support of appellee.

Keith Ellison, Attorney General, Office of the Attorney General for the State of Minnesota, Liz Kramer, Solicitor

7

General, *Kwame Raoul*, Attorney General, Office of the Attorney General for the State of Illinois, *Jane Elinor Notz*, Solicitor General, *Alex Hemmer*, Deputy Solicitor General, *Kris Mayes*, Attorney General, Office of the Attorney General for the State of Arizona, *Philip J. Weiser*, Attorney General, Office of the Attorney General for the State of Colorado, *Kathleen Jennings*, Attorney General, Office of the Attorney General for the State of Delaware, *Rob Bonta*, Attorney General, Office of the Attorney General for the State of California, *William Tong*, Attorney General, Office of the Attorney General for the State of Connecticut, *Brian L. Schwalb*, Attorney General, Office of the Attorney General for the District of Columbia, *Anne E. Lopez*, Attorney General, Office of the Attorney General for the State of Hawaii, *Anthony G. Brown*, Attorney General, Office of the Attorney General for the State of Maryland, *Dana Nessel*, Attorney General, Office of the Attorney General for the State of Michigan, *Matthew J. Platkin*, Attorney General, Office of the Attorney General for the State of New Jersey, *Letitia James*, Attorney General, Office of the Attorney General for the State of New York, *Dan Rayfield*, Attorney General, Office of the Attorney General for the State of Oregon, *Aaron M. Frey*, Attorney General, Office of the Attorney General for the State of Maine, *Andrea Joy Campbell*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Aaron D. Ford*, Attorney General, Office of the Attorney General for the State of Nevada, *Raul Torrez*, Attorney General, Office of the Attorney General for the State of New Mexico, *Jeff Jackson*, Attorney General, Office of the Attorney General for the State of North Carolina, *Peter F. Neronha*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Charity R. Clark*, Attorney General, Office of the Attorney General for the State of Vermont, *Joshua L. Kaul*, Attorney General, Office of the Attorney General for the State of Wisconsin, and *Nicholas W. Brown*, Attorney General,

8

Office of the Attorney General for the State of Washington, were on the brief for *amici curiae* State of Minnesota, et al. in support of appellee.

Matthew Ginsburg, *Harold Craig Becker*, and *Maneesh Sharma* were on the brief for *amicus curiae* the American Federation of Labor and Congress of Industrial Organizations (AFL-CIO) in support of appellee.

*William Pittard* and *Daniel Csigirinszkij* were on the brief for *amicus curiae* Professor Peter Conti-Brown in support of appellee.

*Joseph M. Sellers* was on the brief for *amici curiae* Patrick J. Borchers, et al. in support of appellee.

*Richard F. Griffin* and *Faaris Akremi* were on the brief for *amicus curiae* Professor Jed H. Shugerman in support of appellee.

Before: KATSAS, WALKER, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

Dissenting opinion filed by *Circuit Judge* PAN.

KATSAS, *Circuit Judge*:  These appeals present the question whether Congress may constitutionally prohibit the President from removing members of the National Labor Relations Board and Merit Systems Protection Board without cause.  The district courts upheld the constitutionality of statutory removal protections for members of these boards.

We reverse.  Under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), Congress may restrict the President's ability to remove principal officers who wield only quasi-

9

legislative or quasi-judicial powers.  But under *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020), Congress may not restrict the President's ability to remove principal officers who wield substantial executive power.  As explained below, the NLRB and MSPB wield substantial powers that are both executive in nature and different from the powers that *Humphrey's Executor* deemed to be merely quasi-legislative or quasi-judicial.  So, Congress cannot restrict the President's ability to remove NLRB or MSPB members.

I

The National Labor Relations Board and Merit Systems Protection Board are multimember agencies with wide-ranging statutory responsibilities and with members protected by statute from presidential removal without cause.

A

The National Labor Relations Act constitutes the NLRB as an agency of five members appointed by the President with the advice and consent of the Senate.  29 U.S.C. § 153(a).  The members serve five-year terms.  *Id.*  The NLRA purports to prohibit the President from removing a member except "for neglect of duty or malfeasance in office."  *Id.*

Congress empowered the NLRB to prevent any "unfair labor practice" affecting interstate commerce.  29 U.S.C. § 160(a).  The NLRB conducts formal adjudications to resolve unfair-labor-practice complaints presented to it.  *Id.* § 160(b).  If it finds an unfair labor practice, the NLRB must issue a cease-and-desist order.  *Id.* § 160(c).  It also may order affirmative relief, including reinstatement and backpay, to "effectuate the policies" of the NLRA.  *Id.*  Acting under these remedial authorities, the NLRB has claimed the power to award

10

compensatory and consequential-like damages. *See Thryv, Inc.*, 372 NLRB No. 22, at *9–10 (Dec. 13, 2022), *vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024). *But see NLRB v. Starbucks Corp.*, 125 F.4th 78, 96–97 (3d Cir. 2024) (concluding such relief is *ultra vires*). In some instances, the NLRB may find speech to constitute an unfair labor practice. *See* 29 U.S.C. § 158(a)(1); *Cadillac of Naperville, Inc. v. NLRB*, 14 F.4th 703, 721–22 (D.C. Cir. 2021) (Katsas, J., concurring in part and dissenting in part). In others, it may compose and order company speech as a remedy for unfair labor practices. *See HTH Corp. v. NLRB*, 823 F.3d 668, 675–78 (D.C. Cir. 2016).

The NLRB may litigate in federal court to prevent unfair labor practices. Upon the filing of an administrative complaint, it may seek interim injunctive relief in district court. 29 U.S.C. § 160(j). And upon finding an unfair labor practice, the NLRB may petition an appropriate court of appeals to enforce its order. *Id.* § 160(e). In conducting this litigation, the NLRB acts through its own counsel, rather than that of the Justice Department. *Id.* § 154(a).

Beyond its powers to prevent unfair labor practices, the NLRB has substantial authority over matters involving union elections. Within or across employers, it must determine the "unit appropriate" for collective bargaining. 29 U.S.C. § 159(b). For such units, the NLRB also supervises elections to certify or decertify unions as the employees' bargaining representatives. *See id.* § 159(c)–(e).

Lastly, the NLRB may "from time to time … make, amend, and rescind … such rules and regulations as may be

11

necessary to carry out the provisions of" the NLRA, including the provisions outlined above.  29 U.S.C. § 156.[1]

## B

The Civil Service Reform Act constitutes the MSPB as an agency of three members appointed by the President with the advice and consent of the Senate.  5 U.S.C. § 1201.  The members serve seven-year terms.  *Id.* § 1202(a).  The CSRA purports to prohibit the President from removing a member except for "inefficiency, neglect of duty, or malfeasance in office."  *Id.* § 1202(d).

The MSPB primarily manages disputes between federal employees and their employing agencies.  Among other things, the MSPB may adjudicate all matters within its jurisdiction and may "take final action on any such matter."  5 U.S.C. § 1204(a)(1).  It may "order any Federal agency or employee to comply with any" of its orders or decisions, and it may "enforce compliance" with them.  *Id.* § 1204(a)(2).  To do so, it may "order that any employee charged with complying with such [an] order," except for Senate-confirmed presidential appointees, "shall not be entitled to receive payment for service as an employee during any period that the order has not been complied with."  *Id.* § 1204(e)(2)(A).

---

[1] Separate from the NLRB, Congress has created its office of General Counsel.  That officer is appointed by the President, with the advice and consent of the Senate, to a four-year term.  29 U.S.C. § 153(d).  Unlike NLRB members, the General Counsel has no statutory removal protection.  He has "final authority" to investigate, charge, and prosecute unfair-labor-practice complaints before the NLRB.  *Id.*  He also supervises the NLRB's regional offices, and the Board may delegate additional powers to him.  *Id.*

12

The MSPB's jurisdiction covers a wide range of federal employment disputes. The MSPB often reviews actions already taken by the employing agency. For example, federal employees may "appeal" to the MSPB disciplinary actions taken by an employer to promote "efficiency of the [civil] service." 5 U.S.C. § 7513(a), (d). Employees also may seek "corrective action" from the MSPB for any "prohibited personnel practice." *Id.* § 1221(a). Such practices include acts of discrimination made unlawful by four different statutes, granting unauthorized preferences, coercing political activity, retaliation for various protected activities, improper influence, deception, and obstruction. *Id.* § 2302(b). The MSPB also has jurisdiction to review employment actions alleged to violate statutory protections for military servicemembers or veterans. *See id.* §§ 1204(a)(1), 3330a(d)(1); 38 U.S.C. § 4324.

Sometimes, the MSPB resolves disputes in the first instance. Many such disputes involve claims presented to it by the Office of the Special Counsel. In these cases, the MSPB may order corrective action for prohibited personnel practices, 5 U.S.C. § 1214, or for violations of other statutes enforced by the Special Counsel, *id.* § 1216. The MSPB also may impose discipline for any of these violations. *Id.* § 1215(a)(3). Finally, the MSPB resolves employment disputes involving Administrative Law Judges, who cannot be removed, suspended, or demoted without "good cause" as found by the MSPB. *Id.* § 7521.

In its various adjudications, the MSPB may award a wide range of interim and final relief. Upon request by the Special Counsel, any MSPB member may "order a stay of any personnel action" reasonably believed to constitute a prohibited personnel practice. 5 U.S.C. § 1214(b)(1)(A). Such stays may last for up to 45 days initially, and the MSPB may extend them for "any period" it considers appropriate. *Id.*

**Add. 12**

13

§ 1214(b)(1)(B)(i).    To remedy unwarranted discipline imposed by an employing agency, the MSPB may order affirmative relief including reinstatement and backpay.  *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012). For prohibited personnel practices, it may order "corrective action" that includes reinstatement, backpay, and compensatory damages. *Id.* §§ 1214(g), 1221(g)(1).    In cases where it imposes discipline, the MSPB may order removal, demotion, debarment from federal employment for up to five years, and penalties of up to $1,000, or "any combination" of these sanctions.  *Id.* § 1215(a)(3)(A).

The MSPB has its own litigating authority.  Except in the Supreme Court, its attorneys "may appear for the Board, and represent the Board, in any civil action brought in connection with any function carried out by the Board."  5 U.S.C. § 1204(i).  When aggrieved employees seek judicial review of its decisions, the MSPB (rather than the employing agency or official) is sometimes the respondent.  *See id.* § 7703(a)(2). Specifically, it is the respondent when the employee challenges an adverse procedural ruling, *Spruill v. MSPB*, 978 F.2d 679, 684 (Fed. Cir. 1992), or when the MSPB adjudicates a dispute in the first instance, *Costello v. MSPB*, 182 F.3d 1372, 1381 (Fed. Cir. 1999).

The MSPB has three overlapping grants of rulemaking authority.  It may promulgate "such regulations as may be necessary for the performance of its functions."  5 U.S.C. § 1204(h).  It may promulgate "regulations to carry out the purpose" of conducting administrative appeals. *Id.* § 7701(k). And it may promulgate regulations "for the purpose of section 7521," which governs adverse employment actions against ALJs.  *Id.* § 1305.  The MSPB also may *sua sponte* review regulations promulgated by the Office of Personnel Management. *Id.* § 1204(f)(1).  It may declare such regulations

**Add. 13**

14

invalid, on their face or as implemented, to the extent they purport to require prohibited personnel practices. *Id.* § 1204(f)(2). And it may "require any agency" to "cease compliance" with such regulations. *Id.* § 1204(f)(4)(A).

## II

The President removed Gwynne Wilcox from the NLRB and Cathy Harris from the MSPB. In defense of those actions, the government does not contend that Wilcox or Harris engaged in any conduct that would support for-cause removal under the relevant statutory restrictions. Instead, it argues that the restrictions are unconstitutional.

Wilcox and Harris sued to challenge their removals. The district courts held that the statutory removal protections are constitutional under *Humphrey's Executor*; they declared that Wilcox and Harris continue to hold their respective offices; and they enjoined the government from interfering with the individuals' ability to function as board members. *Wilcox v. Trump*, 775 F. Supp. 3d 215 (D.D.C. 2025); *Harris v. Bessent*, 775 F. Supp. 3d 164 (D.D.C. 2025). The government appealed and sought interim stays pending appeal. A motions panel of this Court granted the stays, *Harris v. Bessent*, No. 25-5037, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025), but the full Court vacated that decision, *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) (en banc) (per curiam).

The Supreme Court then stayed the district courts' orders pending the resolution of these appeals and any ensuing petitions for certiorari. *Trump v. Wilcox*, 145 S. Ct. 1415 (2025) (per curiam). In doing so, the Court found it likely "that both the NLRB and MSPB exercise considerable executive power," which it said would make the removal restrictions unconstitutional. *Id.* at 1415.

15

III

A

Article II of the Constitution vests "[t]he executive Power" of the United States "in a President," U.S. Const., Art. II, § 1, cl. 1, and requires him to "take Care that the Laws be faithfully executed," *id.* § 3. In *Myers v. United States*, 272 U.S. 52 (1926), the Supreme Court held that the Vesting and Take Care Clauses prevent Congress from restricting the President's ability to remove government officers who wield significant executive power on his behalf. *See id.* at 117–18, 163–64. The Court invalidated a statute requiring the Senate to provide advice and consent to effectuate the President's removal of a first-class postmaster. *See id.* at 107, 176. In later cases, the Court applied *Myers* to invalidate statutory restrictions on the President's ability to remove various principal officers. *See Collins v. Yellen*, 594 U.S. 220 (2021) (Director of Federal Housing Finance Agency); *Seila Law*, 591 U.S. 197 (Director of CFPB); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477 (2010) (members of PCAOB). More recently, the Court noted that because the President's "exclusive power of removal in executive agencies" is "conclusive and preclusive," Congress may not restrict it. *Trump v. United States*, 603 U.S. 593, 609 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 & n.4 (1952) (Jackson, J., concurring)).

A different line of precedent qualifies these cases. In *Humphrey's Executor*, the Supreme Court upheld the constitutionality of a statute barring the President from removing members of the Federal Trade Commission absent "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41. The Court acknowledged *Myers*'s holding that Congress cannot restrict the President's ability to remove

**Add. 15**

16

"purely executive officers." *Humphrey's Ex'r*, 295 U.S. at 627–28. But it concluded that *Myers* does not govern the removal of an officer "who exercises no part of the executive power vested by the Constitution in the President." *Id.* at 628. And it characterized the FTC's powers not as executive, but as "quasi-legislative or quasi-judicial." *Id.* In *Wiener v. United States*, 357 U.S. 349 (1958), the Court applied *Humphrey's Executor* to infer and uphold a cause requirement for removing members of the War Claims Commission, a tribunal that adjudicated claims under a statutory scheme for compensating certain Americans held by the Axis powers during World War II. *Id.* at 349–50, 355–56. Other precedents have upheld cause requirements for the removal of certain inferior officers. *Morrison v. Olson*, 487 U.S. 654 (1988); *United States v. Perkins*, 116 U.S. 483 (1886).

In *Seila Law*, the Court read *Humphrey's Executor* narrowly and expressly declined to extend it. According to the Court, "text, first principles, the First Congress's decision in 1789 [regarding removal of executive officers], *Myers*, and *Free Enterprise Fund* all establish that the President's removal power is the rule, not the exception." 591 U.S. at 228. Moreover, *Humphrey's Executor* and *Morrison* reflect "two exceptions—one for multimember expert agencies that do not wield substantial executive power, and one for inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 218. Furthermore, these exceptions "represent what up to now have been the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Id.* (quoting *PHH Corp. v. CFPB*, 881 F.3d 75, 196 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting)). As it had done previously, the Court declined to "extend" *Humphrey's Executor* to a "new situation." *Id.* at 220 (quoting *Free Enter. Fund*, 561 U.S. at 483).

17

*Seila Law* held that the *Myers* rule—not the *Humphrey's Executor* exception—governs removal of the CFPB Director. To distinguish *Humphrey's Executor*, the Court identified three significant executive powers vested in the CFPB. First, the CFPB can "promulgate binding rules" implementing the statutes that it administers. 591 U.S. at 218. Second, it can "issue final decisions awarding legal and equitable relief in administrative adjudications." *Id.* at 219. Third, it can "seek daunting monetary penalties against private parties on behalf of the United States in federal court—a quintessentially executive power not considered in *Humphrey's Executor*." *Id.*

B

These appeals turn on whether *Humphrey's Executor* applies to the NLRB and MSPB. At first glance, that question seems to turn on whether these agencies exercise any significant *executive* power within the meaning of the Vesting Clause, which would bring this case within the rule of *Myers* and *Seila Law*; or whether the agencies exercise only *quasi-legislative* and *quasi-judicial* powers, which *Humphrey's Executor* deemed to fall outside the President's executive power under Article II. *See* 295 U.S. at 627–28. But after *Humphrey's Executor* was decided, two related developments in separation-of-powers jurisprudence made it all but impossible to distinguish executive power from quasi-legislative or quasi-judicial power.

First, the Supreme Court has broadened its understanding of what powers count as executive. In *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam), the Court held that the Federal Election Commission's "enforcement power, exemplified by its discretionary power to seek judicial relief," is an executive power entrusted to the President through the Take Care Clause. *See id.* at 138. In *Bowsher v. Synar*, 478 U.S. 714 (1986), the

**Add. 17**

18

Court held that the power to interpret and apply a statute requiring certain budget cuts is executive. *See id.* at 733 ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."). In *Freytag v. Commissioner*, 501 U.S. 868 (1991), Justice Scalia explained at length that "there is nothing 'inherently judicial' about 'adjudication,'" which Article II agencies perform routinely. *Id.* at 909 (concurring in part and concurring in the judgment); *see id.* at 909–12. And in *City of Arlington v. FCC*, 569 U.S. 290 (2013), the Court explained that rulemaking and administrative adjudication "take 'legislative' and 'judicial' forms, but they are exercises of— indeed, under our constitutional structure they *must* be exercises of—the 'executive Power.'" *Id.* at 304 n.4 (quoting Article II Vesting Clause). With enforcement, rulemaking, and administrative adjudication all classed as executive powers, what is left of the assertedly discrete categories of quasi-legislative or quasi-judicial powers? In sum, "[t]he Court's conclusion [in *Humphrey's Executor*] that the FTC did not exercise executive power has not withstood the test of time." *Seila Law*, 591 U.S. at 216 n.2 (citing *City of Arlington*, 569 U.S. at 304 n.4). To the contrary, it is "hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive,' at least to some degree." *Id.* (quoting *Morrison*, 487 U.S. at 690 n.28).

Second, the Supreme Court increasingly has stressed that there are only three kinds of constitutional powers, and two of them are not delegable. "Our Constitution divided the 'powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial.'" *Free Enter. Fund*, 561 U.S. at 483 (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). Only Congress itself may exercise the legislative power. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (Article I "permits no delegation"). And only life-tenured

19

judges may exercise the "judicial Power of the United States." *Stern v. Marshall*, 564 U.S. 462, 483–84 (2011) (quoting U.S. Const. Art. III, § 1); *see also Mistretta v. United States*, 488 U.S. 361, 425 (1989) (Scalia, J., dissenting) ("A judge may not leave the decision to his law clerk, or to a master."). So by process of elimination, if agencies may receive neither legislative nor judicial powers, what is left for them other than some portion of the executive power?

These considerations suggest that very little remains of *Humphrey's Executor*. Perhaps its most plausible application is to purely adjudicatory bodies like the War Claims Commission at issue in *Wiener*. But under today's separation-of-powers jurisprudence, even those bodies exercise the President's executive power. *See*, *e.g.*, *United States v. Arthrex, Inc.*, 594 U.S. 1, 17 (2021) (Administrative Patent Judges); *Kuretski v. Comm'r*, 755 F.3d 929, 932 (D.C. Cir. 2014) (Tax Court judges). Recall that *Seila Law* limited *Humphrey's Executor* to entities that "do not wield substantial executive power." 591 U.S. at 218. So maybe agencies with any "substantial" power—quasi-judicial, quasi-legislative, or otherwise—fall outside *Humphrey's Executor* because that power is and must be executive. *See Consumers' Rsch. v. CPSC*, 98 F.4th 646, 650–57 (5th Cir. 2024) (Oldham, J., dissenting from denial of rehearing en banc). Maybe *Humphrey's Executor* thus governs only agencies with purely advisory functions—like, say, the United States Commission on Civil Rights, *see Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting). And maybe the Supreme Court, which is now considering whether to overrule *Humphrey's Executor*, will soon hold as much. *See* Stay Order, *Trump v. Slaughter*, No. 25-332 (U.S. Sept. 22, 2025).

20

All of that said, we are reluctant to decide these appeals along those lines.  Of course, we must apply *Humphrey's Executor* as best we can, unless and until the Supreme Court overrules it.  *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).  Moreover, despite rejecting the reasoning of *Humphrey's Executor*, the Supreme Court has twice expressly declined to overrule it.  *See Seila Law*, 591 U.S. at 228; *Free Enter. Fund*, 561 U.S. at 483.  And *Seila Law* acknowledged that *Humphrey's Executor* had upheld removal restrictions for an agency with powers that "would at the present time be considered executive."  591 U.S. at 216 n.2 (quoting *Morrison*, 487 U.S. at 690 n.28).  Given these considerations, maybe Congress still may restrict removal if the board at issue has only those powers that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial, even if those powers are now recognized as executive.

Fortunately, we need not resolve all these tensions.  As we explain below, the NLRB and MSPB exercise significant executive powers, which is enough to trigger the general rule of *Myers* and *Seila Law*.  Moreover, many of those powers exceed ones that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial, which makes this case fall outside any exception based on that decision.

C

So what powers did *Humphrey's Executor* deem to be quasi-legislative or quasi-judicial?  That case involved powers vested in the FTC by the Federal Trade Commission Act as originally enacted in 1914.  Section 5 of that Act prohibited "unfair methods of competition in commerce."  Act of Sept. 26, 1914, ch. 311, § 5, 38 Stat. 717, 719–20 (codified as amended at 15 U.S.C. § 45).  It authorized the Commission to adjudicate complaints alleging unfair methods of competition, to issue

21

cease-and-desist orders, and to seek judicial enforcement of those orders. *Id.* Section 6 of the Act authorized the Commission to make and file reports with other governmental entities, including Congress. *Id.* at 721–22 (codified as amended at 15 U.S.C. § 46). Section 7 authorized the Commission to act "as a master in chancery" in pending antitrust actions. *Id.* at 722 (codified at 15 U.S.C. § 47). For our purposes, "what matters is the set of powers the Court considered as the basis for its decision" in *Humphrey's Executor*. *Seila Law*, 591 U.S. at 219 n.4.

1

In distinguishing *Myers*, the Court deemed only one of the FTC's powers to be quasi-legislative: making reports for Congress. *See Humphrey's Ex'r*, 295 U.S. at 628 ("In making investigations and reports … for the information of Congress under section 6, in aid of the legislative power, it acts as a legislative agency."). That power is "investigative and informative"—one that "Congress might delegate to one of its own committees." *Buckley*, 424 U.S. at 137.

More interesting is a power that *Humphrey's Executor* did *not* describe as quasi-legislative. Section 6(g) of the FTC Act authorized the Commission "to make rules and regulations for the purpose of carrying out the provisions of this Act." 38 Stat. at 722. Yet *Humphrey's Executor* did not mention that provision, much less characterize it as conferring on the FTC the quasi-legislative power to engage in substantive rulemaking. This was hardly surprising because "the agency itself did not assert the power to promulgate substantive rules until 1962 and indeed indicated intermittently that it lacked such a power." *Nat'l Petrol. Refiners Ass'n v. FTC*, 482 F.2d 672, 693 (D.C. Cir. 1973). Before *Humphrey's Executor* was decided, the Commission had expressly disclaimed the power

**Add. 21**

22

to promulgate substantive rules governing primary conduct, as opposed to procedural rules governing the conduct of administrative adjudication under section 5. *See id.* at 693 n.27; *Annual Report of the Federal Trade Commission for the Fiscal Year Ended June 30, 1922* at 36 ("One of the most common mistakes is to suppose that the commission can issue … regulations unconnected with any proceeding before it."). For this reason, the Supreme Court cited the CFPB's power "to promulgate binding [substantive] rules" as one important power not considered in *Humphrey's Executor*—and one key reason why *Humphrey's Executor* does not apply to the CFPB. *Seila Law*, 591 U.S. at 218.

2

*Humphrey's Executor* conceived of "quasi-judicial" power as assisting the Article III courts or, at most, engaging in a restrained species of administrative adjudication modeled on how Article III judges resolve cases or controversies.

In distinguishing *Myers*, the Supreme Court expressly described only one of the FTC's powers as "quasi-judicial"— its section 7 power to assist the courts. *See* 295 U.S. at 628. That provision allowed a federal district court, if it found that equitable remedies were warranted in an antitrust case, to "refer" the case "to the commission, as a master in chancery, to ascertain and report an appropriate form of decree." 38 Stat. at 722. In that instance, the Commission would prepare and file a report, which the court could "adopt or reject" as it chose. *Id.* As *Humphrey's Executor* perceived it, "quasi-judicial" power is thus merely the power to "act[] as an agency of the judiciary." 295 U.S. at 628. Today, we might liken this power to that of a magistrate judge or a special master. *See* 28 U.S.C. § 636 (magistrate judges); Fed. R. Civ. P. 53 (special masters).

**Add. 22**

23

More generally, the Supreme Court also referenced the FTC's power to conduct administrative adjudications under section 5, which it described as "filling in and administering the details" regarding a "general" statutory prohibition of unfair methods of competition. *See* 295 U.S. at 628. According to the Court, that enterprise emphatically did *not* involve any discretionary policy judgments. Instead, the FTC was a "nonpartisan" body required to "act with entire impartiality." *Id.* at 624. And it was "charged with the enforcement of no policy except the policy of the law." *Id.* In *Wiener*, the Court similarly described administrative adjudication by the War Claims Commission: Claims before it "were to be 'adjudicated according to law,' that is, on the merits of each claim, supported by evidence and governing legal considerations." 357 U.S. at 355. These descriptions resemble Justice Scalia's minimalist account of adjudication in *Freytag*—agencies or courts "determine facts, apply a rule of law to those facts, and thus arrive at a decision." 501 U.S. at 909 (concurring in part and concurring in the judgment). These descriptions also conjure up an enduring image of how judges are supposed to adjudicate, as umpires fairly applying set rules to call balls and strikes.

Precedents contemporaneous with *Humphrey's Executor* confirm this restrained conception of FTC administrative adjudication. For one thing, the Supreme Court repeatedly had held that the meaning of "unfair methods of competition," although open-ended, was "for the courts, not the commission, ultimately to determine as [a] matter of law." *FTC v. Gratz*, 253 U.S. 421, 427 (1920); *see FTC v. Curtis Pub. Co.*, 260 U.S. 568, 579–80 (1923) (following *Gratz*). Moreover, courts discerned the meaning of that phrase not through broad or policy-laden pronouncements, but by "the gradual process of judicial inclusion and exclusion," consistent with traditional common-law adjudication. *FTC v. Raladam Co.*, 283 U.S. 643,

24

648 (1931) (cleaned up).  Some of these precedents eventually were disapproved.  *See FTC v. Brown Shoe Co.*, 384 U.S. 316, 320–21 (1966) (disapproving *Gratz*).  But in 1935, insofar as FTC administrative adjudication was deemed a quasi-judicial power, it was at most the power to resolve disputes like judges.

\*   \*   \*   \*

In sum, *Humphrey's Executor* laid down specific conceptions of what counts as "quasi-legislative" or "quasi-judicial" power.  The former includes only legislative research functions such as investigating, writing reports, and making recommendations to Congress.  The latter includes only the power to serve as a trial master or to act as a judge-like adjudicator without policymaking authority.  As *Seila Law* noted, neither category encompasses the powers to promulgate substantive rules or to impose civil fines.  *See* 591 U.S. at 218–19.  And although *Humphrey's Executor* did not separately analyze available remedies, *Seila Law* stressed that the FTC in 1935 could only assist courts or enter cease-and-desist orders, as opposed to awarding damages or affirmative equitable relief.  *See id.*

IV

The powers of the NLRB and MSPB substantially exceed the circumscribed administrative powers that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial.

A

Congress has vested the NLRB with several executive powers beyond the ones addressed in *Humphrey's Executor*.

*First*, the NLRB possesses "broad rulemaking authority." *Am. Hosp. Ass'n v. NLRB*, 499 U.S. 606, 613 (1991).  Section 6

**Add. 24**

25

of the NLRA empowers the agency to promulgate "such rules and regulations as may be necessary to carry out the provisions" of the statute. 29 U.S.C. § 156. In *American Hospital Association*, the Supreme Court held that this authority covers not only rules establishing unfair labor practices under section 8, but also "industry-wide rule[s] delineating … appropriate bargaining units" under section 9. 499 U.S. at 611. Invoking that power, the NLRB has promulgated rules governing collective bargaining in the health care industry. 29 C.F.R. § 103.30. As *Seila Law* made clear, the power to "promulgate binding rules fleshing out" major federal statutes exceeds the powers that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial. *See* 591 U.S. at 218. Needless to say, it is also a quintessential executive power under current constitutional standards.

Wilcox objects that the NLRB has not often engaged in substantive rulemaking. *See* 29 C.F.R. §§ 103.1–3; *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 949 (D.C. Cir. 2013). But that is irrelevant to our inquiry. When evaluating the constitutionality of removal restrictions, courts consider the "authority" that an agency "possesses," not the rigor with which the power is exercised. *Seila Law*, 591 U.S. at 218. So, "an agency's voluntary self-denial" of its rulemaking power "has no bearing" on our constitutional analysis. *Am. Trucking Ass'ns*, 531 U.S. at 473.

*Second*, the NLRB conducts administrative adjudications that are nothing like the model of adjudication that *Humphrey's Executor* treated as quasi-judicial. Recall that model: A "nonpartisan" body of experts acts "with entire impartiality" to undertake "the enforcement of no policy except the policy of the law." *Humphrey's Ex'r*, 295 U.S. at 624. And courts decide what the governing statutory standard means, through a neutral process of case-by-case adjudication. *See Raladam*,

26

283 U.S. at 648; *Gratz*, 253 U.S. at 427.  In other words, courts would decide what constitutes an "unfair method of competition" or an "unfair labor practice," using familiar interpretive tools such as statutory text, structure, canons, history, and precedent.  This fairly describes the functioning of purely adjudicatory bodies like the War Claims Commission, which was charged with nothing more than adjudicating claims "according to law."  357 U.S. at 355.  But it does not fairly describe adjudication conducted by agencies with substantive rulemaking power, which the Administrative Procedure Act defines as including the power to "prescribe law or policy." *See* 5 U.S.C. § 551(4)–(5).  For those agencies, the Supreme Court has held that "adjudication is a generally permissible mode of law-making and policymaking," precisely because the agency has been "delegated the power to make law and policy through rulemaking."  *Martin v. OSHRC*, 499 U.S. 144, 154 (1991); *see SEC v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947) (*Chenery II*).

The NLRB conducts the latter kind of adjudications.  It is tasked with "developing and applying national labor policy." *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786 (1990). So, it may "announc[e] new principles in an adjudicative proceeding."  *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974); *see Consol. Freightways v. NLRB*, 892 F.2d 1052, 1056 (D.C. Cir. 1989) (NLRB adjudication "enunciated a new rule," which "the Board has the authority to do").  The NLRB does this routinely, *see, e.g.*, *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 260–67 (1975); *NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 284–85 (1972), creating a bevy of requirements that are akin to "statutory" rules or "one[s] established by regulation," *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 804–05 (1945).

27

Moreover, policy considerations drive NLRB adjudications. The Supreme Court has contrasted the "narrow confines of law" for the courts with the "spacious domain of policy" for the NLRB. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941). Likewise, this Court has held that the NLRB may "explicate why national labor policy requires" a given rule. *Retail Clerks Int'l Ass'n Loc. No. 455 v. NLRB*, 510 F.2d 802, 807 (D.C. Cir. 1975). The NLRB routinely invokes "policy" considerations not only to create rules by adjudication, but also to overrule them. *In re Lamons Gasket Co.*, 357 NLRB 739, 739 (2011); *In re IBM Corp.*, 341 NLRB 1288, 1290 (2004); *see Valley Hosp. Med. Ctr., Inc. v. NLRB*, 100 F.4th 994, 1003 (9th Cir. 2024) (O'Scannlain, J., specially concurring) (NLRB "frequently changes its mind, seesawing back and forth between statutory interpretations depending on its political composition, leaving workers, employers, and unions in the lurch"). On one recent occasion, the NLRB overruled itself for the fifth time, and this Court, barely mentioning any statutory provisions, upheld the agency's latest position as reasonably explained and thus not arbitrary. *See Hosp. Menonita de Guayama, Inc. v. NLRB*, 94 F.4th 1, 16 (D.C. Cir. 2024) (Katsas, J., concurring), *GVR*, 145 S. Ct. 982 (2024). Perhaps the NLRA will be somewhat more constraining now that *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), has overruled *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984). But it would blink reality to suppose that *Loper Bright* will eliminate the NLRB's ability to conduct policymaking through adjudication under *Chenery II.* Whatever the virtues of that modern species of administrative adjudication, it cannot fairly be described as approximating how Article III judges decide cases, or as resting on "no policy except the policy of the law." *Humphrey's Ex'r*, 295 U.S. at 624. And it plainly involves the exercise of substantial executive power. *See City of Arlington*, 569 U.S. at 304 n.4.

28

*Third*, the NLRB may award substantially broader remedies than the FTC could in 1935. At that time, the FTC, upon finding an unfair method of competition, could issue only a cease-and-desist order. *See Humphrey's Ex'r*, 295 U.S. at 620–21. Such orders impose only a "negative restriction." *Alberty v. FTC*, 182 F.2d 36, 39 (D.C. Cir. 1950). The NLRB, in contrast, may award various forms of affirmative relief. Upon finding an unfair labor practice, it may issue not only a cease-and-desist order, but also one "requiring" the offending employer or union "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of" the NLRA. 29 U.S.C. § 160(c). This may include the power to award compensatory damages. *See Thryv, Inc.*, 372 NLRB No. 22, at *9–10. And it sometimes includes the power to compel employers to read NLRB-composed admissions of liability, *see Advancepierre Foods, Inc. v. NLRB*, 966 F.3d 813, 820–21 (D.C. Cir. 2020), a remedy that Judge Williams likened to the practices of Joseph Stalin and Mao Zedong, *see HTH Corp.*, 823 F.3d at 677. Whatever the merits of that comparison, the NLRB's remedial authority substantially exceeds that of the FTC in 1935. This consideration also further distinguishes *Humphrey's Executor*. *See Seila Law*, 591 U.S. at 219.

*Fourth*, the NLRB has broader litigating authority than the FTC did in 1935. Each agency may petition courts of appeals to enforce final administrative orders. *See* 29 U.S.C. § 160(e) (NLRB); 38 Stat. at 719–20 (codified as amended at 15 U.S.C. § 45) (FTC). But as noted above, NLRB remedial orders may be much broader than those of the FTC in 1935. Moreover, the NLRB has litigating authority to seek interim relief in district courts. 29 U.S.C. § 160(j). In contrast, to obtain any judicial relief besides enforcement of a final cease-and-desist order, the FTC in 1935 would have needed to ask the Attorney General to seek mandamus on its behalf. *See* 38 Stat. at 722 (codified

29

as amended at 15 U.S.C. § 49); *FTC v. Claire Furnace Co.*, 274 U.S. 160, 173–74 (1927); *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 776 n.76 (5th Cir. 2025). The NLRB's greater authority to litigate on behalf of the United States both further distinguishes *Humphrey's Executor*, *see Seila Law*, 591 U.S. at 218–19, and reflects a greater degree of executive power, *see Buckley*, 424 U.S. at 138–40; *In re Aiken County*, 725 F.3d 255, 264 n.9 (D.C. Cir. 2013) (opinion of Kavanaugh, J.) ("civil enforcement decisions brought by the Federal Government are presumptively an exclusive Executive power").

Wilcox objects that NLRB litigation is conducted by its General Counsel, an executive officer removable at-will by the President. But while the General Counsel has "final authority" to prosecute unfair-labor-practice complaints before the NLRB, 29 U.S.C. § 153(d); *see NLRB v. United Food & Com. Workers Union, Loc. 23*, 484 U.S. 112, 118–19 (1987), the NLRA gives the Board itself control over litigation in court, 29 U.S.C. § 160(e), (j). The General Counsel conducts that litigation pursuant to a delegation from the Board under section 3(d), which permits the NLRB to assign to the General Counsel "such other duties as the Board may prescribe." *Id.* § 153(d). Under the terms of that delegation, the General Counsel conducts litigation "in full accordance with the directions of the Board." Authority and Assigned Responsibilities of General Counsel of National Labor Relations Board § I.B, 20 Fed. Reg. 2,175, 2,175 (Apr. 6, 1955).

*Finally*, the NLRB exercises substantial executive power in administering section 9 of the NLRA, which governs the determination of appropriate units for collective bargaining and the conduct of union elections. 29 U.S.C. § 159. Wilcox objects that elections are supervised primarily by the NLRB's regional offices, which in turn are supervised by the General Counsel. *See id.* § 153(d). Yet the NLRA clearly gives the

30

Board itself, not the General Counsel, final authority over section 9 administration. *See id.* § 159(b) ("The Board shall decide in each case … the unit appropriate for the purposes of collective bargaining …."); *id.* § 159(c) ("the Board shall investigate" petitions to conduct a union election). Indeed, the Board's most prominent substantive rule to date involved not an elaboration of unfair labor practices, but a determination of appropriate bargaining units in the health care industry. *See* 29 C.F.R. § 103.30.

Because the NLRB's rulemaking, adjudicatory, remedial, enforcement, and election-administration powers are not solely quasi-legislative or quasi-judicial, the agency falls well outside the *Humphrey's Executor* exception.

## B

The MSPB likewise has more executive powers than ones that *Humphrey's Executor* deemed to be quasi-legislative or quasi-judicial.

Start with rulemaking. The CSRA empowers the MSPB to promulgate regulations "for the performance of its functions," 5 U.S.C. § 1204(h), and "for the purpose of section 7521," *id.* § 1305. Section 7521 prohibits the "removal" of ALJs without a prior MSPB determination of good cause. *Id.* § 7521(a), (b)(1). In *Tunik v. MSPB*, 407 F.3d 1326 (Fed. Cir. 2005), the Federal Circuit held these grants of rulemaking power authorize the MSPB to decide, with the force and effect of law, what constitutes a prohibited "removal." *Id.* at 1345. In other words, they permit the MSPB to define by regulation what primary conduct section 7521 prohibits, not simply to prescribe rules for the adjudication of disputes under that provision. To be sure, the MSPB's rulemaking authority with respect to section 7521 does not rival the broad rulemaking authority of the NLRB, and the contours of its other rulemaking

31

authorities are unclear. Nonetheless, the existence of at least some substantive rulemaking power counts as a distinction of *Humphrey's Executor* and as executive power under Article II. *See Seila Law*, 591 U.S. at 218.

As for adjudication, the MSPB may be less aggressive than the NLRB in naked appeals to shifting policy preferences, but its adjudicatory powers still exceed what *Humphrey's Executor* deemed to be quasi-judicial. This is true on at least three different dimensions—finality, breadth of jurisdiction, and breadth of remedial authority.

*Finality*. The power to "unilaterally issue final decisions" is a significant executive power that was not present in *Humphrey's Executor*. *See Seila Law*, 591 U.S. at 219. In 1935, an FTC cease-and-desist order remained ineffective unless and until the agency persuaded a court of appeals to enforce it. *FTC v. Klesner*, 280 U.S. 19, 22 (1929); *Claire Furnace*, 274 U.S. at 170. In contrast, the MSPB may "take final action on any" matter "within the jurisdiction of the Board," 5 U.S.C. § 1204(a)(1), and also may "order any Federal agency or employee to comply" with any of its orders, *id.* § 1204(a)(2). Aggrieved employees may obtain judicial review of final MSPB decisions, but the decisions remain effective unless and until a court of appeals sets them aside. *See id.* § 7703.

*Breadth of jurisdiction*. In 1935, the FTC was a specialized tribunal. At that time, section 5 of the FTC Act was limited to addressing "unfair methods of competition." *See* 38 Stat. at 719; *cf.* 15 U.S.C. § 45(a)(1) (now also addressing "unfair or deceptive acts or practices"). So, the FTC was largely directed towards antitrust enforcement, as reflected in its role as a "master in chancery" for antitrust cases. *Humphrey's Ex'r*, 295 U.S. at 628. In contrast, the MSPB is

32

more a jack-of-all-trades. In determining prohibited personnel practices, it must administer portions of Title VII, the Age Discrimination in Employment Act, the Fair Labor Standards Act, the Rehabilitation Act, and the Whistleblower Protection Act. 5 U.S.C. § 2302(b)(1), (8). And those five statutes encompass only two of 14 categories of personnel practices that the CSRA prohibits and that the MSPB must consider. *Id.* § 2302(b). The MSPB also must administer the Uniformed Services Employment and Reemployment Rights Act and the Veterans Employment Opportunities Act. *See id.* §§ 1204(a)(1), 3330a(d)(1); 38 U.S.C. § 4324. It must administer the Hatch Act, the Freedom of Information Act, and various other statutes within the prosecutorial authority of the Special Counsel. 5 U.S.C. § 1216(a). Finally, it must decide whether employing agencies have meted out appropriate discipline. *Id.* § 7513(d). To do that, the MSPB makes its own "discretionary judgment," which "is by no means" a mere legal or factual inquiry. *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 325–26 (1981). Instead, it involves application of a non-exclusive, twelve-factor balancing test that considers, among other things, the nature of the offense, the employee's work and disciplinary record, the potential for rehabilitation, mitigating circumstances, and the adequacy of alternative sanctions. *See Conor v. Dep't of Veterans Affs.*, 8 F.4th 1319, 1324 (Fed. Cir. 2021) (citing *Douglas*, 5 M.S.P.B. at 332). According to the MSPB, this searching inquiry is "considerably broader" than one that courts would undertake. *Douglas*, 5 M.S.P.B. at 327. Thus, it cannot plausibly be described as "quasi-judicial." Likewise, it cannot fairly be characterized as involving "no policy except the policy of the law." *Humphrey's Ex'r*, 295 U.S. at 624.

*Breadth of remedial authority.* When it finds a legal violation, the MSPB can do far more than simply order the offending agency to cease and desist. For unwarranted

33

employee discipline, the MSPB may order relief "including reinstatement, backpay, and attorney's fees." *Elgin*, 567 U.S. at 6. For prohibited personnel practices, it may order corrective action that includes reinstatement, backpay, compensatory and consequential damages, medical and other costs, travel expenses, attorney's fees, expert witness fees, and interest. 5 U.S.C. §§ 1214(g), 1221(g)(1). In cases where it imposes discipline, the MSPB may order removal, demotion, debarment from federal employment for up to five years, suspension, reprimand, civil penalties of up to $1,000, or "any combination" of these sanctions. *Id.* § 1215(a)(3)(A). And for violation of its own orders, the MSPB also may order the salary of an offending official to be withheld. *Id.* § 1204(e)(2)(A). All of this sharply distinguishes *Humphrey's Executor*. The power to award "legal and equitable relief in administrative adjudications" is an executive power that was not at issue there. *See Seila Law*, 591 U.S. at 219. Moreover, if the power to "seek daunting monetary penalties" in court is also such a power, *see id.*, then so too is the power to impose such penalties unilaterally.

Unlike the FTC in 1935, the MSPB also may award interim relief in some circumstances—and may do so on a wholesale basis. Upon request by the Special Counsel, any MSPB member may "order a stay of any personnel action" that she reasonably believes to constitute a prohibited personnel practice. 5 U.S.C. § 1214(b)(1)(A). Recently, Harris herself invoked this authority to reinstate nearly 6,000 laid-off employees pending further administrative proceedings. Order on Stay Request, *Special Counsel ex rel. John Doe v. USDA*, No. CB-1208-25-0020-U-1 (MSPB Mar. 5, 2025), https://perma.cc/3F45-PKG5. That too far exceeds the FTC's remedial authority in 1935.

34

Harris objects that we should not consider the MSPB's salary-withholding power because the statute granting it is unconstitutional. This argument addresses only one of many remedial powers that were not present in *Humphrey's Executor*. In any event, the argument fails on its own terms. Harris contends that withholding a salary requires involvement of the Comptroller General, who is a legislative official. She invokes *Bowsher*, which held that Congress could not vest the Comptroller General with the executive power to decide what budget cuts a particular statute required. *See* 478 U.S. at 733–34. The argument correctly assumes that the power to withhold the salary of a government official is executive. But the Comptroller General does not exercise this power. "[T]he Board may order" that the offending employee "shall not be entitled to receive payment for service as an employee" during the period of non-compliance. 5 U.S.C. § 1204(e)(2)(A). The MSPB must "certify" its order to the Comptroller General, who is in no way authorized to review it. *Id.* So, unlike the statute at issue in *Bowsher*, the CSRA does not give the Comptroller General any discretion to bind the Executive Branch.

Finally, consider litigating authority, another executive power not addressed in *Humphrey's Executor*. The MSPB's power to appear "in any civil action brought in connection with any function carried out by the Board," 5 U.S.C. § 1204(i), contemplates MSPB control of any district-court litigation brought by or against the agency. And the MSPB sometimes is the proper respondent when its orders are challenged in a court of appeals. *See Spruill*, 978 F.2d at 684; *Costello*, 182 F.3d at 1381. That too cuts against the MSPB's position here. Purely adjudicatory agencies—ones designed to be "an independent adjudicator" with no policymaking authority—are generally not proper parties to defend their decisions on review, just as district judges are generally not proper parties to defend their decisions on appeal. *Oil Chem. & Atomic Workers Int'l*

**Add. 34**

35

*Union v. OSHRC*, 671 F.2d 643, 651–52 (D.C. Cir. 1982); *see Hinson v. NTSB*, 57 F.3d 1144, 1147 n.1 (D.C. Cir. 1995).

In sum, the MSPB has at least some substantive rulemaking power; it administers a host of wide-ranging federal statutes; it awards various kinds of affirmative, compensatory, and punitive relief; and it litigates in court on its own behalf. Taken together, these powers well exceed the powers deemed to be quasi-legislative or quasi-judicial in *Humphrey's Executor* and the powers vested in the War Claims Commission. For these reasons, Congress may not restrict the President's ability to remove MSPB members.

V

The constitutional problem in these cases arises from two features of each agency: (1) the agency has been vested with significant executive power that cannot be characterized as quasi-legislative or quasi-judicial, and (2) Congress has restricted the President's ability to remove its members. Wilcox and Harris urge us to solve the constitutional problem by stripping away agency powers, rather than by declining to enforce the removal restrictions.

We reject that proposal. When the Supreme Court encounters a statute that unconstitutionally insulates an executive officer from at-will removal, it has typically responded by disregarding the removal restriction. *See Myers*, 272 U.S. at 176; *Free Enter. Fund*, 561 U.S. at 508–10; *Seila Law*, 591 U.S. at 232–38. Our Circuit has done likewise. *Dellinger v. Bessent*, No. 25-5052, 2025 WL 717383, at *1 (D.C. Cir. Mar. 5, 2025) (per curiam). Following that well-worn path, we hold that the appropriate resolution here is to disregard the statutory removal restrictions for NLRB and

36

MSPB members, not to blue-pencil provisions from among the full panoply of the executive powers of each agency.[2]

## VI

We close by flagging three issues not resolved here.

*First*, we do not decide whether Congress may restrict the President's ability to remove officers with solely adjudicatory functions. Our analysis above has distinguished the court-like adjudication of bodies such as the War Claims Commission from the *Chenery II*-like adjudication of agencies vested with both adjudicatory and policymaking responsibilities. And we have shown that the powers vested in the NLRB and MSPB significantly exceed those vested in the FTC in 1935 and those vested in the War Claims Commission. We express no opinion regarding other agencies that may plausibly be described as purely adjudicatory.

*Second*, despite multiple amicus briefs focused on this point, we do not address whether Congress may restrict the President's ability to remove members of the Board of Governors of the Federal Reserve System. Granting a stay in this case, the Supreme Court noted that there is a "distinct historical tradition" regarding the treatment of congressionally chartered banks, which may bear on Congress's ability to restrict the removal of their officials. *Wilcox*, 145 S. Ct. at

---

[2] The Supreme Court took a different approach in *Bowsher*. After concluding that Congress had unconstitutionally conferred executive power on a legislative officer removable only by Congress, the Court responded by stripping the officer of that power. 478 U.S. at 734–36. But this merely implemented a statutory "fallback" provision setting forth how the law at issue should operate if one of its provisions was held unconstitutional. *See id.* at 735. The NLRA and the CSRA contain no such provision.

**Add. 36**

37

1415; *see also* An Act to incorporate the subscribers to the Bank of the United States, ch. 10, § 5, 1 Stat. 191, 193 (1791) (directors of the First Bank of the United States were appointed and removed "by the stockholders").  We have no occasion here to address the scope or import of that tradition.

*Third*, because we hold that the President permissibly removed Wilcox and Harris, we do not consider whether wrongfully removed principal officers may obtain declaratory, equitable, or mandatory relief against the President or other government officials.

## VII

For the reasons set forth above, we reverse the judgments of the district courts.

*So ordered.*

P<span>AN</span>, *Circuit Judge*, dissenting:

The public is well served when some parts of our government are insulated from the fray of politics. That is because certain government functions are, or should be, nonpartisan. For example, courts of law and other adjudicators that apply legal standards to facts must be impartial, and their impartiality is protected when the decision-makers do not fear losing their jobs when there is a change in presidential administrations. And some agencies that employ subject-matter expertise to address technical regulatory and policy issues, such as the Federal Reserve, are better able to execute their duties and to inspire public confidence in their decision-making if they are distanced from political considerations.

Such "independent" government entities have existed in our country in some form since 1790.[1] And 138 years ago, Congress created the first nonpartisan expert independent agency, the Interstate Commerce Commission (ICC). The Supreme Court confirmed that such agencies are constitutional ninety years ago.[2] Today, approximately thirty-three independent agencies apply specialized expertise to make merit-based decisions on behalf of the American people, in diverse areas like commerce, public safety, and energy.[3] And numerous courts of law — such as the Tax Court, the Court of Appeals for the Armed Forces, and the Court of Appeals for Veterans Claims — serve as independent adjudicators, even though they are housed within the Executive Branch.

---

[1]    *See* Christine Kexel Chabot, *Is the Federal Reserve Constitutional? An Originalist Argument for Independent Agencies*, 96 Notre Dame L. Rev. 1, 39–40 (2020) (describing the Sinking Fund Commission of 1790, which had two members who were not removable by the President).

[2]    *See Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

[3]    *See infra* notes 14–20.

2

The key feature that defines a government entity's independence from political influence is its freedom from total control by the President. To safeguard that independence, Congress has limited the President's authority to remove the leaders of agencies that it has determined should be apolitical — and it has set such removal protections with the approval of Republican and Democratic Presidents alike.[4] As relevant here, Congress has specifically provided that the President may remove the leaders of certain independent agencies only "for cause," such as the leaders' inefficiency, malfeasance, or neglect of duty. For at least ninety years, it has been settled law that Congress may impose statutory for-cause removal protections in the exercise of its authority to organize and structure the Executive Branch.

But today, my colleagues make us the first court to strike down the independence of a traditional multimember expert agency: They hold that the for-cause removal protections that safeguard the political independence of the National Labor Relations Board (NLRB) and the Merit Systems Protection Board (MSPB) are unconstitutional. Under my colleagues' reasoning, it appears that no independent agencies may lawfully exist in this country: Their determination that the MSPB cannot be independent — even though it is purely adjudicatory and does not touch upon core constitutional functions assigned to the President — suggests that no agencies can be independent. Although my colleagues attempt to couch their analysis in narrow terms, they redefine the type of executive power that must be placed under the exclusive command of the President, and effectively grant him dominion over approximately thirty-three previously independent agencies.

---

[4]    *See infra* note 8.

3

This case must be viewed in the context of a broader reevaluation of how agency independence fits in our constitutional system. The Supreme Court upheld the constitutionality of independent agencies, like the MSPB and the NLRB, in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and it has repeatedly reaffirmed the essential holding of *Humphrey's*. *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 356 (1958); *Seila Law LLC v. CFPB*, 591 U.S. 197, 218 (2020). But the Court has expressed doubts about the scope of *Humphrey's* and is poised to reconsider its ruling in that case. *See Trump v. Slaughter*, No. 25-332, slip op. at 1 (U.S. Sept. 22, 2025) (granting certiorari before judgment and setting oral argument for December 2025). The pendency of *Slaughter* places us in an unusual position: Although the constitutional arguments before us mirror those raised in *Slaughter*, the Supreme Court has rebuffed requests to hear the instant cases in conjunction with *Slaughter* and has instead left these cases for us to decide. *See Trump v. Wilcox*, 145 S. Ct. 1415, 1416–17 (2025) (declining to address the government's request for certiorari before judgment); Order Den. Cert. Before J., *Harris v. Bessent*, No. 25-312 (U.S. Sept. 22, 2025); Order Den. Cert. Before J., *Wilcox v. Trump*, No. 25-319 (U.S. Sept. 22, 2025). We, in turn, expedited the instant appeals, and we must consider them in the face of conflicting signals from the Court. *See Wilcox*, 145 S. Ct. at 1416–17 (staying lower-court injunctions favoring Wilcox and Harris based on a finding that the government is likely to succeed on the merits, but leaving intact the "narrow exceptions [to at-will removal] recognized by our precedents"). Regardless of the odd procedural posture in which we find ourselves, the bottom line is that we are duty-bound to apply *Humphrey's* until the Supreme Court overrules it, and *Humphrey's* requires us to uphold the independence of the MSPB and the NLRB.

4

The government takes the position that agency independence is unconstitutional because the President must maintain ironclad control over any government entity that is within the Executive Branch.  It openly asks the Supreme Court to overrule *Humphrey's*, and it asks this court to essentially do the same.[5]  The government's extreme view of executive power sharply departs from precedent and from prior applications of the "unitary executive theory."  Although the Supreme Court has adhered to a robust conception of executive power and the unitary executive, it has never held that the Constitution flatly prohibits the existence of independent agencies.  If courts implicitly or explicitly adopt such an extreme interpretation of the Constitution after at least 138 years of contrary practice, with the consequence of awarding even more power to a President who has pushed the limits of Article II, I fear that it will erode public confidence in the judiciary.  Because independent agencies have served our nation well for over a century — with the blessing of all three branches of government, under both Republican and Democratic leaders — the government's new argument that agency independence inflicts "a grave harm to the separation of powers" lacks credibility.  Gov't Br. 2.  That is especially so where the government's theory purports to promote democratic accountability while asking unelected judges to rewrite the constitutional order.

Neither this case nor *Slaughter* is about whether the President should be the master of all executive power wielded by the federal government.  The Supreme Court has already

---

[5]    *See* Brief for the Petitioners at 5, *Slaughter*, No. 25-332 (Oct. 10, 2025) ("If *Humphrey's Executor* is not already a dead letter, this Court should overrule it . . . ."); Gov't Br. 21 ("Because *Humphrey's Executor* rests on repudiated reasoning, the decision can be understood as precedential only as to the specific question it resolved.").

5

recognized that the Constitution vests all executive power in the President; and as a result, he *generally* is entitled to remove principal officers of the Executive Branch, such as agency leaders, in his discretion.  *See Seila Law*, 591 U.S. at 215; *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 483 (2010).  The current question before the courts is narrower:  It is whether the Constitution *mandates* that there can be *no exceptions* to that general rule of at-will removal.  Here, my colleagues implicitly agree with the government that no such exceptions exist — they adopt a vanishingly narrow view of the types of agencies that may remain independent.  Meanwhile, the government asks both this court and the Supreme Court to accept its maximalist view of executive power and to abandon *Humphrey's*.

Our starting point is the Supreme Court's recognition of an exception to the President's at-will removal authority for "multimember expert agencies that do not wield substantial executive power."  *Seila Law*, 591 U.S. at 218.  To overrule that precedent so that the President may seize total control over all independent agencies, the government must argue that the current exception is impermissible because the Constitution compels the President's complete domination of the Executive Branch.  But the government's position is logically flawed:  While arguing for total presidential control in sweeping terms, the government nonetheless concedes that it may be appropriate to carve out exceptions for the Federal Reserve and Article I courts (which are situated within the Executive Branch).[6]  In other words, the government argues for no

---

[6]    Reply Br. 13–15 (noting that Federal Reserve officials might not be subject to at-will removal because of the agency's history); Oral Arg. 32:29–44 ("The common thread between the Article I courts, the Fed, the Article IV courts is that, as either historical or doctrinal matter, there is a significant . . . question as to whether that

6

exceptions while conceding that exceptions are allowed.  If the Constitution permits Congress to impose for-cause removal restrictions to protect the independence of Federal Reserve officials and Article I judges, there is no logical way to hold that the Constitution nevertheless forbids Congress from protecting the leaders of other government entities that have similar needs for independence (*i.e.*, because they also are impartial adjudicators or have a historical tradition of political independence).

Adoption of the government's maximalist theory of executive power (implicitly or explicitly) threatens to fundamentally change the character of our government.  In essence, the government asks the courts to hold that our Constitution requires all actions and decisions made by the Executive Branch to be political.  Thus, instead of relying on subject-matter expertise to make merits-based decisions for the public good, previously independent agencies must advance the political agenda of the President.  Taken to its logical end, the government's theory will eliminate removal protections for all employees of the Executive Branch and place every hiring decision and agency action under the political direction of the President.  But such a radical upending of the constitutional order is not supported by the text or structure of the Constitution and is inconsistent with the intent of the Framers. And while the government claims to uphold the separation of powers, its theory instead concentrates excessive power in the President and thus paves the way to autocracy.

---

governmental entity is wielding traditional executive power."); Brief for the Petitioners at 23, *Slaughter*, No. 25-332 (Oct. 10, 2025) ("No one disputes that the President's illimitable power of removal extends only to executive officers and excludes truly non-executive appointees, such as D.C. Court of Appeals judges." (cleaned up)).

7

The government urges an unprecedented interpretation of the Constitution that would lead to the full politicization of our government and a massive transfer of power to the President. My colleagues take an alternative approach in name only. Rather than expressly declaring *Humphrey's* a dead letter, they redefine *Humphrey's* "substantial executive power" exception such that it does not allow for any independent agencies.  In so doing, they enable the government to achieve its goals while maintaining the appearance of judicial restraint.  Under either approach, independent agencies as we know them cannot exist in this country.  Because that outcome is not required by our Constitution and does harm to our nation, I respectfully dissent.

## I.

### A.  Legal Background

In 1935, the Supreme Court confirmed that Congress has the power to create independent agencies in a landmark opinion: *Humphrey's Executor v. United States*.  President Franklin D. Roosevelt claimed that he was entitled to remove commissioners of the Federal Trade Commission (FTC) at will, and his Administration asserted that the statute that allowed only "for cause" removal of FTC commissioners was "an unconstitutional interference with the executive power of the President."  Brief for the United States at 7, 20, *Humphrey's*, 295 U.S. 602 (No. 667), 1935 WL 32965, at *7, *20.  The Supreme Court unanimously rejected that argument.  The Court upheld the FTC just as Congress had created it — as "a body of experts who shall gain experience by length of service" and "which shall be independent of executive authority, except in its selection, and free to exercise its judgment without the leave or hindrance of any other official or any department of the government."  *Humphrey's*, 295 U.S. at 625–26.  The Court emphasized that the FTC was "neither political nor executive,"

8

was "charged with the enforcement of no policy except the policy of the law," and was to be "nonpartisan" and "impartial[]." *Id.* at 624. Notably, the FTC had five members with staggered terms, and no more than three of them could be from the same political party. *Id.* at 620. The Court held that Congress had authority that "cannot well be doubted" to create "quasi legislative" or "quasi judicial" agencies, and to require them "to act in discharge of their duties independently of executive control." *Id.* at 629. Moreover, freedom from "the suspicion of partisan direction" depended on for-cause removal protection, because "one who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.* at 625, 629.[7]

After the Supreme Court's holding in *Humphrey's*, Congress created many more independent agencies in the mold of the FTC — *i.e.*, multimember expert bodies, performing nonpartisan functions with impartiality. And each new agency's organic statute was signed into law by the then-serving President.[8]    Furthermore, two decades after

---

[7]    The Court distinguished its previous decision in *Myers v. United States*, 272 U.S. 52 (1926). There, the Court invalidated a statutory provision that required the Senate's advice and consent for the removal of postmasters, while making numerous comments about the scope of executive power. *Id.* at 163–64. *Humphrey's* limited *Myers* to its holding, which reached only "purely executive officers." *Humphrey's*, 295 U.S. at 627–28, 631–32.

[8]    Presidents who have signed legislation creating independent agencies include: Grover Cleveland (Interstate Commerce Commission, *see* Interstate Commerce Act of 1887, Pub. L. No. 49-104, § 11, 24 Stat. 379, 383); Calvin Coolidge (National Mediation Board, *see* Railway Labor Act, Pub. L. No. 69-257, § 4, 44 Stat. 577, 579 (1926)), Franklin D. Roosevelt (National Labor Relations Board,

9

*Humphrey's*, the Supreme Court reaffirmed the legality of independent Executive Branch agencies in *Wiener v. United States*, 357 U.S. 349 (1958), extending for-cause removal protection to members of the purely adjudicatory nonpartisan War Claims Commission, even though no express statutory provision required it.  Thus, in the ninety years since *Humphrey's*, all three branches of our government have accepted the important role of apolitical independent agencies within our constitutional system.

Fast forward from 1935 to the year 2020.  In *Seila Law LLC v. Consumer Financial Protection Bureau*, the Supreme

---

*see* National Labor Relations Act of 1935, Pub. L. No. 74-198, § 3(a), 49 Stat. 449, 451); Harry Truman (War Claims Commission, *see* War Claims Act of 1948, Pub. L. No. 80-896, 62 Stat. 1240; *Wiener*, 357 U.S. at 354–56); Richard Nixon (Consumer Product Safety Commission, *see* Consumer Product Safety Act, Pub. L. No. 92-573, § 4(a), 86 Stat. 1207, 1210 (1972)), Gerald Ford (Nuclear Regulatory Commission, *see* Energy Reorganization Act of 1974, Pub. L. No. 93-438, § 201(e), 88 Stat. 1233, 1243), Jimmy Carter (Merit Systems Protection Board, *see* Civil Service Reform Act of 1978, Pub. L. No. 95-454, § 1202(d), 92 Stat. 1111, 1122), Ronald Reagan (National Indian Gaming Commission, *see* Indian Gaming Regulatory Act, Pub. L. No. 100-497, § 5(b)(6), 102 Stat. 2467, 2470 (1988)), George H.W. Bush (Chemical Safety and Hazard Investigation Board, *see* Clean Air Act Amendments of 1990, Pub. L. No. 101-549, § 112(r)(6)(B), 104 Stat. 2399, 2565), Bill Clinton (Surface Transportation Board, *see* ICC Termination Act of 1995, Pub. L. No. 104-88, § 701(b)(3), 109 Stat. 803, 932–33), George W. Bush (Department of Defense: Board of Actuaries, *see* National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 906(a)(1), 122 Stat. 3, 275–76), and Barack Obama (Consumer Financial Protection Bureau, *see* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1011(c)(3), 124 Stat. 1376, 1964 (2010), independence invalidated by *Seila Law*, 591 U.S. at 230–38).

10

Court confronted a newly created independent agency with a novel leadership structure: the CFPB. 591 U.S. at 207, 220. "Congress tasked the CFPB with implementing and enforcing a large body of financial consumer protection laws . . . ." *Id.* at 206 (cleaned up). The CFPB could issue "binding regulations" and exercise "extensive adjudicatory authority." *Id.* at 206–07. It also possessed "potent enforcement powers," including "the authority to conduct investigations, issue subpoenas and civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court." *Id.* at 206 (citing 12 U.S.C. §§ 5562, 5564(a), (f)). The Supreme Court observed that the CFPB was "almost wholly unprecedented" and differed from the "traditional" multileader expert agency examined in *Humphrey's* in important respects. *Id.* at 207, 220. In particular, the CFPB had a single Director who enjoyed a five-year term, which meant that the for-cause removal protection might prevent a President with only a four-year term from ever appointing the agency's leader. *Id.* at 225. Furthermore, the CFPB had a unique funding arrangement — it was funded by the Federal Reserve and therefore not subject to the appropriations process controlled by Congress and the President. *Id.* at 207–08. Citing those unusual structural features, the Supreme Court determined that the CFPB concentrated too much power in one person — the CFPB Director — who was accountable to no one. *Id.* at 204–05, 224–25. The Court thus struck down the for-cause removal protection for the Director, holding that it was unconstitutional and violated the separation of powers. It addressed this constitutional infirmity by making the CFPB Director removable at the President's will. *Id.* at 230–38.

In disapproving the unprecedented structure of the CFPB, the Court noted that although Presidents by default have "at will" removal authority over principal officers within the Executive Branch, *Humphrey's* established an exception to that

11

rule for "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218. The Court did not specify what would constitute "substantial executive power" under its test. *Id.* But the Court made clear that it would "not revisit" *Humphrey's* and would leave it "in place," even though it declined to "extend" the *Humphrey's* exception to a novel, single-director government agency. *Id.* at 215, 220, 228. Thus, the Court expressly left intact its prior approval of "traditional" multileader independent agencies. *Id.* at 207. Indeed, seven members of the Court endorsed the notion that Congress could address the "problem" posed by the CFPB's lack of accountability by "converting the CFPB into a multimember agency." *Id.* at 237 (Roberts, C.J., joined by Alito & Kavanaugh, JJ., concurring in the judgment); *id.* at 298 (Kagan, J., joined by Ginsburg, Breyer & Sotomayor, JJ., concurring in the judgment in part and dissenting in part). That holding was consistent with other cases, before and since, that also addressed the President's authority to remove agency leaders and left *Humphrey's* untouched. *See Free Enter. Fund*, 561 U.S. at 483–84 (striking down two layers of for-cause removal protection for an official but declining to "reexamine" *Humphrey's*); *Collins v. Yellen*, 594 U.S. 220, 250–51 (2021) (striking down the independence of an agency headed by a single person, regardless of whether the executive power it wielded was significant, but recognizing that *Seila Law* did "not revisit our prior decisions" (cleaned up)).

## B. Procedural Background

The President dismissed MSPB Chair Cathy Harris and NLRB Member Gwynne Wilcox in violation of the for-cause removal statutes that safeguard the independence of their respective agencies. The government claims that those for-cause removal statutes are unconstitutional and that the President therefore need not abide by them. Specifically, the

12

government asserts that *Humphrey's* allowed for-cause removal protections only for agencies that exercise "no part of the executive power," and "*any* exercise of executive power subjects an agency head to the President's control." Gov't Br. 22, 26–27 (emphasis added). According to the government, the MSPB and the NLRB wield "substantial executive power" even if their functions are largely adjudicatory, and an agency's exercise of *any* executive power requires it to be placed under the control of the President. In sum, the government's position is that the President is entitled to remove as he pleases any and all principal officers of any executive agency — including the MSPB and the NLRB. Otherwise, the theory goes, the separation of powers will be violated.

Two judges of the district court rejected the government's arguments. *See Harris v. Bessent* (*Harris I*), 775 F. Supp. 3d 164 (D.D.C. 2025) (Contreras, J.); *Wilcox v. Trump* (*Wilcox I*), 775 F. Supp. 3d 215 (D.D.C. 2025) (Howell, J.). They held that *Humphrey's* and *Wiener* are controlling Supreme Court precedents that required them to uphold the for-cause removal protections for members of the MSPB and the NLRB, which are traditional multimember expert agencies. Judge Contreras and Judge Howell issued permanent injunctions that effectively restored Harris and Wilcox to their positions and required the government to comply with the applicable for-cause removal statutes. *See Harris I*, 775 F. Supp. 3d at 189; *Wilcox I*, 775 F. Supp. 3d at 240–41. The government appealed.

During the pendency of the instant appeals, the government moved to stay the district court's injunctions, and this court ultimately denied the government's request. *See Harris v. Bessent* (*Harris III*), Nos. 25-5037, 25-5057, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) (en banc) (per curiam), *vacating Harris v. Bessent* (*Harris II*), 2025 WL 980278 (D.C. Cir. Mar. 28, 2025) (per curiam). The government then asked

**Add. 49**

13

the Supreme Court to stay the district court's injunctions pending appeal and to grant a writ of certiorari before judgment. We heard oral argument in these cases — on an expedited schedule — on May 16. On May 22, the Supreme Court issued an order staying the district court's judgments pending final disposition of the cases. *See Wilcox*, 145 S. Ct. 1415. In so doing, the Court held that the government would likely succeed on the merits because "the NLRB and MSPB [likely] exercise considerable executive power." *Id.* at 1416. However, it expressly left intact the "narrow exceptions [to at-will removal] recognized by [its] precedents." *Id.* (citing *Seila Law*, 591 U.S. at 215–18). The Court did not address the government's request for a writ of certiorari before judgment. *See id.* at 1416–17.

Parallel to Harris's and Wilcox's cases, the government has been litigating the President's removal of FTC Commissioner Rebecca Slaughter. After the President removed Slaughter without cause, the district court relied on *Humphrey's* to order Slaughter's reinstatement. This court denied the government's motion for a stay of the district court's order pending appeal. *See Slaughter v. Trump*, No. 25-5261, 2025 WL 2551247 (D.C. Cir. Sept. 2, 2025). The government then asked the Supreme Court for a stay of the district court's judgment in *Slaughter* and petitioned for a writ of certiorari before judgment.

Before the Supreme Court ruled on the *Slaughter* applications, Harris and Wilcox filed separate petitions for writs of certiorari before judgment. Petition for a Writ of Certiorari Before Judgment, *Harris v. Bessent*, No. 25-312 (U.S. Sept. 15, 2025); Petition for a Writ of Certiorari Before Judgment, *Wilcox v. Trump*, No. 25-319 (U.S. Sept. 15, 2025). They argued that their cases and *Slaughter* present similar legal issues and that the Court, should it grant certiorari before

14

judgment in *Slaughter*, should also grant certiorari before judgment in *Harris* and *Wilcox* and consolidate the three cases. The Court granted a stay of the district court's injunction in *Slaughter* and granted a writ of certiorari before judgment in that case. But the Court denied both Harris's and Wilcox's petitions for certiorari before judgment, thus leaving the instant cases for this court to decide. The Court now is poised to hear oral arguments in *Slaughter*.

Meanwhile, we are called upon to decide (1) whether the government's constitutional challenge to the for-cause removal protections afforded to leaders of the MSPB and the NLRB is foreclosed by *Humphrey's* and *Wiener*; and (2) if it is not, whether the Supreme Court's precedents and the Constitution require us to adopt the expansive view of executive authority urged by the government. The government also argues that the district court lacked authority to effectively reinstate Harris and Wilcox to their posts at their respective agencies.

## II.

### A. Applying Existing Precedents

Just five years after *Seila Law* was decided, the government comes before us to argue that the MSPB and the NLRB — two traditional multileader expert agencies — are unconstitutional in their current forms. Although *Seila Law* held that the President generally has at-will removal authority over all principal officers in the Executive Branch, it recognized a long-standing exception for "multimember expert agencies that do not wield substantial executive power" — and it expressly left *Humphrey's* on the books. *See Seila Law*, 591 U.S. at 204–05, 215–18. The most sensible interpretation of *Seila Law*'s holding is that an agency with features and functions like those approved by the Court in *Humphrey's*

15

passes muster and, by implication, does not exercise "substantial executive power." The MSPB and the NLRB meet that test.

The government contends, however, that the MSPB and the NLRB may not be placed beyond the President's total control because each wields "executive power." The government takes the position that all Executive Branch entities wield executive power and that "*any* exercise of executive power subjects an agency head to the President's control." Gov't Br. 26 (emphasis added). According to the government, because the MSPB and the NLRB are within the Executive Branch, their predominantly adjudicatory functions are exercises of executive power, and they therefore must be controlled by the President. That theory departs from the Supreme Court's holding in *Seila Law*, which preserved the independence of multileader expert agencies that do not wield "*substantial* executive power," not "*any* executive power." In short, *Humphrey's* allows the existence of independent multimember expert agencies that exercise no greater powers than did the 1935 FTC; but the government suggests that zero independent agencies are constitutional. And because the government's theory leaves no room in any corner of the Executive Branch for any exceptions to the President's at-will removal authority, it eviscerates *Humphrey's*. The government thus does not ask us to abide by *Humphrey's*, but instead effectively asks us to overrule it, which we are not at liberty to do.

As I see it, the MSPB and the NLRB fall squarely within the exception to the President's at-will removal authority that the Supreme Court acknowledged in *Humphrey's* and left "in place" in *Seila Law*. *Humphrey's* and *Wiener* control this case because the MSPB and the NLRB are multimember expert agencies that (1) exercise no more executive power than did the

16

1935 FTC that was approved in *Humphrey's*, and (2) are predominantly adjudicatory, like the independent War Claims Commission that was approved in *Wiener*. They are therefore "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 218. Accordingly, for-cause removal protections for leaders of the MSPB and the NLRB are constitutional.

As previously discussed, *Humphrey's* upheld the constitutionality of for-cause removal protections for commissioners of the 1935 FTC. The "set of powers" exercised by the FTC that were "the basis for [the *Humphrey's*] decision," *Seila Law*, 591 U.S. at 219 n.4, included the authority to issue and then adjudicate complaints charging unfair competition; to exercise "wide powers of investigation" and "report to Congress with recommendations"; and to recommend remedies in antitrust suits brought by the Attorney General in federal court, *Humphrey's*, 295 U.S. at 620–21 (citing Federal Trade Commission Act, Pub. L. No. 62-203, §§ 5–7, 38 Stat. 717, 719–22 (1914)).

The *Humphrey's* Court described key features of the FTC that demonstrated its nonpartisanship and its need for independence. Notably, the FTC was led by multiple commissioners serving staggered, seven-year terms and balanced along partisan lines. *See Humphrey's*, 295 U.S. at 620, 624. Moreover, it was intended to be an "independent" "body of experts" that was "charged with the enforcement of no policy except the policy of the law." *Id.* at 624–25. The Court also observed that the FTC's functions were "neither political nor executive, but predominantly quasi judicial and quasi legislative," and any executive functions thus were merely ancillary. *Id.* at 624, 628 & n.1. The Supreme Court also addressed adjudicatory functions in *Wiener*, where the Court held that the President had no power to "remove a

17

member of an adjudicatory body like the War Claims Commission merely because he wanted his own appointees on such a Commission." 57 U.S. at 356. At bottom, the constitutionality of removal restrictions "will depend upon the character of the office." *Humphrey's*, 295 U.S. at 624, 631. As relevant here, both the MSPB and the NLRB are predominantly adjudicative and share many of the key characteristics of the 1935 FTC and the War Claims Commission that justified their independence.

The MSPB functions more like a court than a regulator. It is "predominantly an adjudicatory body," as the government concedes. Oral Arg. 12:19–23, *Harris II*, 2025 WL 980278 (No. 25-5037); *see also* 5 U.S.C. § 1204(a)(1). President Jimmy Carter proposed the MSPB as "the adjudicatory arm of the new personnel system," with a bipartisan multimember structure that would "guarantee independent and impartial protection to employees." Federal Civil Service Reform Message to the Congress, 1 Pub. Papers 445 (Mar. 2, 1978). Thus, the MSPB's mission is "to adjudicate federal employment disputes." *Harrow v. Dep't of Def.*, 601 U.S. 480, 482 (2024). Specifically, it hears appeals of adverse employment actions brought by federal workers. *See* 5 U.S.C. §§ 7701(a), 7512, 7513(d). It also resolves in the first instance a handful of other matters, such as cases brought by the Office of Special Counsel for "corrective action" concerning "prohibited personnel practice[s]" by agencies. *Id.* § 1214(b)(2)(C); *see also id.* §§ 1214(b)(4)(B)(i), 1215(a)(1), 3592(a)(2), 7521(b).

The structure of the MSPB is "patterned on the classic independent regulatory agency sanctioned" in *Humphrey's*. *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993). As in *Humphrey's*, the President may remove a member of the MSPB "only for inefficiency, neglect of duty, or

**Add. 54**

18

malfeasance in office." 5 U.S.C. § 1202(d); *Humphrey's*, 295
U.S. at 622. And like the 1935 FTC, the three members of the
MSPB must be drawn from different political parties, and they
serve staggered terms of seven years. 5 U.S.C. §§ 1201,
1202(a)–(c); *Humphrey's*, 295 U.S. at 620.

The MSPB is passive and must wait for appeals and cases
to be initiated by federal employees, employer agencies, or the
Office of Special Counsel. *Harris II*, 2025 WL 980278, at *30
(Millett, J., dissenting) (citing 5 U.S.C. §§ 1204(a)(1),
1214(b)(1)(a); 5 C.F.R. § 1201.3). Notably, it is the Office of
Special Counsel that investigates and prosecutes certain kinds
of misconduct by federal agencies and then petitions the MSPB
for corrective action. *See* 5 U.S.C. § 1212. As a *de facto*
matter, the Special Counsel now answers to the President.[9]
Moreover, the MSPB does not regulate through rulemaking
because its rulemaking authority is limited to "such regulations
as may be necessary for the performance of its functions." 5
U.S.C. § 1204(h).[10]

---

[9] The Special Counsel is appointed by the President with the
advice and consent of the Senate. Although a statute confers for-
cause removal protection on the Special Counsel, *see* 5 U.S.C.
§ 1211, the President deemed that statute unconstitutional and fired
the former Special Counsel, Hampton Dellinger. Although the
district court ordered the government to reinstate Dellinger, a special
panel of this court stayed the district court's order pending appeal,
*Dellinger v. Bessent*, No. 25-5052, 2025 WL 887518 (D.C. Cir. Mar.
10, 2025) (per curiam), and Dellinger subsequently dropped his suit.
As a result, the President has *de facto* authority to appoint a Special
Counsel of his own choosing. *See* Defendants' Notice of the
President's Designation of Acting Special Counsel, *Dellinger v.
Bessent*, No. 25-cv-385 (D.D.C. Feb. 12, 2025), ECF No. 13.

[10] The responsibility of enforcing civil-service regulations and
laws and "aiding the President" in preparing civil-service rules and
policies is assigned to the Office of Personnel Management, a
separate agency. 5 U.S.C. § 1103(a)(7).

19

As the district court explained, the MSPB "spends nearly all of its time adjudicating inward-facing personnel matters involving federal employees." *Harris I*, 775 F. Supp. 3d at 176 (cleaned up). The MSPB's adjudicatory process is "designed to reach consensus based on established MSPB and federal case law," as decisions are drafted by career attorneys without MSPB members directing the results in advance. *See* Brief for Former Board Members and General Counsel of the MSPB as Amici Curiae Supporting Appellee 8. Like the War Claims Commission in *Wiener*, the MSPB hears claims that are "'adjudicated according to law,' that is, on the merits of each claim, supported by evidence and governing legal considerations"; and it serves as "a body that [is] 'entirely free from the control or coercive influence [of the President], direct or indirect.'" 357 U.S. at 355 (quoting *Humphrey's*, 295 U.S. at 629). In short, the MSPB is so clearly adjudicatory and free of quintessential executive responsibilities that if it exercises "substantial executive power," then every agency does.[11]

---

[11] My colleagues' discussion of the MSPB's supposedly substantial "executive" powers is unconvincing. They suggest that the MSPB exercises substantial executive power because (1) it issues "final decisions," (2) it has "jack-of-all-trades" jurisdiction that is less "specialized" than the 1935 FTC, and (3) it has the power to award "legal and equitable relief in administrative adjudications." Maj. Op. 31–33 (citations omitted). But in *Wiener*, the Supreme Court upheld for-cause removal protections for the leaders of the War Claims Commission, which enjoyed "finality of determination" over a "large number of claimants [with a] diversity in the specific circumstances giving rise to the[ir] claims," and which could order "compensat[ion for] internees, prisoners of war, and religious organizations." 357 U.S. at 350, 354–55. Moreover, my colleagues do not explain why the features they highlight represent the exercise of "executive" power. In fact, many courts issue final decisions,

20

Congress created the NLRB to enforce the National Labor Relations Act of 1935 (NLRA), which encourages collective bargaining and protects the rights of workers. Pub. L. No. 74-198, 49 Stat. 449 (codified as amended at 29 U.S.C. §§ 151–169). In designing the NLRB, Congress relied on *Humphrey's*: It enacted the NLRA "just over a month after *Humphrey's Executor* was decided and modeled the statute on the FTC's organic statute." *Harris II*, 2025 WL 980278, at *31 (Millett, J., dissenting) (citing the two agencies' organic statutes).

The Board of the NLRB closely resembles the *Humphrey's* model. It consists of five members, appointed by the President with the advice and consent of the Senate, who serve staggered five-year terms. 29 U.S.C. § 153(a). A member "may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause." *Id.* Although no statutory provision requires a partisan balance in the NLRB Board's membership, "Presidents since Eisenhower have adhered to a 'tradition' of appointing no more than three members from their own party." *Harris II*, 2025 WL 980278, at *31 (Millett, J., dissenting) (quoting Brian D. Feinstein & Daniel J. Hemel, *Partisan Balance with Bite*, 118 Colum. L. Rev. 9, 54–55 (2018)).

The Board of the NLRB is "predominantly an adjudicatory body." *Harris II*, 2025 WL 980278, at *31 (Millett, J., dissenting). It decides disputes about unfair labor practices and resolves union-representation questions. 29 U.S.C. § 159(b), (c)(1)(A). The Board's remedial authority includes issuing cease-and-desist orders and orders to employers or unions to

---

under many different statutes, and award legal and equitable relief, which suggests that those functions should be considered quasi-judicial under *Humphrey's*.

21

take "affirmative action," such as "reinstatement of employees with or without back pay." *Id.* § 160(c). But to enforce its orders, the Board must petition a federal court of appeals. *Id.* § 160(e); *see also Dish Network Corp. v. NLRB*, 953 F.3d 370, 375 n.2 (5th Cir. 2020) ("The NLRB may be the only agency that needs a court's imprimatur to render its orders enforceable."). Judicial review of a Board order is also available for "[a]ny person aggrieved by a final order of the Board." 29 U.S.C. § 160(f).

Importantly, the investigation and prosecution of unfair labor practices are performed by the General Counsel of the NLRB, who brings cases before the Board for adjudication. The General Counsel is appointed by the President, with the advice and consent of the Senate, and is removable by the President at will. 29 U.S.C. § 153(d). As a result, all investigative and prosecutorial functions — hallmarks of executive power — are wielded by an official accountable to the President. *Cf. Morrison v. Olson*, 487 U.S. 654, 706 (1988) (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function."). Thus, "the character" of the Board is "predominantly" adjudicative. *Humphrey's*, 295 U.S. at 624, 631.[12]

---

[12]    The Board has only "circumscribed" rulemaking authority. *Harris II*, 2025 WL 980278, at *31 (Millett, J., dissenting). True, it has "authority . . . to make, amend, and rescind, in the manner prescribed by [the Administrative Procedure Act], such rules and regulations as may be necessary to carry out the provisions of [the NLRA]." 29 U.S.C. § 156. But in practice, the Board does not "promulgate binding rules," in contrast to the CFPB. *Seila Law*, 591 U.S. at 218. "From its inception in 1935, the Board has exhibited a negative attitude toward setting down principles in rulemaking, rather than adjudication." *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d

22

There is no denying "the intrinsic judicial character of the task[s]" that are performed by the MSPB and the NLRB: They apply law to facts and resolve cases. *Wiener*, 357 U.S. at 355. They do not perform any quintessentially executive functions, such as investigating and prosecuting cases to execute the law. Nor do they touch upon subject areas that are expressly in the President's bailiwick, such as foreign affairs or national defense. Moreover, the quasi-judicial duties of the MSPB and the NLRB do not interfere with the President's exercise of executive power or impede the President's ability to faithfully execute the laws. *See Morrison*, 487 U.S. at 689–90 ("The analysis contained in our removal cases is designed . . . to ensure that Congress does not interfere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II.").

Because both the MSPB and the NLRB are predominantly adjudicatory, they wield less executive power than did the 1935 FTC, which had "wide powers of investigation" and authority to issue complaints that it then adjudicated. *Humphrey's*, 295 U.S. at 620–21; *see also U.S. ex rel. Milwaukee Soc. Democratic Publ'g Co. v. Burleson*, 255 U.S. 407, 427–28 (1921) (explaining that when an executive official is "making

---

947, 949 (D.C. Cir. 2013) (cleaned up), *overruled on other grounds by Am. Meat Inst. v. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc). Although the government asserts that "the NLRB . . . promulgates substantive rules of general applicability governing employer-employee relations," Gov't Br. 29, the entire corpus of substantive NLRB rules is limited to: (1) a rule concerning collective bargaining units in healthcare facilities, 29 C.F.R. § 103.30; (2) a rule addressing joint-employer status, *id.* § 103.40; and (3) jurisdictional standards for colleges and universities, symphony orchestras, and dog- or horse-racing industries, *id.* §§ 103.1, 103.2, 103.3.

23

[a] determination [in which] he must, like a court or a jury, form a judgment whether certain conditions prescribed by Congress exist, on controverted facts or by applying the law[,] . . . [t]he function is a strictly judicial one, although exercised in administering an executive office"). Thus, although the MSPB and the NLRB may exercise *some* "executive power" because they are housed within the Executive Branch, they do not wield "substantial executive power." *Cf. City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (noting that when agencies "conduct adjudications," their activities take "judicial forms," yet "they are exercises of — indeed, under our constitutional structure they *must be* exercises of — the executive power" (cleaned up) (emphasis in original)).

In sum, the MSPB and the NLRB fall safely within *Humphrey's* exception to the President's at-will removal authority. Both agencies have nonpartisan multimember leadership structures that allow every President to select at least some of their members. *See Humphrey's*, 295 U.S. at 625–26 (noting that the 1935 FTC was "independent of executive authority, except in its selection" of commissioners). They also conduct apolitical adjudicatory work that requires independence and expertise; and they receive their funding through the normal appropriations process. At bottom, they are traditional multimember expert agencies that wield less executive power than did the 1935 FTC, and they therefore do not wield "substantial executive power."

If the meaning of "substantial executive power" has changed since *Seila Law* was decided, or if it is different from what was approved in *Humphrey's*, or if there is no longer a test of "substantial" power at all, the Supreme Court must tell us so. *See Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). We should follow the lead of other courts of appeals and our own en banc court, which have

**Add. 60**

24

determined that *Humphrey's* remains good law, despite the parts of *Seila Law* that have been perceived to undermine its reasoning. *See Harris III*, 2025 WL 1021435, at *1; *Meta Platforms, Inc. v. FTC*, No. 24-5054, 2024 WL 1549732, at *2 (D.C. Cir. Mar. 29, 2024) (per curiam); *Severino v. Biden*, 71 F.4th 1038, 1047 (D.C. Cir. 2023); *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 762–63 (10th Cir. 2024); *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 346 (5th Cir. 2024). *Humphrey's* and *Wiener* require us to affirm the judgments entered by the district court. In the alternative, we should hold these cases in abeyance and await further instructions from the Supreme Court in *Slaughter*.

## B.  Departing from Existing Precedents

My colleagues break new ground in determining the type and extent of executive power that must be controlled by the President through the tool of at-will removal. Although *Seila Law* recognized an exception to the President's at-will removal authority for "multimember expert agencies that do not wield substantial executive power," 591 U.S. at 218, my colleagues essentially eliminate that exception by redefining what counts as "substantial executive power." They apply that term so broadly that it encompasses the work of even adjudicatory agencies that have little or nothing to do with traditional executive functions. While my colleagues' analysis is steeped in details about the powers of the agencies at issue, and how those powers compare with the responsibilities of the 1935 FTC, the bottom line is this: If the Constitution cannot tolerate the independence of the purely adjudicatory MSPB, which functions as a court in the specialized realm of employment law, there is no agency that can escape total presidential control. My colleagues hold, in substance, that the existence of independent agencies is incompatible with our Constitution.

25

The government reaches the same end point — the elimination of independent agencies — by taking a different route.  The government urges the more direct approach of replacing the Supreme Court's test of "substantial executive power" with a new standard that gives the President total control over agencies that wield "any executive power."  The government claims that all Executive Branch entities wield executive power, and *any* executive power must be supervised by the President through at-will removal, because the Constitution vests all executive power in him.  Thus, because independent agencies are within the Executive Branch, the President must have total control over them, and there are no constitutionally permissible independent agencies.

The government's position is based on a new, maximalist version of the "unitary executive theory."  Although that theory stands for the proposition that all executive power must be placed in the hands of the President, no court has ever applied it to abolish all independent agencies.  The government claims that there can be no exceptions to the President's general at-will removal authority because at-will removal assures that agencies are accountable to the people:  According to the government, voters elected the President and would want him to direct all the affairs of the Executive Branch.  Other methods of presidential control — such as the appointment of agency leaders, for-cause removal, and the appropriations process — are considered insufficient.

Under the government's maximalist theory, our duly elected representatives in Congress who determined that independent agencies serve the public interest were powerless to do what they thought was best for the nation.  Instead, the government has suddenly realized, the Constitution requires us to eradicate the independence of all Executive Branch agencies.  The government takes that position even though the

**Add. 62**

26

Founders approved a commission with members who were not subject to the President's at-will removal (the Sinking Fund Commission) in 1790; multimember expert agencies have existed since the ICC was established in 1877; and independent agencies with certain features — including multimember structures, bipartisanship, and the task of applying expertise to address nonpolitical issues — were upheld by the Supreme Court in *Humphrey's* and left intact by *Seila Law*.

Given our long-standing acceptance of some agency independence in our constitutional scheme, we should view with suspicion the government's insistence that an immediate, drastic change to our government is necessary. Over the 138 years in which expert independent agencies have operated within our constitutional system, our nation has not perceptibly experienced any harms from the asserted lack of sufficient political accountability.[13] I am concerned that our implicit adoption of the government's radical view of executive authority will enable the President to claim and consolidate too much power, and that will cause the public to lose faith in the impartiality of the judiciary. It may be difficult to persuade members of the public that the Constitution really requires that all appointments and decisions made within the Executive Branch be political, when that has never been the country's experience or understanding.

---

[13] When the government was asked at oral argument to explain how our country has been tangibly harmed by the alleged widespread constitutional problem posed by agency independence, it had no real response. Government counsel spoke of "the blurring of the lines of accountability" and "disabl[ing] the will of the people" — but he could identify no actual detriment to the functioning of our government and its ability to serve the public. Oral Arg. 8:23–24, 11:20–21.

27

The implicit or explicit adoption of a constitutional theory that effectively outlaws independent agencies will have profound effects on the governance of our nation. It threatens to impair the work of approximately thirty-three agencies that Congress has entrusted with important, apolitical missions, like promoting public safety,[14] facilitating commerce,[15] serving the legal system,[16] helping the disadvantaged,[17] protecting

---

[14] The National Transportation Safety Board (49 U.S.C. § 1111(c)), the Occupational Safety and Health Review Commission (29 U.S.C. § 661(b)), the Consumer Product Safety Commission (15 U.S.C. § 2053(a)), the National Advisory Council on the National Health Service Corps (42 U.S.C. §254j(b)(1)), the Federal Mine Safety and Health Review Commission (30 U.S.C. § 823(b)(1)(B)), the Institute of Peace (22 U.S.C. § 4605(f)), the Chemical Safety and Hazard Investigation Board (42 U.S.C. § 7412(r)(6)(B)), and the Federal Aerospace Management Advisory Council (49 U.S.C. § 106(p)(6)(E)).

[15] The Federal Trade Commission (15 U.S.C. § 41), the Federal Maritime Commission (46 U.S.C. § 46101(b)(5)), the Postal Service (39 U.S.C. § 202(a)(1)), the Postal Regulatory Commission (39 U.S.C. § 502(a)), the National Indian Gaming Commission (25 U.S.C. § 2704(b)(6)), the Surface Transportation Board (49 U.S.C. § 1301(b)(3)), the Corporation for Travel Promotion (22 U.S.C. § 2131(b)(2)(D)), and the Financial Oversight and Management Board for Puerto Rico (48 U.S.C. § 2121(e)(5)(B)).

[16] The Sentencing Commission (28 U.S.C. § 991(a)), the State Justice Institute (42 U.S.C. § 10703(h)), the Civilian Board of Contract Appeals (41 U.S.C. § 7105(b)(3)), and the Foreign Claims Settlement Commission (22 U.S.C. §§ 1622(c), 1622b).

[17] The Commission on Civil Rights (42 U.S.C. § 1975(e)) and the Legal Services Corporation (42 U.S.C. § 2996c(e)).

28

workers,[18] harnessing energy or natural resources,[19] and serving members of the military and veterans.[20] Under the government's theory, judges who serve on Article I courts — such as the Tax Court, the Court of Appeals for the Armed Forces, and the Court of Appeals for Veterans Claims — also may be subject to at-will removal because those courts are situated within the Executive Branch and therefore exercise some executive power. *See Kuretski v. Comm'r*, 755 F.3d 929, 943 (D.C. Cir. 2014) (holding that "the Tax Court exercises its authority as part of the Executive Branch"); *Edmond v. United States*, 520 U.S. 651, 664 (1997) (recognizing that the Court of Appeals for the Armed Forces is an "Executive Branch entity"); *United States v. Arthrex, Inc.*, 594 U.S. 1, 20 (2021) (describing the Court of Appeals for Veterans Claims as "an Executive Branch entity").

Although the government currently does not take the position that Article I judges and Federal Reserve officials are subject to at-will removal by the President, those arbitrary carve-outs provide little reassurance — adoption of the maximalist theory would allow the government to change its mind whenever it becomes politically expedient. The

---

[18]    The National Labor Relations Board (29 U.S.C. §153(a)), the Merit Systems Protection Board (5 U.S.C. § 1202(d)), the National Mediation Board (45 U.S.C. § 154), the Federal Labor Relations Authority (5 U.S.C. § 7104(b)), the Foreign Service Labor Relations Board (22 U.S.C. § 4106(e)), and the Foreign Service Grievance Board (22 U.S.C. § 4135(d)).

[19]    The Nuclear Regulatory Commission (42 U.S.C. § 5841(e)), the Regional Fishery Management Councils (16 U.S.C. § 1852(b)(6)), and the Federal Energy Regulatory Commission (42 U.S.C. § 7171(b)(1)).

[20]    The Department of Defense: Medicare-Eligible Retiree Health Care Board of Actuaries (10 U.S.C. § 1114(a)(2)(A)) and the Department of Defense: Board of Actuaries (10 U.S.C. § 183(b)(3)).

29

government's theory also puts at risk inferior officers and career civil servants employed by the Executive Branch: If the Constitution entitles the President to exercise at-will removal authority over all parties who wield any executive power, then previously approved statutory protections for such employees may well be unconstitutional. *See* Brief for the Petitioners at 20, *Slaughter*, No. 25-332 (Oct. 10, 2025) (describing a previously recognized exception for inferior officers as "dubious"). Thus, we may soon be living in a world in which every hiring decision and action by any government agency will be influenced by politics, with little regard for subject-matter expertise, the public good, and merit-based decision-making. Indeed, "[t]he power to remove government officials and replace them with the chief executive's preferred people provides a powerful weapon to convert the government from an instrument of law into the instrument of an autocratic chief executive" — "[a] President can simply fire conscientious people and seek to replace them with quislings willing to do his bidding." David M. Driesen, *The Unitary Executive Theory in Comparative Context*, 72 Hastings L.J. 1, 42 (2020).

The impending upheaval is not required by our Constitution, the Supreme Court's precedents, or the unitary executive theory. The Constitution unquestionably empowers Congress to organize and structure the Executive Branch, and the Constitution's text and structure indicate that Congress's creation of independent agencies is within constitutional bounds. Moreover, the Supreme Court has been careful, thus far, to preserve the viability of independent multileader expert agencies. *See Seila Law*, 591 U.S. at 216–18; *Humphrey's*, 295 U.S. at 632. And that is consistent with the Court's recognition of a strong unitary executive. Under the Court's precedents, the President must be able to remove "purely executive" officials, *Humphrey's*, 295 U.S. at 631–32; *see also Morrison*, 487 U.S. at 689–90, as well as leaders of single-headed

**Add. 66**

30

agencies exercising executive power, *Collins*, 594 U.S. at 253–54, and even leaders of multileader agencies that wield "substantial executive power," *Seila Law*, 591 U.S. at 218. Eliminating agency independence altogether goes far beyond what the unitary executive theory requires.

In sum, both the government's theory and my colleagues' analysis have the practical effect of outlawing independent agencies in this country. In my view, the government and my colleagues misread the Constitution and all the cases that have come before.

### 1. The Unitary Executive Theory

As the Supreme Court explained in *Seila Law*, "[u]nder our Constitution, the 'executive Power' — all of it — is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" 591 U.S. at 203 (quoting U.S. Const. art. II, §§ 1, 3). Rather than divide the power of the Executive Branch among multiple actors, the Framers concentrated all its power in a single President who would be "directly accountable to the people through regular elections." *Id.* at 224. To ensure that Executive Branch officers also answer to the people, such officers generally "must remain accountable to the President" through the President's power of at-will removal. *Id.* at 204, 213, 224. In addition, for the President to faithfully execute the laws, he must effectively supervise those who assist him in carrying out the functions of the Executive Branch, which also necessitates the general power to remove principal officers who lead Executive Branch agencies. *See id.* at 214.

The underlying premise of the unitary executive theory is that the President alone is responsible for exercising all executive power, and he therefore must have the right to control (and remove) agency leaders who assist him in doing

31

the work of the Executive Branch. That idea is uncontroversial as applied to the many agencies that perform core executive functions on the President's behalf. Core executive functions include powers related to the national defense, foreign affairs, and law enforcement. *See Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982) (noting that Article II "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity," including "the enforcement of federal law[,] . . . the conduct of foreign affairs[,] . . . and management of the Executive Branch"). The Constitution plainly requires the President to have unfettered power to remove the leaders of agencies like the Defense Department, the State Department, and the Justice Department. *See Morrison*, 487 U.S. at 690 ("*Myers* was undoubtedly correct . . . in its broader suggestion that there are some 'purely executive' officials who must be removable by the President at will if he is to be able to accomplish his constitutional role." (quoting *Myers v. United States*, 272 U.S. 52, 132–34 (1926))).

But there is a continuum of government functions, and not all such functions must be treated in the same way. Walter Dellinger, when he headed the Office of Legal Counsel, identified a "spectrum" of executive power: "[A]t one end of the spectrum, restrictions on the President's power to remove officers with broad policy responsibilities in areas Congress does not or cannot shelter from presidential policy control," such as the Secretary of Defense, "clearly should be deemed unconstitutional." The Constitutional Separation of Powers Between the President and Congress, 20 Op. O.L.C. 124, 169 (1996). But "[a]t the other end of the spectrum," "officers with adjudicatory duties affecting the rights of private individuals" — such as judges appointed to serve on Article I courts — should not be subject to at-will removal because "the contention that the essential role of the executive branch would

**Add. 68**

32

be imperiled by giving a measure of independence to such officials is untenable under both precedent and principle." *Id.* The spectrum described by Dellinger recognizes that there is a correlation between the amount of executive power that an agency exercises and the amount of presidential oversight that is constitutionally required. The immediate questions here are, "Where do the MSPB and the NLRB fall on that spectrum of executive power?" and ultimately, "May Congress constitutionally create a category of agencies that need not be placed under the President's total control because their functions do not interfere with or sufficiently implicate the President's exercise of executive power?"

*Seila Law* established just five years ago that the test for constitutionally permissible independence is whether a multileader expert agency exercises "substantial executive power." 591 U.S. at 218; *see also Wilcox*, 145 S. Ct. at 1416 (referencing "considerable executive power"). Because the degree of necessary presidential supervision is commensurate with the amount of executive power that an agency wields, multimember agencies that do not exercise "substantial executive power" may enjoy for-cause removal protections because the President influences such agencies in less intrusive ways that nevertheless preserve "the President's ability to perform his constitutional duty." *Morrison*, 487 U.S. at 691; *see also* Lisa Schultz Bressman & Robert B. Thompson, *The Future of Agency Independence*, 63 Vand. L. Rev. 599, 632 (2010) (noting that independent agencies "are subject to other, well-recognized measures of presidential influence that better promote accountability").

For instance, the President influences the MSPB and the NLRB by appointing at least some of their members, *see* 5 U.S.C. § 1201 (MSPB); 29 U.S.C. § 153(a) (NLRB), and by choosing their chairpersons, *see* 5 U.S.C. § 1203(a) (MSPB);

33

29 U.S.C. § 153(a) (NLRB); *see also Humphrey's*, 295 U.S. at 625 (noting that the FTC would "be independent of executive authority, except in its selection"). The President also may ensure that agency leadership is competent and ethical by removing, or threatening to remove, an agency leader for cause. *See* 5 U.S.C. § 1202(d) (MSPB); 29 U.S.C. § 153(a) (NLRB). Moreover, these multileader independent agencies answer to both Congress and the President through the appropriations process, in which the President and Congress together determine the agencies' funding levels. Independent agencies also are held accountable by Congress's power to enact laws, signed by the President, that can affect the agencies' authority and operations. Finally, the President exercises significant control over the MSPB and the NLRB by overseeing many of the cases that are brought before them, through his power to appoint and remove the General Counsel of the NLRB and the Special Counsel. Thus, the MSPB and the NLRB are completely unlike the independent agencies that the Supreme Court has deemed insufficiently accountable, due to features like a single-head leadership structure, double layers of accountability, or insulation from the normal appropriations process. *See Free Enter. Fund*, 561 U.S. at 484; *Seila Law*, 591 U.S. at 225–26; *Collins*, 594 U.S. at 228. Instead, numerous checks on the MSPB and the NLRB ensure that they remain accountable to the President, the Congress, and the American people, even if the President does not have at-will removal authority.

Congress's creation of independent multileader expert agencies is consistent with the unitary executive theory. Although Article II vests executive power in the President, Article I commands that Congress "shall have Power To . . . make all Laws which shall be necessary and proper for carrying into Execution . . . all . . . Powers vested by this Constitution in the Government of the United States, or in any Department or

34

Officer thereof." U.S. Const. art. I, § 8. Thus, "[u]nitary executive theorists concede that Congress has broad power under the Necessary and Proper Clause to structure the executive department." Steven G. Calabresi & Kevin H. Rhodes, *The Structural Constitution: Unitary Executive, Plural Judiciary*, 105 Harv. L. Rev. 1153, 1165–68 (1992); *see also* Michael W. McConnell, *The President Who Would Not Be King* 146 (2020) (The Take Care Clause and the Commander-in-Chief Clause "place the President at the head of a hierarchical system, the substance of which is entirely within congressional control."). Indeed, it is "natural" to conclude that the Necessary and Proper Clause lets Congress make "judgment calls" about the removal of executive officers "as it enacts particular statutes that structure particular agencies." Caleb Nelson, *Special Feature: Must Administrative Officers Serve at the President's Pleasure?*, Democracy Project 2025 (Sept. 29, 2025), https://perma.cc/758B-ZCTS. Even the strongest formulations of the unitary executive theory have recognized narrow "exceptions" to the general rule that the President is entitled to remove principal officers who wield executive power. *Seila Law*, 591 U.S. at 204; *Wilcox*, 145 S. Ct. at 1416 ("Because the Constitution vests the executive power in the President, he may remove without cause executive officers who exercise that power on his behalf, subject to narrow exceptions recognized by our precedents." (citations omitted)).

The current exception to the general rule of at-will removal for independent multimember executive agencies is appropriate because such agencies do not threaten the President's leadership of the Executive Branch: They wield limited executive power, and the President can adequately supervise them using methods other than at-will removal. In particular, a strong unitary executive can coexist with an independent MSPB and NLRB, as created by Congress,

35

because those agencies: (1) are predominantly adjudicatory and therefore do not exercise substantial executive power; (2) specialize in resolving labor and employment disputes, and therefore have nothing to do with the President's core executive responsibilities; and (3) are accountable to the President through his selection of agency leadership, the appropriations and legislative processes, and his influence over the agencies' dockets of cases. Thus, the President remains strong and in command of the Executive Branch, notwithstanding the existence of these independent agencies.

In short, the unitary executive is compatible with the independence of nonpartisan multimember expert agencies that are (1) "neither political nor executive," (2) "charged with the enforcement of no policy except the policy of the law," and (3) "independent of executive authority, except in [their] selection." *Humphrey's*, 295 U.S. at 624–26. That compatibility is especially evident where the agencies in question are predominantly adjudicatory and quasi-judicial, therefore falling near the end of the executive-power spectrum occupied by courts of law. The Supreme Court has allowed traditional independent agencies to exist for at least ninety years and has approved their independence while at the same time recognizing a strong unitary executive. *See Free Enter. Fund*, 561 U.S. at 483 (explaining that Article II "has been understood to empower the President to keep [Executive Branch] officers accountable — by removing them from office, if necessary," but also holding, under *Humphrey's*, "that Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause"); *Seila Law*, 591 U.S. at 203–04 (noting that "the executive power — all of it — is vested in a President," but also acknowledging that, under *Humphrey's*, "Congress could create expert agencies led by a group of principal officers

36

removable by the President only for good cause" (cleaned up)). Thus, the unitary executive theory does not require us to eliminate all independent multimember expert agencies.

### 2.   The Maximalist Unitary Executive

The government urges us to adopt a new, maximalist formulation of the unitary executive theory that entitles the President to assert total control over all agencies that wield any executive power, without exception — and that control logically must extend to every agency, court, or entity within the Executive Branch.  The President's mandatory control must be effectuated, according to the government, through at-will removal power over all the leaders of Executive Branch entities, including those that previously have been independent. The government's maximalist theory that places "*any* executive power" under absolute presidential control is a sharp departure from the Supreme Court's recognition of an exception "for multimember expert agencies that do not wield *substantial* executive power." *Seila Law*, 591 U.S. at 216, 218 (emphases added); *see also Wilcox*, 145 S. Ct. at 1415 (referencing "*considerable* executive power" (emphasis added)).  Yet the government contends that its new maximalist theory is not just better than the alternative, but that the Constitution *commands* our sudden acceptance of it, despite 138 years of our nation's contrary practice and understanding.

My colleagues do not explicitly embrace the government's reasoning, but they *de facto* agree with the underlying premise of total executive control that leaves no room for political independence.  Their view that even the MSPB — a purely adjudicatory agency that functions as an employment-law court — wields "substantial executive power" unmistakably implies that no Executive Branch agencies can remain independent.

**Add. 73**

37

My colleagues thus adopt their own theory of maximalist executive authority.

In considering the approaches advocated by the government and my colleagues, it is beyond debate that the President is entitled to control and to supervise the executive power of the federal government, which "generally" entitles him to remove principal Executive Branch officials at his discretion. *See Seila Law*, 591 U.S. at 213; *accord Free Enter. Fund*, 561 U.S. at 513–14. The question before us is whether the Constitution prohibits any *exception* to the general rule of at-will removal. And the available evidence indicates that the Constitution does not compel such an interpretation. *See* Caleb Nelson, *supra* ("[B]oth the text and history of Article II are far more equivocal than the current [Supreme] Court has been suggesting."). To the contrary, we should reject any theory that requires the abolition of independent agencies because that drastic action (1) is unsupported by constitutional text, structure, and original intent; and (2) violates the separation of powers.

### i.  *Constitutional Text, Structure, and Original Intent*

The Constitution does not specifically address the removal of officers in the Executive Branch, other than by providing for impeachment under certain circumstances. But the Necessary and Proper Clause of Article I empowers Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers [of Congress], and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art. I, § 8. That broad authority allows Congress to create and structure government agencies, and it is "natural" to conclude that Congress can make "judgment calls" about the removal of officers "as it enacts particular statutes that

38

structure particular agencies." Caleb Nelson, *supra*. The right of removal is not inherent to the executive power because that power "entails executing laws . . . , such as statutes enacted by Congress," and the President is "not in charge of the content of those laws." *Id.* Moreover, "neither the Vesting Clause nor anything else in Article II compels the inference that after officers have been duly appointed, and after the President has issued the commissions that the Constitution requires, the President must be able to terminate the appointments and rescind the commissions at will . . . ." *Id.* Thus, nothing in the Constitution's text supports the government's claim that the President's general removal power *must* be absolute and cannot be subject to exceptions.

Importantly, the Framers assumed that the President would not necessarily have the right to remove Executive Branch officials. In 1790, the First Congress established the Sinking Fund Commission to repay the country's Revolutionary War debt. The members of the Commission were "the President of the Senate [*i.e.*, the Vice President], the Chief Justice, the Secretary of State, the Secretary of the Treasury, and the Attorney General." Act of Aug. 12, 1790, ch. 47, § 2, 1 Stat. 186, 186; *see also* Chabot, *supra* note 1, at 39–40. The Vice President — who at that time, before the Twelfth Amendment, was the runner-up from the last presidential election rather than the President's running mate — and the Chief Justice were not subject to removal by the President, thus insulating the Commission from complete presidential control. Chabot, *supra* note 1, at 41. Alexander Hamilton proposed the Commission, the First Congress passed legislation that established it, and President George Washington signed the law — all of which would be surprising if the Commission's independent structure violated the very Constitution that those people had just forged. *See id.* at 42–43.

39

Nor was the Sinking Fund Commission an anomaly. *See* Christine Kexel Chabot, *Interring the Unitary Executive*, 98 Notre Dame L. Rev. 129, 133 (2022) (documenting how the First Congress "repeatedly enabled independent exercises of significant executive power that fell outside of the President's complete control and removal power"). Congress restricted the President's removal authority over the heads of the First (1791) and Second (1816) Banks of the United States, the judges of the Court of Claims (1855), and the Comptroller of the Currency (1863). *Harris II*, 2025 WL 980278, at *37 (Millett, J., dissenting). Even the government concedes that the "early Congresses . . . provided that the Banks of the United States — like the Federal Reserve — would have a degree of insulation from the President's control." Gov't Reply 15. Indeed, James Madison himself, speaking from the House floor, attested in 1789 that "because Congress may establish [executive] offices by law . . . , most certainly it is in the discretion of the Legislature to say upon what terms the office shall be held, either during good behaviour or during pleasure." 1 Annals of Cong. 374–75 (1789).

Although it is true that the First Congress voted to give the President plenary removal power over the Secretary of Foreign Affairs in 1789, the import of that event is debatable. It is unclear whether the President's removal authority in that instance was seen as granted by Congress or required by the Constitution. *Compare* Lawrence Lessig & Cass R. Sunstein, *The President and the Administration*, 94 Colum. L. Rev. 1, 25–29 (1994), *with* Saikrishna Prakash, *New Light on the Decision of 1789*, 91 Cornell L. Rev. 1021, 1021 (2006). Moreover, the First Congress's confirmation that the President has conclusive authority to remove the Secretary of Foreign Affairs — a purely executive official exercising core Article II powers — does not establish that the President necessarily must have at-will removal authority over all other agency

40

leaders in the Executive Branch, including those who do not wield substantial executive power.

In sum, a search for evidence that the Constitution compels us to accept a maximalist interpretation of executive power comes up short. The government's theory that "the President must have full control over each and every exercise of 'executive' power by the federal government (including an unlimitable ability to remove all or almost all executive officers for reasons good or bad)" gives the President "more power than any member of the founding generation could have anticipated." Caleb Nelson, *supra*.

###### ii. The Separation of Powers

The government posits that the Constitution tolerates no exceptions to the President's at-will removal authority because the President is answerable to the people, while unelected agency heads are not. *See* Oral Arg. 4:14–9:24. Thus, the foundation of the government's maximalist theory of executive power is political accountability. And the government claims that a departure from "Article II's design . . . inflicts a constitutional harm on the country." *Id.* at 4:53–57. But once we accept that the President *generally* is entitled to remove Executive Branch officials who wield executive power, the government's theory does not effectively explain why there can be *no exceptions* to the general rule, especially where precedents recognize such exceptions. We must bear in mind that Congress duly enacted the for-cause removal statutes at issue, with the consent of the Presidents who signed the legislation in question.

Congress is "the branch of our Government most responsive to the popular will." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 685 (1980) (Rehnquist,

41

J., concurring in the judgment).  A first-term President faces voters only when he is running for reelection after four years in office, while a second-term President is not checked by the ballot box at all.  But every member of the House and one third of Senators go before their constituents every two years.  *See* U.S. Const. art. I, §§ 2, 3.  And while the President may act unilaterally and privately, members of Congress deliberate and vote collectively and transparently.  They are also closer to their voters:  "Elected representatives solicit the views of their constituents, listen to their complaints and requests, and make a great effort to accommodate their concerns."  *Biden v. Missouri*, 595 U.S. 87, 105 (2022) (Alito, J., dissenting).  Accordingly, "[a] statute enacted by Congress expresses the will of the people of the United States in the most solemn form."  *United States v. Lee Yen Tai*, 185 U.S. 213, 222 (1902).  Respect for democracy, therefore, requires respect for the policy decisions of "those popularly chosen to legislate."  Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L Rev. 527, 545 (1947).  And because we owe "[d]ue respect for the decisions of a coordinate branch of Government," we must review acts of Congress with a "presumption of constitutionality."  *United States v. Morrison*, 529 U.S. 598, 607 (2000).  Unelected judges do not uphold the ideals of democracy and political accountability when they overturn laws that were passed by the people's representatives.

To the extent the goals of the President and Congress are in tension here, the President's power is at its "lowest ebb."  *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).  Where a President defies a law duly enacted by Congress, such a "[p]residential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system."  *Id.* at 638.  Indeed, the example that Justice Jackson used to illustrate the

42

President's relative weakness in the face of contrary congressional intent was *Humphrey's Executor*:  "President Roosevelt's effort to remove a Federal Trade Commissioner was found to be contrary to the policy of Congress and impinging upon an area of congressional control, and so his removal power was cut down accordingly."  *Id.* at 638 n.4.  It bears emphasis that Justice Jackson observed in *Youngstown*, the Court's iconic decision on the separation of powers, that statutory for-cause removal restrictions fall within "an area of congressional control" — *i.e.*, Congress's prerogative to structure the Executive Branch.  *Id.*

In the cases before us, "the equilibrium established by our constitutional system" is indeed at stake.  *Youngstown*, 343 U.S. at 638 (Jackson, J., concurring).  My colleagues' implicit and substantial adoption of the government's maximalist view of the unitary executive will allow the President to seize power that Congress did not intend for him to have, and thus will aggrandize the Executive Branch at the expense of the Legislative Branch.  The "concentration of [so much] power in the hands of a single branch is a threat to liberty."  *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring).  As Justice Brandeis put it, "[t]he doctrine of the separation of powers was adopted by the convention of 1787 not to promote efficiency but to preclude the exercise of arbitrary power.  The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy."  *Myers*, 272 U.S. at 293 (Brandeis, J., dissenting); *see also Gundy v. United States*, 588 U.S. 128, 169 (2019) (Gorsuch, J., dissenting) (warning against "accelerat[ing] the flight of power from the legislative to the executive branch, turning the latter into a vortex of authority that was constitutionally reserved for the people's representatives in order to protect their liberties").  In the face

43

of an attempted power grab that will transform our country, the role of the courts is to prevent undue concentration of power, not guarantee it.

### III.

The government argues that the district court had no authority to "reinstate" Harris and Wilcox, whether through declaratory or injunctive relief.  Gov't Br. 39.  I disagree.

The district court awarded substantively identical declaratory and injunctive relief to Harris and Wilcox.[21]  On appeal, the government does not contest the district court's authority to declare "that the removal[s] w[ere] unlawful." Gov't Br. 40 n.7.  Instead, it argues (1) that the "court's declaration[s] that [Harris and Wilcox] shall continue to remain" members of the MSPB and the NLRB amounted to "full reinstatement" and thus exceeded the district court's authority, *id.*, and (2) that the district court lacked equitable authority to reinstate Harris and Wilcox via injunctions against various subordinate executive officials, *id.* at 38.

The Supreme Court will consider similar arguments in *Slaughter*.  *See* Question Presented, *Slaughter*, No. 25-332 (Sept. 22, 2025) (instructing the parties to brief "[w]hether a federal court may prevent a person's removal from public office, either through relief at equity or at law").  But in the meantime, our own precedents bind us.

We have repeatedly recognized that lower courts enjoy equitable authority to *de facto* reinstate wrongfully removed

---

[21]    In the alternative, the district court noted that Harris and Wilcox likely were entitled to mandamus relief, but it ultimately did not grant such extraordinary relief.

44

officers. *See Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) (recognizing the availability of a *de facto* reinstatement remedy requiring subordinate executive officials to "treat[] Swan as a member of the [agency] Board and allow[] him to exercise the privileges of that office"); *Severino v. Biden*, 71 F.4th 1038, 1042–43 (D.C. Cir. 2023) ("We can enjoin subordinate executive officials to reinstate a wrongly terminated official *de facto*, even without a formal presidential reappointment." (cleaned up)); *see also Harris II*, 2025 WL 980278, at *44 (Millett, J., dissenting) ("*Swan* and *Severino* . . . held that an injunction could restore someone to office *de facto*."); *cf. Sampson v. Murray*, 415 U.S. 61, 63 (1974) ("[T]he District Court is not totally without authority to grant interim injunctive relief to a discharged Government employee . . . ."). Consistent with our precedent, the district court properly awarded declaratory and injunctive relief to Harris and Wilcox.[22]

\*  \*  \*

For the reasons discussed, I would affirm the judgments of the district court. Unlike my colleagues, I would decline the government's invitation to radically reshape our government. As Justice Robert H. Jackson so eloquently stated:

> The actual art of governing under our Constitution does not and cannot conform to judicial definitions of the power of any of its branches based on isolated clauses or even

---

[22]    Further, it is notable that the Supreme Court has recently declined to stay several lower-court orders reinstating federal officials who were removed by the President. *See* Order, *Trump v. Cook*, No. 25A312 (U.S. Oct. 1, 2025) (member of the Federal Reserve Board); Order, *Blanche v. Perlmutter*, No. 25A478 (U.S. Nov. 26, 2025) (Registrar of Copyrights).

45

> single Articles torn from context. While the
> Constitution diffuses power the better to
> secure liberty, it also contemplates that
> practice will integrate the dispersed powers
> into a workable government.

*Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). Throughout our history, the Supreme Court's precedents and our nation's practice and tradition have allowed independent multimember expert agencies to operate successfully within our constitutional system; and as a result, we have reaped the benefits of a workable government that best serves the interests of the American people. The government now urges an extreme view of Article II's Vesting Clause, torn from context: It attempts to reduce the actual art of governing to an uncompromising usurpation of power by the President, all in defiance of Congress's authority and without regard for the public good. My colleagues' substantial acceptance of the government's maximalist theory of executive power brings us closer to autocracy, harms our nation, and violates the separation of powers. I respectfully dissent.

## CERTIFICATE AS TO PARTIES AND AMICI

Pursuant to D.C. Circuit Rule 28, Plaintiff-Appellee Cathy A. Harris hereby submits her Certificate as to Parties and Amici:

Except for the following, all parties, intervenors, and amici appearing before the district court and in this court are listed in the Brief for Appellants.

Additional *amici* appearing before the district court and this Court are the States of Maine and North Carolina, 253 Members of Congress, Patrick Borchers, Joseph P. Carson, Peter Conti-Brown, Michael C. Dorf, James M. Eisenmann, Kellen Funk, Aziz Z. Huq, Riley Keenan, Raymond Limon, Jessica Parks, James Pfander, Jonathan Shaub, Government Accountability Project, Inc, and Public Citizen.

December 12, 2025

/s/Neal Kumar Katyal
NEAL KUMAR KATYAL
MILBANK LLP
1101 New York Ave. NW
Washington, DC 20006
(202) 835-7505
nkatyal@milbank.com

*Counsel for Plaintiff-Appellee*
*Cathy A. Harris*

**Add. 83**